1   Bruce D. Praet SBN 119430
    FERGUSON, PRAET & SHERMAN
2   A Professional Corporation
    1631 East 18th Street
3   Santa Ana, California 92705
    (714) 953-5300 telephone
4   (714) 953-1143 facsimile
    Bpraet@aol.com
5
6   Attorneys for Defendants
7
8              UNITED STATES DISTRICT COURT
9            CENTRAL DISTRICT OF CALIFORNIA
10

11  EMILY GARCIA, et al.              )   NO. 8:22-cv-00131 SPG KES
                                      )
12              Plaintiffs,           )   **DEFENDANTS' NOTICE OF**
                                      )   **MOTION AND JOINT**
13       v.                           )   **MOTION FOR SUMMARY**
                                      )   **JUDGMENT**
14  CITY OF TUSTIN, ESTELLA SILVA, et )
    al.                               )   *[Filed Concurrently with Joint*
15                                    )   *Appendix of Facts; Joint*
                Defendants.           )   *Appendix of Evidence; Joint*
16  _____  )   *Appendix of Objections; Notice*
                                      )   *of Lodging/Manual Filing of*
17  Consolidated with WENDY LORENA    )   *Exhibit "I"; Notice of Lodging*
    GALACIA RAMIREZ, et al.,          )   *[Proposed] Judgment;*
18                                    )   *[Proposed] Judgment]*
                Plaintiffs,           )
19                                    )   **DATE:  December 20, 2023**
         v.                           )   **TIME: 1:30 p.m.**
20                                    )   **CTRM: 5C**
    CITY OF TUSTIN, et al.            )
21                                    )
                Defendants.           )
22                                    )
    _____  )
23

24          Pursuant to the Court's Standing Order, the parties have met and conferred

25  in an effort to narrow the issues presented by this Joint Motion for Summary

26  Judgment with Defendants as the designated moving party.

27          This motion will be made and based upon this Notice, the Joint

28  Memorandum of Points and Authorities attached hereto, the Joint Appendix of

                                      1

1   Facts, the Joint Appendix of Evidence and Joint Appendix of Objections filed
2   concurrently herewith, as well as the complete files and records of this action, and
3   upon such oral and documentary evidence as may be presented at the hearing on
4   this Motion.
5   Dated: October 30, 2023                    FERGUSON, PRAET & SHERMAN
                                               A Professional Corporation
6
7                                   By:        _____/s/ Bruce D. Praet_____
8                                              Bruce D. Praet, Attorneys for
                                               Defendants
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**TABLE OF CONTENTS**

2

3   1.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4        A.   DEFENDANTS' [MOVING PARTY] INTRODUCTION. . . . . . . . . 1

5        B.   INTRODUCTION BY GARCIA PLAINTIFFS. . . . . . . . . . . . . . . . 2

6        C.   INTRODUCTION BY GALICIA PLAINTIFFS . . . . . . . . . . . . . . . 4

7   2.   FACTUAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

8        A.   DEFENDANTS' [MOVING PARTY] FACTUAL SUMMARY. . . . 5

9        B.   FACTUAL SUMMARY BY GARCIA AND GALICIA
             PLAINTIFFS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

10
    3.   SUMMARY JUDGMENT IS WARRANTED SINCE VIRTUALLY
11       ALL MATERIAL FACTS ARE UNDISPUTED . . . . . . . . . . . . . . . . . . . 10

12  4.   DEFENDANTS' FIRST ARGUMENT THAT THE USE OF FORCE
         IN THIS CASE WAS OBJECTIVELY REASONABLE UNDER
13       THE CIRCUMSTANCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

14       A.   GARCIA AND GALICIA PLAINTIFFS' RESPONSE. . . . . . . . . 16

15  5.   DEFENDANTS' SECOND ARGUMENT THAT OFFICER
         SILVA IS ENTITLED TO QUALIFIED IMMUNITY. . . . . . . . . . . . . . 21
16
         A.   GARCIA PLAINTIFFS' RESPONSE. . . . . . . . . . . . . . . . . . . . . . 24
17
         B.   GALICIA PLAINTIFFS' RESPONSE . . . . . . . . . . . . . . . . . . . . . 30
18
              The severity of the crime at issue . . . . . . . . . . . . . . . . . . . . . . . 31
19
              Whether the suspect poses an imminent threat to the safety
20            of the officers or others . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

21            Whether he was actively resisting arrest or attempting to
              evade arrest by flight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
22
              Sufficient clearly established law in addition to Graham puts
23            the Defendants on notice of unreasonable conduct. . . . . . . . . . . . 33

24            The Taser. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

25            The Shooting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

26  ///

27

28  ///

i

6.   DEFENDANTS' THIRD ARGUMENT THAT ADEQUATE
     MEDICAL CARE WAS PROVIDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

     A.   GARCIA AND GALICIA PLAINTIFFS' RESPONSE . . . . . . . . . . 36

7.   DEFENDANTS' FOURTH ARGUMENT THAT *MONELL*
     CLAIMS FOR FAILURE TO TRAIN CANNOT SURVIVE . . . . . . . . . 37

     A.   GARCIA AND GALICIA PLAINTIFFS' RESPONSE . . . . . . . . . . 38

8.   DEFENDANTS' FIFTH ARGUMENT THAT PLAINTIFFS'
     14TH AMENDMENT CLAIMS FOR "LOSS OF FAMILIAL
     RELATIONS" MUST FAIL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

          A.   GARCIA PLAINTIFFS' RESPONSE . . . . . . . . . . . . . . . . . . 40

          B.   GALICIA PLAINTIFFS' RESPONSE . . . . . . . . . . . . . . . . . 41

9.   DEFENDANTS' SIXTH ARGUMENT THAT CLAIMS UNDER
     THE BANE ACT MUST FAIL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

     A.   GARCIA AND GALICIA PLAINTIFFS' RESPONSE . . . . . . . . . . 43

10.  DEFENDANTS' SEVENTH ARGUMENT THAT PLAINTIFFS'
     BATTERY CLAIMS MUST FAIL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

     A.   GARCIA PLAINTIFFS' RESPONSE . . . . . . . . . . . . . . . . . . . . . . . . 44

     B.   GALICIA PLAINTIFFS' RESPONSE . . . . . . . . . . . . . . . . . . . . . . . 45

11.  DEFENDANTS' EIGHTH ARGUMENT THAT PLAINTIFFS'
     NEGLIGENCE CLAIMS MUST FAIL . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

     A.   Alleged Negligent Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

     B.   Alleged Negligent Medical Care . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

     C.   Alleged Negligent Pre-shooting Tactics . . . . . . . . . . . . . . . . . . . . . 46

          A.   GARCIA PLAINTIFFS' RESPONSE . . . . . . . . . . . . . . . . . . 48

          B.   GALICIA PLAINTIFFS' RESPONSE . . . . . . . . . . . . . . . . . 49

12.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

     A.   GARCIA PLAINTIFFS' CONCLUSION . . . . . . . . . . . . . . . . . . . . 50

     B.   GALICIA PLAINTIFFS' CONCLUSION . . . . . . . . . . . . . . . . . . . 50

1

**TABLE OF AUTHORITIES**

2

3 **<u>CASES</u>**

4 *A.D. v. Calif. Highway Patrol* (9th Cir. 2013)
712 F3d 446 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40
5

*A.K.H. v. City of Tustin* (9th Cir. 2016)
6 837 F.3d 1005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

7 *Benavidez v. County of San Diego* (9th Cir. 2021)
993 F.3d 1134 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
8

*Blanford v. Cty. of Sacramento* (9th Cir. 2005)
9 406 F3d 1110 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 28

10 *Brosseau v. Haugen* (2004)
543 U.S. 194
11 125 S. Ct. 596 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 30

12 *Brown v. Ransweiler* (2009)
171 Cal.App.4th 516 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
13

*Bryan v. McPherson* (9th Cir. 2010)
14 630 F.3d 805 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18, 33, 34

15 *Canton v. Harris* (1989)
489 U.S. 378 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38
16

Cavanaugh v. Woods Cross City (10th Cir. 2010)
17 625 F.3d 661 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

18 *Celotex v. Catrett* (1986)
106 S.Ct. 2548 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
19

*Chew v. Gates* (9th Cir. 1994)
20 27 F3d 1432 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

21 *City of Revere v. Mass. Gen. Hosp* (1983)
463 U.S. 239 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
22

*City of San Francisco v. Sheehan* (2015)
23 135 S.Ct. 1765 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

24 *City of Tahlequah v. Bond* (2021)
595 U.S. 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
25

*Connick v. Thompson* (2011)
26 563 U.S. 51
131 S.Ct. 1350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
27

*Cornell v. City and County of San Francisco* (2017)
28 17 Cal. App. 5th 766 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*County of Sacramento v. Lewis* (1998)
523 U.S. 833
118 S. Ct. 1708
140 L. Ed. 2d 1043 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

*Cunningham v. City of Wenatchee* (9th Cir. 2003)
345 F.3d 802 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Curnow v. Ridgecrest Police* (9th Cir. 1991)
952 F.2d 321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Davis v. City of Las Vegas* (9th Cir. 2007)
478 F3d 1048 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Deorle v. Rutherford* (9th Cir. 2001)
272 F.3d 1272 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*District of Columbia v. Wesby* (2018)
138 S.Ct. 577 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12, 21, 22

*Drummond v. City of Anaheim* (9th Cir. 2003)
343 F.3d 1052 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 29

*Eastburn v. Regional Fire Prot. Auth.* (2003)
31 Cal.4th 1175 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Edson v. Anaheim* (1998)
63 Cal.App.4th 1269 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

*Espinosa v. City & Cnty. of San Francisco* (9th Cir. 2010)
598 F.3d 528 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Estate of Casimero Casillas v. City of Fresno*
1:16-CV-1042 (E.D. Cal. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 35

*Estate of Cornejo ex rel. Solis v. City of Los Angeles* (9th Cir. 2015)
618 F. App'x 917 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Estate of Lopez v. Gelhaus* (9th Cir. 2017)
871 F.3d 998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Estate of Najera Aguirre v. County of Riverside* (9th Cir. 2022)
29 F. 4th 624 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 27

*Flores v. Cty. of Los Angeles* (9th Cir. 2014)
758 F.3d 1154 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*George v. Morris* (9th Cir. 2013)
736 F3d 829 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 27

*Glenn v. Washington Cnty.* (9th Cir. 2011)
673 F.3d 864 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 26

*Gonzalez v. Anaheim* (9th Cir. 2014)
747 F3d 789 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

iv

*Gonzalez v. City of Anaheim* (9th Cir. 2014)
747 F.3d 789 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 35

*Graham v. Connor* (1989)
490 U.S. 386 . . . . . . . . . . . . . . . . . . . . . . 4, 10, 12-14, 16-19, 24, 30-32, 34, 44, 45

*Harris v. Roderick* (9th Cir. 1997)
126 F.3d 1189 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 27

*Hayes v. County of San Diego* (9th Cir. 2013)
736 F.3d 1223 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 41, 44-47, 49

*Headwaters v. County of Humboldt* (9th Cir. 2000)
240 F.3d 1185 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hope v. Pelzer* (2002)
536 U.S 730 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 33

*Hopson v. Alexander* (9th Cir. 2023)
71 F4th 692 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Hughes v. Kisela* (9th Cir. 2016)
862 F.3d 775 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Isayeva v. Sacramento Sheriff's Dept.* (9th Cir. 2017)
872 F3d 938 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*J.A.L. v. Santos* (9th Cir. 2018)
724 Fed. App'x 531 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Jeffers v. Gomez* (9th Cir. 2001)
267 F3d 895 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 40

*Johnson v. Jones* (1995)
515 U.S. 304 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Kirkpatrick v. Cnty. of Washoe* (9th Cir. 2016)
843 F.3d 784 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Kisela v. Hughes* (2018)
138 S.Ct. 1148 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12, 21, 26

*Knox v. Southwest Airlines* (9th Cir. 1997)
124 F.3d 1103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Koussaya v. Stockton* (2020)
54 Cal.App.5th 909 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 48

*Lal v. California* (9th Cir. 2014)
746 F3d 1112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 23, 24, 28

*Longoria v. Pinal Cnty.* (9th Cir. 2017)
873 F.3d 699 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

///

*Losee v. City of Chico* (9th Cir. 2018)
738 F. App'x 398 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Lucas v. Long Beach* (1976)
60 Cal.App.3d 341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Marquez v. City of Phoenix* (9th Cir. 2012)
693 F3d 1167 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Martinez v. Cty of Los Angeles* (1996)
47 Cal.App.4th 334 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Matsushita Elec. v. Zenith Radio* (1986)
475 U.S. 574 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Miller v. Clark County* (9th Cir. 2013)
340 F3d 959 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Monell v. Dept. of Social Services* (1978)
436 U.S. 658 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Mullenix v. Luna* (2015)
136 S.Ct. 305 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Munoz v. City of Union City* (2004)
120 Cal. App. 4th 1077 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

*Nehad v. Browder* (9th Cir. 2019
929 F.3d 1125 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Nelson v. City of Davis* (9th Cir. 2012)
685 F.3d 867 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Newmaker v. City of Fortuna* (9th Cir. 2016)
842 F. 3d 1108 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 34

*Oviatt v. Pearce* (9th Cir. 1992)
954 F2d 1470 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*PC. v. City of Los Angeles* (C.D. Cal. Sept. 14, 2012)
No. CV 07-3413-PLA
2012 WL 12847227 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Pearson v. Callahan* (2009)
555 U.S. 223 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 33

