1  Bruce D. Praet SBN 119430
FERGUSON, PRAET & SHERMAN
2  A Professional Corporation
1631 East 18th Street
3  Santa Ana, California  92705
(714) 953-5300 telephone
4  (714) 953-1143 facsimile
Bpraet@aol.com
5

6  Attorneys for Defendants

7

8              UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10

11  EMILY GARCIA, et al.                  )  NO. 8:22-cv-00131 SPG KES
                                         )
12             Plaintiffs,               )  **JOINT APPENDIX OF**
                                         )  **EVIDENCE re JOINT**
13      v.                               )  **MOTION FOR SUMMARY**
                                         )  **JUDGMENT**
14  CITY OF TUSTIN, ESTELLA SILVA, et    )
al.                                      )  *[Filed Concurrently with Notice*
15                                       )  *of Motion and Joint Motion for*
               Defendants.              )  *Summary Judgment; Joint*
16  _____     )  *Appendix of Facts; Joint*
                                         )  *Appendix of Objections; Notice*
17  Consolidated with WENDY LORENA       )  *of Lodging/Manual Filing of*
GALACIA RAMIREZ, et al.,                 )  *Exhibit "I"; Notice of Lodging*
18                                       )  *[Proposed] Judgment;*
               Plaintiffs,               )  *[Proposed] Judgment]*
19                                       )
        v.                               )  **DATE:  December 20, 2023**
20                                       )  **TIME:  1:30 p.m.**
CITY OF TUSTIN, et al.                   )  **CTRM: 5C**
21                                       )
               Defendants.              )
22                                       )
_____         )
23
        Pursuant to the Court's Standing Order re Motions for Summary Judgment,
24
the parties submit the following Joint Appendix of Evidence (JAE):
25

| JAE Tab | Document |
|---------|----------|
| 1.      | Declaration of Bruce D. Praet in support of Motion for Summary Judgment |
| 2.      | BWC "critical incident" release as Defendants' exhibit "1" |

1

| JAE Tab | Document |
| --- | --- |
| 3. | Deposition of Officer Estela Silva, excerpts, exhibit "2" |
| 4. | Deposition of Officer Joshua Yuhas, excerpts, exhibit "3" |
| 5. | BWC "critical incident" screenshot, exhibit "4" |
| 6. | Officer Estela Silva training records, exhibit "5" |
| 7. | Declaration of Renee V. Masongsong in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Summary Adjudication |
| 8. | Deposition of Officer Estela Silva, excerpts, "Exhibit A" |
| 9. | Deposition of Officer Joshua Yuhas, excerpts, "Exhibit B" |
| 10. | Deposition of Officer Robert Handy, excerpts, "Exhibit C" |
| 11. | Video from Body-Worn Camera of Joshua Yuhas, "Exhibit D" |
| 12. | Declaration of Garcia Plaintiffs' Police Practices Expert, Scott DeFoe, "Exhibit E" |
| 13. | Declaration of Jesus Eduardo Arias in support to Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Summary Adjudication |
| 14. | Deposition of Officer Estela Silva, excerpts, "Exhibit A" |
| 15. | Video from Body-Worn Camera of Estela Silva, "Exhibit B" |
| 16. | Video from Body-Worn Camera of Joseph Cossack, "Exhibit C" |
| 17. | Declaration of Galicia Plaintiffs' Police Practices Expert, Roger Clark, Exhibit "D" |

DATED: October 30, 2023   FERGUSON, PRAET & SHERMAN
           A Professional Corporation

          By:  /s/ Bruce D. Praet
              Bruce D. Praet, ATTORNEYS FOR DEFENDANTS

DATED: October 30, 2023   CARRILLO LAW FIRM, LLP
           LAW OFFICES OF DALE K. GALIPO

          By:  /s/ Renee V. Masongsong
              Dale K. Galipo
              Renee V. Masongsong
              Michael S. Carrillo
              ATTORNEYS FOR THE GARCIA PLAINTIFFS

1  DATED: October 30, 2023

2                                          By:    /s/ Jesus Eduardo Arias
                                                  _____
3                                                 Jesus Eduardo Arias,
                                                  ATTORNEYS FOR THE GALICIA
4                                                 PLAINTIFFS

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Bruce D. Praet SBN 119430
   FERGUSON, PRAET & SHERMAN
2  A Professional Corporation
   1631 East 18th Street
3  Santa Ana, California 92705
   (714) 953-5300 telephone
4  (714) 953-1143 facsimile
   Bpraet@aol.com
5
6  Attorneys for Defendants

7

8              UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10

11 EMILY GARCIA, et al.                    ) NO. 8:22-cv-00131 SPG KES
                                           )
12              Plaintiffs,                ) **DECLARATION OF BRUCE**
                                           ) **D. PRAET IN SUPPORT OF**
13      v.                                 ) **DEFENDANTS re JOINT**
                                           ) **MOTION FOR SUMMARY**
14 CITY OF TUSTIN, ESTELLA SILVA, et       ) **JUDGMENT; EXHIBITS**
   al.                                     )
15                                         ) *[Filed Concurrently with Notice*
                Defendants.                ) *of Motion and Joint Motion for*
16                                         ) *Summary Judgment; Joint*
                                           ) *Appendix of Facts; Joint*
17 Consolidated with WENDY LORENA          ) *Appendix of Evidence; Notice of*
   GALACIA RAMIREZ, et al.,                ) *Lodging/Manual Filing of*
18                                         ) *Exhibit "1"; Notice of Lodging*
                Plaintiffs,                ) *[Proposed] Judgment; Proposed*
19                                         ) *Judgment]*
        v.                                 )
20                                         ) **DATE: December 20, 2023**
   CITY OF TUSTIN, et al.                  ) **TIME: 1:30 p.m.**
21                                         ) **CTRM: 5C**
                Defendants.                )
22                                         )
                                           )
23 _____)

24
                  **DECLARATION OF BRUCE D. PRAET**
25
        I, Bruce D. Praet, declare and say:
26
        1. That I am the attorney of record for Defendants in this action and that I
27
   am duly licensed to practice before this and all other courts in the state of
28

                              1

California.  Except where expressly stated to the contrary, I make this declaration from personal knowledge and, if called as a witness, I would testify in conformity with this declaration.

2. Attached hereto are true and correct copies of the cited documents, recordings and deposition excerpts referenced in support of Defendants' Motion for Summary Judgment:

- Lodged separately with the Court as Exhibit "1", is a true and correct copy of the "critical incident" body worn camera recording (BWC) documenting portions of the incident.
- Attached hereto as Exhibit "2" are true and correct copies of excerpts from the deposition of Officer Estela Silva taken March 22, 2023.
- Attached hereto as Exhibit "3", are true and correct copies of excerpts from the deposition of Officer Joshua Yuhas taken March 22, 2023.
- Attached hereto as Exhibit "4" is a true and correct copy of a screen shot taken from BWC "critical incident" recording.
- Attached hereto as Exhibit "5" are true and correct copies of the training records of Estela Silva.

I declare under the penalty of perjury that the evidence cited herein fairly and accurately supports or disputes the facts as asserted.

Executed this 30th day of October 2023.

/s/ Bruce D. Praet
Bruce D. Praet
Declarant

2

**Critical Incident Release Recording**

**Lodge Separately**

**EXHIBIT "1"**

EXHIBIT "2"

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Estela Silva on 03/22/2023

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4    EMILY GARCIA, et al.                    )
                                             )
5                    Plaintiffs,             )
                                             )
6                    vs.                     ) Case No.
                                             ) 8:22-CV-00131-DOC-KES
7    CITY OF TUSTIN, et al.,                 )
                                             )
8                    Defendants.             )
                                             )
9    WENDY LORENA GALICIA RAMIREZ, et al.,   )
                                             )
10                   Plaintiffs,             )
                                             )
11   CITY OF TUSTIN, et al.,                 )
                                             )
12                   Defendants,             )
                                             )
13

14

15

16            REMOTE VIDEOCONFERENCE DEPOSITION OF

17                        ESTELA SILVA

18              WEDNESDAY, MARCH 22, 2023

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  446100

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Estela Silva on 03/22/2023                              Page 20

1      Q.   Did you ever see a knife in the decedent's hands?

2      A.   No, sir.

3      Q.   Did you see what you believed to be a knife on his

4   person?

5      A.   Not that I can see, no, sir.

6      Q.   Did the decedent ever verbally threaten to harm you,

7   verbally threaten to harm you before you fired?

8      A.   At the time I remembered him saying the word

9   (foreign word) which I interpreted as come at, like, meaning

10  to come at me or let's go.

11     Q.   You interpreted that as a verbal threat to harm

12  you?

13     A.   Yes, sir.

14     Q.   Anything else that you heard that you believed was a

15  verbal threat to harm you?

16     A.   No, sir.

17     Q.   And when did you hear him say that in relation to

18  you firing your first shot?

19     A.   It was right before -- it was as he came out and was

20  holding his weapon up his head right before he was willing to

21  swing it.

22     Q.   Okay.  You already told me you didn't see a gun or a

23  knife; is that correct?

24     A.   Yes, sir.

25     Q.   Okay.  And when you say his weapon, are you talking

1    partner officer present, or was it just you and her at that

2    point?

3        A.   He arrived towards the end of our conversation.

4        Q.   Okay.  Why don't you tell me what you remember about

5    the conversation.

6        A.   Yes, sir.  I contacted her at her residence.

7             She stated that this mobile home park is an elderly

8    mobile home park.  So 55 and older.  Regularly, elderly go to

9    her when there is any safety concerns or any police advice

10   that they need.  One of the elderly people residence that

11   lived there contacted her, referenced a man that was in the

12   area waving a knife in the air, speaking to themselves.

13            They pointed out to her where he usually was.  She

14   stated that when she was on a walk that day, she saw him in

15   the area and go inside the bush and hadn't seem him exit the

16   bush, and she was too afraid to contact him herself.

17            So that's why she called the police.

18       Q.   Okay.  Anything else that she told you?

19       A.   No.  Just that she was willing to show us exactly

20   are he was.

21       Q.   Okay.  Did she tell you she had seen him waiving the

22   knife around the day earlier?

23       A.   No, sir.

24       Q.   She told you she saw this person going in the bush

25   that morning?

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Estela Silva on 03/22/2023                                          Page 38

1    contact officer generally do?

2        A.   So the way we train is the primary officer which is

3    the contact officer is usually the person who makes verbal

4    contact with either the reporting party as well as the

5    subject that they're going to speak to, and regularly, they

6    carry -- they're assigned to lethal force.

7        Q.   So the contact officer would generally be the

8    primary officer who would speak so the reporting party and

9    make verbal contact with the potential suspect?

10       A.   (Inaudible response.)

11       Q.   Is that a yes?

12       A.   Yes, sir.

13       Q.   And would you have been the contact officer in your

14   mind in this situation?

15       A.   Yes, sir.  I was assigned as the primary officer.

16       Q.   To the call?

17       A.   Yes, sir.

18       Q.   And you in your mind believed based on your training

19   the contact officer would be the lethal officer?

20       A.   Yes, sir.

21       Q.   And how about the cover officer, what would the

22   cover officer be responsible for based on your training?

23       A.   The cover is usually -- we'll protect the primary

24   officer or be assigned less-lethal.

25       Q.   Did you ever get any training that the cover officer

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Estela Silva on 03/22/2023                                          Page 39

```
 1   would be the lethal cover?
 2        A.   No, sir.   I mean it's an option, but not how we
 3   usually train.
 4        Q.   So at some point do you approach the area of this
 5   bush?
 6        A.   Yes, sir.
 7        Q.   And did you approach it with your partner officer at
 8   the time?
 9        A.   Yes, sir.
10        Q.   And was it just you and your partner officer as far
11   as law enforcement initially there?
12        A.   No, sir.
13        Q.   Who else was there?
14        A.   As we were walking up I saw Officer Frias driving
15   towards us and park his vehicle.  So he walked with us, and
16   then I knew Officer Babb was on his way as well.
17        Q.   Okay.  Do you know Officer Frias' first name?
18        A.   Yes, sir.  It's Hector.
19        Q.   And then the other officer, do you know the first
20   name?
21        A.   Yes, sir.
22        Q.   What is it?
23        A.   It's Taylor.
24        Q.   And the last name, can you spell it, please.
25        A.   B-a-b-b.
```

```
 1      Q.   Thank you.  And I know at some point you attempted
 2   to make contact with the individual in the bush or bushes; is
 3   that correct?
 4      A.   Yes, sir.
 5      Q.   Before you made contact, just so I have it clear in
 6   my mind, what other officers were out there near you?
 7      A.   Made contact?
 8      Q.   Yeah.  At the time you started talking to the person
 9   or giving him commands in the bushes, who else was with
10   you?
11      A.   It was Officer Yuhas and Officer Frias.
12      Q.   Okay.  And did you pull out your gun at some
13   point?
14      A.   Yes, sir.
15      Q.   And why did you pull out your gun?
16      A.   I knew I was approaching a subject with a knife,
17   with a potential knife.
18      Q.   And at some point could you see the individual in
19   the bushes?
20      A.   It wasn't until I was directly in front of the
21   bushes I could see him.
22      Q.   And where was the individual when you first observed
23   them?
24      A.   He was laying on the ground behind the bush.
25      Q.   And if you could tell, was he laying on his side or
```

1      Q.   Had you seen this person before?

2      A.   Yes, sir.

3      Q.   Okay.  Would it be fair to say you at least

4   recognized that the person was not a male, white?

5      A.   Yes, sir.

6      Q.   And would it be fair to say you knew the person did

7   not have blond hair?

8      A.   Yes, sir.

9      Q.   And how did you know the person from before?

10     A.   From prior contacts with him.

11     Q.   Okay.  And did you say something to the effect, I

12   know who you are?

13     A.   Yes, sir.

14     Q.   And how many prior contacts did you have with this

15   person?

16     A.   Three, sir.

17     Q.   And can you tell me the nature of those contacts,

18   please.

19     A.   Yes, sir.  The first contact was a male seen waving

20   a knife in the air.  The second contact was the victim called

21   that they were robbed in the city of Santa Ana, knocked

22   unconscious by the subject, and they saw the suspect in the

23   city of Tustin, and I located him.  And the third was a call

24   for service referenced to transients disassembling a child

25   bicycle in the back of a gas station which resulted in arrest

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Estela Silva on 03/22/2023

Page 44

1   for a assault with a deadly weapon warrant and possession of

2   methamphetamine.

3        Q.   Okay.  The first contact, do you know what year that

4   was in if the --

5        A.   I believe --

6        Q.   -- go ahead.

7        A.   I believe it was 2020.

8        Q.   Okay.  Did that first contact result in an arrest?

9        A.   No, sir.

10        Q.   Was there any conviction that you're aware of

11   related to that first contact?

12        A.   No, sir.

13        Q.   Did you actually speak to this individual in that

14   first contact?

15        A.   Yes, sir.

16        Q.   And to your knowledge, he was not arrested; is that

17   correct?

18        A.   Yes, sir.

19        Q.   Was there any attempt, if you know, to see if the

20   individual was actually involved in a crime?

21        A.   Yes, sir.

22        Q.   And after that investigation, to your knowledge,

23   there was no arrest?

24        A.   Yes, sir.

25        Q.   And then the second contact, did that end up in an

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Estela Silva on 03/22/2023                                    Page 45

1    arrest?

2         A.   Yes, sir.

3         Q.   And what was the arrest for, if you know?

4         A.   It was for robbery and assault with a deadly

5    weapon.

6         Q.   That was related to the second contact?

7         A.   Yes, sir.

8         Q.   And was there any conviction in relation to that, if

9    you know?

10        A.   I don't know.

11        Q.   Do you know if charges were ever brought by the

12   DA?

13        A.   I don't know.

14        Q.   Did you ever go to court for that case in any way?

15        A.   No, sir.

16        Q.   And did you arrest him on that day or someone

17   else?

18        A.   I located him and detained him, but Santa Ana

19   arrived to our location and arrested him.

20        Q.   So you would have handcuffed him and then waited for

21   the arrival of Santa Ana?

22        A.   (Inaudible response.)

23        Q.   Is that yes?

24        A.   Well, so on that contact I did not place handcuffs

25   on him.  I just had him detained and waited for Santa Ana to

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Estela Silva on 03/22/2023                                        Page 46

1    show up.

2         Q.   Okay.  And then the third contact, was for what

3    again?  It was assault --

4         A.   It was a -- yes, sir.

5         Q.   And was he arrested in relation to that contact?

6         A.   Yes, sir.

7         Q.   And did you arrest him?

8         A.   Yes, sir.

9         Q.   What did you arrest him for?

10        A.   I arrested him for assault with a deadly weapon

11   warrant and for possession of methamphetamine.

12        Q.   And did the warrant for the assault deal with that

13   prior incident?

14        A.   I don't know.

15        Q.   You don't know?

16        A.   I don't remember, no.

17        Q.   And did you actually transport him to jail?

18        A.   Yes, sir.

19        Q.   Was he cooperative at least during the time of that

20   arrest?

21        A.   He was verbally confrontational.

22        Q.   Was he physically resistive at all?

23        A.   No, sir.

24        Q.   And did you take him to the jail facility on that

25   occasion?

1    arrested?

2        A.   Correct.

3        Q.   Okay.  And then the second incident in 2020, was

4    that the one when he -- with the bicycle parts?

5        A.   No.  That was the one where he was -- the reporting

6    party stated he saw the suspect that stole his money and

7    knocked him unconscious.

8        Q.   I see.  And then did you find any weapons on the

9    decedent at that time?

10       A.   Not at that time.

11       Q.   In either of the 2020 incidents, did you ever see

12   the decedent trying to fight with law enforcement?

13       A.   No, sir.

14       Q.   And then in the 2021 incident, did the decedent have

15   any weapon on him at that time?

16       A.   No, sir.

17       Q.   Did he try to physically fight with law enforcement

18   at that time?

19       A.   No, sir.

20       Q.   So would it be correct to say that before the date

21   of the shooting incident, you yourself had never seen the

22   decedent fighting with anyone?

