JS-6

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMILY GARCIA, et al.,<br><br>               Plaintiffs,<br><br>    v.<br><br>CITY OF TUSTIN, ESTELLA SILVA, et al.,<br><br>               Defendants. | Case No. 2:22-cv-00131<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 38]** |
| Consolidated with WENDY LORENA GALICIA RAMIREZ, et al.,<br><br>               Plaintiffs,<br><br>    v.<br><br>CITY OF TUSTIN, ESTELLA SILVA, et al.,<br><br>               Defendants. | |

## I.   INTRODUCTION

On August 9, 2021, Luis Garcia ("Garcia") was shot and killed outside a mobile home park by Estella Silva ("Officer Silva"), an officer of the Tustin Police Department. Garcia's two daughters (the "Garcia Plaintiffs") and his wife and son from another

relationship (the "Galicia Plaintiffs," and, together with the Garcia Plaintiffs, ("Plaintiffs")) sued Officer Silva and the City of Tustin ("Defendants") in two separate actions alleging violations of Garcia's constitutional rights under 42 U.S.C. § 1983, as well as other federal and state law claims. After the matters were consolidated, Defendants moved for summary judgment and the Garcia Plaintiffs cross-moved. (ECF No. 38 ("Motion")). For the reasons discussed below, the Court GRANTS Defendants' motion for summary judgment on Plaintiffs' federal claims, finding qualified immunity applies; DENIES the Garcia Plaintiff's cross-motion; and, in declining to exercise supplemental jurisdiction over Plaintiffs' state law claims, thereby DENIES Defendants' motion on those claims.

## II.   BACKGROUND

### A.   Factual Background[1]

The following summarized facts are undisputed, unless otherwise stated. *See* (ECF No. 38-1 3 (Joint Appendix of Facts ("JAF")); (ECF No. 38-2 (Joint Appendix of Evidence ("JAE")).[2]

---

[1] When deciding a motion for summary judgment, the Court only considers evidence admissible at trial, though the form may differ at the summary judgment stage. *Godinez v. Alta–Dena Certified Dairy LLC*, No. CV 15–01652 RSWL (SSx), 2016 WL 6915509, at *3 (C.D. Cal. Jan. 29, 2016). The Court has reviewed the entire record, including the parties' joint appendices of facts, objections, and evidence. The Court discusses only the facts that are relevant to its decision. In those instances where a party has failed to properly address the other party's assertion of fact, as is required by Rule 56(c), the Court considers those facts undisputed for purposes of the Motion. *See* Fed. R. Civ. P. 56(e)(2); C.D. Cal. L.R. 56-3. In those instances where a party has failed to properly support an asserted fact with evidence, as is required by Rule 56(c)(1), the Court considers those facts disputed for purposes of the motions. Further, it is not the Court's practice to rule on each objection individually, nor is it required to do so. To the extent that the Court relies on evidence that is the subject of an objection, the Court overrules the objection. To the extent the Court does not rely on evidence objected to by the parties, the objections are overruled as moot.
[2] Each exhibit in the JAE appears after a tab number and is labeled with either a number or letter of the alphabet. Because some of the exhibits contain the same exhibit letters, the Court will refer to each exhibit by the relevant ECF page number(s) within the JAE.

1. <u>The 911 Call and Officer Silva's Prior Interactions with Garcia</u>

On August 9, 2021, the Tustin Police Department received a 911 call from a resident of the Saddleback Mobile Lodge reporting that her neighbor had seen a homeless man "living in the bushes . . . in front the mobile home park" just south of the front entrance sign. (JAF ¶ 1; JAE at 6 ("Critical Incident Release Recording" or "CIR Recording") at 0:34-1:30). During the call, which was recorded, the caller stated that she had seen the man on August 8, 2021, walking around with a knife in his hand, swinging his hands, and talking to himself, but that she had not seen him on the day of the call. (CIR Recording at 1:33-54). The caller provided a description of the man, stated that she was outside, and indicated that she had heard the man "wrestling around" in the bushes "about a minute ago." (*Id.* at 1:56-2:17). The caller also stated that she could guide responding officers to the man's location. (JAF ¶ 1; CIR Recording at 1:19-29).

Officer Silva was assigned to the call and responded to the mobile home park, along with Officers Yuhas and Frias, who served as backup. (JAF ¶ 2). The subsequent encounter between the officers and Garcia was recorded by Officer Yuhas's body-worn camera, creating video footage which the Court has carefully reviewed.[3] *See* (JAE at 118 ("Yuhas Footage")). The video begins with Officer Silva walking in front of Officer Yuhas past the front sign of the park down a sidewalk to the left of a long block wall bordering the mobile home park. (*Id.* at 0:00-0:18). As she walks, Officer Silva is holding her firearm in her right hand, with the barrel pointed down next to her right leg. (*Id.*). The end of the block wall is adjoined by a thick, tall hedge that together with the block wall appears to form the outside border of the mobile home park. (*Id.*). To the right of the sidewalk is a dense bed of shrubs running the length of the sidewalk and bordering a public street. (*Id.*). The shrubbery appears to be wider than the sidewalk and, as Officer Silva walks next to the shrub bed, appears on average to be the approximate height of Officer Silva's upper thigh. (*Id.*). As Officer Silva approaches the end of the block wall, she raises her firearm

---

[3] No party disputes the authenticity or accuracy of the Yuhas Footage.

towards the hedge because, according to her deposition testimony, she knew she was approaching a suspect who potentially possessed a knife. (Yuhas Footage at 0:19-21; JAE at 13). Officer Silva peers into a narrow opening between the wall and the hedge and sees Garcia, who cannot be seen on the video footage at this time, but later can be heard on its audio. (Yuhas Footage at 0:19-0:23). Officer Silva observes Garcia laying on the ground behind the hedge, sleeping. (JAF ¶¶ 3, 30; JAE at 13). Officer Silva says to Garcia, "Hey, wake up, come out with your hands up." (JAF ¶ 3; Yuhas Footage at 0:22-0:26). Recognizing Garcia, she also says, "I know you, come on." (*Id.* at 0:28-29; JAF ¶¶ 3–4; JAE at 14).

During her deposition, Officer Silva testified that she recognized Garcia because, before the August 9, 2021, encounter, she had three previous contacts with Garcia.[4] (JAE at 14). Officer Silva first contacted Garcia in 2020, after Garcia had been reported brandishing a knife. (*Id.*). When Officer Silva contacted Garcia, she did not personally see him with a knife and did not arrest him. (JAF ¶ 5; JAE at 61–63). Before the second contact in 2020, Garcia was reported to have robbed an individual in Santa Ana and knocked the victim unconscious. (JAE at 60–62). After the alleged victim reported seeing Garcia in Tustin, Officer Silva located and detained Garcia there. (*Id.*). While waiting for Santa Ana officers to arrive, Garcia appeared calm and compliant on Officer Silva's body-worn camera footage and was not handcuffed. (JAE at 136). Garcia was arrested for robbery and assault with a deadly weapon. (JAE at 16). Finally, Officer Silva's third contact with Garcia came after he was reported disassembling a child's bicycle in the back of a gas station, which resulted in Officer Silva arresting Garcia on a felony warrant for assault with a deadly weapon and for possession of methamphetamine. (*Id.* at 14–15; JAF ¶ 7).

---

[4] The Plaintiffs do not dispute Officer Silva had three prior contacts with Garcia, but assert that, during these prior encounters, two of which were partially captured on video, Garcia appeared calm and cooperative on the video footage. (JAF ¶¶ 5–7).

2.   <u>The Officers' Interactions with Garcia on August 9, 2021</u>

On August 9, 2021, after telling Garcia that she knows him, Officer Silva instructs Garcia to come out from the hedge and repeatedly instructs Garcia to keep his hands up. (Yuhas Footage at 0:29-38).  Garcia responds in Spanish, saying, among other phrases, "Okay, let me out."  (CIR Recording at 3:26).[5]  Officer Silva says "Let's go," steps back and to the side for a moment, but then peers back into the hedge, repeatedly telling Garcia, "Let's go," and "Keep your hands up."  (*Id.* at 3:26-28; Yuhas Footage at 0:38-46).  Garcia responds in Spanish, saying "Okay, okay, but let me out," then states twice that he is waiting for a friend.  (CIR Recording at 3:31-38).  When Officer Silva asks Officer Frias if he would go on the other side, Officer Frias states, "Yeah, just watch your crossfire," and walks down the sidewalk and to the other end of the tall hedge.  (Yuhas Footage at 0:53-1:00).  Meanwhile, Officer Silva again states repeatedly to Garcia, "Let's go, get out." (CIR Recording at 3:43-34).  When Garcia responds in Spanish, "Okay, let me grab the keys," Officer Silva in a raised voice commands Garcia, "Show me your hands right now." (*Id.* at 3:44-47).  Garcia then states, "Look, I'm showing them."  (*Id.* at 3:47-48).  Because Garcia is still out of view, the video does not capture whether Garcia is showing his hands. (*Id.*)  However, Officer Silva again tells Garcia in a raised voice, "Keep your hands up," in Spanish says, "Stop playing with your belongings/pockets," and then states, as Garcia continues responding in Spanish, "Let's go, come on, let's go, let's go, come on, step out, come on, hands up, let's go."  (*Id.* at 3:48-4:02, Yuhas Footage at 1:03-1:10).  Officer Yuhas also tells Garcia, "Come here."  (CIR Recording at 4:00).  Garcia, still behind the

---

[5] The Critical Incident Release Recording is an edited version of the Yuhas Footage that contains the 911 call, as well as an edited version of the video from Officer Yuhas's body-worn camera with written commentary and, according to Defendants, a captioned English narrative with "unofficial[]" Spanish translations.  (Mot. at 12).  The parties dispute some of the Spanish to English translations.  For Defendants' Motion, the Court views those translations in the light most favorable to Plaintiffs, the non-moving parties.  For the Garcia Plaintiffs' cross-motion, the Court views those translations in the light most favorable to Defendants.

hedge and out of view of the camera, can be heard on the audio, asking (according to Defendants' translation), "Why are you getting me?", "Let's see, let me out then," and "Why are you going to take me?" [6] (*Id.* at 3:56-4:02).