*Plumhoff v. Rickard* (2014)
134 S.Ct. 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Porter v. Osborn* (9th Cir. 2008)
546 F3d 1131 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 40-42

*Price v. Sery* (9th Cir. 2008)
513 F3d 962 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Reese v. Cty. of Sacramento* (9th Cir. 2018)
888 F3d 1030 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Rivas-Villegas v. Cortesluna* (2021)
595 U.S. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Romero v. Kitsap County* (9th Cir. 1991)
931 F2d 624 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*S.B. v. Cnty of San Diego* (9th Cir. 2017)
864 F3d 1010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 25

*San Francisco v. Sheehan* (2015)
135 S.Ct. 1765 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 38

*Saucier v. Katz* (2001)
533 U.S. 194
121 S.Ct. 2151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 22, 33

*Scott v. Harris* (2007)
550 U.S. 372 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10, 11, 15, 29

*Shafter v. Santa Barbara Co.* (9th Cir. 2017)
868 F3d 1110 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Smith v. Hemet* (9th Cir. 2005)
394 F3d 689 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

*Stanton v. Sims* (2013)
134 S.Ct. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Tatum v. San Francisco* (2006)
441 F3d 1090 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*Tennessee v. Garner* (1985)
471 U.S. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 24

*Tennison v. City and Cnty. of San Francisco* (9th Cir. 2009)
570 F.3d 1078 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Torres v. City of Madera* (9th Cir. 2011)
648 F.3d 1119 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

*United States v. Reese* (9th Cir. 1993)
2 F.3d 870 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Valtierra v. Los Angeles* (C.D. Cal. 2015)
99 F.Supp.3d 1190 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Villalobos v. Santa Maria* (2022)
85 Cal.App.5th 383 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

*Vos v. City of Newport Beach* (9th Cir. 2018)
892 F.3d 1024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 25, 29

*White v. Pauly* (2017)
137 S.Ct. 548 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12, 21-23

*Wilkinson v. Torres* (9ᵗʰ Cir. 2010)
610 F3d 546 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 24, 39

*Young v. Cty. of Los Angeles* (9th Cir. 2011)
655 F.3d 1156 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**FEDERAL RULES**

*Rule 56(c)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**STATUTES**

**Civil Code**

*Section 52.1* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Section 52.1* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

## MEMORANDUM OF POINTS AND AUTHORITIES

### 1.    INTRODUCTION.

As a result of the meet and confer process, all Plaintiffs have agreed to voluntarily dismiss the Fourth Cause of Action [Municipal liability - Ratification] and Sixth Cause of Action [Municipal liability - Unconstitutional Custom, Practice or Policy] with prejudice.[1]  However, this still leaves no less than seven remaining theories of liability (causes of action) set forth in each complaint, each of which will be individually addressed herein.  Because the two original lawsuits brought by two separate groups of plaintiffs arising out of the same officer-involved shooting have since been consolidated, the non-moving parties will be separately set forth as "Garcia" and "Galicia" Plaintiffs respectively.[2]

### A.    DEFENDANTS' [MOVING PARTY] INTRODUCTION.

While every officer-involved shooting is tragic for all concerned, not every such shooting is unreasonable.  Whether decedent, Luis Garcia (hereafter "Garcia") was under the influence of methamphetamine, attempting "suicide by cop" or intentionally attacking Tustin Police Officer Estela Silva, the body worn camera (BWC) video recording of this incident establishes the indisputable fact that Garcia posed an imminent threat of serious bodily injury to the officer when she was forced to make the split-second decision to defend herself with deadly force after less-than-lethal force (i.e. Taser) failed to stop the attack. Discovery is now essentially completed and the material facts of this case will not change.

---

[1]Although there are two separate complaints brought by two different law firms on behalf of two independent sets of plaintiffs, the numbering of these two causes of action are the same in each of the two now-consolidated complaints. While all other causes of action are brought on coinciding theories, the numbering of these causes of action differs in the respective complaints and will therefore hereafter be addressed by title rather than number.

[2]Consistent with the Court's Standing Order, Defendants' arguments have been limited to 22 pages, well below the Court's 25 page limit.

1   Recognizing that the facts on summary judgment must be viewed in the

2   light most favorable to the nonmoving party [*Plumhoff v. Rickard,* 134 S.Ct. 2012

3   (2014)], the Supreme Court has nonetheless made it clear that where, as here,

4   critical portions of this incident were recorded on video [See: Video lodged and

5   submitted as exhibit "1" to the declaration of Bruce D. Praet (hereinafter "Praet

6   Decl.)][3], the district court should view the facts in the light depicted by the

7   videotape.  *Scott v. Harris,* 550 U.S. 372, 380-381 (2007)*.

8   The Supreme Court has also found it necessary on no less than three

9   occasions to remind courts of the benefit to society in whole when qualified

10  immunity is determined at the earliest possible stage of litigation since it is an

11  immunity from suit which is effectively lost if the case is permitted to go to trial.

12  *White v. Pauly,* 137 S.Ct. 548 (2017)*; District of Columbia v. Wesby,* 138 S.Ct.

13  577 (2018)*; Kisela v. Hughes,* 138 S.Ct. 1148 (2018)*.  This case is now ripe for

14  summary judgment and, while respective police practices experts have been

15  deposed, the opinions of these experts will not change the outcome of this case.

16  *City of San Francisco v. Sheehan,* 135 S.Ct. 1765, 1777 (2015).

17  **B.    INTRODUCTION BY GARCIA PLAINTIFFS.**

18  This Court should not only deny Defendants' motion for summary

19  judgment, but it should also enter summary judgment in favor of Plaintiffs and

20  against Silva on Plaintiffs' claim for excessive force under 42 U.S.C. § 1983 and

21  the Fourth Amendment, and against Silva and the City of Tustin on Plaintiffs'

22  claims for battery, negligence, and violation of the Bane Act. The undisputed

23  material facts show that no objectively reasonable officer in Silva's position would

24  have believed that Mr. Garcia posed an immediate threat of death or serious bodily

26  [3]Because this incident is being independently investigated by the California

27  Department of Justice and is not yet finalized, a "critical incident" release of the

BWC video will be lodged with captioned narrative in both English and

28  unofficially translated from Spanish.

2

injury warranting the use of deadly force, and no rational jury could determine otherwise. Silva is not entitled to qualified immunity because the law was clearly established at the time of this incident that it would be unconstitutional to use deadly force under the facts of this case. It is undisputed that Silva was not responding to a serious or violent crime, had no information that Mr. Garcia had injured anyone, and never saw Mr. Garcia with a weapon. When Silva contacted the homeless Mr. Garcia, he was asleep in a bush. It is undisputed that Mr. Garcia was unarmed and had only a wooden stick, that Mr. Garcia never contacted anyone with the stick, that Mr. Garcia was not attacking or attempting to attack anyone at the time of either of Silva's two shots, and that Silva failed to issue a verbal warning that she was prepared to use deadly force prior to shooting. At the time of the shots, Mr. Garcia was being tased and was screaming in pain and moving away from the taser deployment. Silva escalated the situation with Mr. Garcia, when she should have recognized that Mr. Garcia was mentally ill or experiencing a mental crisis.

Defendants grossly mischaracterize the video, which does not show Mr. Garcia verbally threatening Silva, "jabbing" the stick toward her, raising the stick above his head, advancing toward Silva, or running directly toward Frias. Rather, the video shows Mr. Garcia attempting to comply with Silva's impatient commands to come out of the bush and Silva reaching into the bush to grab Mr. Garcia. Mr. Garcia states, "let me get out," "I'm gathering recyclables," "I am showing you my hands," and "why are you going to hit me?". When Mr. Garcia ultimately exits the bush in response to Silva's commands, he is holding a long wooden stick vertically in front of his body at chest level, but he never swings the stick, never lifts his arms above his head, never brings the stick down toward anyone from a raised position, and never makes any aggressive movements with the stick. Any movement that Mr. Garcia made with the stick was in response to being tased and would not justify Silva's use of deadly force. For each of these

1  reasons and the reasons that follow, this Court should deny Defendants' motion

2  for summary judgment, including with respect to Plaintiffs' claims for interference

3  with familial relations, denial of medical care, and inadequate training, and should

4  enter summary judgment in Plaintiffs' favor on Plaintiffs' claims for excessive

5  force under 42 U.S.C. § 1983 and the Fourth Amendment against Silva, as well as

6  on Plaintiffs' claims for battery, negligence, and violation of the Bane Act against

7  Silva and the City.

8  <strong>C.     <u>INTRODUCTION BY GALICIA PLAINTIFFS</u>.</strong>

9    This is another unconstitutional Police death-shooting case of a young

10  vulnerable man. A member of our marginalized homeless population, brutally

11  treated by law enforcement misconduct. Simply for having no home, not optimal

12  mental good health, and for having a wood stick in his hand, that he used to

13  recycle plastic bottles to survive. For no other legal justifiable reason, he was

14  killed by Defendant officer Silva. The Defendants ask the court to find objective

15  reasonable conduct as a matter of law, and to shield them from any liability by

16  way of the qualified immunity doctrine. However in this case, the whole incident

17  was clearly captured in day light by body cam video. Thus, the evidence so far and

18  after completing discovery, supports the judicial finding that under *Graham v.*

19  *Connor, 490 U.S. 386* and under a clear precedents at the time of the incident, it

20  was clearly established that the conduct at hand was objectively unreasonable and

21  unconstitutional. Hence, the Defendants should not be entitled to qualified

22  immunity. Ultimately, whether or not the use of force here was objectively

23  reasonable, along with the derivative issues, should be decided by the Jury.

24  Therefore, the Defendant's motion for summary judgment should be denied.

25  ///

26

27  ///

28

## 2. **FACTUAL STATEMENT.**

### A. **DEFENDANTS' [MOVING PARTY] FACTUAL SUMMARY.**

Shortly after 10:00 a.m. on August 9, 2021, Tustin Police received a 911 call from a retired Anaheim Police Officer who reported that a male, Caucasian, blond hair[4] had been waving a steak knife on the previous day and was now hiding in the bushes outside of the Saddleback Mobile Home Park. [JAF 1] Officer Silva was assigned as the primary officer with Officers Yuhas and Frias responding as back-ups. [JAF 2] After contacting the reporting party and being directed to the bushes where the subject had last been seen, all three officers approached the bushes.  At this point, the entire incident was captured on BWC video [lodged as exhibit "1" to Praet Decl.].  However, for the Court's convenience, key aspects of the encounter will be summarized here[5]:

3:05 - With Officer Yuhas behind her, Officer Silva approached the bushes with her gun drawn due to the reported knife and moved forward enough to look into the bushes to see Garcia sleeping [JAF 3; Silva depo, RT:40 attached as exhibit "2", Praet Decl.] The officer told him to wake up and come out with his hands up.

3:13 - Officer Silva told Garcia "Come on, I know you". [JAF 4] This familiarity with Garcia becomes critical to the totality of the circumstances contributing to Officer Silva's overall state of mind and increasingly more assertive commands given the nature of her prior contacts with Garcia, including:

[4]Although the subject was initially described as having blond hair, this is immaterial since the calling party directed officers to the individual (Garcia) in the bushes before contact was made.  It was also noted that Garcia was wearing a beanie covering his closely cut hair at the time.

[5]Approximate time references will be from the time stamp at the bottom of the lodged critical incident BWC release.

5

1
2
3
4

- • In 2020, Officer Silva had contacted Garcia who had reportedly been brandishing a knife.  Although a knife was located, he was not arrested due to a lack of available witnesses. [JAF 5; Silva depo, RT:43-44, exhibit "2", Praet Decl.]

5
6
7
8

- • Officer Silva's next contact with Garcia was later in 2020 when he was arrested for a robbery in Santa Ana in which Garcia knocked the street vendor victim unconscious. [JAF 6; Silva depo, RT:45 and 49, exhibit "2", Praet Decl.]

9
10
11

- • Thereafter, Officer Silva arrested Garcia on a felony warrant for assault with a deadly weapon and possession of methamphetamine. [JAF 7; Silva depo, RT:46, exhibit "2", Praet Decl.]

12
13
14
15
16
17
18

3:25 - After telling Garcia several times (in Spanish and English) to keep his hands up and come out, Officer Silva holstered her gun and backed up to allow Garcia room to exit the bushes. [JAF 8]  However, Garcia kept making excuses and refused to exit or show his hands. [JAF 9] [Although the yellow captioned translation has Garcia saying "Why are you going to take me?" - the correct translation should be "Why are you arresting me?"; Silva depo., RT:62, exhibit "2", Praet Decl.]

19
20
21
22
23

4:15 - As Garcia continued to refuse to exit the bushes, Officers Silva and Yuhas attempted to reach in to pull him out.  However, Garcia picked up a thick, almost 5 ft. wooden pole and attempted to jab Officer Silva in the stomach before she was able to step back to avoid being struck. [JAF 10; Silva depo, RT:66, exhibit "2" and Yuhas depo, RT:28 attached as exhibit "3", Praet Decl.]