23       A.   Not physically fighting, no.

24       Q.   And you never saw the decedent before the day of the

25   incident with a weapon in his hands or on his person; is that

1    Q.    Okay.  Do you recall what other commands you were

2    giving the decedent other than to come out of the bushes?

3    A.    Yes.  I asked when he came out -- sorry -- I

4    misspoke.

5         When I told him to wake up and that I knew him, he

6    turned around and did not face me, and I asked him to keep

7    his hands out of his pockets since he was putting his hands

8    in his pocket.

9    Q.    Okay.  And could you hear that when you listened to

10   the audio recently, you telling him to keep his hands out of

11   his pockets?

12   A.    Yes, sir.

13   Q.    Do you recall him saying anything in response to you

14   telling him to, you know, come out of the bushes and keep

15   your hands out of your pockets?

16   A.    I believe it was he was waiting for a friend.

17   Q.    Okay.  Anything else you recall him saying?

18   A.    Telling us okay.  He'll step out or let me out.

19   Q.    He said that he'll come out or let me out?

20   A.    Yes, sir.

21   Q.    And how far away were you from him during this part

22   of the conversation?

23   A.    I was fairly close to him.  I can't say an estimate

24   because he was inside the bush.

25   Q.    In other words, did you know if it was more than an

```
1    A.   In his hands.

2    Q.   Okay.  And was that after he got up from laying

3   down?

4    A.   Not immediately, sir.

5    Q.   Can you tell me -- so I'm just imagining at first he

6   was laying on his back sleeping; then he wakes up; I think

7   you said he turned kind of away from you at some point; and

8   then at some point you see the stick.

9         I'm just trying to figure out when it was in the

10  chronology.

11   A.   Yes, sir.  When I told him to get up and that I knew

12  him, that's when he stood up and faced away from me.

13        I wasn't able to see anything that he was doing.

14        His back was turned towards me, and I couldn't see

15  his hands.  He eventually with other commands given, he

16  eventually stepped out, and we reached for him.

17        That's when he retreated back into the bush and

18  picked up the stick.

19   Q.   Okay.  Did you say that you reached for him?

20   A.   Yes.

21   Q.   Were you trying to gab him at that point?

22   A.   Yes.

23   Q.   And did you still have your gun in one of your

24  hands?

25   A.   Yes, sir.
```

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Estela Silva on 03/22/2023                                    Page 66

1    lines of "Let me out," I did give him some room to step out.

2    So I did step to the side and made some room for him to exit.

3            So there was those times.  And then when I retreated

4    or gave him even more distance was right after he jabbed at

5    me with the stick or the pole.

6        Q.   Okay.  Is that -- the jabbing motion you're

7    describing, is that as he was starting to come out of the

8    bushes?

9        A.   No, sir.  This is when he -- after we had attempted

10   to -- Officer Yuhas and I attempted to grab him when he was

11   exiting the bush.  He pulled away and retreated back behind

12   the bush, and I got closer to the opening area of the bush in

13   attempt to grab him, and that's when he already had the stick

14   in his hands and jabbed it towards my stomach, and that's

15   where I created distance.

16       Q.   I just want to make sure I'm understanding the

17   grabbing sequence.

18            I think you told me that when he said on the audio

19   something to the affect, "Why are you grabbing me," you had

20   not even grabbed him yet?

21       A.   That's correct.

22       Q.   Okay.  Then are you saying that you and Officer

23   Yuhas at some point both tried to grab him?

24       A.   Yes.

25       Q.   Okay.  Was that during the time frame that you

1  Q.  How did you notice him moving in between the two
2  shots?

3  A.  Because I assessed the situation, sir.

4  Q.  Okay.  So after your first shot you assessed the
5  situation before you fired your second shot?

6  A.  Yes, sir.

7  Q.  And which way during this assessment in between the
8  two shots, which way did the decedent appear to be moving?

9  A.  Moving south, southbound towards Officer Frias.

10  Q.  Okay.  Are you saying that you fired your second
11  shot to protect Officer Frias?

12  A.  Yes, sir.

13  Q.  And you fired your first shot for what reason?

14  A.  Protect myself, sir.

15  Q.  So the first shot you fired to protect yourself; you
16  reassessed; saw the decedent moving towards Officer Frias.

17  And that's why you fired the second shot?

18  A.  Yes, sir.

19  Q.  And is it your belief that the second shot struck
20  the decedent in the back?

21  A.  I don't know that.  I don't know which --

22  Q.  Sorry.

23  A.  I don't know which -- I mean which shot.

24  I don't know.

25  Q.  Okay.  You're not sure which one of your two shots

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Estela Silva on 03/22/2023                                    Page 94

```
 1              So this would be Exhibit 3, please.

 2              (Exhibit 3 was marked for identification.)

 3              (Video playing.)

 4              MR. GALIPO:  And I believe this is Officer Frias.

 5              Okay.  I think that's good.

 6              (Video paused.)

 7              MR. GALIPO:  Thank you.  We can go back to full

 8    screen.

 9    BY MR. GALIPO:

10         Q.   Did you hear someone say at some point in one of the

11    videos "Watch your crossfire?"

12         A.   Yes.

13         Q.   Do you know who said that?

14         A.   Officer Frias.

15         Q.   Okay.  And did you already have your gun out at that

16    point?

17         A.   Yes, sir.

18         Q.   How many times altogether would you say you've

19    watched the videos of this incident?

20         A.   Handful of times, but I have not watched it that

21    much, sir.

22         Q.   Okay.  Were you disciplined in any way as it related

23    to this incident?

24         A.   No, sir.

25         Q.   Were you -- did you receive any retraining or
```

EXHIBIT "3"

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Joshua Yuhas on 03/22/2023

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4    EMILY GARCIA, et al.                  )
                                            )
 5                 Plaintiffs,              )
                                            )
 6                 vs.                      ) Case No.
                                            ) 8:22-CV-00131-DOC-KES
 7    CITY OF TUSTIN, et al.,               )
                                            )
 8                 Defendants.              )
                                            )
 9    WENDY LORENA GALICIA RAMIREZ, et al., )
                                            )
10                 Plaintiffs,              )
                                            )
11    CITY OF TUSTIN, et al.,               )
                                            )
12                 Defendants,              )
                                            )
13

14

15

16           REMOTE VIDEOCONFERENCE DEPOSITION OF

17                       JOSHUA YUHAS

18                 WEDNESDAY, MARCH 22, 2023

19

20

21

22

23    Reported Stenographically By:

24    Jinna Grace Kim, CSR No. 14151

25    Job No.:  446100
```

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Joshua Yuhas on 03/22/2023

Page 28

1      A.    Raised it, but also jabbed at Officer Silva.

2            So swinging it versus jab, I don't know if you're

3      referring to the same thing?

4      Q.    Let me break it down --

5      A.    -- like baseball swing.

6      Q.    Let me break it down.

7            Did you ever see him swinging it like a

8      baseball-type swing at anyone before you tased him?

9      A.    No.

10     Q.    Did you ever see him swinging the stick at anyone

11     like a baseball swing after you tased him?

12     A.    No, I did not.

13     Q.    This jabbing, was it one jab or more than one?

14     A.    One jab.

15     Q.    How close did the stick get from Officer Silva, if

16     you know?

17     A.    Hard to tell, but I would say less than a foot.

18     Q.    Okay.  Do you normally wear a bulletproof vest as

19     part of your uniform?

20     A.    Yes, I do.

21     Q.    And to your knowledge, was Officer Silva also

22     wearing a bulletproof vest?

23     A.    Yes, sir.

24     Q.    How much time passed in between you see this jabbing

25     motion and you firing your Taser?

EXHIBIT "4"



# EXHIBIT "5"

9/1/22, 2:35 PM                                     Profile Report: SILVA, ESTELA - POST EDI

COMMISSION ON PEACE OFFICER STANDARDS AND TRAINING                          Report generated on 9/1/2022

CONFIDENTIAL

Name: SILVA, ESTELA                    **POST ID:** C72-C48

                                       **Agency:** TUSTIN PD

Sex: F                                 **AKA:** NO ALTERNATE NAMES ON FILE

Race: S

## Certificates

| Cert | Type | Awarded | Edit | I | I~ | Comments |
|---|---|---|---|---|---|---|
| 203297 | B | 04/29/2021 | | 49.2 | 0 | |

Total Number of Certificates: 1

## Employment

| Hired Time | To | R | Rank | Rank Date | Agency | Agency Name | F/P | P/U | Seas. |
|---|---|---|---|---|---|---|---|---|---|
| 10/15/2018 | 09/30/2019 | 6 | TRN | 10/15/2018 | 30220 | TUSTIN PD | F | P | |
| 09/30/2019 | | | PO | 09/30/2019 | 30220 | TUSTIN PD | F | P | |

R = Reason for Separation: 1 = Resignation, 2 = Discharge, 3 = Retirement, 4 = Death, 5 = Felony, 6 = Other, 7 = Promotion/Demotion

## Training

| Comp Date | Cat | CCN | Hrs | Rsch | Crmp | Agency | School | | Course Name |
|---|---|---|---|---|---|---|---|---|---|
| 09/18/2018 | K | 3640-28381-18-004 | 2 | X | Y | 30220 | TPD | | ETHICS IN LAW ENFORCEMENT |
| 01/31/2019 | K | 9180-25586-18-215 | 8 | X | Y | 30220 | POST | | FIRST AID/CPR/AED (WEB) |
| 05/06/2019 | A | 2060-00100-18-003 | 200 | - | N | 30220 | ORANGE SD | | BASIC COURSE-INTENSIVE |
| 09/24/2019 | K | 4890-23272-19-019 | 8 | R | Y | 30220 | M TOLERNCE | | CULT. DIV.-TOOLS FOR TOLERANCE (MOT ONLY) |
| 09/30/2019 | A | 2060-00100-18-005 | 984 | R | Y | 30220 | ORANGE SD | | BASIC COURSE-INTENSIVE |
| 02/07/2020 | K | 2060-20005-19-058 | 8 | R | Y | 30220 | ORANGE SD | * | DRIVING/FORCE OPTION SIM.COMBO |
| 04/27/2020 | K | 2060-23761-19-010 | 8 | R | Y | 30220 | ORANGE SD | | MOBILE FIELD FORCE TRAINING |
| 05/05/2020 | K | 3640-32075-19-001 | 18 | R | Y | 30220 | TPD | * | FIREARMS/TACTICAL RIFLE |

* Meets Perishable Skills

D-000388

9/1/22, 2:35 PM                                          Profile Report: SILVA, ESTELA - POST EDI

| Comp Date | Cat | TCN | Hrs | Rank | Cmp | Agency | School | | Course Name |
|---|---|---|---|---|---|---|---|---|---|
| 07/24/2020 | K | 9180-25589-20-024 | 2 | X | Y | 30220 | POST | | DV RESPONSE & LETHALITY ASSESSMENT (WEB) |
| 07/28/2020 | K | 3640-23093-20-001 | 6 | R | Y | 30220 | TPD | | ELECTRONIC WEAPONS UPDATE |
| 09/28/2020 | K | 2490-21772-20-008 | 9 | R | Y | 30220 | SAPD | | TACTICAL EMERG. FIRST AID/TRAUMA CARE |
| 10/12/2020 | K | 3640-32078-20-002 | 6 | R | Y | 30220 | TPD | * | FIREARMS/TACTICAL RIFLE UPDATE |
| 11/16/2020 | K | 3640-28381-20-005 | 2 | X | Y | 30220 | TPD | | ETHICS IN LAW ENFORCEMENT |
| 11/16/2020 | K | 3640-23287-20-005 | 2 | - | Y | 30220 | TPD | | RACIAL PROFILING UPDATE |
| 02/12/2021 | K | 9180-25585-20-227 | 2 | X | Y | 30220 | POST | * | TACTICAL COMMUNICATION (WEB) |
| 05/05/2021 | K | 9180-25586-20-309 | 8 | X | Y | 30220 | POST | | FIRST AID/CPR/AED (WEB) |
| 06/04/2021 | K | 3950-20280-20-005 | 38 | R | Y | 30220 | CAV/ASSOC | | DUI-DRIVING UNDER INFLUENCE |
| 07/02/2021 | K | 6860-29490-21-002 | 6 | R | Y | 30220 | RIVERSDEDA | | ADVANCED FIREARMS TRAINING |
| 10/11/2021 | K | 3640-32078-21-003 | 10 | R | Y | 30220 | TPD | * | FIREARMS/TACTICAL RIFLE UPDATE |
| 11/01/2021 | K | 3640-29503-21-001 | 4 | R | Y | 30220 | TPD | * | ARSTCTL(PSP) |
| 11/23/2021 | K | 2060-20911-21-016 | 16 | R | Y | 30220 | ORANGE SD | | MENTAL HEALTH INTERVENTION TRAINING |
| 03/15/2022 | K | 3640-28381-21-004 | 2 | X | Y | 30220 | TPD | | ETHICS IN LAW ENFORCEMENT |
| 03/15/2022 | K | 3640-23287-21-005 | 2 | - | Y | 30220 | TPD | | RACIAL PROFILING UPDATE |
| 03/31/2022 | K | 1270-22160-21-018 | 72 | R | Y | 30220 | CHP | | D.R.E. CLASSROOM COURSE |
| 04/07/2022 | K | 5270-33433-21-002 | 8 | R | Y | 30220 | CSU-LNGBCH | | SEXUAL ASLT. INV-1ST RESPONDER |

* Meets Perishable Skills

## Footnotes

No Footnote on file.

D-000389

User - Estela Silva (esilva)

User - Estela Silva (esilva)                                    Printed by Michelle Jankowski (mjankowski)

*Current Certificates*

| 0 Certificates Needed<br>Note: Some records may be hidden due to security | | |
|---|---|---|
| This user does not currently need any certificates. | | |

| 47 Certificates Awarded<br>Note: Some records may be hidden due to security | | |
|---|---|---|
| **Certificate** | | **Expires** |
| Advanced Firearms Training | | Never |
| Agitator I Course | | Never |
| CLETS Less Than Full Access Operator 2018 | | Never |
| CNT Overview | | Never |
| Crisis Intervention Training | | Never |
| Domestic Violence Response 2020 | | Never |
| Driving/Force Options SIM Combo 2020 | | Never |
| Drug Recognition Evaluator (DRE) Program | | Never |
| DUI Seminar - SFST & ARIDE | | Never |
| E Mail Policy Training 2018 | | Never |
| EasiCollect+DNA Collection Training | | Never |
| Electronic Weapons Update 2020 | | Never |
| Ethics in Law Enforcement 2018 | | Never |
| Ethics in Law Enforcement 2020 | | Never |
| FEMA IS-00100.c | | Never |
| Firearms/Tactical Rifle 2020 | | Never |
| Firearms/Tactical Rifle Update 2020 | | Never |
| First Aid/CPR/AED 2019 | | Never |
| First Aid/CPR/AED 2021 | | Never |
| Gang Violence and Current Trends | | Never |
| Hobble Inspection/Update | | Never |
| Homelessness / HLO Presentation | | Never |
| Investigations/Report Writing | | Never |
| K9 apprehension | | Never |
| Mobile Field Force 2020 | | Never |
| Mobile ID | | Never |
| Narcotic Investigation 101 | | Never |
| O.C. / Pepperspray User Course | | Never |
| Patrol Rifle/Less Lethal 2019 | | Never |
| PEBT Training 2020 | | Never |
| POST Basic Certificate | | Never |
| PPE/N95 Mask Training | | Never |
| Pre-Incident Indicators (TLO) | | Never |
| Preventing Workplace Harassment 2019 | | Never |
| Racial Profiling Update 2020 | | Never |
| Range Qualification Nov 2019 | | Never |
| Range Qualification Nov. 2021 | | Never |
| Sexual Assault Investigations For 1st Responders | | Never |
| SRT 011222 | | Never |
| SRT 120121 | | Never |

1/2

9/1/22, 2:38 PM                                  User - Estela Silva (esilva)

| Certificate | Expires |
| --- | --- |
| Street Gang Investigations | Never |
| Tactical Communication 2021 | Never |
| Tactical Emergency Casualty Care for LE | Never |
| Tactical Rifle/Handgun 2021 | Never |
| Taser 7 Briefing Training | Never |
| Traffic Investigation and Report writing for Patrol Officers | Never |
| Women's Undercover Techniques and Survival | Never |

**This report has been generated using PowerDMS™**

D-000391

Luis A. Carrillo, Esq. (SBN 70398)
*lac4justice@gmail.com*
Michael S. Carrillo, Esq. (SBN 258878)
*mc@carrillofirm.com*
**CARRILLO LAW FIRM, LLP**
1499 Huntington Dr., Ste. 402
South Pasadena, CA 91030
Tel: (626) 799-9375 / Fax: (626) 799-9380

Dale K. Galipo, Esq. (SBN 144074)
*dalekgalipo@yahoo.com*
Renee V. Masongsong, Esq. (SBN 281819)
*rvalentine@galipolaw.com*
**LAW OFFICES OF DALE K. GALIPO**
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
Tel: (818) 347-3333 / Fax: (818) 347-4118

Attorneys for Plaintiffs Emily Garcia and C.G.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMILY GARCIA, et al.,<br><br>       Plaintiffs,<br><br>  v.<br><br>CITY OF TUSTIN, et al.,<br><br>       Defendants. | Consolidated Case No. 8:22-cv-00131-SPG-KES<br><br>Assigned to:<br>*District Judge Sherilyn Peace Garnett*<br>*Magistrate Judge Karen E. Scott*<br><br>**DECLARATION OF RENEE V. MASONGSONG IN SUPPORT OF PLAINTIFFS EMILY GARCIA AND C.G.'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' EMILY GARCIA AND C.G.'S MOTION FOR SUMMARY ADJUDICATION** |
| WENDY LORENA GALICIA RAMIREZ, et al.,<br><br>       Plaintiffs,<br><br>  v.<br><br>CITY OF TUSTIN, et al.<br><br>       Defendants. | Date:<br>Time:<br>Crtrm: 5C, 5th Floor<br>       350 W. First Street<br>       Los Angeles. CA 90012 |

1

2

## <u>DECLARATION OF RENEE V. MASONGSONG</u>

3

I, Renee V. Masongsong, hereby declare as follows:

4

  1.  I am an attorney duly licensed to practice law in the State of California and the

5

United States District Court for the Central District of California.  I am one of the attorneys

6

of record for Plaintiffs Emily Garcia and C.G. ("the Garcia Plaintiffs").  I make this

7

declaration in support of the Garcia Plaintiffs' Opposition to Defendants' Motion for

8

Summary Judgment and also in support of the Garcia Plaintiffs' Motion for Summary

9

Adjudication.  I have personal knowledge of the facts contained herein and could testify

10

competently thereto if called.

11

  2.  Attached hereto as Exhibit "A" is a true and correct copy of the relevant

12

portions of the Deposition of Estela Silva, as taken on March 22, 2023.

13

  3.  Attached hereto as Exhibit "B" is a true and correct copy of the relevant

14

portions of the Deposition of Joshua Yuhas, as taken on March 22, 2023.

15

  4.  Attached hereto as Exhibit "C" is a true and correct copy of the relevant

16

portions of the Deposition of Robert Handy, as taken on September 22, 2023.

17

  5.  Manually lodged as Exhibit "D" is a true and correct copy of the video

18

recording from the body-worn camera of Joshua Yuhas, entitled,

19

JoshuaYuhas_202108091013_WFC1022387_127836891. This exhibit is being submitted to

20

the court in electronic format.

21

22

23

24

25

26

27

28

1       6.    Attached hereto as Exhibit "E" is the Declaration of Scott A. DeFoe in support

2   of the Garcia Plaintiffs' Opposition to Defendants' Motion for Summary Judgment and also

3   in support of the Garcia Plaintiffs' Motion for Summary Adjudication.

4

5       I declare under penalty of perjury under that the foregoing that the foregoing is true

6   and correct. Executed on October 18, 2023.

7

8

9                                           Renee V. Masongsong

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF RENEE V. MASONGSONG IN SUPPORT OF PLAINTIFFS EMILY GARCIA AND C.G.'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' EMILY GARCIA AND C.G.'S MOTION FOR SUMMARY ADJUDICATION

# EXHIBIT A

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Estela Silva on 03/22/2023

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4   EMILY GARCIA, et al.              )
                                       )
 5              Plaintiffs,            )
                                       )
 6              vs.                    )Case No.
                                       )8:22-CV-00131-DOC-KES
 7   CITY OF TUSTIN, et al.,           )
                                       )
 8              Defendants.            )
     _____)
 9   WENDY LORENA GALICIA RAMIREZ, et al., )
                                       )
10              Plaintiffs,            )
                                       )
11   CITY OF TUSTIN, et al.,           )
                                       )
12              Defendants,            )
     _____)
13

14

15

16        REMOTE VIDEOCONFERENCE DEPOSITION OF

17                   ESTELA SILVA

18            WEDNESDAY, MARCH 22, 2023

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  446100
```