After approximately a minute has elapsed since Officer Silva began speaking to Garcia, Officer Silva says to Officer Yuhas, "Dude, I'm going in," and moves toward the opening in the hedge. (*Id.* at 4:03-04; Yuhas Footage at 1:17-19). When Officer Yuhas responds, "Hold on, no," Officer Silva stops entering the hedge area. (Yuhas Footage at 1:20-21; JAE 2 at 4:05-07). She again states to Garcia, "Let's go, let's go now, let's go, out, get out, get out," with Garcia responding, "Okay," but then twice stating in Spanish, "I'm collecting recyclables." (CIR Recording at 4:06-14; JAF ¶ 33). At this time, Garcia begins to come into view of the camera, approaching the opening of the hedge with his head down and his body in a crouched position. (Yuhas Footage at 1:28-29). As Garcia's head, which is covered by a dark-colored beanie, and upper body emerge out from the hedge opening and into view of the body-worn camera, Officer Yuhas tells Garcia to face the wall, which from the video is to the right of the hedge opening. (*Id.* at 1:28-30). When both Officers Silva and Yuhas appear to reach for Garcia, Garcia retreats inside the hedge opening and disappears out of view of the video. (*Id.* at 1:29-31).

Officer Silva holsters her firearm and moves toward the hedge opening. (*Id.* at 1:32-34). During this timeframe, the parties dispute the English meaning of statements Garcia makes in Spanish and what, if anything, Garcia does after retreating back out of view inside the hedge opening. *See* (*id.* at 1:32-36; JAF ¶ 11). The video footage shows Officer Silva move toward the hedge opening and use her left hand to push back some branches near her face. (Yuhas Footage at 1:33-34). She then immediately raises in an apparent reflexive manner her right hand in front of her upper torso with her palm facing outward toward the

---

[6] According to Plaintiffs, Garcia stated, "Why are you going to hit me?" (JAF ¶ 34). Defendants dispute Plaintiffs' translation. (*Id.*).

hedge opening and fingers extended up.[7] (*Id.* at 1:34-35).  Officer Yuhas exclaims, "He's got a—he's got a stick, he's got a stick," and both officers back away from the hedge opening.  (*Id.* at 1:35-36; JAF ¶¶ 11, 38; JAE at 100).  As Officer Silva steps back, she draws her firearm from its holster, points the firearm towards the opening of the hedge, and yells to Garcia, "Get your hands up."  (Yuhas Footage at 1:36-38).  At the same time, Officer Yuhas draws his Taser and points it towards the hedge opening.  (*Id.*).  The video shows Garcia emerge from the hedge opening holding a long wooden pole, which as he emerges extends from approximately Garcia's knee to above his head.  (*Id.* at 1:38-39).  He is also holding a partially-full plastic bag.  (*Id.*).  Officer Silva, who had been standing on the sidewalk a couple of feet from Garcia, steps further back from the sidewalk into the adjacent shrubs bordering the sidewalk.  (*Id.* at 1:38-39).  As Garcia steps forward, placing his right shoe, which is visible on the video, onto the sidewalk, his right leg and the front of his body become more visible in the video, and the audio captures the sound of Officer Yuhas deploying his Taser.  (*Id.* at 1:39).  Garcia, apparently struck by the Taser darts, cries out, "Ah!" while the upper portion of his body momentarily moves back within the hedge opening and mostly out of view.  (*Id.* at 1:39-40; JAF ¶ 40).[8]  While Garcia is still

---

[7] Officers Silva and Yuhas both testified that during this timeframe, after retreating into the hedge, Garcia grabbed a large stick and jabbed it toward Officer Silva's stomach.  (JAE at 21, 26; JAF ¶ 10).  The Plaintiffs dispute this occurred.  (JAF ¶ 10).  The video during this timeframe does not show Garcia or what, if anything, he is doing in the hedge.

[8] Officer Silva testified that she saw Garcia raise the stick towards her.  (JAE at 80).  The parties dispute whether any of Garcia's movements with the pole evinced his intent to strike Officer Silva with it or were in response to him being Tased and his body "locking up."  *See* (JAF ¶¶ 37, 43, 46–48; Mot. at 13).  However, while the parties dispute Garcia's intentions, his movements with the pole during this timeframe are in view of the video.  Plaintiffs' police practices expert, Scott Defoe, asserts that "[t]he videos show that Mr. Garcia never raised the stick above his head."  (JAE at 122 ¶ 6).  However, the video shows the top portion of the pole raises higher than Garcia's head during the timeframe before Garcia is shot, whether intentionally raised by Garcia or not.  (Yuhas Footage at 1:38-39).  As Defoe's opinion is blatantly contradicted by the video, the Court views this fact "in the light depicted by the videotape."  *Scott v. Harris*, 550 U.S. 372, 381 (2007).

crying out, the top of the pole he is holding tilts forward.  (Yuhas Footage at 1:40).  Then, as Garcia's upper body shifts forward, he moves further out from the hedge opening, and he steps both feet on the sidewalk, the top portion of the pole moves back vertically and rises up higher, above Garcia's head.  (*Id.* at 1:40-41).  *See also* (JAF ¶ 37).  A still image from Officer Yuhas's body-worn camera during this timeframe shows Garcia standing with both feet on the sidewalk two to three feet in front of Officer Silva while being Tased, with Garcia in a slight squat, his bent arms raised near his chest, and both of his hands gripping the long pole in a vertical position with a portion of the pole extended above Garcia's head. *See* (JAE at 28; JAF ¶ 15).  *See also* (JAF ¶ 37; Yuhas Footage at 1:40).  Officer Silva, who is standing in the dense shrub bordering the sidewalk, fires the first shot from her firearm while the ticking sound of the Taser can still be heard on the video.  (Yuhas Footage at 1:41).  In quick succession and without any of the officers giving any additional commands or verbal warnings, Officer Silva fires a second shot as Garcia, still holding the pole, veers south, to the right of the hedge opening.  (*Id.* at 1:41-42; JAF ¶ 52; JAE at 22, 81).  Garcia drops the pole as he runs southbound down the sidewalk in the direction of Officer Frias, who is standing on the sidewalk directly in front of Garcia.  (Yuhas Footage at 1:41-42; JAF ¶ 44).  As Garcia nears Officer Frias, Officer Frias pushes Garcia off the sidewalk into the thick shrub bed bordering the sidewalk.  (Yuhas Footage at 1:42-43).

After being pushed into the shrubs, Garcia cried out.  (*Id.* at 1:45).  All three officers immediately converged on Garcia, checked him for weapons, cuffed him, and began cutting off his shirt to attend to his wounds.  (*Id.* at 1:43-2:47; JAF ¶ 18).  The officers also contacted paramedics, who arrived within approximately seven minutes, but, tragically, Garcia died.  (*Id.* at 1:43-8:44).

B.    Procedural Background

On January 25, 2022, the Garcia Plaintiffs filed suit against Officer Silva and the City of Tustin, alleging a 42 U.S.C. § 1983 claim for excessive force under the Fourth Amendment as well as other federal and state law claims.  (ECF No. 1 ("Garcia Complaint")).  The Galicia Plaintiffs filed a separate complaint against Officer Silva and

the City of Tustin on August 31, 2022, also asserting a Section 1983 claim for excessive force under the Fourth Amendment and other federal and state law claims.  Complaint, *Galicia Ramirez v. City of Tustin*, No. 8:22-cv-01619-SPG-KES (C.D. Cal. Aug. 31, 2022), ECF No. 1 ("Galicia Complaint").  The parties stipulated to consolidate the two cases, which the Court granted on December 16, 2022.  (ECF No. 27).  On October 30, 2023, Defendants moved for summary judgment.  (Mot.).  The Garcia Plaintiffs opposed Defendants' Motion and cross-moved for summary judgment.  (*Id.* at 12–14).  The Galicia Plaintiffs also opposed Defendants' Motion but did not cross-move for summary judgment. (*Id.* at 14).

### III.   LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A fact is "material" if the substantive law identifies the fact as critical such that the resolution of the fact under governing law might affect the outcome of the case, and a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

"[T]o carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the moving party satisfies its initial burden, the burden then shifts to the opposing party, who "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256 (citation omitted).  A genuine issue requires evidence, not speculation or guesswork. *Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254

F.3d 825, 829 (9th Cir. 2001).  The opposing party may not simply rely upon the allegations or denials in its pleadings.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Nor can it rely on testimony that is conclusory, speculative, or "uncorroborated and self-serving" to raise genuine issues of fact and defeat summary judgment.  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (citation omitted).  Instead, the opposing party, by citing to documents, depositions, declarations, admissions, interrogatory answers, or other material, must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial.  *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 322–23; *Anderson*, 477 U.S. at 257.  "This burden is not a light one.  The non-moving party must show more than the mere existence of a scintilla of evidence."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).

In resolving a summary judgment motion, the court does not weigh the evidence, determine the truth, or make credibility determinations.  *See Anderson*, 477 U.S. at 255.  The court construes the evidence and draws reasonable inferences in the light most favorable to the opposing party.  *Scott*, 550 U.S. at 378.  Thus, summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**IV.   DISCUSSION**

Defendants argue that summary judgment should be granted on Plaintiffs' Fourth Amendment excessive force claims because Officer Silva did not violate Garcia's constitutional rights.  (Mot. at 22–26).  Alternatively, Defendants argue that, even if a constitutional violation took place, Officer Silva is entitled to qualified immunity.  (*Id.* at 31–34).  Defendants also move for summary judgment on each of Plaintiffs' remaining claims, arguing Officer Garcia's actions were objectively reasonable and that the Defendants did not otherwise violate Garcia's and his families' rights or federal and state law.  (*Id.* at 45–50, 53–59).

The Garcia Plaintiffs oppose Defendants' Motion, arguing that Officer Silva's actions were objectively unreasonable and in violation of a clearly established constitutional right. (*Id.* at 26–30). Further, the Garcia Plaintiffs argue the Court should grant them summary judgment on all their claims. (*Id.* at 12). The Galicia Plaintiffs oppose Defendants' motion for summary judgment as to all of their claims, contending that Officer Silva's actions were constitutionally unreasonable, that she is not entitled to qualified immunity, and that all material issues pertaining to their claims should be decided by a jury. (*Id.* at 14). The Court begins its analysis with Plaintiffs' Section 1983 excessive force claims before turning to the remaining claims at issue.

## A.   Plaintiffs' Fourth Amendment Excessive Force Claims

"The purpose of 42 U.S.C. § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Estate of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 627 (9th Cir. 2022) (internal quotation marks and citation omitted), *cert. denied sub nom. Cnty. of Riverside, Cal. v. Est. of Clemente Najera-Aguirre*, 143 S. Ct. 426 (2022). Though absent from the text of Section 1983, "[t]he doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks and citation omitted). The doctrine's purpose is to balance two important, yet competing interests—namely, "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Under the latter circumstance, qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1005 (9th Cir. 2017) (citation omitted). Its protection applies regardless of whether the official's mistake is one of fact, law, or involves a mixed question of fact and law. *Pearson*, 555 U.S. at 231.

The Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Id.* at 232 (citation omitted). "Because qualified immunity is an immunity from suit rather than a mere defense to liability, . . . it is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 231 (internal quotation marks and citation omitted). To determine whether qualified immunity applies on summary judgment, a court asks two questions: (1) whether the facts taken in the light most favorable to the nonmoving party demonstrate a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the officer's alleged misconduct. *Id.* at 232; *S.B. v. Ctny. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017); *Glenn v. Wash. Cnty.*, 673 F.3d 864, 870 (9th Cir. 2011). A court has discretion to decide which of the two questions should be addressed first considering the circumstances in the particular case. *Pearson*, 555 U.S. at 236; *Morales v. Fry*, 873 F.3d 817, 822 (9th Cir 2017). If the answer to either question is "no," then the officer is not liable. *See Pearson*, 555 U.S. at 232.

Here, based on the circumstances involved in this case, the Court addresses both questions and in the same order as presented by the Defendants' and Garcia Plaintiffs' motions.

### 1.    Whether a Constitutional Right was Violated

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of [a] . . . 'seizure' of a free citizen" are "analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." *Graham v. Connor*, 490 U.S. 386, 395 (1989). "In evaluating a Fourth Amendment claim of excessive force, [courts] ask 'whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them.'" *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021) (quoting *Graham*, 490 U.S. at 397). This standard requires courts to "judge the reasonableness of a particular use of force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* at 1121 (quoting *Graham*, 490 U.S. at 396). "The calculus of reasonableness must embody allowance for the fact that

-12-

police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, . . . its proper application requires careful attention to the facts and circumstances of each particular case . . . ." *Id.* at 396 (internal quotation marks and citation omitted).

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (internal quotation marks and citation omitted). Courts "consider: (1) 'the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted,' (2) 'the government's interest in the use of force,' and (3) the balance between 'the gravity of the intrusion on the individual' and 'the government's need for that intrusion.'" *Rice*, 989 F.3d at 1121 (quoting *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (*en banc*)).

Because the reasonableness inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," the Ninth Circuit has "held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly," *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002), especially "where the only witness other than the officers was killed during the encounter," *S.B*, 864 F.3d at 1014. Further, "[b]ecause the person most likely to rebut the officers' version of events—the one killed—can't testify," the court "must carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts." *S.B*, 864 F.3d at 1014 (internal quotation marks and citation omitted).

a)   *The Type and Amount of Force Used*

As stated previously, the first step of the reasonableness inquiry requires courts to assess "the severity of the intrusion on the individual's Fourth Amendment rights by

evaluating the type and amount of force inflicted." *Lowry*, 858 F.3d at 1256 (citation omitted).  In this case, it is undisputed that Officer Silva used deadly force against Garcia.  (JAF ¶ 58).  "The intrusiveness of a seizure by means of deadly force is unmatched." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018) (quoting *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)).  The deadly force used against Garcia "implicates the highest level of Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life' and because such force 'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.'" *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting *Garner*, 471 U.S. at 9).

b)   <em>The Government's Interest in the Use of Force</em>

Under the second step of the inquiry, courts "evaluate the government's interest in the use of force" by assessing "three primary factors" under *Graham v. Connor*, 490 U.S. 386 (1989): "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Lowry*, 858 F.3d at 1257 (citation omitted).  *See also Graham*, 490 U.S. at 396.  "Among these considerations, the 'most important' is the second factor—whether the suspect posed an immediate threat to others." *Williamson City of National City*, 23 F.4th 1146, 1153 (9th Cir. 2022) (citation omitted).  These factors are non-exhaustive; a court should consider the totality of the circumstances and other factors when appropriate, "including the availability of less intrusive alternatives to the force employed and whether proper warnings were given." *Rice*, 989 F.3d at 1121–22.  *See also Lowry*, 858 F.3d at 1257.

i.   <em>Severity of Crime at Issue and Immediacy of Threat</em>

Here, in evaluating the first and second *Graham* factors—the severity of the crime at issue and whether Garcia posed an immediate threat—the Court considers all the material facts confronting the officers at the time deadly force was used.  *See Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) ( "[T]he reasonableness of a seizure must . . . be assessed by carefully considering the objective facts and circumstances that confronted

-14-

the arresting officers."). It is undisputed and the 911 recording makes clear that the officers initially were not responding to a report of a dangerous crime in progress. Instead, the 911 call that precipitated the officers' encounter with Garcia involved a report that a homeless man was "wrestling around" in the bushes in front of the caller's mobile home park.[9] (CIR Recording at 0:34-2:17). The video also shows that, just before Officer Yuhas shouted that Garcia had a stick, neither Officer Silva nor Officer Yuhas had a firearm or other weapon drawn or pointed at Garcia. *See* (Yuhas Footage at 1:34-35).

In the moments just before Officer Silva shot Garcia, however, it is undisputed that Officer Yuhas yelled, "He's got a stick, he's got a stick!", and the video shows that both officers reacted to this perceived threat by backing away from the hedge opening, drawing their weapons, and pointing them at the hedge opening, with Officer Yuhas drawing his Taser and Officer Silva drawing her firearm. (JAF ¶¶ 12, 38; Yuhas Footage at 1:35-36; JAE at 100). Additionally, the parties do not dispute that Officer Silva ordered Garcia to get his hands up. (JAF ¶ 12; Yuhas Footage at 1:36-38). Further, the video shows and the parties do not dispute that Garcia emerged from the hedge holding a long wooden pole within two to three feet from Officer Silva. (JAF ¶¶ 15, 37). The video shows that, while being Tased, the top portion of the pole Garcia was holding tilted forward. (Yuhas Footage at 1:40-41). Then, as he stepped further out from the hedge opening and his upper body weight shifted forward, the top portion of the pole moved back vertically and up above Garcia's head. (*Id.*). Further, a still image from the video during this timeframe shows Garcia standing with both feet on the sidewalk two to three feet in front of Officer Silva

---

[9] Although the caller's description of the homeless man did not exactly match Garcia's appearance, Plaintiffs do not dispute that the caller pointed the officers to the location of Garcia and that Garcia was in the same location the caller described on the 911 call. *See* (JAF ¶¶ 3, 20). The caller indicated that she had seen the homeless man waving around a knife the day before. (*Id.*). Although Officer Silva testified that she initially had her weapon drawn when she approached the hedge due to the caller's report, (JAE 3 at 13), neither she nor Officer Yuhas claims to have seen a knife in Garcia's possession before they tased and shot him, (*id.* at 9; JAE 9 at 108–09).

with Garcia's legs bent in a slight squat, his bent arms raised near his chest level, and both of his hands gripping the long pole in a vertical position with a portion of the pole extended above Garcia's head.  *See* (JAE at 28; JAF ¶ 15).  *See also* (JAF ¶ 37; Yuhas Footage at 1:40).  Finally, the video coupled with audio make clear that, as Garcia was being Tased and came further out onto the sidewalk with the pole, Officer Silva shot Garcia twice and within five seconds of Officer Yuhas's deployment of the Taser. (Yuhas Footage at 1:36-41; JAF ¶ 42).  The parties interpret these facts differently and dispute the level of threat Garcia posed immediately before he was shot.  (Mot. at 22–30).

Viewing the evidence in the light most favorable to Plaintiffs on Defendant's motion, and judging the evidence from the perspective of a reasonable officer on the scene, whether a reasonable officer confronted with the same knowledge, circumstances, and facts as Officer Silva would have considered Garcia an immediate threat is a triable issue of material fact.  Defendants focus on Garcia's undisputed possession of the pole, arguing that Garcia's possession of a deadly weapon justified the use of deadly force.  (*Id.* at 24–25).  Yet, the mere fact that a person possesses an object that could be used as a weapon does not decide the reasonableness inquiry.[10]  *S.R. Nehad v. Browder*, 929 F.3d 1125, 1134

---

[10] Plaintiffs assert that Officer Silva "never saw Mr. Garcia with a weapon" and that Garcia "had no weapons on him." (*Id.* at 13, 19).  The Galicia Plaintiffs' police practice expert, Roger Clark, who was not at the scene on the day of the incident, opines that "Mr. Garcia never used the stick as a weapon to threat [sic] or attack any of the officers." (JAE 141 ¶ 7).  Defendants argue that the pole was a weapon that Garcia could have used to strike Officer Silva, that Garcia was "advancing" on Officer Silva, and that the crime at issue at the time was "the severe crime of assault with a deadly weapon against a police officer [Calif. Penal Code § 245b]." (Mot at 23, 25).  Whether Garcia's wooden pole qualifies as a "deadly weapon" depends on how it was being used before he was shot and, as such, is a triable issue of fact.  *See People v. Aledamat*, 8 Cal. 5th 1, 6 (2019) (holding that, under § 245, "a deadly weapon is any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury" and that "[i]n determining whether an object not inherently deadly or dangerous is used as such," the jury may "consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue" (internal quotation marks and citations omitted)).

(9th Cir. 2019). *See also Hayes v. County of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013) ("[T]he mere fact that a suspect possesses a weapon does not justify deadly force." (citation omitted)). Also, although Officer Silva testified that she fired the first shot in self-defense and the second in defense of Officer Frias, (JAE at 22), when considering "whether there was an immediate threat, a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern," *Mattos v. Agarano*, 661 F.3d 433, 441–42 (9th Cir. 2011) (*en banc*) (internal quotation marks and citation omitted). Although from the vantage point of Officer Yuhas's body-worn video, some objective factors appear to justify Officer Silva's concern, including Garcia's possession of the pole and his close proximity to Office Silva, the video does not show all the objective factors confronting the officers.

Further, it is not entirely clear from the video what caused Garcia to move the pole, but several causes are plausible, including Garcia lifting the pole to get out from the hedge, given the pole's considerable length; the deployment of the Taser causing Garcia's body to move; or, as Defendants argue, *see* (Mot. at 25), Garcia's intent to strike Officer Silva with the pole. Though the video captures Garcia's movements, it does not reveal the intent, if any, behind his actions. *Vos*, 892 F.3d at 1028 ("The mere existence of video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage."). Because "[i]t is the province of the jury to decide what import to give circumstances that can be viewed in various ways," *Seidner v. de Vries*, 39 F.4th 591, 601 (9th Cir. 2022) (internal quotation marks and citation omitted), Garcia's possession of the pole within feet of Officer Silva, though compelling evidence of a threat, is not dispositive of whether Silva's use of force was reasonable. Thus, there remains a genuine dispute of material fact whether Garcia was actively "advancing" or "lunging at" Officer Silva with the pole raised when he was shot, (Mot. at 23–24), or, as the Garcia and Galicia Plaintiffs argue, whether the Taser caused him to move involuntarily, (*id.* at 28–29). Viewing the facts in the light most favorable to the Plaintiffs, as the Court must on

the Defendants' motion, the Court concludes a reasonable jury could find Garcia was simply moving in response to being Tased when Officer Silva fired at him.