24
25
26
27
28

4:20 - Contrary to the yellow captioned interpretation of "Why are you going to hit me?", Officer Silva (a fluent Spanish speaker) understood Garcia to make a verbal challenge of "Come at me" or "Let's go". [Silva depo, RT:20:6-13, exhibit "2", Praet Decl.] It was at this point that Officer Yuhas can be heard warning that "He's got a stick!" as both officers backed away. [JAF 11]

6

4:22 - As Garcia began to emerge from the bushes with the wooden pole, Officer Silva backed away and drew her handgun commanding Garcia to "get your hands up". [JAF 12]  As the designated "less-than-lethal" (i.e. Taser) cover officer, Officer Yuhas deployed his Taser [4:26] in an attempt to stop Garcia's advance with the pole. [JAF 13] Although the desired/intended effect of the Taser is to immediately cause a subject to be immobilized, this application had no physical or disabling effect other than to cause Garcia to call out "AHHH". [JAF 14]

4:27 - Having backed up into an adjacent hedge, Officer Silva fired two quick shots.  Because of the rapidly evolving, tense nature of this moment, a screen shot of Garcia with the wooden pole raised above Officer Silva's head is attached as exhibit "4", Praet Decl. [JAF 15]  Although fired in rapid succession, Officer Silva fired two shots for two distinct reasons:

- Her first shot was fired in self-defense as she recognized the imminent threat Garcia posed with a 5 ft. solid wooden pole raised over his head at a distance of 2-3 feet. [JAF 16; Silva depo, RT:79, exhibit "2", Praet Decl.]
- Seeing Garcia still holding the pole and turn toward Officer Frias a few feet down the sidewalk, Officer Silva quickly fired a second shot to defend Officer Frias. [JAF 17; Ibid.]

Despite obvious immediate efforts of several officers to provide first aid until medics arrived, Garcia succumbed to his injuries. [JAF 18; BWC video at 4:35, lodged as exhibit "1", Praet Decl.].

## B.   FACTUAL SUMMARY BY GARCIA AND GALICIA PLAINTIFFS.

Mr. Garcia did not meet the description of the subject identified in the call for service relating to this incident. (JAF 20). The officers had no information that Mr. Garcia was under the influence at the time of the incident. (JAF 22). The officers had no information that Mr. Garcia had physically injured or attacked

anyone. (JAF 23). Prior to contacting Mr. Garcia, Silva had no information that Mr. Garcia had verbally threatened anyone. (JAF 24). The reporting party did not see Mr. Garcia with a knife on the date of the incident. (JAF 25). Before the date of the incident, Silva never saw Mr. Garcia physically fighting with anyone. (JAF 26). Prior to firing her shots, including on the date of the incident and before the date of the incident, Silva never saw a gun or knife in Mr. Garcia's hands or on his person. (JAF 27). Mr. Garcia was generally calm and cooperative during his prior contacts with Silva. (JAF 28).

Silva did not discuss a tactical plan with her partner officer prior to contacting Mr. Garcia. (JAF 29). When Silva first contacted Mr. Garcia on the date of the incident, he was sleeping. (JAF 30). Silva formed the impression that Mr. Garcia was homeless. (JAF 31). In response to Silva's commands to show his hands and come out of the bushes, Mr. Garcia said that he was showing his hands. and said, "okay, let me get out" and "I'm gathering recyclables" (JAF 32, 33). Mr. Garcia also stated, "why are you going to hit me" and "why are you taking me?" (JAF 35). Mr. Garcia complied with the commands to come out of the bushes. (JAF 36). When Mr. Garcia exited the bushes with the stick, he held the stick vertically with his hands at chest level. (JAF 37). Prior to the shooting, Yuhas verbalized to Silva that Mr. Garcia had a stick. (JAF 38).

At the time of the shooting, Silva knew that Mr. Garcia was being Tased. (JAF 39). Mr. Garcia screamed when he was being Tased. (JAF 40). Based on her training, Silva understands that the Taser has a five-second cycle. (JAF 41). Silva fired both shots within the five-second Taser cycle. (JAF 42). It should have been apparent to Silva that the taser was effective and caused Mr. Garcia's body to lock up. (JAF 43). After he was Tased, Mr. Garcia ran southbound, away from the Taser.  (JAF 44).

Mr. Garcia never swung the stick at anyone. (JAF 45). Prior to firing either shot, Silva never saw Mr. Garcia assault, strike, or make physical contact with any

person, including not striking anyone with the stick. (JAF 46). The stick never came down towards Silva or Frias from a raised position before the shots. (JAF 47-48). Silva never gave Mr. Garcia a command to drop the stick and never told her fellow officers that Mr. Garcia jabbed or attempted to jab her. (JAF 49-50). Prior to shooting, Silva failed to give Mr. Garcia a verbal warning that deadly force would be used. (JAF 51). Silva did not give any commands between her first shot and her second shot. (JAF 52). At the time of the second shot, Mr. Garcia was approximately ten feet away from Frias. (JAF 53). After the shooting, it was determined that Mr. Garcia had no weapons on him. (JAF 57).

Police officers are trained that deadly force is the highest level of force an officer can use, that deadly force can only be used when there is an immediate threat of death or serious bodily injury, that subjective fear alone is insufficient to justify a use of deadly force. (JAF 61-63, 66). Police officers are also trained to give a verbal warning before using deadly force, when feasible, and that they must justify every shot they fire when using deadly force. (JAF 64-65). Police officers are also trained Police officers are trained to control their anger and not overreact when using deadly force. (JAF 67). Silva admits that, based on her training, a police officer cannot shoot a person just for them having a weapon or stick in their hand, for that fact alone. (JAF 60).

Under the facts of this case, Silva could not justify shooting at Mr. Garcia simply because Mr. Garcia was running away and holding a wooden stick, and Silva could not shoot at Mr. Garcia under the fleeing felon theory. Police officers are trained that they can only shoot a fleeing felon where (1) the officer has information that the suspect has committed an atrocious felony involving the infliction of injury or death, AND (2) the suspect poses an immediate threat of death or serious bodily injury. None of those factors were present in the incident involving Mr. Garcia. (JAF 68). From the standpoint of police practices and basic police training, Officer Silva's use of deadly force was contrary to Peace Officer

Standards and Training ("POST"), improper, inappropriate, excessive, and unreasonable, including for the following reasons: (1) there was no immediate defense of life situation; (2) Mr. Garcia made no verbal threats; (3) Silva could not shoot Mr. Garcia for fleeing; (4) Mr. Garcia committed no crime involving the infliction of serious injury or death; (5) Silva could not justify shooting at someone simply because they had a stick, or even a weapon, in their hand; (6) there were other reasonable alternative measures available, including redeploying the Taser; (7) this was not the direst of circumstances; (8) Silva gave no verbal warning prior to using deadly force; (9) subjective fear is insufficient to justify a use of deadly force; (10) Silva showed no reverence for human life; (11) Silva overreacted when she used deadly force, which is a use of excessive force. (JAF 69).

### 3.     SUMMARY JUDGMENT IS WARRANTED SINCE VIRTUALLY ALL MATERIAL FACTS ARE UNDISPUTED.

*F.R.Civ.P., Rule 56(c)* provides that judgment shall be granted forthwith whenever the evidence presented in support of the motion shows that there is no genuine issue as to any material fact.  Once the moving party has met their burden of proving no material issues of fact, the burden shifts to plaintiffs to establish that a genuine issue of material fact exists beyond some mere metaphysical doubt as to the material facts. *Matsushita Elec. v. Zenith Radio,* 475 U.S. 574, 587 (1986).

The instant case becomes ripe for summary judgment for several key reasons: (1) the material facts giving rise to this incident and the eventual application of force are undisputed due to (2) the vast majority of the material events being recorded on video.  *Scott v. Harris,* 550 U.S. 372, 380 (2007), (3) any attempt to provide a subjective explanation for Garcia's undisputed actions is immaterial as it is the objectively reasonable perspective of the officers which must govern. *Graham v. Connor,* 490 U.S. 386, 396 (1989).

///

1    While Plaintiffs will undoubtedly attempt to raise any number of seemingly
2    disputed "facts" regarding Garcia's state of mind/intention and inject a number of
3    speculative "expert" opinions and other issues unrelated to those presented by this
4    motion, the Supreme Court has reminded lower courts that:

5          "The mere existence of *some* alleged factual dispute
6          between the parties will not defeat an otherwise properly
7          supported motion for summary judgment; the
8          requirement is that there be no *genuine* issue of *material*
9          fact." *Scott v. Harris,* 550 U.S. 372, 380 (2007)
10         *(*emphasis in original*).*

11   Even though evidence on summary judgment must be viewed in light most
12   favorable to the non-moving party, plaintiffs must do more than simply show that
13   there may be some metaphysical doubt as to the material facts. *Matsushita Elec. v.*
14   *Zenith Radio,* 475 U.S. 574, 586-587 (1986)  As the Supreme Court has noted:

15         "Summary judgment procedure is properly regarded not
16         as a disfavored procedural shortcut, but rather as an
17         integral part of the Federal Rules as a whole, which are
18         designed to secure the just, speedy and inexpensive
19         determination of every action."
20         *Celotex v. Catrett (1986)* 106 S.Ct. 2548, 2555.

21   Most importantly, the U.S. Supreme Court has repeatedly made it
22   abundantly clear to the trial courts that qualified immunity is "an entitlement not to
23   stand trial" and that it is critical that such immunity questions "be resolved at the
24   earliest possible stage in litigation." *Saucier v. Katz,* 533 U.S. 194, 200-201, 121
25   S.Ct. 2151, 2156 (2001). In fact, as the Ninth Circuit learned in *Saucier*, the trial
26   court was severely chided for taking a "minimalist view of its role in reviewing
27   this issue on summary judgment." *Jeffers v. Gomez,* 267 F3d 895, 909 (9th Cir.
28   2001).  Regrettably, the Supreme Court has continued to find it increasingly

necessary to reinforce the importance of determining qualified immunity at the summary judgment phase. *White v. Pauly,* 137 S.Ct. 548 (2017) (per curiam); *District of Columbia v. Wesby,* 138 S.Ct. 577 (2018) and *Kisela v. Hughes,* 138 S.Ct. 1148 (2018).

Thus, while the specific arguments addressing qualified immunity will be set forth below, the importance of its consideration on summary judgment cannot be minimized in determining that this case is now perfectly situated for full adjudication by summary judgment.

**4.     DEFENDANTS' FIRST ARGUMENT THAT THE USE OF FORCE IN THIS CASE WAS OBJECTIVELY REASONABLE UNDER THE CIRCUMSTANCES.**

Whether analyzed under the objective reasonableness standard long ago established by the Supreme Court in *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865 (1989) or in terms of qualified immunity (*infra*), the undisputed facts establish that Officer Silva, as the only individually named Defendant, is entitled to summary judgment with respect to her application of force. Analyzed first from the straightforward Fourth Amendment standard of *Graham,* the Court must view the undisputed facts:

> "from the perspective of a reasonable officer on the
> scene, rather than with the 20/20 vision of hindsight,
> allow(ing) for the fact that police officers are often
> forced to make split-second judgments – in
> circumstances that are tense, uncertain, and rapidly
> evolving – about the amount of force that is necessary in
> a particular situation." 490 U.S. at 396-397.

This calculus must balance the nature of the intrusion against the countervailing government interests at stake, by looking at the totality of the circumstances facing the officers at the moment they are deciding what force to

apply including, but not limited to "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *Davis v. City of Las Vegas,* 478 F3d 1048, 1054 (9th Cir. 2007). However, these factors are not exhaustive and each situation must be viewed under the totality of the circumstances. *George v. Morris,* 736 F3d 829, 837 (9th Cir. 2013). In all cases, the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Graham, supra*. 490 U.S. at 396. Applying this analysis to the tragic, but undisputed facts of this case, the unavoidable truth reveals that:

1.   With respect to the "severity of the crime at issue", it is undisputed that Garcia had reportedly been brandishing a steak knife on the previous day.  While such criminal activity is certainly serious, it is important not to limit this factor to only the crime the officers were initially called to investigate.  For example, an initial car stop for a minor traffic infraction may quickly escalate to a deadly force encounter when the driver pulls a gun on the officer.   Equally important is the officers' prior knowledge of other serious crimes involving Garcia which must be considered in the totality of the circumstances leading to the eventual use of force. *Miller v. Clark County,* 340 F3d 959, 964-65 (9th Cir. 2013)  Here, it is undisputed that Officer Silva was personally familiar with Garcia's very serious prior arrests for possessing methamphetamine, assault with a deadly weapon and robbery in which he had knocked the victim unconscious.  The crime truly at issue at the moment Officer Silva was forced to make the split-second decision to defend herself with deadly force was the severe crime of assault with a deadly weapon against a peace officer [*Calif. Penal Code § 245b*] when Garcia clearly raised a five foot solid wooden pole over the officer's head as he lunged at her from a distance of only 2-3 feet (see: exhibit "4", Praet Decl.).  Combined with her

1   knowledge that Garcia had previously knocked a robbery victim unconscious, it is

2   inconceivable that any reasonable officer would view Garcia as anything less than

3   an imminent threat of serious bodily injury or death.

4        While it is anticipated that Plaintiffs may attempt to retrospectively

5   introduce Garcia's previously undisclosed mental health history, his unconfirmed

6   mental status at the time does not outweigh his potential danger to officers or the

7   public if he is allowed to escape.  *Lal v. California,* 746 F3d 1112, 1118 (9th Cir.

8   2014).  Not only had no one reported that Garcia might be mentally ill, but Officer

9   Silva's prior contacts with him reinforced the greater likelihood that Garcia was

10  non-compliant as a result of disobedience and methamphetamine.

11       2.  With respect to the threat posed to officers and the public, this is the

12  most important of the *Graham* factors.  *Smith v. Hemet,* 394 F3d 689, 702 (9th Cir.