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4    EMILY GARCIA, et al.              )
                                        )
 5              Plaintiffs,             )
                                        )
 6              vs.                     )Case No.
                                        )8:22-CV-00131-DOC-KES
 7    CITY OF TUSTIN, et al.,           )
                                        )
 8              Defendants.             )
      _____)
 9    WENDY LORENA GALICIA RAMIREZ, et al., )
                                        )
10              Plaintiffs,             )
                                        )
11    CITY OF TUSTIN, et al.,           )
                                        )
12              Defendants,             )
      _____)
13

14

15

16         The remote videoconference deposition of ESTELA

17    SILVA, taken on behalf of the Plaintiffs, beginning at 10:04

18    a.m., and ending at 1:40 p.m., on Wednesday, March 22, 2023,

19    before Jinna Grace Kim, Certified Stenographic Shorthand

20    Reporter No. 14151.

21

22

23

24

25
```

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Estela Silva on 03/22/2023                                          **Page 3**

```
 1    APPEARANCES OF COUNSEL:

 2
      For the Plaintiffs:
 3
                  LAW OFFICES OF DALE K. GALIPO
 4                BY:  DALE K. GALIPO, ESQ.
                  BY:  RENEE V. MASONGSONG, ESQ.
 5                21800 Burbank Boulevard, Suite 310
                  Woodland Hills, California 91367
 6                Tel:  818-347-3333
                  Fax:  818-347-4118
 7                E-mail:  dalekgalipo@yahoo.com
                  E-mail:  rvalentine@galipolaw.com
 8

 9                CARILLO LAW FIRM, LLP
                  BY:  LUIS A. CARRILLO, ESQ.
10                BY:  MICHAEL S. CARRILLO, ESQ.
                  1499 Huntington Drive, Suite 402
11                South Pasadena, California 91030
                  Tel:  626-799-9375
12                Fax:  626-799-9380
                  E-mail:  lac4justice@gmail.com
13                E-mail:  mc@carrillofirm.com

14
                  JESUS EDUARDO ARIAS, ESQ.
15                BY:  JESUS EDUARDO ARIAS, ESQ.
                  18000 Studebaker Road, Suite 700
16                Cerritos, California 90703
                  Tel:  323-815-9450
17                Fax:  323-375-1196
                  E-mail:  jearias@jesuseduardoarias.com
18

19    For the Defendants:

20                FERGUSON, PRAET & SHERMAN
                  BY:  BRUCE D. PRAET, ESQ.
21                1361 East 18th Street
                  Santa Ana, California 92705
22                Tel:  714-953-5300
                  Fax:  714-953-1143
23                E-mail:  bpraet@aol.com

24

25
```

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Estela Silva on 03/22/2023                                          Page 16

| | | |
|---|---|---|
| 1 | A. | That day? |
| 2 | Q. | **Yes.  If you recall.** |
| 3 | A. | Yes.  It was day shift.  So it's 06 to 1830. |
| 4 | Q. | **So is that 6:00 in the morning to 6:30 p.m?** |
| 5 | A. | Yes, sir. |
| 6 | Q. | **And what time approximately did the shooting** |

7  incident occur?

| | | |
|---|---|---|
| 8 | A. | Approximately 10:00 in the morning, sir. |
| 9 | Q. | **Now, at some point you fired some shots; is that** |

10  correct?

| | | |
|---|---|---|
| 11 | A. | Yes, sir. |
| 12 | Q. | **How many shots did you fire?** |
| 13 | A. | (Inaudible response.) |
| 14 | Q. | **How many?** |
| 15 | A. | (Inaudible response.) |
| 16 | | (Court reporter clarification.) |
| 17 | Q. | **You cut out.** |
| 18 | A. | Two. |
| 19 | Q. | **Oh, two.  Thanks.** |
| 20 | | **Two shots.  What type of weapon did you fire the** |

21  shots from?

| | | |
|---|---|---|
| 22 | A. | Glock 17. |
| 23 | Q. | **Do you know what caliber it is?** |
| 24 | A. | 9-millimeter. |
| 25 | Q. | **Did you give any warning, a verbal warning that you** |

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Estela Silva on 03/22/2023                                    Page 17

1     were going to shoot before you fired?

2         A.   No, sir.

3         Q.   Were you aiming at a particular individual?

4         A.   Yes, sir.

5         Q.   Do you know the individual's name?

6         A.   Yes, sir.

7         Q.   What is his name?

8         A.   Luis Manuel Garcia --

9         Q.   Were you holding your weapon in one hand or two when

10   you fired?

11        A.   Two, sir.

12        Q.   Were you in some type of a shooting stance?

13        A.   Not that I recall, no.

14        Q.   When you fired your first shot, how far was the

15   person from you?

16        A.   I don't have approximate number, but if I estimate,

17   probably two to three feet, if that.

18        Q.   And were you aiming at a particular part of his

19   body?

20        A.   Yes, sir.

21        Q.   Where were you aiming?

22        A.   Center mass.

23        Q.   And what was center mass from your perspective for

24   the first shot?

25        A.   Center mass to me usually between below the collar

```
 1   bone to right around the belly button area.

 2        Q.   Okay.  And so you would have been aiming at the

 3   chest/abdomen area; is that fair?

 4        A.   Yes, sir.

 5        Q.   And how about the second shot, what would you

 6   estimate the distance to be between you and the person at the

 7   time of the second shot?

 8        A.   Approximately the same.

 9        Q.   Approximately two to three feet?

10        A.   Yes, sir.

11        Q.   And what part of the body were you shooting at for

12   the second shot?

13        A.   Same, sir.

14        Q.   Center mass?

15        A.   Yes, sir.

16        Q.   The chest/abdomen area?

17        A.   Yes, sir.

18        Q.   Do you know whether any of your shots struck this

19   individual in the back?

20             MR. PRAET:  Do you know now?

21   BY MR. GALIPO:

22        Q.   Well, or at the scene, or did you learn that from

23   any source?  And I want to exclude your lawyer.

24             In other words, did you see something at the scene

25   or learned during the investigation that one of the shots
```

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Estela Silva on 03/22/2023                                Page 19

```
 1   struck the individual in the back?

 2            MR. PRAET:  I don't want you to guess or speculate.

 3            If you know where the shots entered, you can tell

 4   him, but just don't guess.

 5            So go ahead.

 6            THE WITNESS:  It wasn't till later that I knew one

 7   of them struck.  And by later, it was when I was already at

 8   the police station later that day.

 9   BY MR. GALIPO:

10       Q.   Okay.  And when you were at the police station later

11   that day, you learned that one of the shots struck him in the

12   back?

13       A.   (Inaudible response.)

14       Q.   Is that yes?

15       A.   Yes, sir.

16       Q.   Prior to firing your shots, at any time did you see

17   what you believed to be a gun in the decedent's hand?

18       A.   No, sir.

19       Q.   Did you see what you believed to be a gun on his

20   person?

21       A.   I wasn't able to see what was in his waistband.

22            So I don't know.

23       Q.   I'm just wondering if you saw something on his

24   person sticking out or a bulge that you thought was a gun.

25       A.   Not that I recall, no, sir.
```

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Estela Silva on 03/22/2023                                          Page 20

```
 1      Q.   Did you ever see a knife in the decedent's hands?

 2      A.   No, sir.

 3      Q.   Did you see what you believed to be a knife on his

 4  person?

 5      A.   Not that I can see, no, sir.

 6      Q.   Did the decedent ever verbally threaten to harm you,

 7  verbally threaten to harm you before you fired?

 8      A.   At the time I remembered him saying the word

 9  (foreign word) which I interpreted as come at, like, meaning

10  to come at me or let's go.

11      Q.   You interpreted that as a verbal threat to harm

12  you?

13      A.   Yes, sir.

14      Q.   Anything else that you heard that you believed was a

15  verbal threat to harm you?

16      A.   No, sir.

17      Q.   And when did you hear him say that in relation to

18  you firing your first shot?

19      A.   It was right before -- it was as he came out and was

20  holding his weapon up his head right before he was willing to

21  swing it.

22      Q.   Okay.  You already told me you didn't see a gun or a

23  knife; is that correct?

24      A.   Yes, sir.

25      Q.   Okay.  And when you say his weapon, are you talking
```

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Estela Silva on 03/22/2023                                            Page 21

```
 1   about the stick he was holding or --

 2        A.   I believe that -- I believed it was a metal pole,

 3   sir.

 4        Q.   Did you hear anyone say that he has a stick --

 5        A.   No, sir --

 6        Q.   -- before you fired your shots?

 7        A.   No, sir.

 8        Q.   Have you listened to the audio on the video of the

 9   incident?

10        A.   Yes, sir.

11        Q.   And when was the last time you looked at that?

12        A.   Yesterday, sir.

13        Q.   And when you looked at that yesterday, did you hear

14   someone say he has a stick?

15        A.   Yes, sir.

16        Q.   Do you know who said that?

17        A.   Officer Yuhas.

18        Q.   Okay.  Do you know how to spell his last name?

19        A.   I believe it's Y-u-h-a-s.

20        Q.   Prior to you shooting do you know if he had been

21   tased?

22        A.   Yes, sir.

23        Q.   And you're familiar with the sound of the Taser?

24        A.   Yes, sir.

25        Q.   Have you had training with respect to the use of the
```

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.

Estela Silva on 03/22/2023

Page 24

```
 1      A.   Yes, sir.
 2      Q.   Okay.  But you were present during training at times
 3   when that occurred?
 4      A.   Yes, sir.
 5      Q.   And is it your general understanding from your
 6   training that the Taser has like a five-second cycle?
 7      A.   Yes, sir.
 8      Q.   So is it your understanding that if it's used, for
 9   example, in the probe or dart mode and the darts or probes
10   successfully make contact with the suspect's body, there
11   could be like a five-second cycle?
12      A.   (Inaudible response.)
13      Q.   Is that yes?
14      A.   Yes, sir.
15      Q.   Okay.  And would it be fair to say that the Taser
16   kind of has a unique sound that when you hear it, you're
17   familiar with it?
18      A.   Yes, sir.
19      Q.   And so at some point did you hear the Taser going
20   off?
21      A.   I heard the Taser deploy, yes, sir.
22      Q.   Okay.  And did you have an impression of whether it
23   was being deployed in the dart mode or the drive-stun mode?
24      A.   The dart mode, sir.
25      Q.   And did you have an impression at the time as to who
```

| | | |
|---|---|---|
| 1 | | deployed the Taser? |
| 2 | A. | Yes, sir. |
| 3 | Q. | And what was your impression? |
| 4 | A. | It was Officer Yuhas that deployed it. |
| 5 | Q. | And where was he positioned in relation to you at |
| 6 | | the time you heard the Taser go off? |
| 7 | A. | Standing just north of me, sir. |
| 8 | Q. | Okay.  And we're going to get into the directions in |
| 9 | | a little bit, but would that be to your right or left or |
| 10 | | however you want to describe it? |
| 11 | A. | To my right. |
| 12 | Q. | Okay.  Did you see the wires coming out at any |
| 13 | | point? |
| 14 | A. | No, sir. |
| 15 | Q. | Do you know how much time passed from you hearing |
| 16 | | the Taser being deployed to you firing your first shot? |
| 17 | A. | No, sir. |
| 18 | Q. | Do you have any estimate? |
| 19 | A. | No, sir. |
| 20 | Q. | From watching the videos of the incident, were you |
| 21 | | able to hear the Taser when you watched the videos and |
| 22 | | listened to the audio? |
| 23 | A. | Yes, sir. |
| 24 | Q. | And were you able to hear your gunshots? |
| 25 | A. | Yes, sir. |

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Estela Silva on 03/22/2023                                      Page 27

```
 1              And prior to the Taser going off, did you hear the

 2    decedent use any profanity?

 3        A.    I just remember hearing him scream, sir.

 4        Q.    Did you hear him scream before the Taser went off or

 5    after the Taser went off?

 6        A.    It was during, I believe, sir -- or can you

 7    elaborate on the question?

 8        Q.    Sure.  I think you said you heard him scream at some

 9    point?

10        A.    Yes, sir.

11        Q.    And did you hear him scream while the Taser was

12    going off?

13        A.    Yes, sir.

14        Q.    Did you hear him scream at all before the Taser was

15    deployed?

16        A.    No, sir.

17        Q.    Okay.  So you heard him scream almost immediately

18    after the Taser was deployed?

19        A.    Yes, sir.

20        Q.    In your mind did you believe that him screaming had

21    something to do with him being tased?

22              MR. PRAET:  Objection.  Calls for speculation.

23              But if you know why he was screaming, you can

24    answer.

25    BY MR. GALIPO:
```

```
 1      Q.   No.  I'm not asking if you know.

 2           I'm asking if you, in your mind, thought that they

 3   were related.

 4      A.   I don't know, sir.

 5      Q.   Has it been your experience in training that

 6   sometimes a person may make a sound or scream if they're

 7   tased?

 8      A.   Yes, sir.

 9      Q.   Prior to you hearing the tasing sound, did you ever

10   see the decedent swing the stick or pole at anyone?

11      A.   Prior to him being tased, sir?

12      Q.   Correct.

13      A.   He did try to jab it towards me before he was tased,

14   yes.

15      Q.   Okay.  So I'm going to separate jab and swing just

16   for a moment.  We'll go over both.

17           So my first question is, did you see him swing it at

18   anyone?

19           MR. PRAET:  Prior to the Taser?

20           MR. GALIPO:  Correct --

21           THE WITNESS:  No, sir.

22   BY MR. GALIPO:

23      Q.   Did you see him make contact with anyone with the

24   stick or pole prior to the Taser?

25      A.   No, sir.
```

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Estela Silva on 03/22/2023                                        Page 30

```
1      Q.   Do you have any estimate?

2           For example, do you know if it was more or less than

3   five seconds?

4      A.   More than five seconds, I don't know.

5      Q.   And how much jabbing motions did you see?

6           Was it just one?

7      A.   Just one, sir.

8      Q.   And you told me that you did not see him swinging

9   the stick before the Taser went off; is that correct?

10     A.   Yes, sir.

11     Q.   Did you see him swinging the stick at all after the

12  Taser went off?

13     A.   No, sir.

14     Q.   So let's kind of just back up a little bit regarding

15  the call itself.

16          I'm assuming you initially heard the call over your

17  police radio?

18     A.   Yes, sir.

19     Q.   And what was the nature of the call?

20     A.   It was a call referencing a male who was waiving a

21  knife in the air the night prior and talking to himself.

22     Q.   Okay.  Anything else that you recall as far as the

23  information related to the call?