As to the Garcia Plaintiffs' cross-motion, when viewing the above facts in the light most favorable to the Defendants and from the perspective of a reasonable officer, *see Lowry*, 858 F.3d at 1256, there is ample evidence from which a jury could conclude that Garcia posed an immediate threat before Officer Silva shot him.  The video shows that, after approaching the opening in the hedge, Officer Silva reflexively backed away with her hand in front of her chest, Officer Yuhas exclaimed that Garcia had a stick, and both officers moved away from the hedge opening and drew their weapons.  (Yuhas Footage at 1:33-40; JAF ¶ 11).  Faced with these facts, as well as the knowledge of Garcia's prior incident of a reported assault, a reasonable officer could have viewed Garcia's actions— stepping on to the sidewalk within feet of Officer Silva while holding the wooden pole upright as it moved—as an immediate threat and the crime at issue, serious.  As the Ninth Circuit has held, "[i]f the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013).  Further, courts recognize that officers act "without the benefit of 20/20 hindsight" and must often make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014) (quoting *Graham*, 490 U.S. at 396–97).

Although the Garcia Plaintiffs argue that Officer Silva should have determined that Garcia was experiencing a mental crisis, waited for the Taser to finish, or repositioned herself, (Mot. at 28, 30), they have not pointed to evidence in the record showing that Garcia was having a mental crisis at the time of the shooting, let alone that Officer Silva knew of, or should have anticipated, any such crisis.  *See Lowry*, 858 F.3d at 1256 ("An officer's use of force cannot be deemed excessive based on facts that he reasonably would not have known or anticipated.").  Nor does case law support the notion that an officer, who reasonably perceives a threat, must wait for the threat to realize before reacting—

-18-

especially, here, given the speed with which the circumstances confronting Officer Silva were unfolding and the fact that Officer Silva had already backed away from Garcia into the dense shrubbery adjacent to the sidewalk. *See, e.g.*, *Blanford v. City of Sacramento*, 406 F.3d 1110, 1116–18 (9th Cir. 2005) (holding officers' use of lethal force reasonable because plaintiff's conduct made officers' safety concerns "objectively reasonable").

Additionally, the video shows that Garcia continued to move further out and had started veering right from the hedge, still holding the pole, after Officer Silva's first shot. (Yuhas Footage at 1:40-43). A reasonable officer in Officer Silva's situation may, as Officer Silva testified she did, (JAE at 22), have concluded that the perceived threat to her and other officers had not yet dissipated and thus fired a second shot,. *See, e.g.*, *Blanford*, 406 F.3d at 1118 (concluding that, as to a third shot fired by an officer, "from the deputies' position at the time, we cannot say that it was objectively unreasonable for [the officer] not to stop firing when [the plaintiff] did not stop moving or holding the sword"). *See also Ryburn v. Huff*, 565 U.S. 469, 477 (2012) ("[J]udges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation."). Thus, a reasonable officer in Officer Silva's position could conclude at the time of the shooting that Garcia was attempting to commit a severe crime—namely, assault on a police officer—and that he posed an immediate threat to that officer and to others.

ii.    *Whether Resisting or Attempting to Evade Arrest*

As to the third *Graham* factor—whether Garcia was resisting or attempting to evade arrest, *Lowry*, 858 F.3d at 1257—the video and other evidence in the record do not make Garcia's intentions clear. Defendants argue, based on the video, that Garcia's delay in exiting the hedge and "violent[] advanc[e] on the retreating Officer Silva with a solid wooden pole raised over his head" demonstrates that Garcia was actively resisting arrest. (Mot. at 25). This is not, however, the only reasonable interpretation of the video. For much of the time during which Defendants argue that Garcia was non-compliant, he is not in view of Officer Yuhas's body-worn camera. Although Garcia's voice can be heard on

the audio, the parties dispute the English meaning of what Garcia says in Spanish.  Viewed, on Defendants' motion, in the light most favorable to the Plaintiffs, a reasonable jury could find Garcia was neither resisting nor trying to flee.  First, although he is in the hedge and out of view of the camera, Garcia states that his hands are up when asked to raise them.  (CIR Recording at 3:47-48).  Second, he repeatedly says "let me out" when Silva commands him to come out of the hedge.  (*Id.* at 3:26-4:02).  Based on the camera angle, it is difficult to tell whether Garcia could exit the hedge, given Officer Silva's apparently close proximity to the hedge's opening.  (*Id.*).  Additionally, despite Defendants' representations that significant time passed between when Silva first ordered Garcia to exit the hedge and when Garcia finally emerged with the wooden pole, the total elapsed time, based on the body-worn footage, is less than one and a half minutes.  (Yuhas Footage at 0:22-1:41).  Further, although Garcia ran down the sidewalk after being shot, (*id.* at 1:41-43), a reasonable jury could conclude he was fleeing from the danger of being shot again rather than attempting to evade arrest.

Conversely, viewing the evidence in the light most favorable to the Defendants on the Garcia Plaintiffs' cross-motion, a reasonable jury could conclude that Garcia repeatedly refused to heed the officers' commands to exit the hedge.  Further, from Officer Silva reflexively placing her hand in front of her chest, immediately backing away from the hedge opening, and Officer Yuhas exclaiming that Garcia had a stick, a jury could conclude that Garcia threatened Office Silva with the pole, as Officers Silva and Yuhas claim; that a reasonable officer would have felt threatened; and that a reasonable officer would have believed that Garcia was resisting and trying to escape, even after being Tased.

Overall, although the parties each describe the video differently and urge different inferences to be drawn from it, the footage does not blatantly contradict Plaintiffs' assertion that Garcia was not resisting or fleeing, *cf. Scott*, 550 U.S. at 380, nor does it clearly contradict Defendants' contention that Garcia was resisting and attempting to flee.

iii.     *Other Factors*

Other considerations in the reasonableness inquiry include whether proper warnings were given and the availability of less intrusive alternatives to deadly force.  *Glenn*, 673 F.3d at 872.  The "police need not employ the least intrusive means available," however, and "need only act within the range of reasonable conduct."  *Smith*, 394 F.3d at 701.  Here, it is undisputed that Silva gave no verbal warning that any force, even less-than-lethal force, would be used.  (JAF ¶ 51).  Viewing the evidence in the light most favorable to the Plaintiffs, a reasonable jury could find, based on the video, that the Taser was still active at the time Garcia was shot, that it could have been deployed again, that it needed more time to be fully effective, or that other, less-lethal methods, could have been used by the three officers present before deadly force was used.

Defendants, however, argue that Silva did not have time to give a warning.  (*Id.*). Officer Silva's failure to warn is not *per se* evidence that the shooting was unreasonable— *Tennessee v. Garner*, 471 U.S. 1 (1985), and its progeny acknowledge that, under quickly unfolding circumstances, a warning may not be feasible.  *See Garner*, 471 U.S. at 11–12. Given the mere seconds that elapsed from the time Garcia emerged with the wooden pole and him being Tased, then shot, a reasonable officer on the scene could have concluded that a split-second decision was necessary and that it simply was not feasible to give a verbal warning under the circumstances.  Despite being Tased, both the video and screen shot taken from the video show that Garcia kept moving onto the sidewalk with the wooden pole and within two to three feet of Officer Silva.  (Yuhas Footage at 1:38-41; JAE at 28). A reasonable officer on the scene could have concluded that the Taser was not working to dissipate the perceived threat and that use of deadly force was necessary.

c)     *Balance of the Interests*

Balancing the above various considerations, the Court finds that—though it is a close call in favor of Defendants—there is a triable issue of fact regarding whether Officer Silva's use of force was excessive.  The Court is mindful that the Ninth Circuit has held that "summary judgment should be granted sparingly in excessive force cases."  *Gonzalez*,

747 F.3d at 795. Here, the Court does not conclusively hold, as the Garcia Plaintiffs request, that a reasonable jury would find in Plaintiffs' favor. Instead, the Court finds only that a reasonable jury *could* find in Plaintiffs' favor based on the evidence. It is also possible that a jury could find that Officer Silva reasonably perceived Garcia to pose an immediate threat to her and others sufficient to justify her use of deadly force. Given the material factual disputes regarding the inferences that can be drawn from the body-worn video footage and other evidence in this case, the Court "cannot say that a verdict in favor of the defendants on the claim for excessive force is the only conclusion that a reasonable jury could reach." *Id.* at 797. Thus, the evidence presented, taken in the light most favorable to Plaintiffs on Defendants' Motion, precludes finding at the summary judgment stage Defendants' favor on whether Officer Silva's use of deadly force violated Garcia's Fourth Amendment rights. *See S.B.*, 864 F.3d at 1014 (agreeing with district court that the plaintiff established a triable issue of material fact regarding whether the deadly force used by an officer on an individual wielding a knife was reasonable under the Fourth Amendment). Similarly, taken in the light most favorable to the Defendants on the Garcia Plaintiffs' cross-motion, the evidence precludes summary judgment in the Garcia Plaintiffs' favor.

Because neither moving party is entitled to summary judgment on the question of whether the facts demonstrate a violation of a constitutional right, the Court thus turns to Defendants' argument that, notwithstanding, Officer Silva is entitled to qualified immunity on Plaintiffs' Fourth Amendment claims.

### 2. Whether the Constitutional Right was Clearly Established

For a constitutional right to be clearly established, the right must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 7 (2021) (citation omitted). Whether a particular constitutional right is "clearly established" is question of law decided by the court and involves "examining established precedent at a certain level of granularity." *Morales*, 873 F.3d at 822. "Because the focus is on whether the officer had fair notice that

her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.  If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability . . . ." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Mullenix*, 577 U.S. at 12 (citation omitted).  Instead, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." *Id.* (internal quotation marks and citation omitted) (emphasis in original). "This inquiry must be undertaken in light of the specific context of the case." *Id.* (internal quotation marks and citation omitted).  The Supreme Court has recognized that such specificity is especially important in the Fourth Amendment context, where "it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (internal quotation marks, citation, and alteration omitted).