13  2005).  As noted above, Garcia's known history included an assault with a deadly

14  weapon and, most importantly, his willingness to violently render someone

15  unconscious during a robbery or, in this case, smash a solid wooden pole over the

16  head of a uniformed police officer. The violent nature of this imminent threat

17  weighs heavily in favor of Officer Silva.  Moreover, his continuing disobedience

18  to the lawful orders of officers to show his hands and exit the bushes demonstrated

19  his propensity to defy lawful authority [*Calif. Penal Code § 148* - resist, delay or

20  obstruct a peace officer] would justifiably increase officer concerns of an

21  imminent danger.  *Marquez v. City of Phoenix,* 693 F3d 1167, 1175 (9th Cir. 2012).

22  Combined with his two previously reported incidents of brandishing a knife in

23  public, Garcia clearly could not be ignored.

24       However, the most important threat presented by Garcia was his undisputed

25  attack on Officer Silva as he raised a 5ft. solid wooden pole above his head as he

26  advanced on the officer who had retreated as far as possible into an adjacent

27  hedge.  Given that the less-than-lethal Taser had failed to stop his attack and,

28  absent making the split-second decision to defend herself from this imminent

14

threat, there is simply no doubt that Officer Silva would have suffered the same serious injury as Garcia's last robbery victim or worse if her skull had been crushed.  Even after being shot once, Garcia retained possession of his weapon (pole) and advanced on Officer Frias.

While Plaintiffs assert that Garcia never actually swung the pole at Officer Silva, it is clear that officers need not wait for a suspect to actually inflict serious bodily injury before defending themselves and others from an imminent attack. *Blanford v. Cty. of Sacramento,* 406 F3d 1110, 1117 (9th Cir. 2005)*; Scott v. Harris,* 550 U.S. 372, 385-86 (2007)  Whether Garcia actually intended to strike Officer Silva, a furtive movement or harrowing gesture by a suspect may create an immediate threat.  *George v. Morris,* 736 F3d 829, 838 (9th Cir. 2013). The Fourth Amendment does not require officers to be omniscient or absolutely certain of harm before they are permitted to act in self-defense. *Wilkinson v. Torres,* 610 F3d 546, 553 (9th Cir. 2010).

3.  As to the third factor of whether Garcia was actively resisting or attempting to flee to avoid arrest, even Plaintiffs cannot dispute this fact. *Chew v. Gates,* 27 F3d 1432, 1442 (9th Cir. 1994)  While Plaintiffs may speculate that Garcia's continuous disregard to lawful orders and ultimate attack on officers were motivated by drugs, some undisclosed mental illness or merely his desire not to be arrested, such subjective rationale has no place in the objective analysis determining the reasonableness of force used. *Valtierra v. Los Angeles,* 99 F.Supp.3d 1190, 1193 (C.D. Cal. 2015)  Here, Garcia continuously procrastinated in response to clear commands issued in both English and Spanish.  Moreover, despite the application of a Taser, Garcia continued to actively resist by violently advancing on the retreating Officer Silva with a solid wooden pole raised over his head.  Whether Garcia would have actually crushed Officer Silva's skull, the Supreme Court has declared that officers must often act quickly (even if

///

15

1   mistakenly) when delay might gravely endanger their lives.  *San Francisco v.*

2   *Sheehan,* 135 S.Ct. 1765, 1775 (2015).

3        Given the Supreme Court's mandate against 20/20 hindsight and

4   acknowledgment that "the calculus of reasonableness must embody allowance for

5   the fact that police officers are often forced to make split-second judgments – in

6   circumstances that are tense, uncertain, and rapidly evolving – about the amount of

7   force that is necessary in a particular situation" [*Graham, supra* at 396-397], the

8   reasonableness of the force used by Officer Silva is inescapable.

9        **A.   GARCIA AND GALICIA PLAINTIFFS' RESPONSE.**

10        Summary judgment should be granted in Plaintiffs' favor on their Fourth

11   Amendment excessive force claim. "Fourth Amendment claims of excessive force

12   are analyzed under an objective reasonableness standard." *Espinosa v. City &*

13   *Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010). When evaluating a

14   claim of excessive force, the inquiry is whether the officers' actions are

15   "objectively reasonable" in light of the facts and circumstances confronting them.

16   *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011) (quoting *Graham v.*

17   *Connor*, 490 U.S. 386, 397 (1989)). "This inquiry requires a careful balancing of

18   the nature and quality of the intrusion on the individual's Fourth Amendment

19   interests against the countervailing governmental interest at stake." *Id.* The Court

20   must "balance the amount of force applied against the need for that force." *Bryan*

21   *v. McPherson*, 630 F.3d 805, 823-24 (9th Cir. 2010).  "Certain principles are

22   clearly established . . . that implement the fundamental rules regarding the use of

23   deadly force." *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997). Because

24   the shots fired by Silva constitute the greatest possible amount of force, they

25   require the highest justification. "The intrusiveness of a seizure by means of

26   deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). "Law

27   enforcement officers may not shoot to kill unless, at a minimum, the suspect

28   ///

presents an immediate threat to the officer or others or is fleeing and his escape will result in serious threat of injury to persons." *Harris*, 126 F.3d at 1201. Governmental interests to balance against the type of force used include the following factors: "(1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape." *Espinosa*, 598 F.3d at 537. Another factor to consider is the availability of alternative methods to effectuate an arrest or overcome resistance. *Smith v. City of Hemet*, 394 F.3d 689, 701 (2005) (en banc). The inquiry is "highly fact-intensive" and involves "no *per se* rules." *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011). Courts do "recognize that 'police officers are often forced to make split-second judgments . . .'" *Id.* at 1124 (quoting *Graham*, 490 U.S. at 397). "Not all errors in perception or judgment, however, are reasonable," and while courts "do not judge the reasonableness of an officer's actions 'with the 20/20 vision of hindsight,' nor does the Constitution forgive an officer's every mistake." *Id.* (quoting *Graham*, 490 U.S. at 396). As set forth below, the *Graham* analysis heavily favors Plaintiffs in this case.

With respect to the first *Graham* factor, it is undisputed that the officers were not responding to a serious or violent crime. Mr. Garcia did not even meet the description of the blond suspect referenced in the call, and the reporting party had not seen the subject with a knife on the date of the incident, but rather, on the day before, and did not see him waving it around the day before. When Silva contacted Mr. Garcia, he was asleep in the bush with his recyclables. There was no information that Mr. Garcia had injured or threatened to injure anyone, and the officers did not observe him with a weapon or anything that looked like a weapon on the date of the incident. Although Silva recognized Mr. Garcia from prior incidents, Mr. Garcia was generally calm and cooperative with Silva during those prior incidents, and she never saw Mr. Garcia physically fighting with anyone

///

during any prior incident and never saw Mr. Garcia with a gun or knife during any prior incident.

As Plaintiffs' expert Scott DeFoe states in his declaration, a reasonable police officer would have formed the impression that Mr. Garcia was mentally ill or experiencing a mental crisis. The Ninth Circuit has emphasized that when police engage with persons whom they know or should know to be mentally ill, the calculus for reasonable force is different. *See, e.g.*, *Vos v. City of Newport Beach*, 892 F.3d 1024, 1034 (9th Cir. 2018) ("indications of mental illness create a genuine issue of material fact about whether the government's interest in using deadly force was diminished."); *Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003) ("mental illness must be reflected in any assessment of the government's interest in the use of force"). Not only should Silva have taken into account that Mr. Garcia was experiencing a mental crisis, but Silva escalated the situation by failing to give Mr. Garcia time to comply with her commands and by reaching into the bush to grab Mr. Garcia.

The second and "most important" *Graham* factor is whether Mr. Garcia posed an immediate threat of death or serious bodily injury to the officers or others at the time of the shooting. *Bryan*, 630 F.3d at 826. Here, it is beyond any reasonable dispute that Mr. Garcia did not pose an immediate threat of death or serious bodily injury to Silva or anyone else at the time of the shooting. The following undisputed facts support granting summary adjudication in Plaintiffs' favor: (1) Mr. Garcia was unarmed, and the object he had was a wooden stick; (2) Mr. Garcia was being tased the time of the shots; (3) Mr. Garcia never brought the stick down toward anyone from a raised position; (4) Mr. Garcia never swung the stick at anyone; (5) Mr. Garcia never tried to attack anyone during this incident; (6) Mr. Garcia never injured anyone; (7) Mr. Garcia never verbally threatened to harm anyone, and is heard saying on the video "why are you taking me,"; (8) Silva fired when Mr. Garcia was moving away in response to the taser; (9) Silva did not

give Mr. Garcia a verbal warning prior to shooting; (10) there were less-lethal options available when Mr. Garcia was running away, including redeploying the taser if that were necessary; (11) Mr. Garcia to exit the bush, and he complied with the command to exit the bush; (12) Silva was the only officer who used lethal force during this incident. Even if Mr. Garcia had made a move with the stick, that would not justify shooting him. The video shows that Mr. Garcia was moving in response to the taser, as opposed to advancing toward Silva or Frias.

"A simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001). An officer's "desire to resolve quickly a potentially dangerous situation" does not, on its own, justify the use of deadly force. *Id.* Along these lines, officers cannot "unnecessarily create their own sense of urgency." *Nehad v. Browder*, 929 F.3d 1125, 1135 (9th Cir. 2019) (quoting *Torres*, 648 F.3d at 1126). "Reasonable triers of fact can, taking the totality of the circumstances into account, conclude that an officer's poor judgment or lack of preparedness caused him or her to act unreasonably, 'with undue haste.'" *Id*. This Court should consider that here, Silva created the very situation she then resorted to deadly force to resolve. *Porter v. Osborn*, 546 F.3d 1131, 1141 (9th Cir. 2008). There was no rush or sense of urgency in getting Mr. Garcia, who was asleep and committing no crime, out of the bush. Any fear Silva had was subjective, and a subjective fear is insufficient to justify using deadly force. At a minimum, Silva overreacted when she used deadly force, and an overreaction in using deadly force is excessive force.

Under the third *Graham* factor, Mr. Garcia was not actively resisting arrest or attempting to flee to avoid arrest. Mr. Garcia was collecting his recyclables after having been abruptly awoken and ultimately complied with Silva's command to exit the bush, after telling Silva, "let me come out," and "I am showing my hands." Silva escalated the situation with her impatient tone of voice and failure to allow

Mr. Garcia time to comply with the commands or the effects of the taser. Silva would not have been justified for shooting Mr. Garcia for running away from the taser and could not shoot Mr. Garcia under the fleeing felon theory under this set of facts. To justify using deadly force under the fleeing felon theory, the officers would need (1) information prior to the shooting that Mr. Garcia had committed a felony involving the infliction of death or serious bodily injury and (2) Mr. Garcia still would need to pose an immediate threat of death or serious bodily injury at the time of the shots, and a verbal warning must be given. Neither of these factors were present here, as Mr. Garcia had not injured anyone and was unarmed. As seen on the videos, Mr. Garcia was running away from the taser deployment at the time of both shots, and he was not attempting to attack Silva and was not running directly toward Frias. *See Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1164 (9th Cir. 2011) (recognizing "that an officer's 'provocative conduct' can trigger an individual's limited right to offer reasonable resistance'").

Other significant factors to consider are the availability of alternative methods to effectuate an arrest or overcome resistance and whether the officer gave a warning that deadly force would be used. *Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012); *Headwaters v. County of Humboldt*, 240 F.3d 1185, 1204 (9th Cir. 2000) ("[P]olice are 'required to consider what other tactics if any were available to effect the arrest.'"). It is undisputed that Silva did not give Mr. Garcia a verbal warning that she was going to use deadly force prior to shooting, and interpreting the video in the light most favorable to Plaintiffs, it would have been feasible to give Mr. Garcia that warning. Mr. Garcia was already screaming in pain from the taser, and Silva should have recognized that Mr. Garcia was affected by the taser. Silva should have repositioned herself to allow Mr. Garcia space to exit the bush and comply with the taser. The officers also could have redeployed the taser and taken cover, if that were necessary.

///

5.    **DEFENDANTS' SECOND ARGUMENT THAT**
      **OFFICER SILVA IS  ENTITLED TO QUALIFIED**
      **IMMUNITY.**

The test for qualified immunity may be satisfied by either or both determinations that (1) no constitutional violation occurred (supra) and/or (2) the officer(s) did not violate a clearly established constitutional right. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).  Having already established that the undisputed facts of this case dictate that no constitutional violation(s) occurred, Officer Silva is equally entitled to qualified immunity with respect to all federal claims under to the second prong. Although not present here, even the arguable existence of a material issue of fact cannot preclude the application of qualified immunity if the law was not "clearly established" at the time.  *S.B. v. Cnty of San Diego,* 864 F3d 1010, 1015 (9th Cir. 2017)*; Isayeva v. Sacramento Sheriff's Dept.,* 872 F3d 938, 945 (9th Cir. 2017).

As noted above, both the Supreme Court and Ninth Circuit have recently reinforced the compelling obligation of the trial courts to diligently and broadly apply the qualified immunity analysis at the summary judgment phase of litigation. *White v. Pauly,* 580 U.S. ___ , 137 S.Ct. 548 (2017) (per curiam); *Shafter v. Santa Barbara Co.,* 868 F3d 1110 (9th Cir. 2017)*; District of Columbia v. Wesby,* 138 S.Ct. 577 (2018); *Kisela v. Hughes,* 138 S.Ct. 1148 (2018).