24     A.   Not at the time.

25     Q.   Was there like a location put out?
```

1    looked like, like age, weight, height, clothing, thing of

2    that nature?

3        A.   At the time I responded I don't -- I did not

4    remember a description.  It was later until I found out there

5    was a description.

6        Q.   What was the description that you later found out?

7        A.   It was a male, white.  I believe it was with blond

8    hair.

9        Q.   Okay.  How about age or clothing, did you have any

10   information in that regard?

11       A.   Not that I recall, sir.

12       Q.   Anything with respect to height or weight?

13       A.   No, sir.

14       Q.   And nothing with age?

15       A.   Not that I recall, sir.

16       Q.   And lastly, did you have any identifying marks like

17   a specific tattoo or anything like that?

18       A.   No, sir.

19       Q.   Did you have a name?

20       A.   No, sir.

21       Q.   And just so that I'm clear, you had information that

22   the person was waving a knife around?

23       A.   Yes, sir.

24       Q.   And did you have information as to when he was doing

25   that, whether it was in the morning or the day prior, for

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Estela Silva on 03/22/2023                                    Page 33

```
 1    example?

 2        A.   The day prior, sir.

 3        Q.   Did you have any information, for example, that the

 4    person was under the influence of drugs or alcohol?

 5             MR. PRAET:  At what point?  When she got the call or

 6    at any point during the call?

 7             MR. GALIPO:  When she got the call is my question

 8    now.

 9             THE WITNESS:  No, sir.

10    BY MR. GALIPO:

11        Q.   Did you have any information that anyone had been

12    physically injured related to this individual?

13        A.   No, sir.

14        Q.   Did you have any information that the person was

15    homeless?

16        A.   No, sir.

17        Q.   The hair color of the individual, the decedent in

18    had the bushes, what color was his hair?

19        A.   Based on the call, or when I contacted him, sir?

20        Q.   When you saw him.

21        A.   He was wearing a beanie at the time.

22        Q.   Was all of his hair covered?

23        A.   When I contacted him, yes.

24        Q.   And what color was the beanie?

25        A.   I believe it was black.
```

1    Q.   Do you know -- did you find out at some point what

2    color his hair was under the beanie?

3    A.   I believe it was mainly balding, but it was black.

4    Q.   Okay.  Would it be at least fair to say that your

5    understanding now is that the individual did not have blond

6    hair?

7    A.   Yes, sir.

8    Q.   Do you have an estimate, the individual that you

9    ended up seeing in the bushes, how old he was?

10   A.   Approximately 40.

11   Q.   And any estimate as who his height or weight?

12   A.   Height, approximately 5-8, 5-9, weight, maybe 160 to

13   175, sir.

14   Q.   Do you recall what he was wearing?

15   A.   I believe it was a greenish blue hoodie and jeans.

16   Q.   So when you first go to the location, do you recall

17   if you were the first officer there or another officer

18   arrived at about the same time you did?

19   A.   I was the first officer there, sir.

20   Q.   And did you go to the mobile home park?

21   A.   Yes, sir.

22   Q.   And did you park somewhere near the mobile home park

23   or in the mobile home park?

24   A.   I parked inside the mobile home park, sir.

25   Q.   And who was the next officer to arrive, if you

1  partner officer present, or was it just you and her at that

2  point?

3       A.   He arrived towards the end of our conversation.

4       Q.   Okay.  Why don't you tell me what you remember about

5  the conversation.

6       A.   Yes, sir.  I contacted her at her residence.

7            She stated that this mobile home park is an elderly

8  mobile home park.  So 55 and older.  Regularly, elderly go to

9  her when there is any safety concerns or any police advice

10 that they need.  One of the elderly people residence that

11 lived there contacted her, referenced a man that was in the

12 area waving a knife in the air, speaking to themselves.

13           They pointed out to her where he usually was.  She

14 stated that when she was on a walk that day, she saw him in

15 the area and go inside the bush and hadn't seem him exit the

16 bush, and she was too afraid to contact him herself.

17           So that's why she called the police.

18      Q.   Okay.  Anything else that she told you?

19      A.   No.  Just that she was willing to show us exactly

20 are he was.

21      Q.   Okay.  Did she tell you she had seen him waiving the

22 knife around the day earlier?

23      A.   No, sir.

24      Q.   She told you she saw this person going in the bush

25 that morning?

1    A.   Yes, sir.

2    Q.   Did she say whether she had seen this person go in

3  the bush the day before?

4    A.   No, sir.  She just stated that it was someone that

5  she's familiar with that was in that area.

6    Q.   Okay.  But just so I understand what you're saying,

7  the female retired officer did not tell you she had seen this

8  person waiving a knife around; is that fair?

9    A.   That's correct.

10    Q.   Okay.  And then at some point your partner officer

11  arrived, and that was towards the end of the conversation

12  with the reporting party?

13    A.   Yes, sir.

14    Q.   Did you talk to anyone else on-scene before

15  approaching the area of the bush?

16    A.   No, sir.

17    Q.   And did you discuss any tactical plan with your

18  partner as to how you were going to approach the situation?

19    A.   Not discussed it, no, sir.

20    Q.   Have you heard the term before in training

21  "contact-officer, cover-officer?"

22    A.   (Inaudible response.)

23    Q.   Is that a yes?

24    A.   Yes, sir.

25    Q.   Okay.  And based on your training, what does the

1      Q.   Thank you.  And I know at some point you attempted

2   to make contact with the individual in the bush or bushes; is

3   that correct?

4      A.   Yes, sir.

5      Q.   Before you made contact, just so I have it clear in

6   my mind, what other officers were out there near you?

7      A.   Made contact?

8      Q.   Yeah.  At the time you started talking to the person

9   or giving him commands in the bushes, who else was with

10  you?

11     A.   It was Officer Yuhas and Officer Frias.

12     Q.   Okay.  And did you pull out your gun at some

13  point?

14     A.   Yes, sir.

15     Q.   And why did you pull out your gun?

16     A.   I knew I was approaching a subject with a knife,

17  with a potential knife.

18     Q.   And at some point could you see the individual in

19  the bushes?

20     A.   It wasn't until I was directly in front of the

21  bushes I could see him.

22     Q.   And where was the individual when you first observed

23  them?

24     A.   He was laying on the ground behind the bush.

25     Q.   And if you could tell, was he laying on his side or

```
 1   in some other position?
 2        A.   He was laying on his back.
 3        Q.   On his back?
 4        A.   Yes, sir.
 5        Q.   And how far was he from you approximately when you
 6   first saw him?
 7        A.   I honestly couldn't say.  I was directly in front of
 8   the bush leaned up against the brick wall.  So that was the
 9   best way I could see him.  So I could probably say one to two
10   feet, sir.
11        Q.   Okay.  Do you recall what you said to the person?
12        A.   Yes, sir.
13        Q.   What did you say?
14        A.   I told him to wake up.
15        Q.   Did he appear to be sleeping?
16        A.   Yes, sir.
17        Q.   And how could you tell that he was sleeping?
18        A.   Eyes were closed.
19        Q.   Okay.  Just based on his body position, his eyes
20   closed, and he just appeared to be sleeping?
21        A.   Yes, sir.
22        Q.   You already told me what he was wearing.
23        A.   Yes, sir.
24        Q.   And basically what he looked like.
25        A.   Yes, sir.
```

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Estela Silva on 03/22/2023                                    Page 42

```
 1      Q.   Could you tell what race he was?

 2      A.   Hispanic, sir.

 3      Q.   Hispanic.  Was there any indication from dispatch or

 4   otherwise what the race of this blond-haired person was?

 5      A.   It was a male, white.

 6      Q.   Okay.  So the suspect that you had information with

 7   the blond hair was male, white?

 8      A.   (Inaudible response.)

 9      Q.   Is that yes?

10      A.   Yes, sir.

11      Q.   And you at some point realized that the person

12   sleeping in the bushes was Hispanic; is that correct?

13      A.   Yes, sir.

14      Q.   And are you also Hispanic?

15      A.   Yes, sir.

16      Q.   And what, if anything, did the person say in

17   response to you saying to wake up or words to that effect?

18      A.   I don't remember what he said.

19           I just remember him actually waking up, opening his

20   eyes.

21      Q.   Okay.  And then once he was waking up or opening his

22   eyes, did you give him further commands?

23      A.   I told him that I knew who he was.

24      Q.   Did you know who he was?

25      A.   Yes, sir.
```

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Estela Silva on 03/22/2023                                    Page 43

```
 1       Q.   Had you seen this person before?

 2       A.   Yes, sir.

 3       Q.   Okay.  Would it be fair to say you at least

 4   recognized that the person was not a male, white?

 5       A.   Yes, sir.

 6       Q.   And would it be fair to say you knew the person did

 7   not have blond hair?

 8       A.   Yes, sir.

 9       Q.   And how did you know the person from before?

10       A.   From prior contacts with him.

11       Q.   Okay.  And did you say something to the effect, I

12   know who you are?

13       A.   Yes, sir.

14       Q.   And how many prior contacts did you have with this

15   person?

16       A.   Three, sir.

17       Q.   And can you tell me the nature of those contacts,

18   please.

19       A.   Yes, sir.  The first contact was a male seen waving

20   a knife in the air.  The second contact was the victim called

21   that they were robbed in the city of Santa Ana, knocked

22   unconscious by the subject, and they saw the suspect in the

23   city of Tustin, and I located him.  And the third was a call

24   for service referenced to transients disassembling a child

25   bicycle in the back of a gas station which resulted in arrest
```

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Estela Silva on 03/22/2023                                    Page 44

```
 1   for a assault with a deadly weapon warrant and possession of

 2   methamphetamine.

 3        Q.   Okay.  The first contact, do you know what year that

 4   was in if the --

 5        A.   I believe --

 6        Q.   -- go ahead.

 7        A.   I believe it was 2020.

 8        Q.   Okay.  Did that first contact result in an arrest?

 9        A.   No, sir.

10        Q.   Was there any conviction that you're aware of

11   related to that first contact?

12        A.   No, sir.

13        Q.   Did you actually speak to this individual in that

14   first contact?

15        A.   Yes, sir.

16        Q.   And to your knowledge, he was not arrested; is that

17   correct?

18        A.   Yes, sir.

19        Q.   Was there any attempt, if you know, to see if the

20   individual was actually involved in a crime?

21        A.   Yes, sir.

22        Q.   And after that investigation, to your knowledge,

23   there was no arrest?

24        A.   Yes, sir.

25        Q.   And then the second contact, did that end up in an
```

1    him was that assault with a deadly weapon warrant, sir.

2         Q.    Maybe just so I have the right order, that was the

3    one where you detained him; is that right?

4         A.    No, sir.  There was -- so in 2021 I arrested him for

5    that assault with a deadly weapon warrant, and in 2020 I had

6    two contacts with him.  One of them being the waving of the

7    knife and then later on that year, it was when I detained him

8    for Santa Ana Police Department.

9         Q.    I see.  Thank you.

10             So let's just talk about the two in 2020 first.

11        A.    Yes, sir.

12        Q.    The waving the knife, did you ever see him waving a

13   knife in that incident?

14        A.    I did not, no.

15        Q.    Did he have any knife on him when you made contact

16   with him in that incident?

17        A.    There was a knife in the area, and it was taken from

18   him.

19        Q.    But did you ever see a knife in his hand or on his

20   person?

21        A.    No.

22        Q.    Did you have any information that he had injured

23   anyone in that incident?

24        A.    No, sir.

25        Q.    And I think you told me earlier he was not

1   arrested?

2        A.   Correct.

3        Q.   Okay.  And then the second incident in 2020, was

4   that the one when he -- with the bicycle parts?

5        A.   No.  That was the one where he was -- the reporting

6   party stated he saw the suspect that stole his money and

7   knocked him unconscious.

8        Q.   I see.  And then did you find any weapons on the

9   decedent at that time?

10       A.   Not at that time.

11       Q.   In either of the 2020 incidents, did you ever see

12   the decedent trying to fight with law enforcement?

13       A.   No, sir.

14       Q.   And then in the 2021 incident, did the decedent have

15   any weapon on him at that time?

16       A.   No, sir.

17       Q.   Did he try to physically fight with law enforcement

18   at that time?

19       A.   No, sir.

20       Q.   So would it be correct to say that before the date

21   of the shooting incident, you yourself had never seen the

22   decedent fighting with anyone?

23       A.   Not physically fighting, no.

24       Q.   And you never saw the decedent before the day of the

25   incident with a weapon in his hands or on his person; is that

1    correct?

2        A.    That's correct.

3        Q.    So going back now to when you approached him in the

4    bushes, and you initially saw him sleeping on his back, do

5    you have an estimate as to how long, how much time passed

6    from the time you first saw him sleeping to the time he

7    started to wake up?

8        A.    Seconds, sir.  I can't give an estimate.

9        Q.    Was it a relatively short period of time?

10       A.    Yes, sir.

11       Q.    Have you been trained on the concept of

12   de-escalation?

13       A.    Yes, sir.

14       Q.    And what does that mean to you based on the

15   training; to try to de-escalate a situation?

16       A.    Just tactics that we can use non-verbal or verbal to

17   either calm down a situation or a person.

18       Q.    And what type of tactics?

19             Like, for example, speaking in a calm voice?

20       A.    Yes, sir.

21       Q.    What other tactics were you trained to try to

22   de-escalate a situation or calm the situation down?

23       A.    Even our mere presence in uniform can be used as a

24   de-escalation.  Our verbal, the way we talk to someone,

25   whether it's a calm voice or raising it when it needs to, the

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Estela Silva on 03/22/2023                                        Page 52

1      Q.    Okay.  Do you recall what other commands you were

2    giving the decedent other than to come out of the bushes?

3      A.    Yes.  I asked when he came out -- sorry -- I

4    misspoke.

5            When I told him to wake up and that I knew him, he

6    turned around and did not face me, and I asked him to keep

7    his hands out of his pockets since he was putting his hands

8    in his pocket.

9      Q.    Okay.  And could you hear that when you listened to

10   the audio recently, you telling him to keep his hands out of

11   his pockets?

12     A.    Yes, sir.

13     Q.    Do you recall him saying anything in response to you

14   telling him to, you know, come out of the bushes and keep

15   your hands out of your pockets?

16     A.    I believe it was he was waiting for a friend.

17     Q.    Okay.  Anything else you recall him saying?

18     A.    Telling us okay.  He'll step out or let me out.

19     Q.    He said that he'll come out or let me out?

20     A.    Yes, sir.

21     Q.    And how far away were you from him during this part

22   of the conversation?

23     A.    I was fairly close to him.  I can't say an estimate

24   because he was inside the bush.

25     Q.    In other words, did you know if it was more than an

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Estela Silva on 03/22/2023

Page 53

```
 1   arms' length away?

 2       A.    Yes, sir.

 3       Q.    It was more than that?

 4       A.    Yes, sir.

 5       Q.    Okay.  And did you still have your gun in your

 6   hand?

 7       A.    Yes, sir.

 8       Q.    Was your gun pointed generally in his direction?

 9       A.    No, sir.

10       Q.    Where was your gun trained at that point?

11       A.    It was canted down.  I was using the flashlight on

12   my gun to illuminate behind the bush since it was so dark.

13       Q.    Do you recall the decedent saying several times,

14   "Okay, okay?"

15       A.    I believe so.

16       Q.    Do you recall the decedent saying several times,

17   "Let me get out, let me get out?"

18       A.    Yes, sir.

19       Q.    And then you referenced that he said something to

20   the effect he was waiting for a friend?

21       A.    Yes, sir.

22       Q.    Do you think you were talking to the decedent in a

23   calm voice during this part of the conversation?

24       A.    At the beginning, I was.

25       Q.    How about as time went on?
```

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Estela Silva on 03/22/2023                                    Page 54

```
 1      A.   He wasn't listening to my commands.

 2           So I raised my voice at him.

 3      Q.   At some point do you recall the decedent saying that

 4  he's showing his hands?

 5      A.   Yes, sir.

 6      Q.   Now, what if anything did you notice on the decedent

 7  when he was initially sleeping?

 8           In other words, did you see the stick at that

 9  time?

10      A.   No, sir.

11      Q.   Did you see any bags at that time?

12      A.   Yes, sir.

13      Q.   Can you describe the bags that you saw?

14      A.   I saw several bags around him.

15           It looked like trash bags to me.

16      Q.   Did you form the impression that the decedent might

17  be homeless or semi-homeless?

18      A.   Yes, sir.

19      Q.   And what did you base that on?

20           The fact he had the bags and was sleeping in the

21  bushes?

22      A.   And what I believed to be a sleeping bag underneath

23  him and several what I believed was trash around him.