While a case need not be "directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (citation omitted).  "The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotation marks and citations omitted).  The standard "requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him," and "[t]he rule's contours must be so well defined that it is clear to an officer that his conduct was unlawful in the situation he confronted." *Id.* (internal quotation marks and citation omitted).  "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Id* (internal quotation marks and citation omitted).

Although "[g]eneral excessive force principles, as set forth in *Graham* and *Garner*, are not inherently incapable of giving fair and clear warning to officers, . . . they do not by themselves create clearly established law outside an obvious case." *S.B.*, 864 F.3d at 1015

(quoting *White v. Pauly*, 580 U.S. 73, 80 (2017)).  Absent an "obvious case" in the excessive force context, the "clearly established" analysis requires a case to be identified "where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Morales*, 873 F.3d at 823 (quoting *White*, 580 U.S. at 79). "Precedent involving similar facts can help move a case beyond the otherwise hazy borders between excessive and acceptable force and thereby provide an officer notice that a specific use of force is unlawful." *Rivas-Villegas*, 595 U.S. at 7 (citation omitted).

"It is the plaintiff who bears the burden of showing that the rights allegedly violated were clearly established." *Vos*, 868 F.3d at 1118 (citation omitted).  A plaintiff must either explain why his case is "obvious" under existing general principles or, more commonly, show specific binding cases that control the issue or identify "a robust consensus of cases of persuasive authority" in similar situations that demonstrate the right is clearly established. *Wesby*, 583 U.S. at 63 (internal quotation marks and citation omitted).  *See also Waid v. County of Lyon*, 87 F.4th 383, 388 (9th Cir. 2023) (same).

### a) *Whether this is a Rare "Obvious" Case*

Here, both the Garcia and Galicia Plaintiffs initially argue that the instant case is an "obvious case," (Mot. at 34, 40–41), "where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 583 U.S. at 64.  As the Ninth Circuit has observed, however, "because a categorical statement that conduct obviously violates the Fourth Amendment is particularly hard to make when officers encounter suspects every day in never-before-seen ways, including countless confrontations . . . that yield endless permutations of outcomes and responses," Fourth Amendment violations must be "'beyond debate' to be considered obvious." *Waid*, 87 F.4th at 388 (internal quotation marks and citations omitted).  For that reason, obvious violations have only been found "in exceedingly rare circumstances with extreme facts." *Id.* at 389.  *See, e.g.*, *C.B. v. City of Sonora*, 769 F.3d 1005, 1027 (9th Cir. 2014) (finding that police officers' "removal from school grounds of a compliant and calm 11–year–old child" presented an obvious case where child was not suspected of any wrongdoing and

did not appear to pose any kind of threat); *Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1084 (9th Cir. 2013) (five-hour detention and interrogation of shooting victim's parents was "an obvious case" where no probable cause or even reasonable suspicion justified sheriff officers' detention).

Even when viewed in the light most favorable to the Garcia and Galicia Plaintiffs, the facts do not show an "obvious" constitutional violation, as in *Graham* or *Garner*. The Court has already discussed at length the triable issues of fact involving Garcia's actions and intentions regarding his possession of the wooden pole before he was shot, whether he posed an immediate threat to Officer Silva and others, and whether he was attempting to flee. *See* Section IV.A.1, above. Accordingly, this case is not so obvious that Plaintiffs need not produce specific binding cases that control the issue or, alternatively, point to a robust consensus of persuasive authority showing a sufficiently clear foundation for the right in similar situations. *Wesby*, 583 U.S. at 63; *Waid*, 87 F.4th at 388.

b)   *Whether the Garcia Plaintiffs' Cited Precedent Places the Unlawfulness of Officer Silva's Actions Beyond Debate*

The Garcia Plaintiffs also argue that Ninth Circuit authority clearly established that Officer Silva's use of deadly force under the circumstances of the case violated Garcia's constitutional rights. In support of their argument, the Garcia Plaintiffs cite *S.B. v. County of San Diego*, 864 F.3d 1010 (9th Cir. 2017); *Vos v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018); and *Hughes v. Kisela*, 862 F.3d 775 (9th Cir. 2016), for the general proposition that "[c]ourts have found an officer's use of force to violate the Fourth Amendment in cases where the *Graham* factors did not weigh as heavily in [the] [p]laintiffs' favor." (Mot. at 34–35). The Garcia Plaintiffs' reliance on these three cases is, however, detrimental to their argument that the constitutional question at issue was "beyond debate" at the time of the incident. None of these cited cases conclusively establish that a violation of a constitutional right under the Fourth Amendment occurred— neither as to the facts of the cases themselves nor in Garcia's circumstances.

In *S.B.*, for example, Deputies Moses, Vories, and a third officer responded to a call reporting that Brown, who had mental health issues and was intoxicated, had been "acting aggressively"; members of Brown's family were concerned for their safety and had left his house to report his conduct. *S.B.*, 864 F.3d at 1011. After entering Brown's house, the officers observed Brown with kitchen knives sticking out of his pockets. *Id.* When Vories yelled, "Knife," Moses pointed his gun at Brown and ordered Brown to raise his hands, but Brown initially did not comply. *Id.* When the officers ordered Brown to his knees, he initially complied, but then grabbed a knife from his back pocket and moved as though he was going to stand. *Id.* at 1012. Moses shot him at least three times, and Brown died. *Id.* Because certain material aspects of the officers' deposition testimony regarding the moments before the fatal shooting differed, the district court determined that triable issues of fact precluded determining, as a matter of law, whether Moses' use of deadly force was objectively reasonable under the Fourth Amendment and whether Moses's conduct violated clearly established law. *Id.* at 1012–14.

On appeal, the Ninth Circuit reversed the district court's denial of summary judgment and held that Moses was immune from liability. *Id.* at 1017. In so holding, it stated, "[w]e disagree with the district court that it was clearly established [at the time of the incident] that using deadly force in this situation, even viewed in the light most favorable to plaintiffs, would constitute excessive force under the Fourth Amendment." *Id.* at 1016. The court stated that it could not locate precedent where an officer acting under similar circumstances was held to have violated the Fourth Amendment. *Id.* at 1015–16. Further, the Ninth Circuit stated that the shooting was not an "obvious" or "run-of-the-mill" constitutional violation. *Id.* at 1017.

Similarly, in *Vos*, the Ninth Circuit determined that existing precedent did not place the purported unreasonableness of the officers' conduct "beyond debate"; there, too, triable issues of fact existed on the question of whether they had used excessive force. *Vos*, 892 F.3d at 1036. Vos had entered a 7-Eleven convenience store in which he armed himself with a scissors, cut a store employee's hand, asked an officer to shoot him while pretending

1    to hold a firearm behind his back, and then went into a back room and closed the door. *Id.*

2    at 1028–29.  Around twenty minutes later, Vos came out from the back room and, from a

3    distance of approximately 30 feet, began charging towards the officers while holding an

4    object over his head. *Id.*  When Vos did not heed commands to drop the weapon, the

5    officers shot him. *Id.*  The district court granted summary judgment in favor of the

6    individual officer defendants and the city. *Id.* at 1030.  The Ninth Circuit, in affirming the

7    district court, determined that, even if the officers were mistaken regarding the threat posed

8    by Vos, the mistake was reasonable under existing precedent, and thus the officers were

9    entitled to qualified immunity. *Id.* at 1035–36.

10       The Garcia Plaintiffs' reliance on the Ninth Circuit's opinion in *Hughes* fares no

11   better.  In *Hughes*, the Ninth Circuit reversed the district court's grant of summary

12   judgment on the plaintiff's excessive force claim, finding instead that the record could

13   support a jury's conclusion that the officer, who shot a woman after she started walking

14   towards a bystander with a large kitchen knife, had violated the Fourth Amendment.

15   *Hughes*, 862 F.3d at 785.  In so holding, the panel relied on another Ninth Circuit decision,

16   *Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011), which the panel described as

17   "[t]he most analogous Ninth Circuit case" to the facts before the panel, but which was

18   decided *after* the shooting at issue. *Hughes*, 862 F3d at 783.

19       The Supreme Court reversed the Ninth Circuit. *Kisela v. Hughes*, 584 U.S. 100, 108

20   (2018).  In so doing, the court noted that *Glenn*, decided in 2011, could not have given fair

21   notice to the officers at the time of the incident in 2010.[11]  The Supreme Court further

22

23   [11] Citing to *Glenn*, the Garcia Plaintiffs argue that the facts in the present case are much

24   stronger and that, because the panel in *Glenn* did not find the decedent's possession of a

     knife dispositive, this Court should similarly not find Garcia's possession of the wooden

25   pole dispositive. (Mot. at 36).  In *Glenn*, however, the officers knew the decedent was

26   intoxicated, emotionally disturbed, and suicidal. *Glenn*, 673 F.3d at 873.  Furthermore, the

     decedent was holding a three-inch pocketknife to his own neck and thus was threatening

27   himself—not others—before the officers shot him with a beanbag gun and then firearms.

     *Id.*  Here, unlike in *Glenn*, Officer Silva knew that Garcia had assaulted someone else in

28   the past, knocking the victim unconscious, and both she and Officer Yuhas saw Garcia

1  concluded that the most on-point Ninth Circuit authority was *Blanford v. City of*
2  *Sacramento*, 406 F.3d 1110 (9th Cir. 2005), in which the Ninth Circuit found that no
3  constitutional violation had occurred. *Kisela*, 584 U.S. at 106.  As in *Blanford*, the court
4  explained, the officer confronting Hughes believed she was a threat to a bystander just a
5  few feet away, had seen Hughes fail to heed his commands to drop her weapon, and had
6  mere seconds to assess the potential danger. *Id.*  In any event, the Supreme Court stated
7  that it "need not, and does not, decide whether [the officer] violated the Fourth Amendment
8  when he used deadly force against Hughes.  For even assuming a Fourth Amendment
9  violation occurred—a proposition that is not at all evident—on these facts [the officer] was
10  at least entitled to qualified immunity." *Id.* at 103–04.