Clearly frustrated by an apparent ongoing lack of understanding by the district and appellate courts with respect to the meaning of "clearly established", the Supreme Court in *White* stressed that:

> "It is again necessary to reiterate the long-standing principle that
> 'clearly established law' should not be defined at a high level of
> generality.  As this Court explained decades ago, the clearly
> established law must be 'particularized' to the facts of the case.
> Otherwise, [p]laintiffs would be able to convert rule of qualified

immunity into a rule of virtually unqualified liability simply by

alleging violation of extremely abstract rights." *137 S.Ct. at 552.*

The Supreme Court's ongoing caution to the courts "not to define 'clearly established law' at a high level of generality" remains consistent. It has continuously stressed that the law must be examined as to "whether the violative nature of a particular conduct is clearly established . . . in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna,* 136 S.Ct. 305, 308 (2015).

> *"Such specificity is especially important in the Fourth Amendment context , where the Court has recognized that 'it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. The correct inquiry is whether it was clearly established that the Fourth Amendment prohibited the officers' conduct in the 'situation he confronted'." Ibid.*

Most recently, the Supreme Court has left no doubt about the need for lower courts to grant qualified immunity on summary judgment absent identifying a case with such "specificity" that "an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Wesby, supra.,* p. 589. In fact, the pre-existing law must have been so clearly established so as make the unlawfulness of the officers' conduct "beyond debate". *Id.,* p. 590. Even if the officers were mistaken as to the facts or law, qualified immunity must still be applied as long as such mistake was reasonable. *Saucier v. Katz,* 533 U.S.194, 205 (2001) In the instant case, the burden is on Plaintiffs to establish that the right in question was clearly established at the time of this incident. *Romero v. Kitsap County,* 931 F2d 624, 627 (9th Cir. 1991). However, like *White*, Plaintiffs cannot cite a single case in which an officer dealing with a similar situation has been found to have violated the Constitution.

1      While many courts have historically tried to defer the issue of qualified

2   immunity, the Supreme Court has consistently stressed that such an approach will

3   not be tolerated.  As the Court most recently reiterated in *White,* this has become

4   necessary "both because qualified immunity is important to 'society as a whole',

5   and because 'as an immunity from suit, it is effectively lost if a case is erroneously

6   permitted to go to trial.  *Id,* 137 S.Ct. at 550-51.  This is precisely why it is so

7   critical to recognize qualified immunity for Officer Silva now that discovery has

8   concluded, but before the parties prepare for trial.

9      While it is highly unlikely that Plaintiffs will find a case which even

10   remotely suggests that it is "beyond debate" that Officer Silva somehow violated

11   some "clearly established" law under circumstances specifically similar to these,

12   the Supreme Court has stressed that "qualified immunity gives government

13   officials breathing room to make reasonable but mistaken judgments" and

14   "protects all but the plainly incompetent or those who knowingly violate the law."

15   *Stanton v. Sims,* 134 S.Ct. 3, 5 (2013).  The burden is on Plaintiffs to point to a

16   case which "squarely governs" the facts at issue in the instant circumstances and

17   renders it beyond debate that Officer Silva's split-second decision under tense,

18   uncertain and rapidly evolving circumstances would amount to excessive force.

19   *Hopson v. Alexander,* 71 F4th 692, 698 (9th Cir. 2023).

20      Given that Plaintiffs will not meet their burden of finding a case which

21   "squarely governs" these specific facts, the case of *Lal v. California,* 746 F3d

22   1112 (9th Cir. 2014) provides some guidance.  Although occurring at the

23   culmination of a pursuit, the threat giving rise to the justified use of deadly force

24   was similar to that presented by Garcia here.  However, instead of raising a solid

25   wooden pole over his head as he advanced to within a yard of the officer as here,

26   the suspect in *Lal* was shot when he raised, but did not throw, a rock over his

27   head.  As the Ninth Circuit noted, "the officers objectively feared serious physical

28   harm and a reasonable officer could have believed that (Lal) threatened him with

1  immediate serious danger (is) sound." *Id,* p. 1119.  Here, there can be little, if any,

2  distinction between the large rock raised by Lal and the 5 ft solid wooden pole

3  raised by Garcia as he advanced to within a yard of Officer Silva.

4       While Plaintiffs will undoubtedly speculate that Garcia was merely trying to

5  leave (albeit with a 5 ft. wooden pole raised over his head), "the Fourth

6  Amendment does not require that a police officer be 'omniscien[t], and absolute

7  certainty of harm need not precede [an officer's] act of protection". *Wilkinson v.*

8  *Torres,* 610 F3d 546, 553 (9th Cir. 2010)  The clearly established law now and in

9  2021 entitles Officer Silva to qualified immunity and Plaintiffs cannot provide a

10  specific case to the contrary.

11       **A.**    **GARCIA PLAINTIFFS' RESPONSE**.

12       Silva is not entitled to qualified immunity for her use of deadly force against

13  Mr. Garcia simply because there is no case specifically holding that it is

14  unconstitutional to use deadly force without warning against an unarmed homeless

15  man who had just been tased, who held a stick vertically in front of his body but

16  never swung the stick at anyone and never brought the stick down toward anyone

17  from a raised position, and who ran a short distance away from the shooting

18  officer in response to the taser. This case falls within the obvious. *See Estate of*

19  *Najera Aguirre v. County of Riverside*, 29 F. 4th 624, 629 (9th Cir. 2022) (holding

20  that in an "obvious case," the standards set forth in *Graham* and *Garner*, though

21  cast "at a high level of generality" can "clearly establish that a constitutional

22  violation has occurred "even without a body of relevant case law.") (quoting

23  *Rivas-Villegas v. Cortesluna*, 595 U.S. 1 (2021)); *see also Brosseau v. City of*

24  *Haugen*, 543 U.S. 194, 199 (2004). Silva's use of deadly of force violated Mr.

25  Garcia's constitutional rights, and the law was clearly established that shooting

26  under these circumstances would be unconstitutional. Courts have found an

27  officer's use of force to violate the Fourth Amendment in cases where the *Graham*

28  factors did not weigh as heavily in Plaintiffs' favor as they do in the instant case.

1    For example, in *S.B. v. County of San Diego*, 864 F.3d 1010 (9th Cir. 2017),
2  the Ninth Circuit found that the deputy's use of deadly force was not objectively
3  reasonable and violated the Fourth Amendment where the decedent was acting
4  aggressively at the time of the shooting, grabbed a knife, the officers did not issue
5  a verbal warning that deadly force would be used, and non-lethal options were
6  available. *S.B.*, 864 F.3d at 1014. The instant case is even stronger than *S.B.*
7  because Mr. Garcia was not acting aggressively, and he had only a wooden stick
8  that he used to collect cans to recycle. Similar to *S.B.*, here, Silva failed to give a
9  warning that deadly force would be used prior to shooting, and less-lethal options
10 were available, including redeploying the taser.

11   *Vos v. City of Newport Beach* is also instructive, where officers shot a
12 mentally unstable man who was running toward officers with scissors raised above
13 his head. 892 F.3d at 1033–34. The court rejected the defendants' argument that
14 deadly force was reasonable because Vos "forced the confrontation" by charging
15 the officers and found that the availability of less-lethal options was critical. *Id*. at
16 1033. The court considered that the officers outnumbered Vos, Vos was not armed
17 with a gun, and less-lethal force options were available to the officers. This case is
18 even stronger than *Vos* because whereas Vos was armed with scissors, raised the
19 scissors above his head while charging at officers, and injured a bystander with the
20 scissors, here, Mr. Garcia only had a wooden stick, never raised the stick above his
21 head, and never injured anyone.

22   In *A.K.H. v. City of Tustin*, 837 F.3d 1005, 1013 (9th Cir. 2016), there was
23 no qualified immunity for an officer who shot a suspected gang member he was
24 attempting to arrest who, in response to the officer's command to show his hands,
25 whipped his hand from his hoodie pocket raising it over his head in an arcing
26 motion, and causing the officer to "believe that he had a weapon and he was going
27 to use that weapon on [him]." *Id.* at 1009. Similarly, Mr. Garcia had a stick in
28 front of him with a bag of recyclables, and the subjective fear of Silva that he

1  might use the stick as a weapon—which he did not—is insufficient to grant

2  qualified immunity. This case is even stronger than *A.K.H.* because Mr. Garcia

3  never lifted the stick above his head, and any movement with the stick was a result

4  of being tased.

5      In *Hughes v. Kisela*, 862 F.3d 775 (9th Cir. 2016), *rev'd on other grounds*,

6  138 S. Ct. 1148 (2018) (reversing only on ground that constitutional right was not

7  clearly established in 2010), the Ninth Circuit denied summary judgment where an

8  officer shot a woman holding a large kitchen knife after she walked toward

9  another woman within five to six feet of her and did not comply with orders to

10  drop the knife. The court considered that the officers did not have information that

11  the woman was threatening or hurting anyone, that she did not appear angry or

12  menacing, and that multiple officers responded to the scene. *Id*. Likewise, Mr.

13  Garcia was homeless, abruptly awakened, and scared during this incident, as

14  opposed to angry or menacing, he did not threaten anyone, and at the time of the

15  shooting, he was not in the process of attacking anyone.

16      The Ninth Circuit's decision in *Kisela I* relied on *Glenn*, *supra*, where the

17  Ninth Circuit held that the officers were not entitled to summary judgment on the

18  reasonableness of their use of deadly force. In *Glenn*, officers received a report of

19  an agitated, intoxicated man carrying a pocketknife. 673 F.3d 867. An officer shot

20  the man with several beanbags, causing him to run away from the beanbag fire and

21  toward an occupied home, when an officer-involved shooting occurred. 673 F.3d

22  at 869. The *Glenn* court found that the decedent's possession of a knife was not

23  dispositive. Similarly, here, the taser deployment caused Mr. Garcia to run, and

24  this Court should not find Mr. Garcia's possession of the stick dispositive.

25  Although Mr. Garcia only had a stick during this incident, making this case much

26  stronger than *Kisela* and *Glenn*, the Ninth Circuit has consistently found that the

27  fact that a suspect has a weapon does not render the use of deadly force

28  reasonable, even in cases where the suspect has a gun. *See, e.g., Estate of Lopez v.*

*Gelhaus*, 871 F.3d 998, 1020-21 (9th Cir. 2017); *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013); *Harris*, 126 F.3d at 1204; *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991). This is consistent with Silva's own training that she could not shoot Mr. Garcia just for having the stick.

In *Hayes v. County of San Diego*, 736 F.3d 1223, 1233-34 (9th Cir. 2013), an excessive force and negligent use of deadly force case, the Ninth Circuit reversed a district court's grant of summary judgment where the decedent approached officers while armed with a knife, but where the decedent was not charging the officers, was given no warning that deadly force would be used, was not witnessed acting erratically with the weapon, and where officers had no information that the decedent had threatened to harm anyone. *Id*. Likewise, here, Mr. Garcia was not charging anyone; rather, he was moving away from the taser deployment, and Mr. Garcia was given no warning, was not attempting to attack anyone, and had not injured or threatened to injure anyone. Recently, in *Estate of Najera Aguirre*, the Ninth Circuit relied on *Hayes, supra*, and *Morris, supra*, in holding that as early as 2016, it was clearly established that it would be unconstitutional to "use deadly force against a non-threatening individual, even if the individual is armed, and even if the situation is volatile." 29 F. 4th at 629 (citing *City of Tahlequah v. Bond*, 595 U.S. 9 (2021)). In *Najera*, officers in 2016 responded to a call that the decedent was destroying property with a stick or bat and had threatened a woman with a baby. *Id*. at 626. The decedent refused to drop the stick and advanced toward officers, and an officer-involved shooting occurred. *Id*. The parties in *Najera* disputed whether the decedent was holding the stick in a threatening manner. *Id*. The Ninth Circuit affirmed the denial of qualified immunity, holding that, on Najera's facts, the decedent presented no threat at the time of the shooting. *See also Newmaker v. City of Fortuna*, 842 F. 3d 1108 (9th Cir. 2016) (affirming denial of summary judgment where the officer alleged that the decedent had grabbed his baton, but the officer's credibility was

genuinely in doubt); *Estate of Casimero Casillas v. City of Fresno*, 1:16-CV-1042 (E.D. Cal. 2018) (denying summary judgment and qualified immunity to officers who shot a man who was holding a metal pipe at the time of the shooting, where officers argued that the decedent charged at them with the pipe). Here, this Court should consider whether Silva's self-serving contention that Mr. Garcia made a threatening movement toward her with the stick is contradicted by the video and places her credibility genuinely in doubt. *See Gonzalez v. City of Anaheim*, 747 F.3d 789, 791 (9th Cir. 2014).

The cases cited by Defendants are inapposite.  In *Lal v. California*, 746 F.3d 1112, 1113-14 (9th Cir. 2014), the decedent was involved in a domestic disturbance wherein officers heard the decedent hitting his wife through the phone, led police on a 45-minute high-speed chase, attempted to cause a motorcycle officer to crash, threw rocks at officers and a police car, stated that he wanted to kill himself, pointed a cell phone as if it were a gun, and otherwise tried provoked officers into shooting him. After all of Lal's criminal activity, the officers still gave him a verbal warning that he would be shot if he continued to throw rocks at officers. *Id*. at 1115. A simple review of the video of the incident involving Mr. Garcia shows how distinguishable these two cases are. *Lal* would only be on point if Mr. Garcia had injured someone prior to the incident, had actually swung the stick at officers and struck a police car with the stick, had asked Silva to shoot him, had pantomimed pointing a gun at officers, and if Silva had given Mr. Garcia a warning. None of that was present here, where Silva overreacted and shot Mr. Garcia simply because he was holding a stick when he came out of the bush as directed.