24      Q.   Okay.  And then where was the stick when you first

25  saw it?
```

1        A.    In his hands.

2        Q.    Okay.  And was that after he got up from laying

3    down?

4        A.    Not immediately, sir.

5        Q.    Can you tell me -- so I'm just imagining at first he

6    was laying on his back sleeping; then he wakes up; I think

7    you said he turned kind of away from you at some point; and

8    then at some point you see the stick.

9              I'm just trying to figure out when it was in the

10   chronology.

11       A.    Yes, sir.  When I told him to get up and that I knew

12   him, that's when he stood up and faced away from me.

13             I wasn't able to see anything that he was doing.

14             His back was turned towards me, and I couldn't see

15   his hands.  He eventually with other commands given, he

16   eventually stepped out, and we reached for him.

17             That's when he retreated back into the bush and

18   picked up the stick.

19       Q.    Okay.  Did you say that you reached for him?

20       A.    Yes.

21       Q.    Were you trying to gab him at that point?

22       A.    Yes.

23       Q.    And did you still have your gun in one of your

24   hands?

25       A.    Yes, sir.

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.

Estela Silva on 03/22/2023                                      **Page 56**

| | | |
|---|---|---|
| 1 | Q. | And are you right-handed or left-handed? |
| 2 | A. | I'm right-handed. |
| 3 | Q. | Did you have your gun in your right hand? |
| 4 | A. | Yes, sir. |
| 5 | Q. | Did you try to reach for him with your left hand? |
| 6 | A. | Yes, sir. |
| 7 | Q. | And were you able to make physical contact at that |
| 8 | | point? |
| 9 | A. | Yes, sir. |
| 10 | Q. | What part of his body did you make contact with? |
| 11 | A. | I believe it was his upper arm or shoulder area. |
| 12 | Q. | Was he facing you or turned slightly at that time? |
| 13 | A. | He was facing me. |
| 14 | Q. | Okay.  Do you recall, would it have been his right |
| 15 | | side if you grabbed him with your left arm? |
| 16 | A. | Yes, sir. |
| 17 | Q. | And what happened after you made that contact? |
| 18 | A. | He retreated back into the bush. |
| 19 | Q. | Stepped further away from you? |
| 20 | A. | Yes. |
| 21 | Q. | Okay.  So initially you're saying when you went to |
| 22 | | grab his right arm, he did not have the stick at that point |
| 23 | | in his hands; is that correct? |
| 24 | A. | That's correct. |
| 25 | Q. | But after you did that, he retreated back and that's |

1   the bags in his hand when you tried to grab him?

2        A.   He did.

3        Q.   He did?

4        A.   Yes, sir.

5        Q.   And do you know if he had the bags in one hand or

6   more than one at that point?

7        A.   That, I don't remember.

8        Q.   Okay.  What color were the bags, if you recall?

9        A.   I believe it was black and white.

10       Q.   Was there two bags, if you recall?

11       A.   Yes, sir.

12       Q.   One white and one black?

13       A.   Yes, sir.

14       Q.   You just don't remember if he had them in separate

15  hands or the same hand?

16       A.   Correct.

17       Q.   Did you ever advise the fellow officers there that

18  you were going to go into the bushes?

19       A.   I did.

20       Q.   Did they say anything in response?

21       A.   They told me no, and to wait.

22       Q.   Okay.  Why did you want to go in the bushes?

23       A.   When I said that, I misspoke.  I didn't actually

24  mean I was going go inside.  I meant he was so close to me I

25  could have reached in and grabbed him.

1      Q.   Okay.  So when you said you were going to go in,

2  you're saying that your choice of words was not good?

3      A.   Yes, sir.

4      Q.   And when the fellow officers said no, you got the

5  impression that they thought you wanted to go inside the

6  bushes?

7      A.   Yes, sir.

8      Q.   But you were meaning that you didn't want to go in

9  the bushes; you just wanted to reach in and grab him?

10     A.   Yes, sir.

11     Q.   And at that point you hadn't seen any weapon on him;

12  no gun; no knife; correct?

13     A.   Not in his hands that I could see, no.

14     Q.   So you felt at least at that point it was safe for

15  you to try to grab him?

16     A.   I was reaching and grab him.

17     Q.   And would it be fair to say that you repeatedly

18  asked him to come out of the bushes?

19     A.   Yes, sir.

20     Q.   And would it be correct that he said on multiple

21  occasions, "Let me out, let me out," or words to that

22  effect?

23     A.   Yes, sir.

24     Q.   Did you consider backing up a little bit to give him

25  some room to come out?

1    borsas, bag, or pockets, that's when he had his hands in his

2    pockets.

3        Q.   Okay.  But when you told him that, could you see

4    that he had bags?

5        A.   Not in his immediate area, no.

6        Q.   Okay.  Because right after that he says, "Why are

7    you grabbing me."

8        A.   Yeah.  He said that before I even touched him.

9            MR. PRAET:  Actually, misstates testimony.

10           She testified he said, "Why are you arresting me."

11           You just said, "Why are you grabbing."  So I just

12   want to make sure that we have -- are you looking at the

13   transcript, or are you going by what she said?

14           MR. GALIPO:  I'm trying to do both, but I'll clear

15   it up.

16   BY MR. GALIPO:

17       Q.   The transcript says, and again, it may be

18   inaccurate.  I don't know.

19           The transcript says, "Why are you grabbing me," and

20   you're saying you don't recall him saying that?

21       A.   I do recall him saying that, but that was before I

22   even touched him.  That was when he was still behind the

23   bush.

24       Q.   Okay.  Do you recall him saying something like he's

25   picking up his receipt at some point?

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Estela Silva on 03/22/2023                                    Page 64

1      Q.    Do you recall the decedent saying, "Why are you

2    going to hurt me?"

3      A.    No, sir.

4      Q.    Do you recall him saying, "Leave me alone?"

5      A.    (Inaudible response.)

6      Q.    Is that a no?

7      A.    No, sir.

8      Q.    When you listened to the audio recently from the

9    body cam, did you hear words to that effect, "Why are you

10   going to hurt me" or "Leave me alone" right before the

11   tasing?

12     A.    No, sir.

13     Q.    I think you told me earlier that you did hear the

14   decedent screaming after the Taser was deployed; is that

15   correct?

16     A.    Yes, sir.

17     Q.    The transcription has "Aaahhh" with a lot of "a's"

18   and a lot of "h's," but it was like a screaming sound?

19     A.    Yes, sir.

20     Q.    And then it says, again, this is the transcription.

21         I should probably mark this as Exhibit 1 just so we

22   have it attached to the transcript.

23         MR. GALIPO:  And I'll make sure you get a copy,

24   Bruce.  I'm sure you have it.

25         MR. PRAET:  I'm assuming it's Bates-stamped.

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Estela Silva on 03/22/2023                                    Page 71

```
 1      Q.   Well, you know the Taser was going off; right?

 2           Because it was just two or three seconds into the

 3   cycle?

 4      A.   Yes, sir.

 5      Q.   And you heard him screaming after the Taser went

 6   off?

 7      A.   Yes, sir.

 8      Q.   Did you ever give him any commands to, for example,

 9   don't jab at me or words to that effect?

10      A.   No.

11      Q.   No?

12      A.   No, sir.

13      Q.   Did you ever tell your fellow officers that he had

14   jabbed you or attempted to jab you?

15      A.   No, sir.

16      Q.   Did you ever tell him to drop the stick?

17      A.   No, sir.

18      Q.   Did you give him any commands at all in between the

19   time that you last stepped back and the time you fired your

20   shots?

21      A.   I believe it was "Put your hands up" or "Show me

22   your hands," something along those lines.

23      Q.   You think that's the last thing you said before you

24   fired?

25      A.   Yes, sir.
```

1    Q.    And would you have said that before or after the

2    tasing started?

3    A.    Probably before, sir.

4    Q.    So your recollection is your last command was to put

5    his hands up or words to that effect, then the tasing, then

6    two to three seconds after the tasing, started your shots?

7    A.    Yes, sir.

8    Q.    And your two shots, were they fairly close in

9    time?

10    A.    Yes, sir.

11    Q.    Did you assess after your first shot, but before you

12    fired the second shot?

13    A.    Yes, sir.

14    Q.    Would it be fair to say that based on your training,

15    you were aware that you could not shoot someone merely for

16    seeing, for example, a gun in their hand, that fact alone?

17    A.    Can you reask the question?  I'm sorry.

18    Q.    Sure.  Would you agree that based on your training,

19    a police officer cannot shoot a person just for them having a

20    gun in their hand, that fact alone?

21          There has to be more?

22    A.    Yes, sir, there has to be more.

23    Q.    And same thing with a knife, officers are trained

24    they could not shoot someone merely for seeing a knife in

25    their hand; is that fair?

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Estela Silva on 03/22/2023                                        Page 73

```
 1      A.   (Inaudible response.)

 2      Q.   Is that a yes?

 3      A.   Yes, sir.

 4      Q.   And also obviously the same with a stick, I mean

 5   officers are trained that they can't shoot someone merely for

 6   seeing a stick in their hand; is that fair?

 7      A.   Yes, sir.

 8      Q.   At any point before you shot the decedent, either on

 9   that day or any prior day, had you ever seen him assault

10   anyone?

11      A.   (Inaudible response.)

12      Q.   Is that a --

13      A.   No, sir.

14      Q.   Okay.  Had you ever seen him make, you know, punch

15   or kick or make any physical contact with anyone at any time

16   before you shot him?

17           MR. PRAET:  Just to clarify, Dale, you're including

18   the jab where there was no contact?

19           MR. GALIPO:  That's why I said "Make contact."

20           MR. PRAET:  Okay.  I'm sorry.

21           Go ahead.

22           THE WITNESS:  No, sir.

23   BY MR. GALIPO:

24      Q.   Would you agree that before you shot him, you never

25   saw the decedent assault or you never saw him physically
```

1    strike anyone at any time before you shot him.

2            Would you agree with that?

3        A.   Yes, sir.

4        Q.   When you pressed the trigger, were you intending to

5    press the trigger?

6        A.   Yes, sir.

7        Q.   And I think you already told me you were aiming

8    center mass?

9        A.   Yes, sir.

10       Q.   And you were aware based on your training that

11   shooting someone center mass is likely to cause death or

12   serious bodily injury?

13       A.   Yes, sir.

14       Q.   Were you trained that deadly force was the highest

15   level of force an officer can use?

16       A.   Yes, sir.

17       Q.   Were you trained that deadly force should only be

18   used in limited circumstances?

19       A.   When it's reasonably appears necessary.

20       Q.   And the standard is it has to be reasonably appears

21   necessary and there has to reasonably appear to be an

22   immediate or imminent threat of death or serious bodily

23   injury?

24       A.   (Inaudible response)

25       Q.   Is that yes?

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Estela Silva on 03/22/2023                                Page 75

```
1        A.   Yes, sir.

2        Q.   And were you likewise trained if there is not an

3   immediate or imminent threat of death or serious bodily

4   injury, you should not use deadly force?

5             MR. PRAET:  Objection.  Misstates her testimony.

6             Reasonably believe or is?

7             MR. GALIPO:  I'm not trying to restate her

8   testimony.  I'm trying to ask her a question.

9   BY MR. GALIPO:

10       Q.   Do you want me to repeat it?

11       A.   Yes, please.

12       Q.   Sure.  Were you trained that if you do not

13  reasonably believe there is an immediate or imminent threat

14  of death or serious bodily injury, then you should not use

15  deadly force; is that correct?

16       A.   Yes, sir.

17       Q.   And in those circumstances you're trained to use

18  less-lethal options; is that fair?

19       A.   Yes, sir.

20       Q.   Are you also trained to give a verbal warning when

21  feasible before using deadly force?

22       A.   When it's feasible, yes.

23       Q.   And are you trained that in terms of using deadly

24  force, you have to justify every shot?

25       A.   Yes, sir.
```

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Estela Silva on 03/22/2023                                    Page 76

1     Q.   And I think you've already told me this, but you had
2   a Taser on you; correct?
3     A.   Yes, sir.
4     Q.   Did you have pepper spray on you?
5     A.   No, sir.
6     Q.   Did you have a police baton?
7     A.   No, sir.
8     Q.   Do you normally carry either OC spray or police
9   baton?
10    A.   A police baton, sir.
11    Q.   And why didn't you have your police baton on you at
12  that point?
13    A.   It was inside my vehicle.
14    Q.   Okay.  And why did you leave it in the vehicle, if
15  you know?
16    A.   What do you mean if I know?
17    Q.   Did you leave it in the vehicle, intentionally?
18    A.   No.
19    Q.   Okay.  I'm just wondering why you left it in your
20  vehicle.
21         Did you forget to bring it, or what happened?
22    A.   I forgot to bring it, sir.
23    Q.   What type of baton is it?
24    A.   It's a small ASP baton and as well as a large wooden
25  baton.

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Estela Silva on 03/22/2023                                    Page 80

```
 1   struck him in the back?

 2        A.   Correct.

 3        Q.   What do you estimate the distance between you and

 4   the decedent at the time of your second shot?

 5        A.   Same.  Approximately two to three feet away from

 6   me.

 7        Q.   Okay.  And what would you estimate Officer Frias'

 8   distance to be from the decedent at the time of your second

 9   shot?

10        A.   Approximately maybe ten, maybe ten or six to ten

11   feet away from him.

12        Q.   Okay.  Did you note whether Officer Frias had

13   anything in his hands?

14        A.   He did not.

15        Q.   Did you look towards Officer Frias before firing

16   your second shot?

17        A.   Yes, sir.

18        Q.   And before firing your second shot, did you ever see

19   the decedent strike anyone with a stick?

20        A.   No, sir.

21        Q.   Did you ever see the decedent swing the stick at

22   anyone before you fired your second shot?

23        A.   I saw him raise the stick towards me, sir.

24        Q.   I'm wondering if you ever saw him actually swing it.

25        A.   No, sir.  I saw him attempt to swing is right before
```

1    he was about to swing it.

2        Q.    So you would at least agree with me you never saw

3    him swing it?

4        A.    No, sir.

5        Q.    You would agree?

6        A.    I would agree, yes.

7        Q.    Did you ever see the stick coming down towards you

8    before you fired?

9        A.    No, sir.

10        Q.    Did you ever see the stick coming down towards

11    Officer Frias before you fired?

12        A.    No, sir.

13        Q.    And then did you give any commands in between your

14    first shot and second shot?

15        A.    No, sir.

16        Q.    Did you hear any of the other officers say anything

17    immediately before you fired?

18        A.    No, sir.

19        Q.    Did any of the other officers on-scene other than

20    you fire or use lethal force?

21        A.    No, sir.

22        Q.    You mentioned that there was a forth officer

23    arriving when you approached the bushes.

24              Do you know if he ever got out of his car?

25        A.    Yes, sir.

```
 1    A.   Chest seals on both -- both wounds.
 2    Q.   Is that when you realized there was a shot to the
 3  back?
 4    A.   I didn't know which one was an exit or an entry.
 5         So I don't know.
 6    Q.   You knew there was a bullet wound to the back, but
 7  you didn't know until later that was an entry wound?
 8    A.   Correct.
 9    Q.   And then what did you do after rendering aid?
10         Did you stay at the scene for some period of time?
11    A.   Yes, sir.
12    Q.   When did you give your statement in relation to the
13  incident?
14         Was it the same day?
15    A.   No, sir.
16    Q.   Was it the next day, if you recall?
17    A.   No, sir.
18    Q.   When did you give your statement in relation to the
19  incident?
20    A.   I believe it was a month after the incident.
21    Q.   Do you know why it was so long after the incident
22  that you gave your statement?
23    A.   Yes, sir.
24    Q.   What is your understanding?
25    A.   I was already scheduled for a pre-planned vacation
```

1   recorded?

2      A.   Yes, sir.

3      Q.   Do you know how long your statement was

4   approximately?

5      A.   Approximately three hours.

6      Q.   Wow.

7           MR. PRAET:  Longer than your depo.

8           MR. GALIPO:  Yeah.  I don't feel as bad now.

9   BY MR. GALIPO:

10     Q.   Did they show you some of the video footage during

11  your statement?

12     A.   No, sir.

13     Q.   Okay.

14          MR. GALIPO:  I think we have been going for quite a

15  while.  Is this a good time for our last break?

16          MR. PRAET:  It is.  You want to go off the record?

17          MR. GALIPO:  Yes.

18          (Recess taken.)

19  BY MR. GALIPO:

20     Q.   Had you had conversations then with the decedent

21  before the day of the shooting with your prior contacts?

22     A.   Yes, sir.

23     Q.   Was it your understanding that he was homeless?

24     A.   Yes, sir.

25     Q.   Did you have an understanding as to whether or not

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Estela Silva on 03/22/2023                                          Page 88

```
 1    he had any mental health issues?

 2         A.    No, sir.

 3         Q.    You didn't know one way or the other?

 4         A.    No.

 5         Q.    The one incident that you talked about, a knife, do

 6    you know if that was a butter knife?

 7         A.    I believe it was a kitchen knife, sir.

 8         Q.    Do know if it was a butter knife or some other type

 9    of knife?

10         A.    It was a kitchen knife, sir, a steak knife.

11         Q.    Okay.  I guess a butter knife could be one type of

12    kitchen knife.  Okay.  Thank you.

13              And then the information you had related to this

14    call included -- the call meaning the day of the shooting,

15    including your conversation with the retired law enforcement

16    officer, did you have any information that he had attacked

17    anybody?

18         A.    No, I did not.

19         Q.    Any information that he was specifically threatening

20    anyone?

21         A.    Prior to my knowledge about Mr. Garcia, do you mean?

22         Q.    On the day of the incident, I think there was

23    something about someone the day before had been waving a

24    knife around or something?

25         A.    Yes.
```

```
 1       Q.   Okay.

 2       A.   But I believe my question to you is, is this before

 3   contacting Mr. Garcia or is this during my contact?

 4            Because by the time I contacted him I remembered my

 5   contacts with him and how he assaulted the street vendor.

 6       Q.   Well, right now, I'll break it down for you.

 7            So first was just on the knowledge of the call

 8   before you contacted him, did you have any information that

 9   the suspect in that call had attacked or verbally or

10   threatened anyone specifically?

11       A.   No, sir.

12       Q.   And then the street vendor, is that the ice cream

13   person or someone else?

14       A.   That's the -- yes, that is the Santa Ana case.

15       Q.   Okay.  The stick, at the time that he was tased, do

16   you know which hand he had it in?

17       A.   Both hands, sir.

18       Q.   At the time you shot him, do you know what hand he

19   had it in?

20       A.   They were in both, sir.

21       Q.   And you said you saw him drop it at some point?

22       A.   Yes, sir.

23       Q.   When did you see him drop the stick?

24       A.   It was after the second shot.

25       Q.   Did you notice at some point after the second shot
```

```
 1    an officer push Mr. Garcia out of the way?

 2        A.   Yes, sir.

 3        Q.   Did you pat him down after you handcuffed him?

 4        A.   Yes, sir.

 5        Q.   Did he have any weapons on him?

 6        A.   No, sir.

 7        Q.   Did you ever see a knife at anytime during this

 8    incident?

 9        A.   No, sir.

10        Q.   I noticed that there were what appear to be pink

11    handcuffs in the video.

12             Are those your handcuffs?

13        A.   Yes, sir.

14        Q.   Did you color them pink or paint them pink?

15             How did that happen?

16        A.   No.  I got them pink, sir.

17             That's how they were purchased.

18        Q.   Okay.  Were there different colors to select from?

19        A.   Yes, sir.

20        Q.   Were you trained in part with respect to the

21    use-of-force you have to control your fear?

22        A.   No, sir.

23        Q.   Were you trained that you need to control your

24    anger?