11       The Garcia Plaintiffs also cite to *A.K.H. v. City of Tustin*, 837 F.3d 1005 (9th Cir.
12  2016).  Although the Ninth Circuit concluded the plaintiff had put forth evidence sufficient
13  to establish a Fourth Amendment violation in that case, *id.* at 1013, the facts of *A.K.H.* are
14  not sufficiently analogous to give Officer Silva fair notice that her conduct could be
15  unlawful.  In *A.K.H.*, a woman reported to 911 that her ex-boyfriend, Herrera, had taken
16  her cell phone, but that she was unhurt and Herrera, who was walking down the road to
17  catch a bus, was not carrying any weapons. *Id.* at 1008.  An officer drove up next to Herrera,
18  commanded Herrera to remove his hands from his sweatshirt pockets, and, just as Herrera
19  was removing his hand from his pocket in response to the officer's commands, immediately
20  shot Herrera twice from the officer's vehicle without warning. *Id.*  The Ninth Circuit held
21  that the officer's use of force was excessive because Herrera was not a threat to anyone
22  when he was shot, the officers had no reason to believe he was armed, and the officer
23  unreasonably escalated to deadly force without warning while Herrera was complying with
24  his commands. *Id.* at 1009–13.

25

26  holding a long wooden pole mere feet from Officer Silva just before Officer Yuhas
27  deployed his Taser and Officer Silva subsequently shot Garcia.  Thus, as in *Hughes*, *Glenn*
28  did not give Officer Silva fair notice that her conduct could be unlawful. *See also Brosseau*,
    543 U.S. at 197–98.

Here, unlike Herrera, Garcia was holding a long wooden pole, which could be considered a weapon. Furthermore, unlike the officer in *A.K.H.*, who remained inside his police car, Officer Silva was only two to three feet in front of Garcia, within striking distance of the pole and with no physical barrier between her and Garcia.[12] Additionally, in *A.K.H.*, no officer used less-lethal force before escalating to lethal force. Here, as the video footage shows, Officer Silver fired her first shot after commanding Garcia to get his hands up and after Officer Yuhas had deployed his Taser. Further, Officer Silva fired her first shot when Garcia was holding the wooden pole vertically in his hands two to three feet in front of her. By contrast, the officer in *A.K.H.* fired on Herrera immediately after commanding Herrera to remove his hands from his pockets without ever seeing a weapon in Herrera's hands and while Herrera was complying with the officer's commands. Finally, the officers in *A.K.H.* had no information that Herrera could be armed and dangerous, whereas in the present case, Officer Silva saw that Garcia was armed with the pole and knew Garcia had knocked someone unconscious during a robbery a year earlier.

Finally, the Garcia Plaintiffs cite to *Hayes v. County of San Diego*, 736 F.3d 1223 (9th Cir. 2013), for the proposition that the objective unreasonableness of Officer Silva's conduct was clearly established. (Mot. at 37–38.) However, the Court does not find that *Hayes* moves this case "beyond the otherwise hazy border between excessive and acceptable force" by providing Officer Silva with notice that her specific use of force was unlawful. *Kisela*, 584 U.S. at 105 (internal quotation marks and citation omitted). In *Hayes*, the Ninth Circuit reversed and remanded a district court's grant of summary judgment to police officers on a negligent wrongful death claim, which uses the same standard as the Fourth Amendment,[13] holding instead that the objective reasonableness of

---

[12] Plaintiffs assert that Officer Silva was wearing a bullet-proof vest at the time of the incident, (JAF ¶ 21), but the video shows that she was not wearing any protective gear on her head or over her face to possibly protect against contact with the wooden pole in those areas, *see generally* (Yuhas Footage).

[13] *S.B.*, 864 F.3d at 1014 n.4 (A "California wrongful death claim . . . uses [the] same standard as [the] Fourth Amendment.").

the officer's use of deadly force was a triable issue for a jury.  *Hayes*, 736 F.3d at 1231–32, 1235.  In response to a neighbor's domestic disturbance report, deputies arrived at Hayes's house, where his girlfriend told the officers she was concerned that Hayes would harm himself.  *Id.* at 1227.  Two deputies entered the house with their guns holstered and saw Hayes standing approximately eight feet away with his right hand behind his back.  *Id.* When one deputy ordered Hayes to show his hands, Hayes, while stepping toward the deputy, raised both hands to shoulder level, revealing he was holding a large knife with the tip pointed down.  *Id.* at 1227–28.  Both deputies immediately drew their guns and fired two shots each at Hayes, killing him.  *Id.* at 1228.  The district court granted summary judgment in favor of the officers, holding that their use of force was objectively reasonable and therefore not negligent as a matter of law.  *Id.* at 1231.  On appeal, the Ninth Circuit rejected the district court's conclusion that the officers were entitled to summary judgment on the negligent wrongful death claim as a matter of law.  *Id.* at 1232.  Viewing the evidence in the light most favorable to the plaintiff, it found that there was a triable issue of fact regarding the reasonableness of the deputies' use of deadly force.  *Id.* at 1232–35.[14]

Several facts make *Hayes* distinguishable from the present case.  First, before entering the house, the officers were told that Hayes had threatened to harm himself, not anyone else, and, while in his home, the officers did not give Hayes any indication that they perceived his actions as a threat.  *Id.* at 1234.  In contrast, Officers Yuhas's and Silva's reactions—backing away from the hedge opening, Officer Yuhas's exclamation that Garcia had a stick and then drawing his Taser, and Officer Silva drawing her firearm, pointing it at Garcia, and commanding Garcia to get his hands up—all were indications that the officers perceived Garcia's actions with the wooden pole as threatening.  Yet, Garcia did not drop the pole and continued to move onto the sidewalk and towards Officer Silva

---

[14] The court, however, "declined to address the district court's decision regarding alleged violations of Hayes's Fourth Amendment rights" and did "not address the district court's further finding of qualified immunity in relation to the alleged Fourth Amendment violation."  *Id.* at 1229, 1231.

holding it.  Second, at the time Hayes was shot, Hayes was at least six to eight feet from the nearest officer, as compared to Garcia, who was just two to three feet from Officer Silva.  Third, in *Hayes*, the officers did not use any less-than-lethal force, instead immediately shooting Hayes.  Additionally, unlike Hayes, who apparently complied with the officers' commands to raise his hands and had the tip of his knife pointed down, Garcia did not put his hands up, as commanded by Officer Silva, and instead continued to hold the wooden pole within feet of Officer Silva.

Regardless, the Ninth Circuit, considering the evidence in the light most favorable to the appellant, the decedent's daughter, did not hold that the officers violated the Fourth Amendment.  *See White*, 580 U.S. at 79 (stating that, for law to be "clearly established," at least one case must have held that an officer acting under similar circumstances "violated the Fourth Amendment").  Instead, the panel held that triable issues of fact precluded finding the officers' conduct objectively reasonable, as required to grant summary judgment in favor of the officers, and declined to determine whether the defendants would be entitled to statutory immunity under California law, given that the district court had not addressed the issue.  *Hayes*, 736 F.3d at 1235, 1235 n.7.

The Garcia Plaintiffs also cite in cursory fashion *Estate of Aguirre v. Cnty. of Riverside*, 29 F.4th 624 (9th Cir. 2022); *Newmaker v. City of Fortuna*, 842 F.3d 1108 (9th Cir. 2016); and other Ninth Circuit authorities.  (Mot. at 37–39).  These cases similarly do not demonstrate that, at the time of the incident, the unconstitutionality of Officer Silva's actions was "beyond debate."  *Aguirre* was decided after the shooting incident in this case. Additionally, in *Aguirre*, the court held the officer's decision to shoot the decedent was "objectively unreasonable" and violated clearly established law because, unlike here, there was forensic evidence conflicting the officer's account of the shooting, nothing in the record suggested the decedent was threatening or advancing toward bystanders when he was killed, and, based on the decedent's facts, the decedent "presented no threat at all to the officer—or anyone else—in that moment."  *Id.* at 628, 630.

-31-

1    Similarly, in *Newmaker*, discussed more fully in IV.A.2.c. below, the court held,
2    unlike here, that there was a triable issue of material fact as to whether the officers involved
3    in that case were telling the truth about their conduct.  *See Newmaker*, 842 F.3d at 1116–
4    18 (concluding triable issues of material fact precluded summary judgment where officers'
5    accounts of fatal shooting of suspect were materially contradicted by video evidence and
6    autopsy report, the officers' accounts changed over time and were influenced by a defense
7    investigator, and the record could support the conclusion that the officers were not telling
8    the truth).

9    The Garcia Plaintiffs' failure to identify authority clearly establishing the
10   unlawfulness of Officer Silva's conduct is especially pronounced in light of existing
11   authority finding no constitutional violation—or no clearly established right—in similar
12   circumstances.  *See, e.g.*, *Blanford*, 406 F.3d at 1119 (holding that officers did not violate
13   the Fourth Amendment by shooting man holding a sword in front of residence who failed
14   to heed their commands to drop the weapon); *Woodward v. City of Tucson*, 870 F.3d 1154,
15   1162 (9th Cir. 2017) (holding that officers' use of deadly force did not violate a clearly
16   established right where officers shot an individual advancing towards officers with a two-
17   foot length of broken hockey stick raised in threatening manner in small apartment and
18   officer yelled, "Police, stop!" before firing and further explaining that, "[i]ndeed, the case
19   law makes clear that the use of deadly force can be acceptable in such a situation").  *See*
20   *also Hernandez v. City of Huntington Beach*, 798 Fed.Appx. 85, 87 (9th Cir. 2019)
21   (affirming, in part, in an unpublished opinion, a district court's grant of qualified immunity
22   to police officers because, "at the time of the shooting, it was not clearly established that
23   [the officers] violated the Constitution by shooting [the decedent] when he was holding a
24   sharp stick in a threatening manner several feet away from bystanders . . . . [,] had
25   disobeyed [the officer's] orders, and had moved toward" bystanders).

26   Finally, the Garcia Plaintiffs' citation to *Drummond ex rel Drummond v. City of*
27   *Anaheim*, 343 F.3d 1052 (9th Cir. 2003), and reliance on retained police practices experts
28   to argue that "[Officer] Silva violated her training when she shot Mr. Garcia," *see* (Mot. at

40), also do not preclude application of qualified immunity.  Although police training materials may be relevant in determining whether reasonable officers would have been on notice that their conduct was unreasonable, they are not dispositive and do not set the standard for when a right is clearly established.  *See, e.g.*, *Vasquez v. City of Kern*, 949 F.3d 1153, 1164–65 (9th Cir. 2020); *Estate of Hernandez*, 2021 WL 4139157, at *7 (concluding that, "even if department policy were the proper yardstick in determining qualified immunity, . . . . [a] retained expert's opinion does not equate to clearly established law within the meaning of the qualified immunity doctrine").

c)    *Whether the Galicia Plaintiffs' Cited Precedent Places the Unlawfulness of Officer Silva's Actions Beyond Debate*

In opposition to Defendants' Motion regarding qualified immunity, the Galicia Plaintiffs cite *Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010); *Newmaker v. City of Fortuna*, 842 F.3d 1108 (2016); and an unidentified district court opinion from *Estate of Casimero Casillas v. City of Fresno*, No. 1:16-CV-1042 (E.D. Cal. 2018), to argue that the Defendants' motion for summary judgment based on qualified immunity should be denied. (Mot. at 43–45).  As an initial matter, the Galicia Plaintiffs rely on *MacPherson* to argue Officer Yuhas's deployment of his Taser in dart mode was unlawful.  Officer Yuhas is not, however, a defendant in this lawsuit, and the Galicia Plaintiffs have not presented any evidence or argument showing that his conduct in deploying the Taser under the circumstances can be imputed to Officer Silva or that Officer Silva can otherwise be held liable for his actions.