In *Blanford v. Sacramento County*, 406 F.3d 1110 (9th Cir. 2005), the decedent was trying to break into a residence while wielding a large sword. After being given a verbal warning that deadly force would be used if Blanford did not stop and drop the sword, Blanford intentionally raised the large sword and

growled. Far from trying to break into a residence, here, Mr. Garcia was asleep in a bush. Silva never told Mr. Garcia to drop the stick. Rather, Silva commanded Mr. Garcia to exit the bush, and he complied with that command. When he exited the bush, he was holding the stick vertically in front of his body at chest level, with the top of the stick extending upwards. Unlike Blanford, Mr. Garcia never wielded the stick in an aggressive manner, never swung the stick at anyone, never raised the stick above his head, and never brought the stick down toward anyone from a raised position.

Although Plaintiffs believe that the video evidence supports a finding in Plaintiffs' favor with respect to the use of excessive and unreasonable deadly force, to the extent that this Court disagrees and finds disputes of material fact bearing on Silva's use of deadly force, then Plaintiffs respond that qualified immunity cannot be granted in the face of disputed issues of material fact. *See Johnson v. Jones*, 515 U.S. 304, 313 (1995); *Cunningham v. City of Wenatchee*, 345 F.3d 802, 809 (9th Cir. 2003); *Knox v. Southwest Airlines*, 124 F.3d 1103, 1109 (9th Cir. 1997). Where there is video evidence contradicting a party's version of the facts, the court "should ... view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380-381 (2007). Unless a plaintiff's account is "so utterly discredited" or "blatantly contradicted" by the video evidence, *Scott* at 380, the "mere existence of video footage ... does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage." *Vos*, 892 F.3d at 1028; *Longoria v. Pinal Cnty.,* 873 F.3d 699, 706 (9th Cir. 2017).

Finally, it is well established that a police officer's violation of police training weighs against granting qualified immunity. *See Drummond*, 343 F.3d at 1062 ("training materials are relevant not only to whether the force employed in this case was objectively unreasonable . . . but also to whether reasonable officers would have been on *notice* that the force employed was objectively

1   unreasonable"). An officer who makes a conscious decision to violate basic

2   training guidelines, designed to safeguard the subject, should not be heard

3   subsequently to claim to have made a reasonable mistake or to have reasonably

4   believed his or her decision to be lawful. Here, Silva violated her training when

5   she shot Mr. Garcia despite the absence of any immediate threat of death or

6   serious bodily injury.

7                    **B.     GALICIA PLAINTIFFS' RESPONSE.**

8          Defendants are not entitled to qualified Immunity because under the

9   *Graham* objectively reasonableness standard and based on  clearly established law

10  precedents, Defendants were on notice that their conduct was unconstitutional.

11  The *Graham* objectively reasonableness test applies to this case. The Supreme

12  Court has clearly established that the law does not require factual identical cases in

13  order to satisfy the "clearly established" law standard for a qualified immunity

14  question. *Hope v. Pelzer* (2002) 536 U.S 730 at 741. Furthermore, the highest

15  Court has also established that in the "obvious case" the "objective reasonable "

16  standard established by *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865 (1989)

17  "alone", can clearly establish the answer to qualified immunity.

18         The Court in *Graham* ruled that in order to decide whether the officer's

19  conduct was "objectively reasonable" courts should pay careful attention to the

20  facts, and to the totality of the circumstances of each particular case analyzing

21  thecase at hand in light of the following factors;

22          1) The severity of the crime at issue 2) Whether the suspect poses an

23          imminent threat to the safety of the officers or others; 3) Whether he

24          was actively resisting arrest or attempting to evade arrest by flight.

25          "When the conduct at hand is so obvious, Graham alone can offer the

26          basis for the Court's Decision" See Hope at 741. See also *Brosseau v.*

27          *Haugen*, 543 U.S. 194, 199, 125 S. Ct. 596, 598 (2004). (In re

28          reference to the so called "obvious case").

1    Here, Plaintiffs respectfully submit to the Court that based on the totality of
2    the circumstances at hand, and given what the evidence already shows, for the
3    following reasons; "this is an obvious case".

4                    **The severity of the crime at issue:**

5    Based on the facts - seen in the light most favorable to the Plaintiffs - , but
6    more importantly based on the evidence available in this case, including Video
7    Footage, it is clear that this case does not involve any serious crime.  Rather,
8    thefacts and the evidence show that Mr. Garcia was not armed, had not committed
9    any crime, and was cooperative and talking to the officers who arrived looking for
10   a suspect with blond hair, who was seen the day before with a knife around the
11   area. Mr. Garcia was not threatening or attacking anyone, did not have a knife and
12   did not even fit the physical description of the individual the officers were looking
13   for.

14   Defendants agree and therefore it will never be disputed that  Officer Silva
15   in fact knew Mr. Garcia, and even sometimes referred to him by his first name as
16   "Manuel" (See Deposition of Estela Silva at 114:16-24, attached as "Exhibit A" to
17   the Declaration of Counsel Jesus Eduardo Arias). Further, she knew that "Manuel"
18   had never been violent towards any officer including herself in the prior
19   encounters.

20   On the day of the incident, the evidence shows that Mr. Garcia was not
21   involved and  had not committed any crime.  Thus, under *Graham* it was not
22   objectively reasonable to use deadly force by officer Silva in a situation involving
23   no commission of any serious crime by the victim of the shooting.

24            **Whether the suspect poses an imminent threat to the safety of the**
25            **officers or others**

26   Defendants argue that *Graham* stands for the proposition that the
27   "reasonableness" of a particular use of force must be judged from the perspective
28   of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

1   This is not a case however, where the Defendants were forced to make a split -

2   second judgment.  Rather, Defendant Silva  had prior sufficient knowledge and a

3   reasonable opportunity to assess and to determine the course of her conduct.

4   Specially when she knew Mr. Garcia and she knew that he had never been violent

5   or aggressive towards her or any other officer.

6        He was not armed, he never attempted to attack her, never threatened her

7   and the evidence shows that at no point he used the wood stick as any sort of

8   weapon form against her or anybody else.  The defendant's argument that she

9   feared to be struck by with Mr. Garcia's wood stick,  amounts  to only subjective

10  fear at best. And a meritless excuse to kill an innocent man at worse.  The law is

11  clear that subjective fear is not enough justification for the use of deadly force.

12  Thus, under Graham test as well, the conduct of the Defendant was therefore not

13  objectively reasonable.

14              **Whether he was actively resisting arrest or attempting to evade**

15              **arrest by flight**

16       The evidence in this case shows that at no point Mr. Garcia was informed

17  that he was being arrested.  The evidence also shows that his reaction of running

18  away from officer Silva and Frias, was a human factor reaction to the physical

19  pain of the taser used against him without any warning.  A reasonable jury may

20  find that Mr. Garcia was not resisting or attempting to flee but rather simply

21  reacting to the taser deployment. And even if it is established that he may have

22  intended to run, he was doing so just to get away from the shooting officer (s).

23  Alternative less lethal options availability is crucial in this matter, and in no way

24  can be argued by the Defendants that the felony fleeing doctrine applies to this

25  matter.   Therefore,  following *Graham* standard, this element also favors the

26  determination that the use of deadly force given the circumstances of this case was

27  objectively unreasonable.

28  ///

1    Following the train of the legal rationale and the jurisdictional view by the

2    supreme court in *Hope v. Pelzer*; the review of the totality of the circumstances of

3    this case  sustain the finding that  in light of the reasonableness standard

4    established by the law under  Graham, the conduct exercised by Defendant Silva

5    given the circumstances was unconstitutional. Excessive, and objectively

6    unreasonable.

7    **Sufficient clearly established law in addition to Graham puts**

8    **the Defendants on notice of unreasonable conduct.**

9    The 2 prongs from the law on point are; 1) Do the facts alleged show

10   aviolation of Constitutional right? And if so, was the right at issue clearly

11   established at the time of the Defendant's misconduct ? *Saucier v. Katz*, 533 U.S

12   194.

13   The Supreme Court has established that in considering the procedure

14   required by Saucier "the Judges of the Districts Courts an the courts of Appeal

15   should be permitted to exercise their sound discretion in deciding which of the 2

16   prongs of the qualified immunity analysis should addressed first in light of the

17   circumstances of the case at hand.  *Pearson* at 236.

18   First, Plaintiffs have  explained in their complaint(s) that the Constitution

19   protected Mr. Garcia's right from deprivation of his rights to be free from use of

20   excessive force. Thus the allegations show clearly here a constitutional violation.

21   **The  Taser**

22   The 9th  Circuit court has already established that Tasing violates the 4th

23   Amendment when an officer deploys his taser in dart mode without warning, upon

24   a non threatening individual, who had committed no serious crime, because "taser

25   and similar devices, when used in dart mode, constitute an "intermediate,

26   significant level of force that must be justified by the governmental interest

27   involved".  *Bryan v. MacPherson*, 630 F.3d 805, at 809 (9th Circuit November 30

28   2010). (McPherson III).

1    The Court has held upon this issue as follows;

2    "Taser and similar devices in dart mode constitutes an "intermediate,

3    significant level of force that must be justified by the governmental interest

4    involved," *Bryan,* 608 F.3d at 622, falls well within the national mainstream of the

5    decisions which have examined the nature and quality of the intrusion posed by

6    tasers. Most recently, the Tenth Circuit (Judges Kelly, Brorby, and Gorsuch)

7    concluded that the use of a taser gun like the one at issue here "against a non-

8    violent misdemeanant who appeared to pose no threat and who was given no

9    warning" was unconstitutional excessive force under *Graham*, for which the

10   officer did not enjoy qualified immunity. *Cavanaugh v. Woods Cross City*, 625

11   F.3d 661, 2010 (10th Cir. 2010). Citing the decision in Bryan, Judge Kelly wrote;

12        "Although Tasers may not constitute deadly force, their use

13        unquestionably "seizes" the victim in an abrupt and violent manner.

14        Accordingly, the "nature and quality" of the intrusion into the

15        interests of Ms. Cavanaugh protected by the Fourth Amendment was

16        quite severe". McPherson III, 810.

17   The 9th Circuit Court McPerson III decision clearly explains that the

18   reason why qualified immunity was granted  to the  particular circumstances in

19   McPerson was because at the time of the incidents (2005) it was not clearly

20   established law whether tasering without warning  a  non  violent misdemeanant

21   posing no threat was unconstitutional or not.

22        However, 9th Circuit Court McPerson III decision was clearly established

23   law in August of 2021.

24                    **The shooting**

25        See *Newmaker v. City of Fortuna*, 842 F. 3d 1108 (9th Cir. 2016)

26   (affirming denial of summary judgment where the officer alleged that the

27   decedent had grabbed his baton, but the officer's credibility was genuinely in

28   doubt.

34

1    *Estate of Casimero Casillas v. City of Fresno*, 1:16-CV-1042 (E.D. Cal.
2    2018) (denying summary judgment and qualified immunity to officers who shot
3    a man who was holding a metal pipe at the time of the shooting, where officers
4    argued that the decedent charged at them with the pipe).

5         Here, the Defendant cannot establish with speculation only, that Mr.
6    Garcia was about to use the wood stick against her. The evidence simply does
7    not support such factual self serving conclusion.  See *Gonzalez v. City of*
8    *Anaheim*, 747 F.3d 789, 791 (9th Cir. 2014).

9         And therefore, in the interest of justice the Defendant's motion for
10   summary judgment based on qualified immunity should be denied.

11        **6.    DEFENDANTS' THIRD ARGUMENT THAT ADEQUATE**
12              **MEDICAL CARE WAS PROVIDED.**

13        Stated as the Garcia Plaintiffs' Third Cause of Action under the 14th
14   Amendment "deliberate indifference" standard and by the Ramirez Plaintiffs'
15   Third Cause of Action under the 4th Amendment, all Plaintiffs allege that Officer
16   Silva somehow failed to provide adequate medical care to Garcia following the
17   shooting. The Ninth Circuit analyzes claims of denial of medical care under the
18   Fourth Amendment.  *Tatum v. San Francisco,* 441 F3d 1090, 1098-99 (9th Cir.
19   2006).  As such, the Fourth Amendment "does [not] require an officer to provide
20   what hindsight reveals to be the most effective medical care for an arrested
21   suspect."  *Id.*  On the contrary, the Ninth Circuit held in *Tatum* that where "the
22   officers promptly requested medical assistance, the Constitution required them to
23   do no more." *Id.*

24        Here, the BWC video clearly demonstrates that officers not only promptly
25   called for medics, but Officer Silva and others immediately commenced with
26   extensive first aid until medics arrived. [JAF 18; See: exhibit "1", Praet Decl.,
27   BWC at 4:35] While Plaintiffs may suggest that medics did not commence CPR
28   until they arrived several minutes later, medics are not parties and, candidly,

there is no evidence that CPR for gunshot wounds to the chest would have even been appropriate.  Whether viewed under *Tatum* or a "deliberate indifference" standard, it is clear that no cause of action for lack of adequate medical care can survive summary judgment.