25        A.   What do you mean?
```

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Estela Silva on 03/22/2023                                        Page 91

```
 1      Q.   In other words, don't let your anger interfere with
 2   the objective use of force?
 3           In other words, you might be angry at someone or
 4   something, but you can't necessarily just use force because
 5   you're angry?
 6      A.   Yes, sir.
 7      Q.   Were you trained that subjective fear alone is not
 8   sufficient to use deadly force?
 9      A.   (Inaudible response.)
10      Q.   Is that yes?
11      A.   Yes, sir.
12      Q.   And were you trained that you should not overreact
13   when using force?
14      A.   What do you mean overreact?
15      Q.   In other words, the situation has to justify the
16   use-of-force; you don't want to just because of fear or anger
17   overreact and use unnecessary force?
18      A.   Yes, sir.
19      Q.   And why did you stop shooting immediately -- why did
20   you stop shooting after the second shot?
21      A.   Because I saw that he had dropped the stick, but
22   continued running towards my partner.
23      Q.   Okay.
24           MR. GALIPO:  We're going to show a couple of videos.
25           We'll see how this works.  I think we already have
```

1     Q.  Would it be fair to say that over the course of the

2   42 or 36 I believe 36 minutes of this recording, the behavior

3   of Mr. Garcia was always calm.

4         Would you agree?

5     A.  Yes, sir.

6     Q.  He was not violent; correct?

7     A.  Towards me, no.

8     Q.  Was he violent against anybody else other than

9   you?

10    A.  Other than the victim that called and reported him;

11  is that your question?

12    Q.  Officer, the victim is not in this video; right?

13    A.  That's correct.

14    Q.  I'm asking you questions about this encounter with

15  Mr. Garcia.

16       Was only Mr. Garcia you and your fellow partners

17  officers; correct?

18    A.  But I believe my question to you is, the

19  circumstances to the call for service for that incident was a

20  violent crime.

21    Q.  Yeah --

22    A.  That's why I'm asking.

23    Q.  But at this point you're investigated -- you have no

24  at this point -- number one, you knew Mr. Garcia already from

25  the prior occasion; correct?

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Estela Silva on 03/22/2023                                    Page 111

```
 1      A.   Correct.

 2      Q.   Number two, Mr. Garcia was detained and he was in

 3   handcuffs; correct?

 4      A.   Was not in handcuffs, no.  His hands are behind his

 5   back.

 6      Q.   Oh, voluntarily he is putting his hands just behind

 7   his back?

 8      A.   I don't remember if he voluntarily did that, or I

 9   told him to do that.

10      Q.   But he was -- okay.  So based on that is he -- is he

11   responding to your questions?

12      A.   Yes, he was.

13      Q.   Was he cooperative, you would say?

14      A.   Yes, sir.

15      Q.   Okay.  Did he act physically violent at that moment

16   at that encounter against you?

17      A.   No, sir.

18      Q.   Against any other officer?

19      A.   No.

20      Q.   Did he make any threats against you?

21      A.   No, sir.

22      Q.   Against any of the officers?

23      A.   No, sir.

24      Q.   Were you able to form an opinion and confirm that

25   this was the same homeless person that you had encountered
```

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Estela Silva on 03/22/2023                                   Page 112

```
 1   before?

 2        A.   Yes, sir.

 3        Q.   And he was not violent?

 4        A.   At that time towards me, no, sir.

 5        Q.   And he was not armed?

 6        A.   Not at that time.

 7        Q.   He was not resisting to in any way.

 8             By the way, you know the difference of levels of

 9   behavior, for example, from active resistance, passive

10   resistance.

11             Do you know what I'm talking about?

12        A.   Yes, sir.

13        Q.   And how would you label the behavior of Mr. Garcia

14   at this moment in this encounter?

15        A.   He was not resisting.

16        Q.   Okay.  He was cooperative; correct?

17        A.   Yes, sir.

18        Q.   Okay.  At this moment at the end of this encounter

19   it appears that Santa Ana Police Department officer showed

20   up; correct?

21        A.   Correct.

22        Q.   And are you trained in effective communication?

23        A.   What do you mean by like --

24        Q.   For example, to have communications with other

25   officers even from other law enforcement agencies to have an
```

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Estela Silva on 03/22/2023                                          Page 127

```
 1                         CERTIFICATE

 2                             OF

 3             CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5             I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8             That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10             That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12             That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15             Further, that the foregoing is an accurate

16   transcription thereof.

17             I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21             IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  March 22, 2023.

23
                            _____
24                          Jinna Grace Kim, CSR No. 14151

25
```

# EXHIBIT B

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   EMILY GARCIA, et al.              )
                                       )
 5                  Plaintiffs,        )
                                       )
 6                  vs.                )Case No.
                                       )8:22-CV-00131-DOC-KES
 7   CITY OF TUSTIN, et al.,           )
                                       )
 8                  Defendants.        )
     _____)
 9   WENDY LORENA GALICIA RAMIREZ, et al., )
                                       )
10                  Plaintiffs,        )
                                       )
11   CITY OF TUSTIN, et al.,           )
                                       )
12                  Defendants,        )
     _____)
13

14

15

16          REMOTE VIDEOCONFERENCE DEPOSITION OF

17                    JOSHUA YUHAS

18            WEDNESDAY, MARCH 22, 2023

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  446100
```

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4   EMILY GARCIA, et al.              )
                                       )
 5                   Plaintiffs,       )
                                       )
 6                   vs.               )Case No.
                                       )8:22-CV-00131-DOC-KES
 7   CITY OF TUSTIN, et al.,           )
                                       )
 8                   Defendants.       )
     _____)
 9   WENDY LORENA GALICIA RAMIREZ, et al., )
                                       )
10                   Plaintiffs,       )
                                       )
11   CITY OF TUSTIN, et al.,           )
                                       )
12                   Defendants,       )
     _____)
13

14

15

16          The remote videoconference deposition of JOSHUA

17   YUHAS, taken on behalf of the Plaintiffs, beginning at 2:18

18   p.m., and ending at 3:24 p.m., on Wednesday, March 22, 2023,

19   before Jinna Grace Kim, Certified Stenographic Shorthand

20   Reporter No. 14151.

21

22

23

24

25
```

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Joshua Yuhas on 03/22/2023                                                    Page 3

```
 1    APPEARANCES OF COUNSEL:

 2
      For the Plaintiffs:
 3
              LAW OFFICES OF DALE K. GALIPO
 4            BY:  DALE K. GALIPO, ESQ.
              BY:  RENEE V. MASONGSONG, ESQ.
 5            21800 Burbank Boulevard, Suite 310
              Woodland Hills, California 91367
 6            Tel:  818-347-3333
              Fax:  818-347-4118
 7            E-mail:  dalekgalipo@yahoo.com
              E-mail:  rvalentine@galipolaw.com
 8

 9            CARILLO LAW FIRM, LLP
              BY:  LUIS A. CARRILLO, ESQ.
10            BY:  MICHAEL S. CARRILLO, ESQ.
              1499 Huntington Drive, Suite 402
11            South Pasadena, California 91030
              Tel:  626-799-9375
12            Fax:  626-799-9380
              E-mail:  lac4justice@gmail.com
13            E-mail:  mc@carrillofirm.com

14            JESUS EDUARDO ARIAS, ESQ.
              BY:  JESUS EDUARDO ARIAS, ESQ.
15            18000 Studebaker Road, Suite 700
              Cerritos, California 90703
16            Tel:  323-815-9450
              Fax:  323-375-1196
17            E-mail:  jearias@jesuseduardoarias.com

18
      For the Defendants:
19
              FERGUSON, PRAET & SHERMAN
20            BY:  BRUCE D. PRAET, ESQ.
              1361 East 18th Street
21            Santa Ana, California 92705
              Tel:  714-953-5300
22            Fax:  714-953-1143
              E-mail:  bpraet@aol.com
23

24

25
```

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Joshua Yuhas on 03/22/2023                                    Page 15

```
 1   area?

 2       A.   Yes, we did.

 3       Q.   And was there any discussion or tactical plan made

 4   before you approached the bush area?

 5       A.   Verbally, no.

 6       Q.   Was there any non-verbal signals?

 7       A.   Yes, there was.

 8       Q.   Can you tell me what those were, please.

 9       A.   Usually, when you have two officers go to a call,

10   mainly when it involves a weapon, is one officer will take on

11   a lethal stance, meaning they will take out their firearm.

12   And then the second officer will take out a non-lethal

13   weapon, whether it be a baton, a Taser, just so you have a

14   lethal coverage and non-lethal coverage.

15       Q.   Okay.  And was it your understanding you would be

16   non-lethal coverage?

17       A.   Yes, sir.

18       Q.   Is that why you took out your Taser?

19       A.   Yes, sir.

20       Q.   And was -- who was the primary officer assigned to

21   the call, if you know?

22       A.   Officer Silva.

23       Q.   And was she also kind of like the contact officer

24   initially with the gentleman in the bushes?

25       A.   Yes, sir, she was.
```

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Joshua Yuhas on 03/22/2023                                        Page 21

1      Q.   And how did you try to grab Mr. Garcia?

2           Could you explain that, please.

3      A.   I believe I tried to grab him with my right hand,

4  and because he kind of pulled his hands back, I used my left

5  hand to try to grab him.

6      Q.   And do you recall what part of his body you tried to

7  grab?

8      A.   With my right hand I tried to grab his left arm, and

9  with my left hand I tried to kind of grab him by the --

10 either the back of his neck or like his beanie to try to pull

11 him out that way.

12     Q.   Okay.  Did you actually make physical contact with

13 him?

14     A.   Yes, I did.

15     Q.   Would that be with both hands?

16     A.   I am not sure about the right hand, but with the

17 left hand, yes, I did.

18     Q.   Could you tell at that time if Officer Silva was

19 also trying to grab him?

20     A.   Yes, she was.

21     Q.   Could you tell if she made contact?

22     A.   I believe she did, but I believe he pulled away.

23     Q.   And was he close to the edge -- I guess the outer

24 edges of the bushes by the sidewalk when you tried to grab

25 him?

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Joshua Yuhas on 03/22/2023                                    Page 22

```
 1      A.   Close, meaning edge of the bush?

 2      Q.   Yeah.  I'm imagining there is a part of the bush

 3   that's closer to the sidewalk, and there is a part of the

 4   bush that's further away from the sidewalk?

 5      A.   Yes.  It's closer to the sidewalk.

 6      Q.   Okay. And in watching some of the videos of this, in

 7   watching some of the videos of this, do you see the portion

 8   where you try to grab him?

 9      A.   Yes, sir.

10      Q.   And you don't recall at that time whether he had

11   anything in his hands; is that correct?

12      A.   At the time or in the video?

13      Q.   Let me break it down because Bruce made that

14   distinction before.

15           First of all, at the time when you tried to grab

16   him, do you recall if he had anything in his hands?

17      A.   I don't recall.

18      Q.   From watching the video, could you see in the video

19   whether he had anything in his hands when you tried to grab

20   him?

21      A.   Yeah.  I believe he had a bag of what appeared to be

22   cans in his hand.

23      Q.   Okay.  Did you have the impression that he might be

24   homeless?

25      A.   Yes, I did.
```

1     Q.    I think one of the initial things that we heard on

2     the audio that Officer Silva said is, "Wake up, wake up" or

3     words to that effect.

4           Were you present when she said that?

5     A.    Yes, I was.

6     Q.    Okay.  So somebody sleeping in the bushes and then

7     having a bag of cans, was that one of the reason you thought

8     he might be potentially homeless?

9     A.    Yes.

10    Q.    And so when you tried to grab him, did he back up or

11    retreat away from you?

12    A.    Yes, he did.

13    Q.    And did he say something, if you know?

14    A.    I don't recall.  I think he muttered something in

15    Spanish, but again, I don't know Spanish.

16          So I didn't understand what he said.

17    Q.    And then what do you do next after you tried to grab

18    him and he kind of pulled back?

19    A.    I heard what I perceived to be the cans.

20          He threw it at something because there was a loud

21    bang, if you will, and then I saw him kind of turn to the

22    side away from us, pick up what looked like a large pole.

23          So I took a step back, pulled my Taser out.

24          I believe I yelled out, "He's got a stick, he's got

25    a stick, he's got a stick."

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Joshua Yuhas on 03/22/2023                                    Page 24

1      Q.   Okay.  So when he turned and you made a gesture, you

2   were kind of turning to your right; is that what you recall,

3   exposing more of his left side to you?

4      A.   Yes.

5      Q.   And then did you see where he pulled the stick

6   from?

7      A.   Appeared to be somewhere on the ground next to where

8   he was standing.

9      Q.   Okay.  And when you saw him grab that and you

10   recognized it, is that why you yelled out, "He's got a stick,

11   he's got a stick," or words to that effect?

12      A.   Yes, sir.

13      Q.   And you can see yourself saying that on the audio of

14   the body-worn camera?

15      A.   Yes, sir.

16      Q.   And did you reposition yourself at that point?

17      A.   Yes.  I believe I backed up maybe a step or two.

18      Q.   And why did you back up a step or two at that

19   point?

20      A.   To give myself distance.  It looked like he had a

21   five-foot metal pole.  So I didn't want to be super close to

22   the bush.  I wanted to give myself enough time to observe and

23   react.

24      Q.   Okay.  And then how much time do you think passed

25   from you saying, "He's got a stick, he's got a stick" to you

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Joshua Yuhas on 03/22/2023                                    Page 26

```
 1   to recognize where the laser was on his body.

 2        Q.   Okay.  And then after you deployed the Taser, did

 3   you at some point see the wires coming out?

 4        A.   I did.

 5        Q.   And going towards Mr. Garcia?

 6        A.   Yes, sir.

 7        Q.   Did you hear Mr. Garcia scream at some point after

 8   you tased?

 9        A.   Yes, sir, I did.

10        Q.   Okay.  And it appeared like he momentarily locked

11   up; is that fair?

12        A.   No.

13        Q.   You don't think he locked up?

14        A.   I don't believe he locked up, no.

15             He continued moving out of the bushes towards us.

16             So no.  I don't believe he locked up at all.

17        Q.   Okay.  You don't see him tensing up on the video

18   after you deployed the Taser?

19        A.   Not that I recall, no.

20        Q.   And does that Taser have a five-second cycle?

21        A.   It does.

22        Q.   And do you know how much time passed from you tasing

23   him to you hearing a gunshot?

24        A.   Few seconds.

25        Q.   When you say a few, maybe two or three?
```

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Joshua Yuhas on 03/22/2023

```
 1     A.   Yes.  It was less than five.

 2     Q.   So it was still in the Taser cycle?

 3     A.   It was.

 4     Q.   Did you hear any verbal warning that shots were

 5   going to be fired?

 6     A.   I did not.

 7     Q.   Prior to the shots being fired, did you hear two

 8   shots, by the way?

 9     A.   I did, sir.

10     Q.   Prior to the shots being fired, did you ever hear

11   Mr. Garcia verbally threaten to harm anyone?

12     A.   I didn't understand what he was saying.

13          It was all in Spanish.

14     Q.   So if he said it in Spanish, you wouldn't have been

15   able it understand it?

16     A.   No, sir.

17     Q.   Did you ever see him hit anyone with the stick?

18     A.   Actually hit anybody with it, no, but he attempted

19   to.

20     Q.   Okay.  We're going to get to that.

21          But my first question is whether you saw him hit

22   anyone with the stick.

23     A.   I did not.

24     Q.   Did you ever see him swinging the stick before you

25   tased him?
```

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Joshua Yuhas on 03/22/2023                                        Page 28

```
 1      A.    Raised it, but also jabbed at Officer Silva.

 2            So swinging it versus jab, I don't know if you're

 3   referring to the same thing?

 4      Q.    Let me break it down --

 5      A.    -- like baseball swing.

 6      Q.    Let me break it down.

 7            Did you ever see him swinging it like a

 8   baseball-type swing at anyone before you tased him?

 9      A.    No.

10      Q.    Did you ever see him swinging the stick at anyone

11   like a baseball swing after you tased him?

12      A.    No, I did not.

13      Q.    This jabbing, was it one jab or more than one?

14      A.    One jab.

15      Q.    How close did the stick get from Officer Silva, if

16   you know?

17      A.    Hard to tell, but I would say less than a foot.

18      Q.    Okay.  Do you normally wear a bulletproof vest as

19   part of your uniform?

20      A.    Yes, I do.

21      Q.    And to your knowledge, was Officer Silva also

22   wearing a bulletproof vest?