As to Officer Silva's use of her firearm, the Galicia Plaintiffs' reliance on *Newmaker* to oppose summary judgment on qualified immunity grounds is similarly misplaced.  In *Newmaker*, the Ninth Circuit reversed the district court's grant of summary judgment to the defendant officer based on qualified immunity, concluding that "[s]ummary judgment is not appropriate in § 1983 deadly force cases that turn on the officer's credibility that is genuinely in doubt."  *Newmaker*, 842 F.3d at 1116.  Specifically, the panel found that the versions of events offered by the officers at the scene were not only inconsistent and in

conflict, but that they had changed over time, were materially contradicted by both video evidence and the autopsy report, had been suggested to the officers by a defense investigator, and accordingly required a jury to determine "whether the officers were telling the truth about when, why, and how" the decedent was shot. *Id.* at 1115–17.

Here, unlike in *Newmaker*, the primary material facts are not in dispute.   In particular, the Galicia Plaintiffs do not, and, in light of the Yuhas footage, cannot dispute that Garcia initially refused to exit the hedge in response to Officer Silva's repeated commands to do so; that when Garcia did eventually emerge from the hedge he was holding a long wooden pole that, at times, he held vertically; that Officer Yuhas exclaimed that Garcia had a stick; that both officers backed away from the hedge opening and drew their weapons; that Officer Silva drew her firearm and commanded Garcia to get his hands up; that Garcia was standing only a few feet from Officer Silva at the time; and that Garcia continued to hold the pole both while being Tased and after Officer Silva fired her first shot. *See* (JAF ¶¶ 11–15, 37–38; Yuhas Footage at 0:22-1:41).  Additionally, the Galicia Plaintiffs do not dispute that Officer Silva knew Garcia from previous contacts in which Garcia was reported to have knocked a victim unconscious.  (Mot. at 41 ("[I]t will never be disputed that Officer Silva in fact knew Mr. Garcia . . . ."); JAF ¶¶ 4–7).

Further, unlike *Newmaker*, what the Galicia Plaintiffs appear to primarily challenge in opposition is Officers Silva and Yuhas's *interpretation* of undisputed material facts as well as Garcia's intentions, not whether the officers truthfully accounted what happened. In particular, the Galicia Plaintiffs challenge whether a reasonable officer could have considered Garcia to be "armed" at the time he possessed the wooden pole, (Mot. at 41 (contending that "the [] facts and the evidence show that Mr. Garcia was not armed")); whether Garcia intended to "advance" on or attack Officer Silva with the wooden pole when, among other actions, Garcia stepped forward onto the sidewalk holding the wooden pole, (*id.* at 41–42 (arguing, among other assertions, that "[Garcia] never attempted to attack [Officer Silva], never threatened her[,] and the evidence shows that at no point he used [sic] the wood stick as any sort of weapon form against her or anybody else"));

whether Officer Silva's fear of being struck by the wooden pole was merely subjective, (*id.* at 42 (stating Officer Silva's fear "amounts to only subjective fear at best")); and whether Garcia ran away in response to the Taser or based on an intent to flee, (*id.* (arguing that Garcia ran away in "a human factor reaction" to the Taser deployment). Importantly, however, and unlike in *Newmaker*, the evidence presented in this case does not show that the officers' accounts conflict with one another's, have changed over time, are materially contradicted by the video or other evidence in the record, have been suggested to the officers by others, or require a jury to determine whether the officers are telling the truth about when, how, and why Garcia was shot. *Newmaker* is thus inapposite.

Finally, the Galicia Plaintiffs cite *Casillas*,[15] in which the district court held triable issues of material fact precluded summary judgment where evidence contradicted the officer's testimony regarding his use of deadly force without warning on an individual holding a pipe and where evidence of whether the individual raised the pipe was genuinely in dispute. *Casillas*, 342 F.Supp.3d at 997–99, 1002. As the Court has already explained, unlike in *Casillas*, there is no dispute that Garcia suddenly emerged from the hedge holding a large pole that extended above his head. Additionally, the Galicia Plaintiffs have not shown that, based on this district court case, the law governing Officer Silva's conduct under the circumstances was clearly established. *See also S.B.*, 864 F.3d at 1016 ("[D]istrict court decisions—unlike those from courts of appeals—do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity.").

Even if a jury were to attribute the cause or intent of Garcia's movement of the pole to innocent factors—namely, his involuntary reaction to being Tased, instead of an intent to strike Officer Silva—such a finding still would not preclude application of qualified immunity to the Galicia Plaintiffs' claims under the particular facts of this case, given that

---

[15] Because the Galicia Plaintiffs only provided a docket number for the *Casillas* case and otherwise did not provide a proper citation, the Court was left to speculate as to which opinion the Galicia Plaintiffs were referring. The only opinion the Court found addressing summary judgment in 2018 was the opinion at 342 F.Supp.3d 990 (E.D. Cal. 2018).

"[a] furtive movement, harrowing gesture, or serious verbal threat" can justify deadly force against someone who is armed.  *See George*, 736 F.3d at 838.  Nor would Officer Silva's reasonable, but mistaken judgment regarding Garcia's intentions with the pole, preclude application of qualified immunity.  *See Pearson*, 555 U.S. at 231; *Lopez ex rel. Lopez*, 871 F.3d at 1005.

d)  <em>Conclusion to Section IV.A.2</em>

Both the Garcia and Galicia Plaintiffs have failed to satisfy their burden of presenting caselaw demonstrating that, based on the facts and circumstances of this case, and as of the time the shooting took place, Officer Silva's conduct violated Garcia's clearly established constitutional rights.  Viewing the facts in the light most favorable to the Plaintiffs on Defendants' Motion, none of the cases Plaintiffs have identified demonstrate that it was clearly established that the Fourth Amendment prohibited Officer Silva's use of deadly force in the specific situation she confronted.  *Mullenix*, 577 U.S. at 13.  Although the Court does not require a case directly on point, *see Reese v. City of Sacramento*, 888 F.3d 1030, 1038 (9th Cir. 2018), none of Plaintiffs' cited cases demonstrate that, under the particular circumstances of this case, the contours of the right to be free from deadly force were "sufficiently clear that every reasonable [officer] would have understood that what he [or she] was doing violate[d] that right," *Mullenix*, 577 U.S. at 11.  Further, although the Court concludes that there is a triable issue of material fact regarding whether Officer Silva used excessive force under the circumstances, the Court does not conclude that existing precedent, as identified by the Plaintiffs, places the constitutional right at issue "beyond debate."  Because Plaintiffs have not met their burden, Officer Silva is immune from liability on Plaintiffs' Section 1983 claims of excessive force under the Fourth Amendment and, as such, the Court GRANTS Defendants' motion for summary judgment on those excessive force claims and DENIES the Garcia Plaintiff's cross-motion.

## B.    Plaintiffs' Claims for Denial of Medical Care

Defendants next move for summary judgment on the Garcia and Galicia Plaintiffs' Fourth Amendment claims that Silva failed to provide adequate medical care to Garcia

following the shooting.  (Mot. at 45–46).  The Garcia Plaintiffs' claim alleges, based on the deliberate indifference standard, that the officers failed to provide adequate medical care after the shooting.  (Garcia Compl. ¶¶ 32–37).  The Galicia Plaintiffs allege the same. (Galicia Compl. ¶¶ 61–74).  For purposes of summary judgment, however, all Plaintiffs argue that the Fourth Amendment's "objective reasonableness" standard governs the issue. (Mot. at 46).  The Court agrees.

The Ninth Circuit analyzes claims regarding deficient medical care during and immediately following an arrest under the Fourth Amendment.  *See Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006).  The Fourth Amendment requires officers to provide objectively reasonable care to the arrestee or suspect.  *Id.*  An officer can fulfill this obligation "by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital."  *Id.* (citation omitted).  Furthermore, a police officer who promptly summons necessary medical assistance has acted reasonably under the Fourth Amendment, even if the officer does not themselves administer CPR.  *Id.  See also id.* ("Here, the officers promptly requested medical assistance, and the Constitution required them to do no more.  We hold that it was objectively reasonable for [the officers] to request an ambulance for [the suspect], rather than performing CPR themselves." (citations omitted)); *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986) ("We have found no authority suggesting that the due process clause establishes an affirmative duty on the part of police officers to render CPR in any and all circumstances.").

Here, Defendants argue that they are entitled to summary judgment because the body-worn video demonstrates that Officer Silva and her colleagues complied with their obligation to promptly summon medical assistance.  (Mot. at 45).  Plaintiffs respond by arguing that the same footage demonstrates a factual dispute as to whether Officer Silva was prompt enough in her response.  (*Id.* at 46–47).  Plaintiffs point, for instance, to Officer Silva's choice to handcuff Garcia to argue that adequate medical care was not provided. (*Id.*).  But Plaintiffs have not provided any analogous case law to support their position. Instead, it is established that officers do not need to perform CPR and fulfill their

obligations under the Fourth Amendment if they promptly summon medical assistance. *Tatum*, 441 F.3d at 1099. Here, Officer Silva and her colleagues called paramedics promptly after the shooting and attempted to provide preliminary medical care themselves by staunching Garcia's bleeding until the paramedics arrived. (Yuhas Footage at 1:43-8:44). While the video of Garcia immediately in the wake of the shooting shows the tragic nature of the incident, it does not demonstrate a Fourth Amendment violation for failure to provide adequate medical care. Therefore, the Court GRANTS Defendants' Motion for Summary Judgment as to the Garcia and Galicia Plaintiffs' Second and Third Claims, respectively, for Denial of Medical Care.