## A.   GARCIA AND GALICIA PLAINTIFFS' RESPONSE.

Mr. Garcia's right to medical care during and immediately after his arrest is governed by the Fourth Amendment and its "objective reasonableness" standard and requires law enforcement officers to provide objectively reasonable post-arrest care.  *Tatum v. City and Cty. of San Francisco*, 441 F.3d 1090, 1098-99 (9th Cir. 2006). At a minimum, though, the Ninth Circuit has required police officers to "seek necessary medical attention by promptly summoning help or taking the injured arrestee to a hospital." *Estate of Cornejo ex rel. Solis v. City of Los Angeles*, 618 F. App'x 917, 920 (9th Cir. 2015); *see also City of Revere v. Mass. Gen. Hosp*, 463 U.S. 239, 245 (1983). The law is also clearly established that the scope of the Fourth Amendment right to objectively reasonable medical care confers upon peace officers the duty not to obstruct, delay or interfere with medical care. *See PC. v. City of Los Angeles*, No. CV 07-3413-PLA, 2012 WL 12847227, at *11 (C.D. Cal. Sept. 14, 2012) (affirming jury instruction for denial of medical care claim based on denial *or delay* of medical care).

Drawing all reasonable inferences in favor of Plaintiffs, there is sufficient evidence that Silva failed to provide objectively reasonable post-arrest care to Mr. Garcia. Following the shooting, Silva learned that one of her shots struck Mr. Garcia in the back and observed Mr. Garcia bleeding on the ground. (JAF 56). Rather than providing immediate medical care required for this obviously life-threatening injury, Silva handcuffed Mr. Garcia as he was immobile and screaming in pain, and there was a delay of approximately seven minutes between the shooting and the time the medics treated Mr. Garcia. (JAF 59). Mr. Garcia died as a result of the injuries inflicted by the shooting. Thus, triable

1    issues exist that Mr. Garcia's rights to medical care under the Fourth

2    Amendment were violated.

3        **7.    DEFENDANTS' FOURTH ARGUMENT THAT *MONELL***

4             **CLAIMS FOR FAILURE TO TRAIN CANNOT SURVIVE.**

5        As their Fifth Causes of Action, both sets of Plaintiffs have alleged a so-

6    called *Monell* claim against the City of Tustin based upon claims of a "failure to

7    train".  Initially, it is well established that the City of Tustin cannot be vicarious

8    liable or sued on a theory of respondeat superior, but instead may only be liable

9    if it participated in the alleged wrongdoing in some meaningful way.  *Monell v.*

10   *Dept. of Social Services,* 436 U.S. 658, 690-91 (1978).  For constitutional claims

11   of "inadequate training", the Supreme Court established that such claims must be

12   viewed under a heightened "deliberate indifference" standard and that

13   allegations of "negligent" training are insufficient. *Canton v. Harris,* 489 U.S.

14   378, 390 (1989).  Even if a particular officer may have been somehow

15   inadequately trained, such will not suffice to state such a claim against the City

16   of Tustin. *Id., p. 391.*  Here, however, the undisputed evidence is that Officer

17   Silva had not only completed, but exceeded, all state (POST) training

18   requirements. [JAF 19; See: Training records attached as exhibit "5", Praet

19   Decl.] Similarly, Officer Silva was familiar with the Tustin Police policy on use

20   of force and other related policies [Silva depo, RT:7, exhibit "2", Praet Decl.]

21   and there is no allegation that the TPD use of force policy was in any way

22   inadequate or unconstitutional.  *Price v. Sery,* 513 F3d 962, 973 (9th Cir. 2008)

23       Not only is there zero evidence that the City engaged in the requisite

24   "deliberate indifference" in training Officer Silva, but even a policy of

25   inadequate training is still insufficient to state a constitutional claim unless such

26   deliberately indifferent policy is shown to be the moving force in causing

27   decedent's injury. *Oviatt v. Pearce, 954 F2d 1470, 1481 (9th Cir. 1992).*  While

28   it is anticipated that Plaintiffs will cite opinions of their paid experts suggesting

1  that Officer Silva was either inadequately trained or somehow could/should have

2  acted differently, the Supreme Court has made it clear that such expert opinions

3  may not defeat summary judgment. *San Francisco v. Sheehan,* 575 U.S. 600,

4  616 (2015)

5        Put simply, there is no evidence that the City of Tustin had inadequate,

6  much less deliberately indifferent training or that the (proper) training of Officer

7  Silva was somehow the moving force in her split-second decision to defend

8  herself from the imminent threat initiated by Garcia.

9              **A.    GARCIA AND GALICIA PLAINTIFFS' RESPONSE.**

10       A municipality may be liable for the inadequacy of police training under

11  section 1983 "where the failure to train amounts to deliberate indifference to the

12  rights of persons with whom the police come into contact." *Flores v. Cty. of Los*

13  *Angeles*, 758 F.3d 1154, 1158 (9th Cir. 2014) (quoting *City of Canton v. Harris*,

14  489 U.S. 378, 388 (1989)). Claims for municipal liability based on a failure to

15  train require demonstration "(1) of a constitutional violation; (2) of a municipal

16  training policy that amounts to a deliberate indifference to constitutional rights;

17  and (3) that the constitutional injury would not have resulted if the municipality

18  properly trained their employees." *Benavidez v. County of San Diego*, 993 F.3d

19  1134, 1153-54 (9th Cir. 2021) (citation omitted). Contrary to the City's

20  contention that Plaintiffs' inadequate training claim fails because no underlying

21  constitutional violations occurred, on Plaintiffs' facts set forth above, Silva

22  violated Mr. Garcia's right to be free from excessive force under the Fourth

23  Amendment she shot him.

24       In certain cases, even a single instance of unconstitutional conduct may

25  demonstrate a failure to train. *See Benavidez*, 993 F.3d at 1154. Evidence of a

26  pattern of constitutional violation is not always required.  In a "narrow range of

27  circumstances, a particular "showing of obviousness can substitute for the

28  pattern of violations ordinarily necessary to establish municipal culpability."

*Connick v. Thompson*, 563 U.S. 51 at 63, 131 S.Ct. 1350 (2011). *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 794 (9th Cir. 2016) (finding that the municipality's inadequacy in training social workers was so likely to result in the violation of the constitutional rights that a jury could find liability for failure to train without needing a pattern). Silva's failures to verbally warn Mr. Garcia before using deadly force against him, failure to form and communicate a tactical plan, failure to take Mr. Garcia safely into custody, and failures to de-escalate a situation involving a mentally disturbed individual also indicate that the City failed to properly train Silva on these issues. Failing to train Silva and other City of Tustin officers in de-escalating situations, creating a tactical plan, and failing to take Mr. Garcia safely into custody, was so obvious that it would lead to violations of constitutional rights of persons she came into contact with, a jury need not find a pattern. And thus, summary judgment should be denied as to the failure to train against the City of Tustin.

### 8.   DEFENDANTS' FIFTH ARGUMENT THAT PLAINTIFFS' 14TH AMENDMENT CLAIMS FOR "LOSS OF FAMILIAL RELATIONS" MUST FAIL.

Set forth as the First Cause of Action for the Ramirez Plaintiffs and the Third Cause of Action for the Garcia Plaintiffs, all plaintiffs allege 14th Amendment claims for "loss of familial relations". Under the 14th Amendment, an officer's conduct only violates due process if it "shocks the conscience". *A.D. v. Calif. Highway Patrol,* 712 F3d 446, 453 (9th Cir. 2013). In order to shock the conscience, an officer must either act with (1) "deliberate indifference" or (2) a "purpose to harm . . . unrelated to legitimate law enforcement objectives". *Id.*

Here, because Officer Silva's decision was the result of "a snap judgment because of an escalating situation" rather than prolonged deliberation, her conduct may only be found to shock the conscience if she acted with a purpose unrelated to legitimate law enforcement objectives. *Wilkinson, supra.,* 610 F3d at

554. Legitimate law enforcement objectives include arrest, self-defense or the defense of others. *A.D.,* 710 F3d at 454. Under this applicable standard, an officer only "violates the due process clause if (s)he used force with an illegitimate purpose in mind." *Id., at 453.* It is Plaintiffs' burden on summary judgment to submit non-speculative evidence that demonstrates that Officer Silva acted with an improper motive. *Jeffers v. Gomez,* 267 F3d 895, 907 (9th Cir. 2001). As noted above, self-defense against the reasonable belief of an imminent attack in not an improper motive.

In *Porter v. Osborn,* 546 F3d 1131, 1137-39 (9th Cir. 2008)*,* the Ninth Circuit held that the purpose to harm standard applied where, as here, an incident rapidly escalated over a five minute period, forcing officers to make "split-second" decisions. Because the heightened purpose to harm standard is substantially greater than the reasonableness standard applied under the Fourth Amendment, even an allegedly unreasonable use of force will be insufficient to establish that an officer acted with the requisite ulterior motive. *Gonzalez v. Anaheim,* 747 F3d 789, 798 (9th Cir. 2014) Here, there is zero evidence that Officer Silva acted with a purpose to harm unrelated to any legitimate law enforcement objective. On the contrary, the undisputed evidence is that she made a split-second decision to defend herself from an unprovoked attack by Garcia.

### A.   GARCIA PLAINTIFFS' RESPONSE.

In *Tennison v. City and Cnty. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009), the Ninth Circuit made clear that acting with "deliberate indifference to or reckless disregard for [a person's] rights" was "consistent with the standard imposed in the substantive due process context, in which government action may violate due process if it 'shocks the conscience.'" Plaintiffs' Fourteenth Amendment claim survives no matter which standard is applied. The Ninth Circuit has indicated that a standard higher than "deliberate indifference" should

apply only in situations "that escalate so quickly that the officer must make a snap judgment." *Porter v. Osborn*, 546 F.3d 1131, 1137-40 (9th Cir. 2008) (collecting cases). In such cases, a "purpose to harm standard" should apply instead. *Id.* In *Hayes*, the Ninth Circuit held, consistent with *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998), that the "snap judgment" to use deadly force must be a reaction to an *unforeseen* escalation by the subject. *Osborn*, 546 F.3d at 1230. The Ninth Circuit has only applied *Lewis* to scenarios where deliberation was impractical due to unforeseen escalations such as where the subject suddenly brandished a weapon. This case does not support application of the "purpose to harm" standard. Silva escalated the situation when she reached into the bush to grab Mr. Garcia when there was no rush. Mr. Garcia was homeless, asleep in a bush, and committing no crime. There was no legitimate law enforcement objective in shooting the unarmed Mr. Garcia when he was screaming in pain from the Taser, running away from the Taser, had not injured anyone or threatened to injure anyone, and was not attempting to attack anyone.

## **B.   GALICIA PLAINTIFFS' RESPONSE.**

Plaintiffs bring their own  individual cause of action for loss of their particular familial relationship. The Fourteenth Amendment's substantive due process clause protects against  "government  power  arbitrarily  and oppressively  exercised." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998).

The Supreme Court has made it clear ... that only official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)). "The relevant question ... is whether the shocks the conscience standard is met by showing ... deliberate indifference, or if it requires a more demanding showing of

1   "a purpose to harm" by the decedent for reasons unrelated to legitimate law

2   enforcement objectives.

3   　　　The Defendants contend that in this case the proper standard is purpose to

4   harm. The Court in *Porter* reviewed precedent and found that the more

5   deferential "purpose to harm" standard should apply only when officers are

6   "reacting to an urgent public safety threat in situations like a " fleeing motorists

7   in a situation where inaction could be the most dangerous." *Id*. *Supra*. "the very

8   term deliberate indifference implies the standard is sensibly employed only when

9   actual deliberation is practical". *Lewis* at 846.

10   　　　Here, the Defendants  had clearly an extensive period of time to deliberate

11   before every single step – act they decided to take in handling the situation they

12   were encountering with respect to Mr Garcia.  Therefore, this was not the "snap-

13   judgment" "split of a second typical shooting case. Here, the Defendant Silva

14   had a reasonable and sufficient opportunity for practical deliberation of her

15   conduct a priori. Thus, a reasonable trier of fact could conclude for example that

16   having her gun out in the first place for such situation was deliberate

17   indifference, and shocks the conscience.  To have the opportunity of engage in

18   communication with the person, realize that she knew him as a non aggressive

19   man and fail to de escalate the situation,  can be seen by the jury as deliberate

20   indifference and therefore shocking the conscience. And lastly, in the totality of

21   the circumstances of this case shooting an unarmed, non violent person,

22   homeless and having a mental crisis, for no justifiable reason was deliberate

23   indifference and can be found as shocking the conscience by the jury.  All of the

24   above was both deliberately indifference   and purposeful harmful conduct by

25   Defendant Silva,  who created and materialized an unnecessary risk of

26   deprivation of  the constitutional liberties of Mr. Garcia, amid taking his life.

27   　　　Hence, based on the law on point, and in light of the circumstances of this

28   particular case the court should deny Defendants motion for summary judgment.

## 9.    **DEFENDANTS' SIXTH ARGUMENT THAT CLAIMS UNDER THE BANE ACT MUST FAIL.**

Set forth as the Eighth Cause of Action for the Galacia Plaintiffs and the Ninth Cause of Action for the Garcia Plaintiffs, both allege that the actions of Officer Silva violated the so-called Bane Act (*Calif. Civil Code § 52.1*). However, the Bane Act requires Plaintiffs to prove not only that an officer's use of force was unreasonable, but to further prove that the officer acted with the specific intent to violate the individual's constitutional rights. *Reese v. Cty. of Sacramento,* 888 F3d 1030, 1041-44 (9th Cir. 2018) Evidence that an officer's conduct might amount to a constitutional violation under an "objectively reasonable" standard is insufficient. *Losee v. City of Chico,* 738 F. App'x 398, 401 (9th Cir. 2018). In order for a Bane Act claim to survive, Plaintiffs must show that Officer Silva "intended not only the force, but its unreasonableness.". *Reese, 888 F3d at 1045.*

Not only was Officer Silva's split-second decision to defend herself objectively reasonable (supra), but there is simply no evidence that she somehow harbored a specific intent to violate Garcia's constitutional rights. As such, Plaintiffs' Bane Act claims must be dismissed.

### A.    **GARCIA AND GALICIA PLAINTIFFS' RESPONSE.**

Plaintiffs are also entitled to judgment in their favor on their claim for violation of the Bane Act against Silva. The Ninth Circuit in interpreting *Cornell v. City and County of San Francisco*, 17 Cal. App. 5th 766, 798 (2017) stated, "it is not necessary for the defendants to have been 'thinking in constitutional *or legal terms* at the time of the incident[], because a reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights.'" *Reese v. County of Sacramento*, 888 F.3d 1030 (9th Cir. 2018) (quoting *United States v. Reese*, 2 F.3d 870 (9th Cir. 1993). As discussed above, Silva clearly used excessive force against Mr. Garcia and demonstrated a

reckless disregard for Mr. Garcia's safety and his constitutional rights. Silva fired without first issuing a warning, showing no reverence for human life. Mr. Garcia was unarmed, and he had not injured or threatened to injure anyone, had not tried to attack anyone, and had not made any swinging motions with the stick.

### 10.   **DEFENDANTS' SEVENTH ARGUMENT THAT PLAINTIFFS' BATTERY CLAIMS MUST FAIL.**

Although the Galacia Plaintiffs have typically included a state claim for "Battery" as their Eighth Cause of Action [Ninth Cause of Action for Garcia Plaintiffs] in their Complaints, these are for all intents and purposes little more than a mirror image of their federal "excessive force" claims. Because such claims are generally analyzed under the same reasonableness standard provided by federal law [*Edson v. Anaheim, 63 Cal.App.4th 1269, 1274-1275 (1998)*], Defendants will not repeat the above-stated argument as to why Officer Silva's use of force was objectively reasonable.

To the extent that the California Supreme Court has now seemingly included an additional consideration of pre-shooting tactics with respect to allegations of negligence [*Hayes v. Co. of San Diego, 57 Cal.4th 622, 629 (2013)*] such "negligence" claims will be separately addressed below.

### A.   **GARCIA PLAINTIFFS' RESPONSE.**

Plaintiffs are also entitled to summary judgment in their favor and against Silva and the City on their state law claims for battery and negligence, for the same reasons discussed in connection with Plaintiffs' constitutional claim for excessive force, *supra*. Under California law, battery and negligence claims arising out of excessive force by a peace officer are evaluated by way of traditional Fourth Amendment analysis under *Graham*, *supra*. *See Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1121, fn. 6 (2004) ("Federal civil rights claims of excessive force are the federal counterpart to state battery and wrongful

1   death claims; in both, the plaintiff must prove the unreasonableness of the

2   officer's conduct. Accordingly, federal cases are instructive."); *see also Hayes*,

3   736 F.3d at 1232; *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1274 (1998).

4   As set forth in detail above, the facts bearing on the reasonableness of Silva's use

5   of lethal force against Mr. Garcia are undisputed and show that Silva's gunshots

6   were an objectively unreasonable and negligent use of force as a matter of law.

7                **B.**    **GALICIA PLAINTIFFS' RESPONSE.**

8        For the reasons discussed in connection with Plaintiffs' constitutional

9   claim for excessive force, supra. Under California law, battery and negligence

10  claims arising out of excessive force by a peace officer as evaluated by way of

11  traditional Fourth Amendment analysis under *Graham*, supra. See *Munoz v. City*

12  *of Union City*, 120 Cal. App. 4th 1077, 1121, fn. 6 (2004); Galicia plaintiffs

13  submit that all state law claims including battery and Negligence should not be

14  determined as a matter of law but should be left to the Jury to decide at trial.

15          **11.**   **DEFENDANTS' EIGHTH ARGUMENT THAT PLAINTIFFS'**

16                       **NEGLIGENCE CLAIMS MUST FAIL.**

17        Fortunately, both sets of Plaintiffs have coincidentally set forth their

18  "negligence" wrongful death claims under state law as their respective Seventh

19  Causes of Action.  Because Plaintiffs have alleged a variety of "negligence"

20  theories, each will be addressed separately:

21                **A.**    **Alleged Negligent Training**

22        Since this theory is necessarily directed solely against the City of Tustin as

23  the only named defendant other than Officer Silva, liability against a public entity

24  under state law may only be imposed as provided by statute.  *Calif. Govt. Code §*

25  *815.*  As the California Supreme Court made clear in *Eastburn v. Regional Fire*

26  *Prot. Auth.,* 31 Cal.4th 1175 (2003)*,* a claim for "negligence" against a public

27  entity must be premised on a specific statute imposing a legal duty (i.e. the

28  general duty of care provided by *Calif. Civil Code § 1714* is insufficient).  While

a public entity may be held vicariously liable for the negligence of their
employee, direct liability against the public entity may only be imposed by a
specific statute requiring a particular level of training. *Koussaya v. Stockton,* 54
Cal.App.5th 909, 943 (2020). Here, Plaintiffs have not and cannot cite any
statute which required the City to provide particular training and, as noted above,
Officer Silva not only met, but exceeded, all training standards. Under this theory
of "negligent training", the question is not whether Officer Silva properly applied
her training, but whether the City was somehow negligent in providing training
under any non-existent statutory duty.

### B.    Alleged Negligent Medical Care.

*California Govt. Code § 845.6* expressly provides that "Neither a public
entity nor a public employee is liable for injury proximately caused by the failure
of the employee to furnish or obtain medical care." *Lucas v. Long Beach,* 60
Cal.App.3d 341 (1976). Notwithstanding this statutory immunity, Plaintiffs
cannot cite to a single statutory duty imposed upon the City of Tustin or Officer
Silva to provide a particular level of medical care to Garcia. More importantly, as
set forth above, the undisputed evidence shows that Officer Silva and other
officers in fact did immediately provide substantial medical care to Garcia while
awaiting the arrival of medics. As such, this theory must also fail.

### C.    Alleged Negligent Pre-shooting Tactics.

Ever since the California Supreme Court expanded the use of force analysis
of an officer's use of force to now include potentially "negligent" pre-shooting
tactics [*Hayes v. Cty. of San Diego,* 57 Cal.4th 622 (2013)], plaintiffs have now
included allegations of "negligent tactics". However, this additional factor does
not substantially change the analysis:

> "As long as an officer's conduct falls within the range
> of conduct that is reasonable under the circumstances,
> there is no requirement that he or she choose the 'most

1           reasonable' action or the conduct that is the least likely

2           to cause harm and at the same time the most likely to

3           result in the successful apprehension of a violent

4           suspect, in order to avoid liability for negligence." *Id.,*

5           *p. 632 (*Quoting *Brown v. Ransweiler,* 171 Cal.App.4th

6           516, 537-538 (2009)*.*

7        Since the *Hayes* decision, both state and federal courts have had occasion

8  to apply this standard. In a case similar to the instant matter, the Ninth Circuit

9  upheld summary judgment on not only the federal claims, but as to all state claims

10  under *Hayes.*  In *J.A.L. v. Santos,* 724 Fed. App'x 531, 534 (9th Cir. 2018)*,*

11  decedent refused to drop his weapon (knife) and, when as here the officers

12  attempt at less-than-lethal force (Taser) failed, decedent came at them with his

13  weapon, forcing officers to use deadly force.  Addressing the *Hayes* issue, the

14  Ninth Circuit noted:

15           "California law does not require officers to 'choose the most

16           reasonable action or the conduct that is least likely to cause harm.  In

17           lethal force cases, the California Supreme Court has specifically

18           warned against 'dividing a plaintiff's cause of action into a series of

19           decisional moments.'"

20        Most recently, California courts have applied the pre-shooting tactical issue

21  addressed in *Hayes* to make it clear that "there is no precedent which requires law

22  enforcement officers to use all feasible alternatives to avoid a situation where

23  deadly force can justifiably be used."  *Villalobos v. Santa Maria,* 85 Cal.App.5th

24  383, 391 (2022) [Quoting *Martinez v. Cty of Los Angeles,* 47 Cal.App.4th 334,

25  348 (1996).] While Plaintiffs' paid experts use 20/20 hindsight to second-guess

26  the pre-shooting tactics of Officer Silva, California courts have condemned such

27  criticisms by finding that:

28  ///

1  "It would be unreasonable to require police officers in the field to

2  engage in the sort of complex calculus that would be necessary to

3  determine the 'best' or most effective and least dangerous method of

4  handling an immediate and dangerous situation.  We must never

5  allow the theoretical, sanitized world of our imagination to replace

6  the dangerous and complex world that policemen face every day."

7  *Villalobos,* 85 Cal.App.5th at 392.

8      As both state and federal courts have now made clear, the fact that a paid

9  expert might identify alternative tactics from the comfort of their office with the

10  benefit of 20/20 hindsight will not defeat summary judgment on a claim of

11  "negligent" pre-shooting tactics.  Whether Officer Silva's pre-shooting tactics

12  were perfect or even the most reasonable, they need only fall within the broad

13  spectrum of reasonable.  *Koussaya v. Stockton,* 54 Cal.App.5th 909, 936 (2020)

14  *"*What constitutes "reasonable" action may seem quite different to

15  someone facing a possible assailant than to someone analyzing the

16  question as leisure. [Citation] Placing the burden of proof on the

17  plaintiff to establish that an officer's use of force was unreasonable

18  'gives the police appropriate maneuvering room in which to make

19  such judgments free from the need to justify every action in a court

20  of law." *Ibid.*

21      Here, the undisputed facts make it clear that Officer Silva's pre-shooting

22  tactics fell well within the acceptable range of reasonableness so as to result in

23  the dismissal of these negligence claims on summary judgment.

24          **A.    GARCIA PLAINTIFFS' RESPONSE.**

25      With respect to Plaintiffs' negligence claim, the California Supreme Court

26  has clarified that in police shooting cases, the negligence analysis is even broader

27  than a typical Fourth Amendment analysis because state law specifically

28  considers negligent "pre-shooting" conduct as part of the "totality of the

48

circumstances" evaluation. *Hayes*, 57 Cal. 4th at 639 (an officer's tactical conduct and decisions preceding the use of deadly force are relevant considerations in determining whether the use of deadly force gives rise to negligence liability, which can arise, for example, if the tactical conduct and decisions show, as part of the totality of circumstances, that the use of deadly force was unreasonable.").

Here, Silva engaged in pre-shooting negligent tactics, including escalating the situation with her impatient attitude when Mr. Garcia had just woken up and was attempting to comply, reaching into the bush to grab Mr. Garcia, failing to give Mr. Garcia time to comply with her commands and the taser deployment, failing to give Mr. Garcia a verbal warning that deadly force would be used. This conduct supports a finding of summary adjudication in Plaintiffs' favor on this claim as to Silva's negligent use of force. Law enforcement officers are trained that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident.  In this case, there was no rush, as there was no crime in progress, and Silva never saw Mr. Garcia with a weapon.

## B.   GALICIA PLAINTIFFS' RESPONSE.

For the reasons discussed in connection with Plaintiffs' constitutional claim for excessive force, supra. Under California law, the claim for Negligence should be adjudicated under a "totality of the circumstances" evaluation. See *Hayes*, 57 Cal. 4th at 639.  The Galicia plaintiffs submit that the Negligence cause of action as alleged within this matter, should not be determined as a matter of law in a summary adjudicative motion, but should be left to the Jury to decide at trial.

## 12.   CONCLUSION.

As tragic as any death might be, it is abundantly clear and respectfully submitted that the established law and undisputed facts mandate dismissal of all claims against Officer Silva and the City of Tustin on summary judgment.
///

## A.   GARCIA PLAINTIFFS' CONCLUSION

Plaintiffs respectfully request that this Court deny Defendants' motion for summary judgment and instead enter summary judgment in favor of Plaintiffs and against Silva on their claim for Excessive Force under the Fourth Amendment, and against Silva and the City on their claims for Battery, Negligence, and violation of the Bane Act.

## B.   GALICIA PLAINTIFFS' CONCLUSION

In Summary judgment proceedings, Courts do not resolve "triable issues of fact". The Court's intervention is to determine whether they exist or not. And if they do, the matter should proceed to the trier of fact for justice.  The purpose of Summary judgment should be;  to weed out non litigable issues or matters. Not seek to  preempt the right of the parties to the fundamental right of justice by Jury Trial.

DATED: October 30, 2023        FERGUSON, PRAET & SHERMAN
                                A Professional Corporation

                          By:    /s/   Bruce D. Praet
                                Bruce D. Praet, ATTORNEYS FOR
                                DEFENDANTS

DATED: October 30, 2023        CARRILLO LAW FIRM, LLP
                                LAW OFFICES OF DALE K. GALIPO

                          By:    /s/ Renee V. Masongsong
                                Dale K. Galipo
                                Renee V. Masongsong
                                Michael S. Carrillo
                                ATTORNEYS FOR THE GARCIA
                                PLAINTIFFS

Renee V. Masongsong, counsel of record for Plaintiffs Emily Garcia and C.G., certifies that their portion of this brief contains 7,000 words, and complies with the word limit of L.R. 11-6.1.

///

DATED: October 30, 2023

By:    /s/ Jesus Eduardo Arias

Jesus Eduardo Arias,
ATTORNEYS FOR THE GALICIA
PLAINTIFFS