23      A.    Yes, sir.

24      Q.    How much time passed in between you see this jabbing

25   motion and you firing your Taser?
```

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Joshua Yuhas on 03/22/2023                        Page 29

1     A.    Few seconds.

2     Q.    A few seconds?

3     A.    Yes.

4     Q.    Okay.  And just so I'm on the same page with you,

5   when you say a few, are you thinking like two to three?

6     A.    Yes.

7     Q.    And how much time would you say then passed from the

8   jabbing motion to the shots?

9           Would it be like four or five seconds?

10    A.    Hard to say.  I would say less than ten, but more

11  than two or three.

12    Q.    Okay.  Because I'm just figuring if you had the

13  jabbing motion, there was some passage of time before your

14  tasing; correct?

15    A.    Correct.

16    Q.    And then there would be some passage of time between

17  your tasing and the shots?

18    A.    Correct.

19    Q.    Did you ever see the stick coming down from a raised

20  position before you tased him?

21    A.    Before I tased him did I ever see it come down from

22  a raised position?

23    Q.    Correct.

24    A.    No.

25    Q.    Did you ever see it come down from a raised position

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Joshua Yuhas on 03/22/2023                                    Page 30

1   before you heard the two shots?

2       A.   No.

3       Q.   Did you see him turn away from you at some point

4   before the second shot?

5       A.   Yes, I did.

6       Q.   And did you have the impression that he might have

7   been shot in the back on the second shot?

8       A.   I don't know.  It happened too quickly.

9       Q.   After the incident you were looking at the gunshot

10  wounds or trying to figure out where they were?

11      A.   Yes, sir.

12      Q.   Would it be fair to say that at some point you

13  observed a couple shots to the front?

14      A.   Yes.

15      Q.   And one to the back?

16      A.   Hard to tell.  I know there was two shots fired.

17           There was an entry and exit, and I believe another

18  entry, but it was hard to tell where it came from, and what

19  was the entry versus what was an exit.

20      Q.   Right.  Right now I'm not asking you to distinguish

21  entry and exit.

22           I'm just trying to figure out, you saw three wounds;

23  two in the front and one in the back?

24      A.   I believe so.

25      Q.   Okay.  And you were not sure which were entries and

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Joshua Yuhas on 03/22/2023                                          Page 31

```
 1   which were exits at that time?
 2       A.   Correct.
 3       Q.   And was there some reference to he might have been
 4   shot in the leg at some point?
 5       A.   Yes, there was.
 6       Q.   And who said that, if you know?
 7       A.   I don't recall.  I just remember hearing somebody
 8   say it, and because of that we took his pants off to check
 9   for wounds.
10       Q.   Did you see any wounds to the leg?
11       A.   No.
12       Q.   Did you hear any verbal warning that deadly force
13   was going to be used?
14       A.   No.  At least not in English.
15       Q.   Okay.  Do you know if Officer Frias ever pulled out
16   his firearm before the shooting?
17       A.   I don't believe he did.
18       Q.   And to your knowledge, was the only officer that
19   used lethal force Officer Silva?
20       A.   Yes, sir, it was.
21       Q.   Did you see what the position of the stick was at
22   the time of the second shot from Officer Silva?
23       A.   I don't recall.
24       Q.   Do you recall if he dropped the stick at some
25   point?
```

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Joshua Yuhas on 03/22/2023                                   Page 34

```
 1            What circumstances are you talking about, Dale?

 2            MR. GALIPO:  Well, just in general.

 3   BY MR. GALIPO:

 4       Q.   You tased somebody with a stick in this case;

 5   correct?

 6       A.   Yes, I did.

 7       Q.   I'm just wondering, was that part of your training

 8   that there may be situations that someone has a stick, and

 9   you could tase them.

10       A.   As far as training to that specific situation?

11       Q.   Well, not exactly a 100 percent, but generally,

12   someone could have a knife or a stick or something, and one

13   option would be to tase them?

14       A.   Yes.

15       Q.   Are you trained on the concept of de-escalation?

16       A.   Yes, sir.

17       Q.   What does that mean, generally, to you?

18       A.   Using what you can to calm the person, calm the

19   situation, calm the crowd, try to bring it from whatever

20   level it's at down to something a little calmer.

21       Q.   Okay.  And is part of that done just by tone of

22   voice, things of that nature?

23       A.   Yes, sir.  Your presence, your tone of voice, the

24   words you use.

25       Q.   Was it your understanding that Mr. Garcia was asked
```

1    to come out of the bushes at some point?

2         A.   Yes.

3         Q.   And was it your understanding that he was repeatedly

4    asked to come out of the bushes?

5         A.   Yes.

6         Q.   And that he eventually did come out of the bushes?

7         A.   Eventually, yes.

8         Q.   Did he have the bags with him, if you recall, at the

9    time you tased him?

10        A.   I don't recall.  If he did, I believe it would have

11   been in his left hand.

12        Q.   Okay --

13        A.   But I'm not totally sure.

14        Q.   And the stick, did he have that in his right hand

15   when you tased him?

16        A.   I believe he had it in his both hands and he had it

17   in the raised position.

18        Q.   It was pretty long.  I think you said the stick was

19   like five-feet long?

20        A.   Yeah.

21        Q.   And so the initial nature of the call, a blond white

22   male with a knife, do you know if Mr. Garcia had a knife on

23   him at the time of the incident?

24        A.   I do not know.

25        Q.   Did you ever see a knife on him or around him either

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Joshua Yuhas on 03/22/2023                                      Page 36

1    before the shooting or afterwards when he was searched?

2         A.   He did not have a knife on him.

3         Q.   Did you ever see a gun or anything that looked like

4    a gun on him or near him?

5         A.   No, I did not.

6         Q.   And would it be fair to say that part of the call

7    was not someone hitting people with a stick?

8              In other words, that was not part of the call; we

9    got a homeless Hispanic guy going around hitting people with

10   a stick?

11        A.   Yes.

12        Q.   That wasn't part of the call, was it?

13        A.   That was not the call, no.

14        Q.   And you didn't have any information anyone had been

15   injured, did you?

16        A.   No, I did not.

17        Q.   How long did you stay at the scene after the

18   incident?

19        A.   I honestly couldn't tell you.  I did for a little

20   while to help with the scene security as far as setting up

21   caution tape, looking for witnesses, helping with traffic

22   control, and then shortly thereafter, I left to go back to

23   the station.

24        Q.   Okay.  Did you ever look to see if your probes were

25   attached to Mr. Garcia?

1  relating to your Taser?

2      A.   No, I have not, sir.

3      Q.   Did you hear the Taser going through the five-second

4  cycle?

5      A.   Yes, I heard it.

6      Q.   And was it during the cycle that you heard the

7  shots?

8      A.   Before the five seconds were up, yes, I did hear the

9  shots.

10      Q.   At some point did you see Mr. Garcia moving

11  southbound?

12      A.   At some point during the shots, did I see him going

13  southbound?

14      Q.   At some point, let's say after you tased him, during

15  the Taser cycle, did you see him moving southbound?

16      A.   Yes.  I believe so.  It happened quickly, but I

17  believe so, yes.

18      Q.   Okay.  And is it Officer Frias that was south of

19  him?

20      A.   Yes.

21      Q.   And did you hear a shot go off, maybe the second

22  shot as Mr. Garcia was moving southbound?

23      A.   That, I'm unsure.  I don't know if he was turning or

24  if he was going southbound.

25           I'm not sure.  It all happened real quick.

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Joshua Yuhas on 03/22/2023                                    Page 45

```
 1                        CERTIFICATE

 2                            OF

 3           CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5           I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8           That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10           That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12           That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15           Further, that the foregoing is an accurate

16   transcription thereof.

17           I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21           IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  March 22, 2023.

23

24                        _____
                          Jinna Grace Kim, CSR No. 14151
25
```

EXHIBIT C

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
**Robert Handy on 09/22/2023**

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4    EMILY GARCIA, et al.                    )
                                             )
5                    Plaintiffs,             )
                                             )
6                    vs.                     ) Case No.
                                             ) 8:22-CV-00131-DOC-KES
7    CITY OF TUSTIN, et al.,                 )
                                             )
8                    Defendants.             )
     _____        )
9    WENDY LORENA GALICIA RAMIREZ, et al.,   )
                                             )
10                   Plaintiffs,             )
                                             )
11   CITY OF TUSTIN, et al.,                 )
                                             )
12                   Defendants,             )
     _____        )
13

14

15

16          REMOTE VIDEOCONFERENCE DEPOSITION OF

17                    ROBERT HANDY

18              FRIDAY, SEPTEMBER 22, 2023

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.: 16772

```
 1                 UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4    EMILY GARCIA, et al.              )
                                        )
 5                 Plaintiffs,          )
                                        )
 6                 vs.                  )Case No.
                                        )8:22-CV-00131-DOC-KES
 7    CITY OF TUSTIN, et al.,           )
                                        )
 8                 Defendants.          )
      _____)
 9    WENDY LORENA GALICIA RAMIREZ, et al., )
                                        )
10                 Plaintiffs,          )
                                        )
11    CITY OF TUSTIN, et al.,           )
                                        )
12                 Defendants,          )
      _____)
13

14

15

16            The remote videoconference deposition of ROBERT

17    HANDY, taken on behalf of the Plaintiffs, beginning at 10:02

18    a.m., and ending at 11:44 a.m., on Friday, September 22,

19    2023, before Jinna Grace Kim, Certified Stenographic

20    Shorthand Reporter No. 14151.

21

22

23

24

25
```

EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.
Robert Handy on 09/22/2023                                    Page 3

```
 1    APPEARANCES OF COUNSEL:

 2
      For the Plaintiffs:
 3
              LAW OFFICES OF DALE K. GALIPO
 4            BY:  DALE K. GALIPO, ESQ.
              BY:  RENEE V. MASONGSONG, ESQ.
 5            21800 Burbank Boulevard, Suite 310
              Woodland Hills, California 91367
 6            Tel:  818-347-3333
              Fax:  818-347-4118
 7            E-mail:  dalekgalipo@yahoo.com
              E-mail:  rvalentine@galipolaw.com
 8

 9            CARILLO LAW FIRM, LLP
              BY:  LUIS A. CARRILLO, ESQ.
10            BY:  MICHAEL S. CARRILLO, ESQ.
              1499 Huntington Drive, Suite 402
11            South Pasadena, California 91030
              Tel:  626-799-9375
12            Fax:  626-799-9380
              E-mail:  lac4justice@gmail.com
13            E-mail:  mc@carrillofirm.com

14
              JESUS EDUARDO ARIAS, ESQ.
15            BY:  JESUS EDUARDO ARIAS, ESQ.
              18000 Studebaker Road, Suite 700
16            Cerritos, California 90703
              Tel:  323-815-9450
17            Fax:  323-375-1196
              E-mail:  jearias@jesuseduardoarias.com
18

19    For the Defendants:

20            FERGUSON, PRAET & SHERMAN
              BY:  BRUCE D. PRAET, ESQ.
21            1361 East 18th Street
              Santa Ana, California 92705
22            Tel:  714-953-5300
              Fax:  714-953-1143
23            E-mail:  bpraet@aol.com

24

25
```

1    little more than 9 minutes in between the shooting and where

2    you noted CPR started by medics whether he needed it or not?

3            Just that's what I'm looking at in your report.

4    A.    Yeah.  I think that the report -- the chart there

5    indicates that the shooting -- sorry -- he turned around

6    towards Officer Frias one minute and 40-some seconds, and

7    officers were providing first-aid at two minutes and 24

8    seconds.

9            The handcuffs were removed at nine minutes and 52

10   seconds, and CPR was started by medics at 11 minutes and 15

11   seconds.

12   Q.    Okay.  And are you reflecting here that there is a

13   gap of approximately seven minutes or more between the time

14   of the shooting and the time that the medics take over the

15   first aid that the officers were attempting to provide?

16   A.    I think they do other things before CPR.

17           So I think the medics are actually providing other

18   things prior to CPR, but the CPR started at that time.

19   Q.    Right.  And the reason I ask if it was seven minutes

20   is because I see that you have stamp of nine minutes and 24

21   seconds into the video that fire arrived and took over

22   medical --

23   A.    I'm sorry.  I thought you were going back to the

24   11-15, yes, that's accurate.

25   Q.    And did you make any determination as to when any of

```
 1                        CERTIFICATE

 2                           OF

 3           CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5           I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8           That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10           That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12           That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15           Further, that the foregoing is an accurate

16   transcription thereof.

17           I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21           IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  September 22, 2023.

23

24           _____
             Jinna Grace Kim, CSR No. 14151

25
```

# EXHIBIT D— MANUALLY FILED

# EXHIBIT E

1  LAW OFFICES OF DALE K. GALIPO
   Dale K. Galipo, Esq. (Bar No. 144074)
2  dalekgalipo@yahoo.com
   Renee V. Masongsong, Esq. (Bar No. 281819)
3  rvalentine@galipolaw.com
   21800 Burbank Boulevard, Suite 310
4  Woodland Hills, California 91367
   Tel:   (818) 347-3333
5  Fax:   (818) 347-4118
6
7  *Attorneys for Plaintiffs C.G. and Emily Garcia*
8
9
                **UNITED STATES DISTRICT COURT**
10              **CENTRAL DISTRICT OF CALIFORNIA**
11

| | |
|---|---|
| EMILY GARCIA, et al., | Case No. 8:22-cv-00131 SPG KES |
| Plaintiffs, | **DECLARATION OF SCOTT DEFOE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION AND IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| CITY OF TUSTIN, ESTELLA SILVA, et al., | |
| Defendants. | |

-1-

## DECLARATION OF SCOTT A. DEFOE

I, Scott DeFoe, declare as follows:

1.      I am a police practices expert specializing in the procedures of police practices and proper police tactics, including proper procedures for the detention and arrest of individuals and the type and degree of force, if any, appropriate under different circumstances.

2.      I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so.

3.      My opinions are based in part on my training, professional experience, and education. I am a twenty-year veteran of the Los Angeles Police Department. I held supervisory positions for the last 14 years of my career.  During my tenure with the LAPD, I received over 100 commendations, including the Medal of Valor, Purple Heart, and Police Star.

4.      Before reaching my opinions in this case, I reviewed the officers' deposition transcripts, the videos from the body-worn cameras, and the available police reports.

5. At the time of the shooting of Luis Garcia on August 9, 2021, police officer training and standards on deadly force included that:

        a. Deadly force is the highest level of force a police officer can use.

        b. Deadly force should only be used as a last resort.

        c. Deadly force should only be used in the direst of circumstances when all other options have been exhausted and no other reasonable measures are available.

        d. When feasible, a verbal warning should be given before using deadly force.

        e. Deadly force is only justified on the basis of an "objectively reasonable" belief that the suspect poses an immediate threat of

1    death or serious bodily injury; in other words, a subjective fear is

2    not enough.

3    f.   Deadly force can only be used in an "immediate defense of life"

4         situation; in other words, in defense of immediate or imminent

5         death or serious bodily injury.

6    g.   The decision to use deadly force must be guided by the reverence

7         for human life.

8    h.   An officer must justify every shot he or she fires when using

9         deadly force.

10   i.   An overreaction in using deadly force is excessive force.

11       6. Police officers are trained that they can only use deadly force in an

12   immediate defense of life situation, in other words, when the officer has an

13   objectively reasonable belief that the subject poses an immediate or imminent threat

14   of death or serious bodily injury.  Police officers are trained that in the absence of an

15   immediate defense of life situation, officers should use reasonable alternative

16   measures to deadly force.  There was no immediate defense of life situation when

17   Silva fired either of her two shots at Mr. Garcia.  Mr. Garcia, a Hispanic man did not

18   meet the description of the blond subject identified in the call for service.  The call

19   provided no information that Mr. Garcia was seen with a weapon on that day, that

20   Mr. Garcia had injured or threatened to injure anyone, or that Mr. Garcia was under

21   the influence.  When Silva contacted Mr. Garcia, he was sleeping in a bush.  The

22   object that Mr. Garcia had was a wooden stick.  Prior to firing her two shots, Silva

23   never saw Mr. Garcia make physical contact with any person, including not seeing

24   Mr. Garcia strike anyone with the stick.  Also prior to the shooting, Silva never saw

25   Mr. Garcia attack or attempt to attack anyone, never saw Mr. Garcia swing the stick

26   at anyone, and never saw the stick coming down towards her or any other officer.

27   The videos show that Mr. Garcia never raised the stick above his head, never made a

28

swinging motion with the stick at anyone, and never brought the stick down toward anyone from a raised position.

7. With respect to Silva's second shot, under the facts of this case, Silva could not justify shooting at Mr. Garcia simply because Mr. Garcia was running away and holding a wooden stick, and Silva could not shoot at Mr. Garcia under the fleeing felon theory.  Police officers are trained that they can only shoot a fleeing felon where (1) the officer has information that the suspect has committed an atrocious felony involving the infliction of serious injury or death, and (2) the suspect poses an immediate threat of death or serious bodily injury, and a verbal warning must be given, when feasible.  None of those factors were present in the incident involving Mr. Garcia.

At the time of this incident on August 9, 2021, Peace Officer Standards and Training ("POST"), Learning Domain 20, Chapter 3—Use of Deadly Force, set forth four requirements that would make it reasonable for an officer to use deadly force against a fleeing subject escaping on foot.  None of the four requirements were met in this case.  These four requirements are:

(1) . . . if the subject threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction of serious bodily harm [or death] . . .

(2) . . . probable cause to believe that the subject poses a threat of death or serious physical harm, either to the officer or others . . .

(3) . . .probable cause to believe that the use of deadly force is reasonably necessary . . . [to prevent escape]

(4) . . . some warning be given prior to the use of deadly force where feasible. . .

Here, Mr. Garcia was not armed with a weapon, and the call provided no information that Mr. Garcia had injured anyone or threatened to injure anyone.  The

-4-

reporting party indicated that she did not see Mr. Garcia with a knife on the date of the incident and did not see Mr. Garcia swinging the knife at anyone the day prior to the incident.  The video shows that, at the time of the shots, Mr. Garcia was screaming from the Taser deployment and running away from the Taser.  It appears from the video that Mr. Garcia did not run directly toward Officer Frias and had no awareness of Officer Frias' presence or location.  Silva failed to give Mr. Garcia a verbal warning that deadly force would be used prior to shooting.

8. Silva failed to formulate a safe tactical plan with Officer Yuhas.  Law enforcement officers are trained that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident.  In this case, there was no rush, as there was no crime in progress; rather, Mr. Garcia was homeless and asleep in a bush.  The tactical plan should have outlined verbal skills (defusing and de-escalation techniques), including giving Mr. Garcia time to calm down, providing reassurance that the officers were there to help, and taking the time to assess the situation.  Rather, the officers escalated the situation.  Silva's continued commands and tone of voice escalated the situation.  Silva also escalated the situation when she reached into the bush and grabbed Mr. Garcia.  The Taser deployment and failure to give Mr. Garcia time to comply with the Taser also escalated the situation.

9. There was a gross lack of situational awareness and fundamental tactical errors in this incident.  Silva failed to take a position of cover or move to a position of cover to establish time and distance for Mr. Garcia to comply with the commands.  Mr. Garcia verbally expressed to Silva that he was attempting to comply with her commands to exit the bush and show his hands.  The officers escalated the situation by failing to give Mr. Garcia time to comply with the commands.

10. The officers failed to determine that Mr. Garcia was mentally ill or experiencing a mental crisis.  A reasonable police officer would have determined

1   that Mr. Garcia was homeless and mentally ill or experiencing a mental crisis.

2       11. The City of Tustin Police Department failed to properly train Silva with

3   respect to Crisis Intervention Techniques, including de-escalation techniques such as

4   talking slowly, having more patience, asking the subject questions, and recognizing

5   the signs of mental illness.  The utilization of a mental health professional at the

6   onset of an incident such as this incident can be an invaluable tool.

7       12. Silva failed to consider her backdrop or background when she fired, as she

8   could have shot and killed Officer Frias, who was positioned in Silva's background

9   or backdrop.

10      13.  From the standpoint of police practices and basic police training, Officer

11  Silva's use of deadly force was contrary to Peace Officer Standards and Training

12  ("POST"), improper, inappropriate, excessive, and unreasonable, including (but not

13  limited to) for the following reasons:

14          a.  There was **No Immediate Defense of Life Situation** as explained

15              above.  Mr. Garcia was not in the process of attacking or attempting to

16              attack anyone at the time of either of Silva's two shots.  The videos of

17              this incident do not support any contention that Mr. Garcia made a

18              "jabbing" motion, and Silva never told Mr. Garcia not to "jab" her and

19              never told her fellow officers that Mr. Garcia attempted to "jab" her.

20              Even if Mr. Garcia had made a "jabbing" motion with the stick, which

21              is not seen on the videos, this would not warrant the use of deadly

22              force.  When Silva fired her two shots, she knew that Officer Yuhas

23              was Tasing Mr. Garcia and knew that the Taser is deployed in a 5-

24              second cycle.  Prior to firing her shots, Silva did not see Mr. Garcia

25              punch, kick, or make physical contact with anyone, never saw Mr.

26              Garcia with a weapon, never saw Mr. Garcia swing the stick at anyone,

27              never saw Mr. Garcia bring the stick down from a raised position, and

28

-6-

did not have any information that Mr. Garcia had physically injured anyone.

b. **No verbal threats.**  The officers had no information prior to this incident that Mr. Garcia had verbally threatened to injure anyone, and the video does not support that Mr. Garcia made any verbal threats to injure any person during the incident.

c. **Silva Could Not Shoot Mr. Garcia for Fleeing** for the reasons explained above.  Mr. Garcia was unarmed during the entirety of this incident, and the officers had no information that Mr. Garcia had injured anyone.  It appears from the videos that Mr. Garcia was running in response to the Taser deployment.

d. **No crime involving the infliction of serious injury or death.**  Silva was not responding to a violent crime in this case.  Silva had no information that Mr. Garcia had injured anyone, let alone inflicted serious injury or death.  When Silva contacted Mr. Garcia, he was sleeping in a bush.  Additionally, Silva never saw Mr. Garcia fighting with anyone during any of her prior interactions with him, and she never saw him with a weapon in the past.

e. **Silva Could not shoot Mr. Garcia for having a stick**.  Under the facts of this case, Silva cannot justify shooting at Mr. Garcia simply because Mr. Garcia had a stick.  Silva admitted at her deposition that he was trained that you cannot shoot someone for merely having a stick—or even a weapon—in their hand.

f. **Other reasonable alternative measures available**.  Police officers are trained that they can only use deadly force in a "last resort" situation.  Shooting was not a "last resort" in this case.  Other reasonable alternative measures were available, including giving Mr. Garcia time

1  to comply with the command to exit the bush, tactical repositioning to

2  allow Mr. Garcia space to exit the bush, giving Mr. Garcia time to

3  comply with the Taser deployment, giving a verbal warning that Silva

4  was prepared to use deadly force, giving further commands between the

5  two shots, or redeploying the Taser, if necessary.

6  g. **Not the direst of circumstances**.  Police officers are trained that they

7  can only use deadly force in the direst of circumstances.  This was not

8  the "direst of circumstances."  The responding officers outnumbered

9  Mr. Garcia, and the officers had less-lethal options, including the Taser.

10  h. **No warning regarding deadly force**.  Police officers are trained to

11  give a verbal warning that deadly force will be used when feasible.

12  Silva failed to issue a verbal warning prior to using deadly force, even

13  though it would have been feasible to do so under this set of facts.  It

14  also would have been feasible to give Mr. Garcia a command to drop

15  the stick, but Silva failed to do so.

16  i. **Subjective fear is insufficient to justify a use of deadly force**.  Basic

17  police training requires that any use of deadly force must be based on

18  an "objective" rather than "subjective" "reasonable necessity" of action

19  to "imminent danger."  In this case, the record does not support any

20  objectively reasonable explanation that Mr. Garcia posed an immediate

21  threat of death or serious bodily injury at the time that any of the shots

22  were fired, and Silva's statement that she felt threatened is insufficient

23  to justify her use of deadly force.

24  j. **No reverence for human life**.  Police officers are trained that they

25  must show a reverence for human life.  Silva showed no reverence for

26  human life when she shot Mr. Garcia at center mass when he was

27  unarmed and, as to the second shot, while he was running away, and, as

28

to both shots, without issuing a verbal warning that deadly force would be used.

k. **<u>Overreaction in using deadly force is excessive</u>**.  Police officers are trained to control their anger and not overreact when using deadly force.  At a minimum, Silva overreacted when she fired two shots at Mr. Garcia, who had only a stick and was not in the process of attacking or attempting to attack anyone with the stick.

I declare under penalty of perjury of the laws of the United States of America, that the foregoing is true and correct.  Executed on October 18, 2023, at Huntington Beach, California.

<u>Scott A. DeFoe</u>

Jesus Eduardo Arias, Esq. LL.M. | SBN 293983
LAW OFFICES OF JESUS EDUARDO ARIAS
18000 Studebaker Rd. Suite 700
Cerritos California 90703
E| jearias@jesuseduardoarias.com
Tel| 323) 815 9450 Fax| 323) 375 1196
*Attorney for Plaintiffs* Wendy Lorena Galicia Ramirez, and
Kevin Josue Galicia Ramirez

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMILY GARCIA et al.,<br>                     Plaintiffs, | Consolidated Case No.<br>8:22-cv-00131-SPG-KES |
| <br>                     v. | Assigned to:<br>*District Judge*<br>*Sherilyn Peace Garnett* |
| CITY OF TUSTIN, et al.,<br>                     Defendants<br>_____ | **DECLARATION OF JESUS EDUARDO ARIAS ESQ., IN SUPPORT OF** |
| WENDY LORENA GALICIA<br>RAMIREZ, et al.,<br>                     Plaintiffs | **PLAINTIFFS WENDY LORENA GALICIA RAMIREZ AND KEVIN JOSUE GALICIA RAMIREZ OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS'** |
| <br>                     v. | **WENDY LORENA GALICIA** |
| CITY OF TUSTIN, et al.,<br>                     Defendants | **RAMIREZ AND KEVIN JOSUE GALICIA RAMIREZ MOTION FOR SUMMARY ADJUDICATION** |

I, JESUS EDUARDO ARIAS declare as follows:

1. I am an attorney licensed to practice in all Courts of the State of CALIFORNIA.  In this case, I represent one group of the Plaintiffs: Mrs. Wendy Lorena Galicia Ramirez and Kevin Josue Galicia Ramirez.

2. I offer this declaration in support of the Galicia Plaintiffs' Opposition to Defendants' Motion for Summary Judgment and also in support of the Galicia Plaintiffs' Motion for Summary Adjudication.

3. The facts set forth herein are personally known to me and, if called as witness, I could and would completely testify thereto.

4. Attached hereto as Exhibit "A" is a true and correct copy of the relevant portions of the Deposition of Estela Silva, as taken on March 22, 2023.

5. Manually lodged as Exhibit "B" is a true and correct copy of the video recording from the body-worn camera of Estella Silva, entitled, EstelaSilva_202011131704_WFC1038075_64673917. This exhibit is being submitted to the court in electronic format.

6. Manually lodged as Exhibit "C" is a true and correct copy of the video recording from the body-worn camera of Joseph Cossack, entitled,   JosephCossack_202105060913_WFC1060137_102939576. This exhibit is being submitted to the court in electronic format.

7. Attached hereto as Exhibit "D" is the Declaration of Roger Clark in support of the Galicia Plaintiffs' Opposition to Defendants' Motion for Summary Judgment and also in support of the Galicia Plaintiffs' Motion for Summary Adjudication.

I declare under penalty of perjury and under the laws of the State of California, and under the Laws of the United States that the foregoing is true and correct.

Executed on October 19, 2023

/s/Jesus Eduardo Arias

Jesus Eduardo Arias LL.M. Esq.

Attorney for Plaintiffs Wendy Galicia and Kevin Galicia

DECLARATION OF JESUS EDUARDO ARIAS ESQ., IN SUPPORT OF PLAINTIFFS WENDY LORENA GALICIA RAMIREZ AND KEVIN JOSUE GALICIA RAMIREZ OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' WENDY LORENA GALICIA RAMIREZ AND KEVIN JOSUE GALICIA RAMIREZ MOTION FOR SUMMARY ADJUDICATION

# EXHIBIT A

1      A.   That day?

2      Q.   **Yes.  If you recall.**

3      A.   Yes.  It was day shift.  So it's 06 to 1830.

4      Q.   **So is that 6:00 in the morning to 6:30 p.m?**

5      A.   Yes, sir.

6      Q.   **And what time approximately did the shooting**

7   **incident occur?**

8      A.   Approximately 10:00 in the morning, sir.

9      Q.   **Now, at some point you fired some shots; is that**

10  **correct?**

11     A.   Yes, sir.

12     Q.   **How many shots did you fire?**

13     A.   (Inaudible response.)

14     Q.   **How many?**

15     A.   (Inaudible response.)

16          (Court reporter clarification.)

17     Q.   **You cut out.**

18     A.   Two.

19     Q.   **Oh, two.  Thanks.**

20          Two shots.  What type of weapon did you fire the

21  shots from?

22     A.   Glock 17.

23     Q.   **Do you know what caliber it is?**

24     A.   9-millimeter.

25     Q.   **Did you give any warning, a verbal warning that you**

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Estela Silva on 03/22/2023                                    Page 33

 1   example?

 2        A.   The day prior, sir.

 3        Q.   Did you have any information, for example, that the

 4   person was under the influence of drugs or alcohol?

 5             MR. PRAET:  At what point?  When she got the call or

 6   at any point during the call?

 7             MR. GALIPO:  When she got the call is my question

 8   now.

 9             THE WITNESS:  No, sir.

10   BY MR. GALIPO:

11        Q.   Did you have any information that anyone had been

12   physically injured related to this individual?

13        A.   No, sir.

14        Q.   Did you have any information that the person was

15   homeless?

16        A.   No, sir.

17        Q.   The hair color of the individual, the decedent in

18   had the bushes, what color was his hair?

19        A.   Based on the call, or when I contacted him, sir?

20        Q.   When you saw him.

21        A.   He was wearing a beanie at the time.

22        Q.   Was all of his hair covered?

23        A.   When I contacted him, yes.

24        Q.   And what color was the beanie?

25        A.   I believe it was black.

**EMILY GARCIA, ET AL. vs CITY OF TUSTIN, ET AL.**
Estela Silva on 03/22/2023                                    Page 114

```
 1              This will be the third time that you encountered

 2    Mr. Garcia, and I'm talking about the incident in 2021.

 3              Do you remember that incident?

 4    A.   Yes, sir.

 5    Q.   Now, at this time it was in daylight; correct?

 6    A.   Yes, sir.

 7    Q.   Okay.  Mr. Garcia told you again that he wanted to

 8    go to Mexico, did he not?

 9    A.   Yes, sir.

10    Q.   In fact, you told him, Hey --

11              (Speaking foreign language.)

12              Which is fairly translated it's been a long time

13    since you said that you want to go to Mexico.

14              Do you remember you yourself telling him that?

15    A.   I believe so.

16    Q.   Yeah.  You say, hey, at some point you called him

17    Manuel, and you seemed to be having a conversation of normal

18    encounter or regular encounter with a person having a

19    non-violent conversation during that incident.

20              Would you agree?

21    A.   (Inaudible response.)

22    Q.   Okay.  At some point --

23              (Court reporter clarification.)

24    A.   I said yes, sir.

25    Q.   Do you remember at some point Mr. Manuel Garcia --
```

# EXHIBIT B
Manually
Filed

# EXHIBIT C
Manually
Filed

# EXHIBIT D

Jesus Eduardo Arias, Esq. LL.M. | SBN 293983
LAW OFFICES OF JESUS EDUARDO ARIAS
18000 Studebaker Rd. Suite 700
Cerritos California 90703
E| jearias@jesuseduardoarias.com
Tel| 323) 815 9450 Fax| 323) 375 1196
*Attorney for Plaintiffs* Wendy Lorena Galicia Ramirez, and
Kevin Josue Galicia Ramirez

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMILY GARCIA, et al., <br>          Plaintiffs, <br><br> vs. <br><br> CITY OF TUSTIN, ESTELLA SILVA, et al., <br>          Defendants. | CASE NO. 8:22-cv-00131 SPG KES <br><br> **DECLARATION OF ROGER CLARK IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT .** |

## <u>DECLARATION OF ROGER CLARK</u>

I, ROGER CLARK, declare as follows:

1. I am a Police Practices Expert qualified to testify in the areas of use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration.

2. I am a competent adult and the facts set forth herein are familiar to me and, if called to testify, I could and would completely do so.

3. My opinions rest on my training, professional experience, and education. I am a twenty-seven-year veteran of the Los Angeles County Sheriff's Department. I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988).

4. For this matter, I have reviewed multiple police reports, audio and video recordings, TPD policies and procedures, shooting reports, Depositions, written discovery, and other materials that were provided to me.

5. On August 9, 2021, the Tustin Police Department Communication's Unit - "Dispatch", received a phone call for service from a local resident about a suspicious male living in the bushes outside of a residential mobile home park located at 15401 Williams Avenue in Tustin, CA. Officer Joshua Yuhas and Estela Silva arrived at a bushes area and contacted Mr. Luis Manuel Garcia. At a certain point during their interaction, Mr. Garcia came out of the bushes while holding a stick in his hands. Shortly after, Officer Yuhas deployed his Taser against him and then Officer Silva shot her firearm against Mr. Garcia, who died as a result of the shooting later that day.

6. Police Officers are trained and certified regarding how to recognize and

interact with persons demonstrating behaviors consistent with mental crisis and/or mental illness in order to make appropriate decisions regarding intervention strategies. Their contacts are different that when dealing with criminal suspects who demonstrate cognitive awareness. Officer Silva appears to have failed to follow the basic training materials on handling a person with a mental crisis in her encounter with Mr. Garcia. Officer Silva's failure to comply with the required tactics exacerbated the tensions inherent in the confrontation with a possibly mentally ill and/or emotional distraught person, which resulted in the needless and avoidable "violent outcome" of her encounter with Mr. Garcia.

7. POST Standards specifies that there are a number of key factors that can affect which force option is approved and appropriate under the concept of the "totality of circumstances." Officers are trained that they are not allowed to inflict excessive force on persons that they arrest and that they must calculate their use of force based on the credible threat(s) evident in the totality of the circumstances. On the date of the incident, Officer Silva chose to use deadly force against Mr. Garcia, despite alternative less lethal options available - including allowing Mr. Garcia time to comply, and continuing giving orders to show his hands, or simply wait for the less lethal taser deployment to have effect upon him. This would have afforded Officer Silva the opportunity to learn that Mr. Garcia was unarmed and not dangerous. Moreover, officer Silva had previous knowledge that Garcia's behavior from previous occasions was never violent as to any officer. Even on the day of the shooting Mr. Garcia never used the stick as a weapon to threat or attack any of the officers. Therefore, taking into consideration the totality of the circumstances and the events of this case, an objectively reasonable officer in Silva's situation would not have used deadly force like Silva did.

8. The use of deadly force is the most serious decision a peace officer may ever

have to make. Such a decision should be guided by the reverence for all
human life and used only when other means of control are unavailable,
unreasonable, or have been exhausted. In this matter, Officer Silva use of
deadly force was unreasonably excessive and violated POST Standards
because:

a) When Silva responded to the scene, Mr. Garcia had never threatened
anyone or posed a lethal threat as to any civilian.

b) No assault was occurring when she arrived. Mr. Garcia was not
assaultive nor aggressive as to any civilian during the encounter.

c) In the recordings, Mr. Garcia never swung or jabbed the wooden pole
against any of the Officers including Silva at the time of the shooting.

d) After the taser deployment was issued, officer Silva failed to allow the
effects of muscle incapacitation, which would have facilitated the
officer's procedure and control of Mr. Garcia's body.

e) There were no verbal warnings or proper commands prior to the use of
what should be a "last resort" deadly force which was unjustified and
unnecessary.

f) There were other lesser than lethal alternatives reasonably available
and which were not utilized by Officer Silva.

Officer Silva should not have used deadly force until any of the other means
of control at the Officers disposition were considered unavailable,
unreasonable, or exhausted.

9. Officers are also trained that under California negligence law, an officer's
pre-shooting conduct leading up to a deadly use of force may affect whether
a use of force is ultimately reasonable and therefore may be considered in the
analysis of a use of deadly force. Accordingly, the reasonableness of an
officer's use of deadly force includes consideration of the officer's tactical
conduct and decisions leading up to the use of deadly force." Officer Silva

pre-shooting tactical performance demonstrated the lack of a plan, strategy, effective communication, and tactical organization in relation to the apparent objective of the TP officers; "taking Mr. Garcia out of the bushes area".

**10.**     Based on my qualifications and on the materials reviewed, the use of deadly force in connection with this incident was unreasonable because there were far more reasonable less-than-lethal force options available besides the fatal shooting of Mr. Garcia. As well as fundamental tactical errors and a gross lack of situational awareness in this incident, where contributory factors  in my opinion to the fatal results caused by the  failed attempt of officer Silva to handle this non threatening situation.

I declare under penalty of perjury and under the laws of the State of California, and under the Laws of the United States that the foregoing is true and correct.

Executed on October 19, 2023, California.

Roger A. Clark

Page 5