### C. Plaintiffs' Claims for *Monell* Liability Based on Failure to Train[16]

A local governing body may be liable under Section 1983 only when "action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Municipalities can be held liable under Section 1983 only for their own illegal acts; they may not be held liable based solely on a *respondeat superior* theory. *Id.* "[R]igorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bryan Cnty. v. Brown*, 520 U.S. 397, 405 (1997). Thus, "a plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1232–33 (9th Cir.2011) (quoting *Brown*, 520 U.S. at 397). *See also Rivera v. Cnty. of Los Angeles*, 745 F.3d 384, 389 (9th Cir. 2014) ("[M]unicipalities, including counties and their sheriff's departments, can only be liable under § 1983 if an unconstitutional action 'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" (quoting *Monell*, 436 U.S. at 690)).

---

[16] The parties represent that, during the meet and confer process, Plaintiffs agreed to voluntarily dismiss with prejudice their *Monell* claims based on ratification and unconstitutional custom, practice, or policy. (Mot. at 11). Those claims—the Fourth and Sixth Claims from both the Garcia Plaintiffs' and Galicia Plaintiffs' Complaints—are thus DISMISSED with prejudice.

"The Supreme Court has made clear that policies can include written policies, unwritten customs and practices, failure to train municipal employees on avoiding certain obvious constitutional violations, and, in rare instances, single constitutional violations are so inconsistent with constitutional rights that even such a single instance indicates at least deliberate indifference of the municipality." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (citations omitted).

Plaintiffs allege one theory of *Monell* liability: a failure to train. (Garcia Compl. ¶¶ 71–82; Galicia Compl. ¶¶ 97–101). It is undisputed that "*Monell* liability can turn on a municipality's failure to train its officers, but the failure must amount to a 'deliberate indifference to the rights of persons with whom the police come into contact.'" *Vanegas v. City of Pasadena*, 46 F.4th 1159, 1167 (9th Cir. 2022) (quoting *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1158 (9th Cir. 2014)). "To allege such a failure, the plaintiff must establish 'sufficient facts to support a reasonable inference (1) of a constitutional violation; (2) of a municipal training policy that amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained their employees.'" *Id.* (quoting *Benavidez*, 993 F.3d at 1153–54). "*Monell* liability is 'at its most tenuous where a claim turns on a failure to train.'" *Id.* (quoting *Benavidez*, 993 F.3d. at 1154).

Proving *Monell* liability under a failure-to-train theory "usually requires a pattern of similar constitutional violations by untrained employees." *Id.* (internal quotation marks omitted). Here, like in *Vanegas v. City of Pasadena*, 46 F.4th 1159 (9th Cir. 2022), Plaintiffs fail to establish such a pattern. In opposing Defendants' motion for summary judgment on these claims, Plaintiffs fail to offer any evidence of a pattern of similar constitutional violations. (Mot. at 48–49). Plaintiffs also fail to articulate which of the City's training policies amount to "deliberate indifference" of a constitutional right. (*Id.*). Thus, the Court GRANTS Defendants' motion for summary judgment as to the Plaintiffs' fifth claims for *Monell* liability based on the County's failure to train.

**D.      Plaintiffs' Claims for Loss of Familial Relations**

Defendants further move for summary judgment on the Garcia and Galicia Plaintiffs' Third and First Claims, respectively, for interference with familial relations in violation of the Fourteenth Amendment.  To state a claim under the Fourteenth Amendment for loss of familial relations, a plaintiff must prove that an officer's use of force "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).  Additionally, a law enforcement officer's "snap judgment" in an escalating situation may only be found to shock the conscience if she acts with a purpose to harm "unrelated to legitimate law enforcement objectives." *Id.*  Intentional purpose to harm could, for example, be found where an officer uses force to "get even" with or bully a detainee. *Id.* at 1140.

Here, there is no evidence that Silva acted with a purpose to harm Garcia unrelated to legitimate law enforcement objectives.  Indeed, Silva represents that she responded out of self-defense and defense of her fellow officers.  Although the Court has already found that the body-worn video footage creates a genuine dispute as to the reasonableness of Officer Silva's belief that Garcia was a threat at the time of the shooting, it does not demonstrate purpose to harm.  As Plaintiffs have not provided sufficient evidence to support their loss of familial relations claims, *see Gonzalez*, 747 F.3d at 797–98 (affirming summary judgment where plaintiffs "produced no evidence that the officers had any ulterior motives for using force"); *Wilkinson v. Torres*, 610 F.3d 546, 554–55 (9th Cir. 2010) (accord), the Court GRANTS Defendants' motion as to Plaintiffs' loss of familial relations claims.

**E.      Supplemental Jurisdiction over Plaintiffs' State Law Claims**

Defendants also move for summary judgment on Plaintiffs' claims under the Bane Act, as well as Plaintiffs' claims for battery and negligence.  (Mot. at 53–58).  These state law claims are before the Court through supplemental jurisdiction.  *See* 28 U.S.C. § 1367(a).  "[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).  Where, as here, a "district court has dismissed all claims over which it has original jurisdiction," the court "may

decline to exercise supplemental jurisdiction over a claim" before it under 28 U.S.C. § 1367(a).[17]  28 U.S.C. § 1367(c).  As a general rule, "if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."  *Gibbs*, 383 U.S. at 726.  *See also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Haynie v. Cnty. of Los Angeles*, 339 F.3d 1071, 1078 (9th Cir. 2003) (affirming district court's dismissal of pendent state law claims after granting defendants' motion for summary judgment on Section 1983 claims); *Vasquez v. City of San Jose*, 634 F. Supp. 3d 712, 732 (N.D. Cal. 2022), *aff'd*, No. 22-16691, 2024 WL 445320 (9th Cir. Feb. 6, 2024) (after finding qualified immunity barred Section 1983 excessive force claim and that other federal claim failed on the merits, dismissing without prejudice plaintiff's remaining claims under the Bane Act and California common law); *Tongson v. Cnty. of Maui*, 621 F. Supp. 2d 1019, 1025 (D. Haw. 2008) (after granting summary judgment on Section 1983 claims, declining to exercise supplemental jurisdiction over remaining state law claims because "the interests of comity, fairness, and convenience most certainly will be served, and outweigh the interest of judicial economy").

Here, the Court's "discretion to decline to exercise supplemental jurisdiction over state law claims is triggered by the presence of one of the conditions in § 1367(c)" and supported "by the *Gibbs* values 'of economy, convenience, fairness, and comity.'"  *Acri*, 114 F.3d at 1001.  Comity, which the Supreme Court has suggested may be "the principal argument against exercise of pendent jurisdiction," *Gibbs*, 383 U.S. at 727 n.15, weighs especially strongly against the continued exercise of federal jurisdiction over Plaintiffs'

---

[17] Although the Court is not required to explain its decision to exercise or decline supplemental jurisdiction where no party has raised the issue, *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1000 (9th Cir.), *supplemented*, 121 F.3d 714 (9th Cir. 1997), *as amended* (Oct. 1, 1997), it elects to do so here.

1   claims. Plaintiffs no longer have any viable federal claims; their remaining claims arise

2   under California statute and common law. Declining to exercise supplemental jurisdiction

3   will avoid "[n]eedless decisions of state law" and provide the parties with "a surer-footed

4   reading of applicable law." *Id.* at 727. *See also Elshazli v. D.C.*, 415 F. Supp. 3d 20, 29

5   (D.D.C. 2019) (declining to exercise pendent jurisdiction over negligence claim after

6   defendant prevailed on summary judgment as to Section 1983 excessive force claim and

7   holding that "this case presents a local issue that would be better resolved by local jurists").

8         The factors of judicial economy and convenience are neutral; "there are no

9   countervailing circumstances that require the conclusion that retaining jurisdiction will

10  most sensibly accom[m]odate these factors." *O'Connor v. State of Nev.*, 27 F.3d 357, 363

11  (9th Cir. 1994), *as amended* (July 1, 1994), *as amended* (July 12, 1994) (internal quotation

12  marks, alterations, and citation omitted).[18] As for fairness, the Court has already explained

13  the benefits of a state court forum for Plaintiff's state-law claims. Furthermore, given 28

14  U.S.C. § 1367(d)'s provision that the applicable period of limitations shall, at minimum,

15  "be tolled while the claim is pending and for a period of 30 days after it is dismissed,"

16  Plaintiffs will not suffer any undue prejudice to their ability to reassert their state-law

17  claims in state court. *See, e.g., Bain v. Film Indep., Inc.*, No. CV 18-4126 PA (JEMX),

18  2020 WL 5491314, at *7 (C.D. Cal. Aug. 6, 2020), *aff'd*, No. 20-55948, 2022 WL

19  17592422 (9th Cir. Dec. 13, 2022).

20

21

22  [18] *See also Morris v. Sutton*, No. 1:17-cv-01488-AWI-SAB, 2019 WL 6250698, at *5 (E.D.

23  Cal. Nov. 22, 2019) (in case where federal jurisdiction predicated on Section 1983 claim,

24  rejecting defendant's motion for reconsideration of dismissal of state claims without

25  prejudice on grounds, among others, that "whatever merit existed in [defendant's]

26  summary judgment motion will likely continue to exist in [plaintiff's] state court lawsuit"

27  and because "[i]t is a simple reality—one that Congress, the Supreme Court, and Ninth

28  Circuit are surely aware of—that there will oftentimes be redundancy of discovery and

other litigation procedures when a state law claim is dismissed pursuant to § 1367(c)(2)-

(3) and renewed in a subsequent state court lawsuit").

**V.    CONCLUSION**

For the reasons stated above, the Court GRANTS, IN PART, and DENIES, IN PART, Defendants' Motion for Summary Judgment, as follows:

- GRANTED as to Plaintiffs' claims under Section 1983 for excessive force under the Fourth Amendment;

- GRANTED as to Plaintiffs' claims for inadequate provision of medical care under the Fourth Amendment;

- GRANTED as to Plaintiffs' claims for loss of familial relations under the Fourth and Fourteenth Amendment;

- GRANTED as to Plaintiff's claims for *Monell* liability for failure to properly train;

- DENIED as to Plaintiffs' claims under the Bane Act;

- DENIED as to Plaintiffs' battery claims; and

- DENIED as to Plaintiffs' negligence claims.

For the reasons stated above, the Court DENIES the Garcia Plaintiffs' cross-motion for summary judgment on their claims.   The Court further declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims, DENIES Defendants' Motion as to those claims, and DISMISSES those claims without prejudice.

**IT IS SO ORDERED.**

DATED:    March 18, 2024

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE