UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION - SANTA ANA

| | |
|---|---|
| EMILY GARCIA, et al., | ) Case No. SACV 22-131-SPG (KESx) |
| Plaintiffs, | ) Los Angeles, California<br>) Friday, April 17, 2026 |
| v. | ) 1:09 P.M. to 3:02 P.M. |
| CITY OF TUSTIN, et al., | ) |
| Defendants. | ) |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE

Appearances: See Page 2

Deputy Clerk: Patricia Gomez

Court Reporter: Recorded; CourtSmart

Transcription Service: JAMS Certified Transcription
16000 Ventura Boulevard #1010
Encino, California 91436
(661) 609-4528

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

For the Plaintiffs:

Law Offices of Dale K. Galipo
By: DALE K. GALIPO
RENEE V. MASONGSONG
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
(818) 347-SUSPECT:3
dalekgalipo@yahoo.com
rvalentine@galipolaw.com

Law Offices of Jesus Eduardo Arias
By: JESUS EDUARDO ARIAS
1150 South Olive Street, Sixth Floor
Los Angeles, California 90015
(323) 815-9450
jearias@jesuseduardoarias.com

Carillo Law Firm LLP
By: JOSE M. FLORES
1499 Huntington Drive, Suite 402
Pasadena, California 91030
(626) 799-9375
mf@carrillofirm.com

For the Defendants:

JONES MAYER
By: BRUCE D. PRAET
3777 North Harbor Boulevard
Fullerton, California 92835
(714) 446-1400
bpraet@aol.com

LOS ANGELES, CALIFORNIA, FRIDAY, APRIL 17, 2026, 1:09 P.M.

(Jury present.)

THE COURT: All right. We're back on the record. Please call your next witness.

DALE K. GALIPO: Yes. Thank you, Your Honor.

The plaintiffs would like to call Scott DeFoe.

(Pause.)

THE CLERK: Please raise your right hand.

SCOTT ALLEN DEFOE, PLAINTIFFS' WITNESS, SWORN

THE CLERK: Thank you very much. Please have a seat, and please state your name for the record.

THE WITNESS: My name is Scott Allen DeFoe, S-c-o-t-t A-l-l-e-n D-e-F-o-e.

THE COURT: All right. Good afternoon, Mr. DeFoe.

THE WITNESS: Good afternoon.

THE COURT: Counsel, you may --

THE WITNESS: May I have my water up here? Would that be okay?

THE COURT: Yes.

THE WITNESS: Thank you.

THE COURT: Counsel, you may proceed.

MR. GALIPO: Thank you, Your Honor.

Good afternoon, Mr. DeFoe.

THE WITNESS: Good afternoon.

///

DIRECT EXAMINATION

BY MR. GALIPO:

Q Do you have a background in law enforcement?

A I do.

Q What agency did you primarily work for?

A The Los Angeles Police Department for approximately 26 years.

Q What rank did you retire out as?

A Sergeant II+1.

Q In terms of your work at the LAPD, was there a period of time you were assigned to patrol?

A Yes.

Q Was there a period of time you were supervising patrol officers?

A Yes.

Q Was there a period of time you were assigned to the SWAT team?

A Yes.

Q As part of your duties and work with the LAPD, did you have to train officers with respect to tactics?

A Yes.

Q Did you train officers with respect to use of force?

A I did.

Q Can you tell the ladies and gentlemen a little bit about your educational background?

A I have a bachelor of science degree from Northeastern University in Boston, where I'm from, I have a master of public administration form Cal State L.A., and I have a master of legal studies from Pepperdine School of Law.

Q Do you have any military background?

A Six years United States Army Reserve.

Q During your tenure at the LAPD, did you receive any awards or accommodations as your work as a police officer?

A I received a hundred commendations, to include the Medal of Valor, which is the highest award for bravery; the Police Star, which is the third-highest award for bravery; and the Purple Heart while I was shot working in the line of duty in an undercover assignment.

Q After your work with the LAPD -- and I think you worked for a short time with the Riverside Sheriff's Department?

A For one year.

Q Did you at some point start doing consulting work as an expert witness in police cases?

A Yes.

Q And did that work include consulting both on behalf of plaintiffs, the people that were bringing the lawsuit; and on defendant police officers who were defending it?

A Yes.

Q How long altogether have you been serving as an expert witness in police practice cases?

A Part time from 2013 to 2014. On full time from September 2017 to present.
Q Just to give the ladies and gentlemen of the jury an idea of your work as an expert, approximately how many officer-involved shooting cases have you reviewed?
A Approximately 470.
Q Have you served as an expert witness in California?
A Yes.
Q In both state and federal court?
A Correct.
Q Including in this very building?
A Yes.
Q Have you served as an expert witness in other states?
A Yes.
Q Can you give us an idea of how many other states you have served as an expert police consultant witness?
A Approximately 40 states, as well as in Canada.
Q Have you been retained as an expert in high-profile cases?
A Yes.
Q Can you just give us a few examples?
A The George Floyd case, plaintiff expert; the Tyre Nichols case out of Memphis, Tennessee, plaintiff's expert. I'm currently the expert in the Uvalde school shooting case for the plaintiff.

Q Have you -- you said you are retained at times on behalf of the defense?
A Yes, sir.
Q When was the last time you've testified in court on behalf of the police officers, defending their position?
A This Tuesday -- this past Tuesday, three days ago, in federal court in San Diego.
Q Was that a shooting case?
A It involved three agents involved in a shooting, yes.
Q Do you keep current on POST standards that relate to tactics and use of force?
A I do.
Q My office has retained you on prior cases to look at?
A Correct.
Q Do you have a certain criteria with respect to taking cases, in other words, looking at the materials and/or videos before deciding whether you could support the party wanting to retain his position?
A Yes
Q Can you tell the ladies and gentlemen of the jury a little bit about your criteria?
A If the subject has a gun, I will not take the case. If an officer gets hurt, I will not take the case.
Q In this case, at some point did -- were you provided with some videos -- I think some body-worn camera videos and

also a dashcam video -- to look at before deciding whether this is a case that you felt you can give opinions on to support the plaintiffs' side?

A Yes.

Q And at some point did you review those videos before deciding, at least tentatively, your opinions?

A Yes.

Q I'd like to play for you Exhibit 2, which I believe is one of the videos you reviewed, and we're going to play it through, and then I have a few questions for you.

(Exhibit 2 video is played.)

MALE OFFICER: Babbs, come up and (indecipherable) right here.

(Pause.)

MALE OFFICER: You sure he's still there?

FEMALE OFFICER: Yeah.

Hey? Wake up. Come out with your hands up.

SUSPECT: Oh, okay.

FEMALE OFFICER: I know you. Come on.

MALE OFFICER: Who is it?

SUSPECT: (In Spanish.)

FEMALE OFFICER: Let's go. Come on. Get out.

SUSPECT: (In Spanish.)

FEMALE OFFICER: Keep your hands up. Keep your hands up. Keep your hands up.

SUSPECT: (In Spanish.)
FEMALE OFFICER: Let's go. (In Spanish.)
SUSPECT: Okay. (In Spanish.)
MALE OFFICER: (Indecipherable.)
FEMALE OFFICER: Let's go.
MALE OFFICER: (Indecipherable).
FEMALE OFFICER: Keep your hands up.
SUSPECT: Okay. Okay. (In Spanish.)
FEMALE OFFICER: Let's go. Come on.
SUSPECT: Okay. (In Spanish.)
FEMALE OFFICER: No. Get out.
MALE OFFICER: (Indecipherable.)
SUSPECT: (In Spanish.)
FEMALE OFFICER: Hey, can you go on the other side?
MALE OFFICER: Yeah. Just (indecipherable).
SUSPECT: Oh, yeah. (In Spanish.)
FEMALE OFFICER: Let's go.
SUSPECT: Okay.
FEMALE OFFICER: Get out.
SUSPECT: (In Spanish) --
FEMALE OFFICER: (In Spanish.)
SUSPECT: (In Spanish.)
FEMALE OFFICER: Keep your hands up. (In Spanish.) Let's go.
SUSPECT: (In Spanish) --

FEMALE OFFICER: Come on. Let's go.
SUSPECT: (In Spanish) --
FEMALE OFFICER: Let's go.
SUSPECT: (In Spanish) --
FEMALE OFFICER: Come on. Step out. Come on.
MALE OFFICER: Come here.
SUSPECT: (In Spanish) --
FEMALE OFFICER: Hands up. Let's go.
SUSPECT: (In Spanish.)
FEMALE OFFICER: Dude, I'm going in.
SUSPECT: (In Spanish.)
MALE OFFICER: Hold on.
FEMALE OFFICER: Let's go.
MALE OFFICER: No.
SUSPECT: (In Spanish) --
FEMALE OFFICER: Let's go now.
SUSPECT: Okay. (In Spanish.)
FEMALE OFFICER: Let's go.
SUSPECT: (In Spanish) --
FEMALE OFFICER: Out. Get out.
SUSPECT: (In Spanish) --
FEMALE OFFICER: Get out.
SUSPECT: (In Spanish) --
FEMALE OFFICER: Get out.
SUSPECT: (In Spanish) --

MALE OFFICER: Face the wall.
SUSPECT: (In Spanish.)
MALE OFFICER: God damn it.
SUSPECT: (In Spanish) --
MALE OFFICER: He's got a -- he's got a stick. He's got a stick.
SUSPECT: (In Spanish) --
FEMALE OFFICER: Get your hands up.
(Sound of Taser.)
SUSPECT: (In Spanish.) Ah.
(Shots fired.)
SUSPECT: Ay yi yi yi. Ay yi yi. (In Spanish.)
(Exhibit 2 video ends.)
BY MR. GALIPO:
Q Is -- and I stop it there at, I think, 150. Is that part of a video that you looked at in deciding whether or not you could serve as an expert in this case?
A Yes.
Q And what were some of what you were looking for when you -- we could take that down.
When you were looking at the video -- and we'll go into specifics in a moment -- what are some of the things you were looking for?
A The reason for the initial contact. You know, did you have reasonable suspicion to detain that person? Why were

you confronting that person? -- first part of it. Once there was contact made by Officer Silva, in this matter, did she convey anything to her partner officers of what she sees while looking into the area? Even at that point you had someone who was sleeping in there. You could see based on, probably, looking in there, there were cans and things consistent with someone who may be homeless or transient. I would be looking at, you know, do we even have a crime here? What has this person done to why I'm going to detain the person? And, if so, am I going to formulate a plan with my partners that are there?

I also observed that Officer Silva clearly escalated the situation. It's not sometimes what we say, it's how we say it. And so by affording someone the opportunity -- you woke them up. They're gathering their belongings, in that case his only belongings, getting that to come out, giving someone a reasonable opportunity to comply. You have a human being that's in the bushes there; so we want to give him an opportunity to comply -- if you are going to detain him because I wouldn't know the reason for a detention at this point.

And then, obviously, once he starts coming out of the bush, as you asked him to do -- is to come out -- he does come out, and then there's immediately a force option by Officer Silva and Officer Yuhas that grab at him -- don't

understand the reason for the force -- letting him come out. And then, when he comes out, he's immediately tased by Officer Yuhas, once again, no assaultive behavior, no resistive behavior at that point, and then subsequently he's shot and killed shortly after that.

So I'm looking at everything from the planning, the tactics, the escalation, the use -- consideration of less-than-lethal force and then ultimately the use of the Glock 9-millimeter pistol that Officer Silva fired twice killing the decedent in this case.

Q And when you looked at the shooting itself, I'm assuming you not only looked at the videos but you reviewed officer statements and depositions at some point; is that correct?

A I reviewed a total of 44 separate items, including deposition transcripts, policies, audio recordings, police reports, body-worn camera recordings, and then obviously discovery. That's material that the -- each party gets from the other party through the process.

Q So -- and I'm going to break this down in a moment, Mr. DeFoe, but what was your general opinion regarding the shooting when you first watched these videos?

A Probably one of the worst shootings I've seen of the 450 shootings I've been -- at that time been retained on. In my -- all of the shootings that I take, the subject does not have a weapon, including a gun, at the time. So I believe --

as I conveyed to Mr. Galipo, I believe it was one of the worst shootings I'd seen.

Q Why do you say that?

A A, the subject was compliant -- decedent was compliant. You asked him to come out. I believe there was an unnecessary escalation. There was no reason to initiate force. That unnecessarily escalated the situation. The deployment of the Taser in probe mode -- once again, if I'm going to tase this gentleman here, I'm going to want to see what the effect of the Taser is. In this case if I don't achieve neuromuscular incapacitation -- that means both probes strike this gentleman and it overrides his sensory systems and motor skills. This case the decedent screams, which is associated, as a former Taser instructor, of the pain associated with the Taser; and he runs, which would be consistent if you don't achieve neuromuscular incapacitation.

At that point, a, there was never a reason to fire the round in the first place because I never found that carrying the stick in the manner that it was being carried presented a lethal threat. There was never attempt to look like he was going to strike her with it. He was carrying cans in his other bag. If I'm going to assault someone with a stick, I'm going to have both of my hands free. If I was swinging an object -- a bat, a stick -- I'm not going to be carrying my belongings out if there was ever an intent to

strike any of the officers. Never made any verbal threats. A little reluctant, probably not to the speed that Officer Silva wanted him to leave the bush. That's part of the deescalation process.

Q And was it important to you that based on the video and the officers' statements and testimony that he never swung the stick and the stick was never coming down towards any officer?

A According to all the officers' testimony, correct.

Q Why was that important to you?

A Because there was no imminent threat of great bodily injury or death that would necessitate the use of lethal force, and that's the threshold. I can't -- if I hit you with the stick in the stomach or I poke you with the stick, that's not lethal force. That's assaultive behavior, and there's -- within POST, "Peace Officer Standards and Training," there are Learning Domains that coincide with, obviously, the Tustin Police Department's use-of-force policy about the reasonableness of force based on the totality of the circumstances.

Q While we're talking about the deadly force now, let me just ask you: Are there POST standards that apply to deadly force?

A Yes.

Q Is there police training that applies to when you can

and cannot use deadly force?
A Yes.
Q And so is subjective fear -- or, in other words, an officer says, "I thought" someone was going to do something, for example, with a stick, "I thought they were going to hit me over the head with a stick" -- is that enough, based on the training, to use deadly force?
A Future harm is insufficient. It has to be what the subject's level of resistance is at that time and was it life-threatening? It's the only time you can use lethal force is when it's life-threatening.
Q Does POST have some different categories of suspect behavior in Learning Domain 20 and then associate it with the type of force you can use depending on the behavior of the suspect?
A Yes.
Q Can you explain that to the jury, please?
A Well, first, there's compliance. If I ask this gentleman to "Come here" and he -- and I said, "I need you to come here," and you come here, you're being compliant.

The second would be passive noncompliant. You see that a lot in demonstrations. Maybe he's sitting in the middle of a street, and I'm like, "You need to come" -- he's demonstrating for whatever the reason might be. He's like, "I'm not coming," but he's offering no form of physical

resistance at that point.

Active resistance, which is a third tier, is that -- it's called "tensing, bracing, or running away." Officer comes up to me, maybe I brace against the desk, or I get out of the stolen car and I run. That's active resistance.

The next is assaultive. I come up, I put my hands up, preassaultive behavior that I look like "Hey, I want to fight you," I say something like that, or I swing at you, or I poke you with something. That's assaultive behavior.

And then last is life-threatening, where my behavior is likely to cause serious bodily injury or death. That could be with an object, could be with a weapon. It could be with hands and feet depending on the circumstances.

Q And according to the POST table, if the behavior is resistant, is that enough to use deadly force?

A Resistance behavior will typically coincide with -- depending on the circumstances, would be control hold, where I'm grabbing you, conducting a wrist lock, twist lock -- something to control you with the ultimate objective to what -- apply handcuffs, right, mechanical restraints. Maybe the utilization of OC spray, pepper spray -- 2 to 12 feet typically for pepper spray. A Taser, potentially -- if you're borderline at that point on resistive, potentially a Taser -- 7 to 15 feet -- the optimal range. Doesn't rise to the level of where I'm going to use a baton or an impact

weapon to strike you with. That would be more on the assaultive behavior. And then the next tier is obviously lethal force.
Q How about assaultive behavior? Based on the POST matrix, can you use deadly force against someone who is being assaultive?
A No.
Q So it has to be immediately life-threatening?
A Unless the assaultive behavior rises to the point where it would likely cause serious bodily injury or death.
Q And so does the threat of death or serious bodily injury have to be immediate?
A Immediate or imminent. Yes.
Q And is -- based on the POST standards, does it break down what "immediate" and "imminent" means in terms of the ability, opportunity, and apparent intent?
A Yes.
Q Can you explain that to the jury, please?
A Does the subject have the availability -- like, is he or she in a position to do it? Is there an opportunity -- right? -- the person is going to do it. And then there's an intent: Am I going to do it? Am I trying to do it? Maybe my actions or my words -- "I'm going to kill you," and now I take something and I'm going to hit you with it, or I take a knife out and I'm going to try to stab you with it. That

would be an imminent threat -- ability, opportunity based on the subject's actions.

Q Based on your review of the materials, Mr. DeFoe, did you -- where did you think Mr. Garcia was on his requirements of ability, opportunity, and apparent intent to immediately cause death or serious bodily injury based on the facts of this case?

A The decedent was being compliant. "Come out of the bushes" -- he was coming out of the bushes at that point. So that's compliant. So you're asking me to do something, and I'm complying in doing it. That's why, when I looked at the force as he was coming out, it didn't make any sense. It did not seem reasonable based on the totality of the circumstances.

Q Are officers trained to control their fear?

A Yes.

Q Are they trained not to overreact in using force, including deadly force?

A Yes. Overreaction is excessive force.

Q Are officers trained that they're responsible to justify each shot?

A Yes.

Q Is the training that a verbal warning should be given before using deadly force when feasible?

A As well as less-than-lethal force.

Q And why is that important? Can you explain that to the jury?
A Well, you want to give someone a reasonable opportunity to comply. If I tell you to "Get on the ground. Don't move," that's a command. But if I tell you to "Get on the ground" or "Don’t move or I'm going to shoot you," that's a warning. That's a reasonable opportunity to comply. That's the difference between the two.

Now, I've got to take into consideration your ability to comply. Is there an issue that's causing you, maybe, to be delayed? You see that a lot with people that are drinking. They're on a central nervous system depressant. I tell you to do something, you're probably going to get delayed a little bit because your mind is not functioning in the manner that it should to immediately respond. We see that with driving accidents and other things.

So it's got to be a reasonable opportunity to comply, and then, if the person doesn't do that, if the force option is still reasonable at that time -- like, it can't be something where I punch this gentleman and then I back up and then, if I walk towards him, you can shoot me -- or you can do something. The fact that I did something and stopped doesn't mean that any future harm that may come allows me to use force at that time based on something that happened

before.
Q And are officers trained that deadly force should only be a last resort?
A Yes.
Q What does that mean in terms of the training?
A It's a reverence for human life. It's human life we're dealing with. So what other options do you have? Use words and actions to influence behavior -- can you use to try to negate the use of lethal force? That's why officers are trained or should be trained seven-to-eight-hundred-hour police academy. They go through training. They're provided impact weapons, such as batons. They're provided or should be provided OC spray. They're provided -- with taxpayer money -- Tasers along with the instruction. There's a number of less-lethal-force options that officers are provided and trained with so we don't have to resort to use of lethal force unless it's necessary. If it's necessary, then obviously lethal force will be reasonable based on the totality of the circumstances.
Q So as an expert, when you look at a case like this, is one of the factors you're looking at -- one factor is tactics; correct?
A Yes.
Q We're going to talk about that in a moment.
Regarding the shooting, are one of the factors you

look at as to whether there was an imminent or immediate threat of death or serious bodily injury?

A At the time of the shooting, yes.

Q Do you also look at -- as to whether there were other reasonable options?

A Yes.

Q And do you also look to see whether a verbal warning was given or not?

A Yes.

Q So in this case, based on your analysis, was there an imminent or immediate threat of death or serious bodily injury?

BRUCE D. PRAET: Objection, Your Honor. That's for the jury.

MR. GALIPO: I think all the officers testified to it, Your Honor.

MR. PRAET: Beyond scope of an expert.

THE COURT: Sidebar.

(Sidebar held on the record.)

THE COURT: Your objection?

MR. PRAET: Sure. Objection, Your Honor, is that that's beyond the scope of an expert witness. The officers can testify to their observations, but it's for the jury to determine whether or not it was reasonable to believe that there was an imminent threat, not an expert's.

MR. GALIPO: I don't agree with that, Your Honor. I do think the jury ultimately decides whether it was excessive or reasonable, but their expert has proffered opinions that he thinks that there was an imminent threat of death or serious bodily injury; that's why he believes the shooting was justified. Mr. Praet had all four of the officers say before this jury that they thought there was an imminent threat of death or serious bodily injury at the time, and that's the state --

THE COURT: Did you object?

MR. GALIPO: -- of our record. Pardon?

THE COURT: Did you object?

MR. GALIPO: I can't remember. I don't think I did because I thought it was appropriate [sic] question, just like I think this is an appropriate question. Because, if part of the analysis is whether there appeared to be an imminent threat of death or serious bodily injury, experts are allowed to testify to that.

JESUS E. ARIAS: On behalf of the Galicia plaintiffs, Your Honor, some of the officers -- indeed we join and described that to them -- it was a serious bodily injury to them and the only reason they didn't (indecipherable) was because the line of fire. So we join the position of the Garcia --

THE COURT: Did you object?

MR. ARIAS: I don't remember, Your Honor.

THE COURT: Anything further?

MR. PRAET: No, Your Honor.

THE COURT: Hm. It's more of a factual question than a legal question, and I agree that, when it comes to an expert, the expert shouldn't be opining on a legal question, but I think it's fair game in terms of -- I shouldn't keep saying "fair game." I think it's appropriate for an expert to opine based on his observations, and you have your cross.

MR. PRAET: Okay.

MR. ARIAS: Thank you, Your Honor.

THE COURT: All right?

MR. GALIPO: Thank you.

THE COURT: Thank you.

MR. PRAET: Thank you, Your Honor.

(Sidebar off.)

THE COURT: The objection is overruled.

BY MR. GALIPO:

Q Do you remember the question, Mr. DeFoe?

A I don't.

Q I'm not surprised. I'll try to think of it.

Do -- based on your reviewing the materials in this case, do you have an opinion as to whether or not Mr. Garcia posed an imminent or immediate threat of death or serious bodily injury at the time he was shot?

A I do.
Q What's your opinion?
A He did not pose a serious threat or imminent threat of great bodily injury or death at the time he was shot.
Q Do you have an opinion as to whether there were other reasonable options available to the officers?
A Yes.
Q What's your opinion on that?
A Well, when he exited the bush, as you asked him to do, unless you were going to detain him for a crime, then you'd have to let him leave because based on my understanding of the case, there was no crime involving the decedent in this case. If you -- the other options would be that, if you reasonably believe that he presented a threat, it never rose to the level in this case -- based on the videos that I've watched probably north of a hundred times at any point was he a threat to any of the officers when he exited the bush area.
So my feeling would be you have to let him leave, if you're not going to detain him, and I don't know the reason, based on what I read, to detain him any further. You asked him to leave the area. I understand that he's sleeping in a bush. I didn't see him doing anything wrong at the time based on the comments of the call, but just have him leave would be the most you could do at that point and then he -- and then go on his way.

Q And -- we'll talk about tactics in a moment.

And based on your review, were adequate commands given to Mr. Garcia prior to him being shot?

A No.

Q Why not?

A He was told to put his hands up coming out, and based on the review of the video, his hands were up. "Can I see your hands?" By looking at the video, I can see his hands. There was never a command to drop whatever he had in his hands, and then create some space to drop it, and then give him a reasonable opportunity to comply. If you're concerned about either a dowel that he's carrying or you're concerned about the recyclable cans that he's carrying as a homeless person -- if you're concerned about either of those, just have him drop those things.

And back away from the opening as well. It's an awfully poor tactic. If I'm concerned about someone being in that opening -- if I'm concerned that there's someone bad in that door right there, I'm not going to stand right in front of the door and then articulate that I was afraid of the person behind the door. I'm going to pull back to a position of cover, especially when you have police cars parked on the street that you could clearly pull back to, even prior to Officer Babb arriving. As you watched him walk along the path between the bushes, you clearly could have just backed

up and then called him out of the bush from a position of cover -- safer for the officers, safer for the community as well. Never want to be that close -- especially with a handgun out close to that bush if you're concerned at all that the suspect may be or subject may be any type of threat.
Q And do -- are officers trained about the concept of tactically repositioning?
A Yes.
Q And how would that apply to this case?
A Once I looked in there -- and Officer Silva recognized the decedent from prior contacts -- just going to pull back. (Indecipherable) I recognize him from before. Maybe they say what -- does he have a warrant or something any -- just because I've interacted with someone before and they may have committed a crime before doesn't mean I can detain them now. There still has to be the reason for the detention now. So unless there's some reason to detain now -- there was someone did something wrong in the past -- that's why it's called the criminal "history," it's in the past. I can't just arbitrarily detain him now unless I can justify the reason for the detention. It's called "reasonable suspicion" under the Fourth Amendment.
Q And in terms of tactically repositioning, did you look at video and photos of the area to see whether or not Officer Silva could have backed up further, either in the

bushes or towards the street?
A As I mentioned, everything she needed to accomplish didn't need to be done at the opening of the bush, and I'm glad that her partner said, "Don't go in the bush by yourself," which would have been even more of a poor tactic she was already demonstrating. But, no, you -- once I see someone, if I'm concerned, I'm just going to back away. A, I want to create some distance and time and, once again, to deescalate. I'm going to ask you to come out. I don't need to tell you or talk at you in a way that's going to escalate the thing. "Hey, do me a favor. Got a call. Someone sleeping in a bush. Hate to wake you up like this. Grab your stuff. We need to have you move along." That's it. That's your case.
Q Female officers -- most departments now have female officers, obviously; correct?
A They do.
Q Is there any different standard in terms of the use of deadly force, in other words, a different standard that applies to a male officer versus a female officer?
A My wife was a detective in LAPD for 20 years. We were classmates. I worked with women of all -- and men of all sizes and shapes and heights. The -- it's equitable for all size. As a supervisor at LAPD SWAT, our -- one of our best officers was, probably, 5-foot-3, and she was a female. So

the fact that someone is tall or short, small, regardless of body shape or type or gender, it's equitable for all of us. We have the same policies and procedures, we all go through the same training, and the standards should be the same male or female.

Q So let's back up to the beginning of this call, and you understand that there was a report on the morning of August 9th about a white, blonde-haired male waving a knife around the night before. Is that your understanding?

A Yes.

Q And some reporting party, who was, I guess, a retired Anaheim police officer, was told of this by someone else. Is that your understanding?

A Correct.

Q And that person, the retired officer, apparently saw someone go into the bushes on the morning of August 9th. Is that also your understanding?

A Correct.

Q So -- and then, as you are aware, Officer Silva is the primary officer. She approaches the opening of the bush, looks in, she might have shined her tac light in, and at some point sees Mr. Garcia sleeping in the bushes. Is -- are you with me so far?

A I'm with you.

Q Is it a crime, to your knowledge, for him to be sleeping

in the bushes?
A I don't know of the ordinance -- if there's an ordinance in Tustin -- I don't want to misspeak -- by sleeping in there, but my understanding -- once again, unfortunately, the homeless population sleep somewhere and many times behind cover, which would be in a bush. So I'm not aware if there's a reason or an ordinance within the city that would necessitate you detaining him, but if there was, then you just ask him to leave.
Q Was the fact that he was sleeping and awakened by Officer Silva one of the facts you considered in the totality of the circumstances?
A Yes.
Q Why was that important?
A There was no crime in progress. There was nothing that was occurring at the time. He was sleeping. And at the time, you woke him up and -- and right away you realize that, guess what? That's not the blonde-haired guy or the Caucasian with the knife. That's a male Hispanic and not the guy we're here for; so I would convey to my partners, "Hey, partners, the guy we're looking for is not here because I've interacted with him before, and he's a male Hispanic, and we're looking for a Caucasian. So we don't even have a reason to detain him because it's a different person that's in the bush, and it's not the male white with the alleged

knife."

Q And one of the commands he was given was to come out of the bushes; is that correct?

A Yes.

Q And you mentioned something earlier about the escalation in the voice of Officer Silva. Can you elaborate on that?

A We just heard it again just a moment ago when we listened to the video. There's no reason to allow your emotions to drive the day. If I ask you to do something, I'm professional, and I speak to you rather than at you, you're much more apt to listen.

And then with that comes, maybe, some dialogue and some compassion and by being -- and that's a way to deescalate. You're waking a homeless person up who's trying to gather all he has, which is his cans, and move along -- there's no crime in progress. You maybe tell your partners, "Hey, we just need one of you here. The other two can leave. We have no crime here. We're just going to have him make sure he gets his stuff up and leave." That would probably be the way to do it. But "Come on. Let's go. Let's go," and all of that escalation is unnecessary. It just unnecessary escalates the situation.

Q And the fact that Officer Silva had, according to her, three prior contacts with Mr. Garcia -- you have an understanding as to the nature of those contacts?

A I do.
Q Does any of that change your opinion with respect to the tactics or the use of force? The fact that she had arrested him before or there was an incident where there was some meth found on him and another incident where she understood he was in some confrontation with a street vendor -- does any of that change your opinion on the -- on your -- facts of this case?
A Well, as a former drug recognition expert -- central nervous system stimulants, such as methamphetamine -- well, he's sleeping. So we know he's probably more than likely not high on meth at that time, at least not right then. So that's not the issue.
Second issue is: How did I react with him the last time? If I -- areas I worked in L.A. -- you arrest people all the time, and you meet them again all the time because you work in the areas. I worked in Watts in 77th Division -- they live in that neighborhood. So I'm going to base my interaction based on how the prior interactions were.
If Officer Silva felt threatened by the decedent in this case, I don't think she should have been standing in the opening of that bush if -- reasonably believed he was a threat. If I reasonably believe he's a threat because he was aggressive with me in the past -- "Hey, partners, I got to" -- "pull back" -- "pull back away from the bush. Last

interactions we had a problem with him. He was combative with the police, something happened," and that's going to change my plan, and that's going to change how I may interact with him depending on what the prior incidents were.

The fact that someone has been arrested before -- it should cause situation awareness, it should cause the use of good tactics, but her actions demonstrated the opposite because, if she was afraid of him, she wouldn't have decided she wanted to go in the bush by herself, especially if there's concern about the size of the officer. And secondly, if there was an issue of "I felt threatened by him," I'm going to tell my other partners. I'm going to convey, "Hey, partners, this is what we have." That never happened.

Q Did you ever hear her communicating to her partners about her prior contacts or experiences with Mr. Garcia?

A Not one word of it.

Q And do you understand that, at least according to Officer Silva, each time she had contacted Mr. Garcia previously, he was cooperative, not physically resistive in any way?

A Towards her, correct.

Q You noted in part of the video where Officer Silva says she wants to go into the bushes and the -- I think it was Officer Yuhas who said "no"?

A Correct.

Q And how about when they grabbed him as he was coming out? Based on their request for him to come out, them grabbing him -- what is your thoughts on that?
A It's evident on the video. He was startled. If I ask you to come out and you immediately put your hand in my face, I'm going to be startled. I just saw a gun being pointed in my direction prior to that, don’t really know what I did wrong -- I don't want to speak for the decedent here because he's not here to ask him questions, but I don't know what he's thinking at the time other than it -- the response seems startled. If I walk up to someone and I put my hands in their face and they're not expecting that -- because I'm complying with what you're asking me to do. I'm coming out of the bush. And he's coming out -- he's bending down, coming out from the bush, and immediately there's force that occurs: beanie grabbed, pushed back into the spot. Once again, I would be more concerned -- just waking up -- as why is this happening at this point?
Q Do you recall that part of what is being said during this time -- words to the effect -- when she said, "Show me your hands," Mr. Garcia saying something to the effect "I am showing them to you"?
A Yes.
Q And "I" -- "I'm waiting for a friend," "I have recyclables" -- things of that nature?

A I do.
Q He's asking, "Why are you taking me?" -- words to that effect?
A Yes.
Q I want to ask you about this jab. Your understanding from reviewing -- at least Officer Silva's statement in deposition, she claims that at some point Mr. Garcia was attempting to jab her with the stick or pole. Do you recall seeing that?
A I do.
Q First of all, in looking at all the video footage -- the dashcam, Officer Yuhas's, Officer Babb, Officer Frias -- do you see any jabbing of the pole or stick coming out towards Officer Silva's stomach?
A No.
Q Are you aware that Officer Frias, Officer Yuhas, and Officer Babb all testified that they did not see that happen?
A Correct.
Q Let's just assume for a moment it did happen. Let's assume that, as Mr. Garcia is getting out of the bushes, he has this pole or stick and he's got to hold it somewhat horizontal just to get out of the bushes. Are you with me so far?
A I am.
Q And let's assume that the end of it comes within a foot

or so of Officer Silva's stomach, in my hypothetical. Can you just assume that for a moment?
A Sure.
Q And let's assume Officer Silva's wearing, as officers ordinarily do, a bulletproof vest. Are you with me?
A I am.
Q Would that -- if -- assuming that happened just for a moment, would that justify using deadly force, in your opinion, against Mr. Garcia?
A No.
Q Why not?
A There's still no imminent threat of great or serious bodily injury or death based on even if that was in fact true.
Q So now he comes out, and I'm to the point now where he's got the stick or pole and a bag of something, apparently recyclables, in has hand, and I'm talking about the moment of the tasing. Are you with me?
A I am.
Q And you're aware that Officer Yuhas yelled out, "He's got a stick. He's got a stick." You heard that on the audio; correct?
A I did.
Q And I think you've already mentioned it, but there were no commands to drop it?

A Correct.
Q Did you note in reviewing the statements of Officer Frias, Yuhas, and Babb -- they all said repeatedly in their statements there were repeated commands given to Mr. Garcia to drop the pole or drop the stick? Do you recall seeing that?
A I did.
Q Did you hear any of that on the audio?
A No.
Q In your opinion, would that have been a proper command to give?
A If you were concerned about the stick, sure. You want to ask him to drop the stick. I also don’t want to be standing at the mouth of the area he's coming out if he has a stick. So once I hear my partner say he has a stick, I'm just going to back away from the opening, and then, if I want him to drop the stick, I'm going to -- I'm further away. I'm going to say, "Hey, drop the stick," and then, if he doesn't drop the stick, then that may be escalating things. If he doesn't drop the stick -- I'm going to give him a reasonable opportunity to comply. If I feel that it's threatening, it may be a force option. It just depends on what he'll -- he does with that stick.
Q Let's talk about the tasing for a moment. You're aware that Officer Yuhas deployed the Taser; correct?

A Correct.
Q Based on the audio, was there any verbal warning that a Taser was going to be deployed?
A No.
Q Do you have an opinion as to whether or not the Taser prongs struck Mr. Garcia?
A They did.
Q And what do you base that on?
A The autopsy.
Q And you saw certain officers in their statements indicating that the prongs appeared to strike him. Do you recall seeing that?
A I do.
Q And you said you were a Taser instructor before?
A I was.
Q The jury has heard a little bit about this, but the greater the spread, -- meaning the greater the distance between the two prongs up to, like, a foot, for example -- the stronger the current the person is receiving?
A And more likely to achieve neuromuscular incapacitation.
Q Okay. The question, I guess, is if you're closer -- you said earlier the preferred distance is 7 to 15 feet?
A Correct. With a Taser 7, which is the model he deployed, you could be closer than that, maybe a little further away, than you could with the former model, which is

the X26.
Q Okay. And so let's just assume -- in this case the spread was obviously less than a foot; correct?
A Correct.
Q Does that mean that you get no effect of the Taser at all?
A No. You're still going to get the pain associated with the barb traveling at 270 feet per second that's entering your body. So it's going to hurt. There's still going to be current, as there was in this case, for approximately 3.5 seconds. So the screaming you hear as he runs south -- in a southerly direction out of there, I would assume -- being present during tasings, as well as being an instructor -- the pain was associated with the tasing, without me offering medical opinions, obviously.
Q Where do you come up with 3.5 seconds? Because isn't the cycle generally 5 seconds?
A It is. Typically 5 seconds -- if you pull the trigger, it's going to run 5 seconds. If you depress the trigger, it'll continue to run. If you take your finger off, you can press it again, it'll be another 5 seconds. Based on the connectivity, from the information I reviewed, it seemed like the connection was about 3.5 seconds, which is consistent with him screaming as he exited the opening of the bush.
Q What, if anything, happened, based on your review of the

materials, that stopped the 5-second cycle short to 3.5 seconds?
A Could have been a number of things. It could have been the -- one of the -- when he was pushed to the ground after being shot -- that may have caused that if it was within that time frame. When running after being shot, one of the connections or both could have come ajar. Many times people will just tear it out. Like, they'll take it out. So that would have either been unintentional, after being shot twice, or taken out himself -- that could have been a result of it -- or being pushed to the ground.
Q And the 3.5 seconds -- did you see that somewhere in the investigation reports?
A Yes.
Q Did you feel his conduct rise to the level of making the Taser appropriate?
A No. As I testified earlier, Counsel, there was no reason at the time in which to deploy the Taser based on the subject's level of resistance.
Q And the Taser is less lethal; correct?
A It is. Typically.
Q And given the fact that Officer Silva was aware the Taser was deployed, she heard it being deployed, saw the barbs going towards Mr. Garcia, and heard him screaming, and then fired during the Taser cycle, how does that affect your

opinions in this case?
Q Well, she's not going to know if it's going to achieve neuromuscular incapacitation. So the idea -- once again, using the less-lethal-force option, and let's see if it worked, and if it didn't work -- and, once again, doesn't necessitate the use of lethal force if the Taser didn't work because it has to be an imminent threat of great bodily injury or death at the time in which you pull that trigger of that Glock 17 9-millimeter pistol that she fired.
Q Did you note in your review, Mr. DeFoe, that Officer Yuhas did not deploy a second cartridge on the Taser?
A Correct.
Q Did you note that Officer Yuhas did not pull out his gun?
A Correct.
Q Did you note that Officer Babb did not pull out his gun?
A Correct.
Q Did you note that Officer Frias did not pull out his gun?
A Correct.
Q Was that important to you in your review of the case?
A Yes.
Q Can you tell the jury why?
A Well, if I reasonably believe that you're a lethal threat, I'm going to stop a lethal threat with lethal force.

Now, with Yuhas, if I designate this gentleman "You're the Taser person. That's your job," I understand that, and everyone else, if you believe there's a lethal threat, should have their pistols out, but your job is the Taser or that woman's job is the OC spray -- whatever we designate that person is, that's your job. Now, you may transition from that job, drop your Taser, and grab your pistol because now that less-than-lethal threat has risen to lethal threat. So it just depends on the totality of the circumstances.

Q So let's just say, for example, different people have these different assignments like you're explaining, and the person comes out of the bushes with a gun in their hand. Does that mean they're not allowed to pull their gun out?

A I would not expect this gentleman to tase the person with the gun. I'd want him to transition to his pistol because now it's an immediate or imminent threat of death or great bodily injury to him or someone else, which is the threshold, and then use reasonable lethal force if there was a lethal threat.

Q And is the fact that none of the other officers pulled their gun out, to you -- tell you something as an expert as to whether or not at the time they perceived an imminent threat of death or serious bodily injury?

A Perceived, as well as, if I had prior contacts with

someone and I believed them to be a threat, I would assume my partner officer would let me know that this person may be a threat. Because I would be very angry if they -- someone had a -- prior interactions with someone who may have been aggressive or threatening, and they just didn't tell me, and now this guy comes out of the bush with anything -- knife, a gun or anything -- based on your hypothetical, Counsel, yes, I want to know that because that's changing everything. Because by not saying it, I'm putting my partners in jeopardy because they -- they've not interacted with the guy in the bush, because they don't know who he is, because she's the only one looking into the bush where the decedent is at the time.

Q You've watched the videos in real time; correct?

A In all -- real time, slow time. I've looked at them a bunch of different ways.

Q You've even looked at them frame by frame; correct?

A As well as still shots, frame by frame as well.

Q Is the best evidence, in your opinion as an expert in this case, the video in real time?

A Yes.

Q Now, I want to ask you about the sequence of shots, according to Officer Silva. Did you, in reviewing her deposition, note that she was informed at the police station that one of the shots struck Mr. Garcia in the back?

A Page 19 of her deposition.
Q Okay. Now, I -- you understand that, according to Officer Silva, she fired the first shot to protect herself?
A Correct.
Q And she fired the second shot, according to Officer Silva, to protect Officer Frias. Is that your understanding?
A What she testified to.
Q So according to Officer Silva, she thought that Mr. Garcia was immediate threat to her at the time she fired her shot but at the time -- the first shot -- but at the time she fired the second shot, she thought it was an immediate threat to Frias. Is that your understanding?
A Yes.
Q And according to Officer Silva, based on her deposition, she assessed between the shots. Do you recall that?
A Correct.
Q I think she even estimated there was two seconds between the first shot and the second shot. Do you recall that?
A She did.
Q And that Silva -- I mean, Garcia was running at Frias at the time of the second shot. Do you recall that?
A Correct. And she fired to protect her partner from what she believed to be a threat.
Q Based on your review of the materials, how much time was there between the first shot and the second shot?

A Third of a second.
Q So was that important to you, that in this third of a second, according to Officer Silva, Mr. Garcia went from being a threat to her to not being a threat to her, being a threat to Frias?
A It was very important.
Q Can you explain to the jury why?
A There's no way she had assessed. She fired both of those rounds almost simultaneously, and the idea that I'm going to fire and then immediately look and say, "Oh, I'm going to assess because he's running towards my partner right now," doesn't comport with the facts. Listening to the gunfire, they're simultaneous rounds right on top of one another.
I know that sound. I was a handgun instructor and a range master for 20 years; so I understand the manner in which she pressed that 9-millimeter semiautomatic pistol, first in double action, which means it's more about a 4 1/2-, 5-pound pull on the trigger. Second is in single action, means the trigger -- you can hear it click -- those people that shoot pistols -- and it's much easier for the second, third, fourth, all the way up to the 15-plus rounds she had or 17-plus rounds she had in her pistol.
Q Lastly, Mr. DeFoe, the jury has heard a lot of evidence this week about the case and --

A I didn't hear what you said, Counsel.

Q The jury -- I'm sorry -- has heard a lot of evidence this week about the case, seen a lot of videos, and I want to ask you, as an expert witness, if an officer or officers say they believed there was a imminent threat of death or serious bodily injury, they believed that the person could have used what they had in their hand to cause them serious bodily injury, is that the end of the analysis for you as an expert in opining as to whether the use of deadly force was appropriate or not?

A It's got to be objectively reasonable based on the totality of the circumstances at the time in which the force was used.

Q Does that go to the concept you're talking about earlier about subjective fear, sufficiency of fear, and fear of future harm?

A Yes.

Q Does part of the POST Learning Domain actually say: Fear of future harm, no matter how great the fear and how likely the harm, is insufficient to use deadly force?

A It's in Learning Domain 20.

MR. GALIPO: Thank you. That's all I have, Your Honor.

MR. ARIAS: The Galicia plaintiffs have no questions for the witness.

THE COURT: Cross-examination?

MR. PRAET: Yes. Thank you, Your Honor.

Good afternoon, Mr. DeFoe

THE WITNESS: Good afternoon, sir.

CROSS-EXAMINATION

BY MR. PRAET:

Q When I took your deposition back in 2023, you were charging $525 an hour for your testimony in this case; is that right?

A For testimony at deposition and trial, that's correct, Counsel.

Q And how much do you charge for your review of this case?

A At that time it was $420 -- $425 per hour for review, report writing, and deposition and trial preparation.

Q When I took your deposition back in 2023, you had spent a little over 40 hours to analyze the decisions that Officer Silva made in just a couple seconds out there on August 9th; is that right?

A Let me check. I don't want to misspeak.

You're correct. It's actually 41.25 hours.

Q Okay. So that's -- just as of 2023 you had made about $20,000 off this case?

A On the two -- three years I've worked on the case, I've billed and received a total of $17,531.25.

Q And that doesn't include what you're being paid to come

here today?
A Associated my time -- it does not include that.
Q And I think you said it's up to 470 officer-involved shooting cases that you've been paid to offer opinions in?
A I've been retained on 470 matters, Counsel.
Q Right. And you're paid for all those ones you're retained in; right?
A I am.
Q Okay. And you said back in 2023 it was $425 an hour. What is it now?
A It's $450 an hour for review, report writing, site visits, analysis. Depositions and trials it's $550 per hour.
Q And in all those now 470 officer-involved shootings that you've reviewed, isn't it true that you have found that the officers were at fault in over 99 percent of those cases?
A I think -- I think about 98 percent.
Q And do you make about 17- to $20,000 apiece on each of those cases?
A Just depends. Some of them more than others depending on the level of the number of depositions, out-of-state travel. Just depends on the case.
Q And you certainly agree that it's critical that any review of any officer-involved-shooting decisions have to be made by the officer on the scene rather with -- rather than with the benefit of 20/20 hindsight?

A With a caveat that there's always a review, as there should be, to see if the force was objectively reasonable after the fact based on the totality of the circumstances.
Q Right. But officers are taught and you agree that it has to be from the perspective of the officer on scene, not with the benefit of 20/20 hindsight; right?
A That's correct.
Q Okay. You said -- how much time have you spent reviewing the videos in this case?
A Probably a couple hours overall.
Q Real time? Slow motion?
A Correct.
Q Frame by frame?
A Sorry to cut you off. Yes, sir.
Q That's all right.
And frame by frame is -- these frames are 130th of a second each, about; right?
A Sounds about right.
Q Okay. Now, Officer Silva didn't have the ability out there on the street to review this incident in slow motion or frame by frame, did she?
A No. That's part of the analysis, not part of what she's doing on the street.
Q Part of "your" analysis?
A Correct.

Q Okay. But the jury has to look at it from her perspective; right?

MR. GALIPO: I'm going to object. It calls for a legal conclusion as phrased.

MR. ARIAS: The Galicia join.

THE COURT: Overruled.

THE WITNESS: Can you repeat that for me, sir?

BY MR. PRAET:

Q Sure. The jury has to look at this case from the perspective of the officer on the scene without the benefit of 20/20 hindsight; right?

A Correct. Based on the evidence, information, and testimony that they hear and see in the course of this trial, yes.

Q From the time that Mr. Garcia comes out of the bushes with the pole to the time of the first shot is about two seconds; right?

A Yes.

Q Before we get to your opinions, let me just go through a little bit of your background because I don't think Mr. -- well, let me just ask you a few questions.

You actually resigned from the Los Angeles Police Department six years before you were eligible to retire; right?

A Correct.

Q Before you quit the Los Angeles Police Department in 2010, you were getting paid by folks like Rick Caruso to accompany his kids to the Bahamas?
A I worked the March of 2010, and I did take a trip with Mr. Caruso's family, yes.
Q And you got paid for that?
A I did.
Q Okay. You were also getting paid by outside lawyers to critique the activities of current police officers who were getting sued?
A No. When I left, Counsel, I took a case -- one case in the end of -- I already was running my vacation time. In, I think, May of 2010 I took one case in officer-involved shooting in Chiriaco Summit, and that was the only case I took from 2010 to 2014.
Q Your work for Mr. Caruso that you were getting paid outside for would have required you to obtain a work permit from your employer, the Los Angeles Police Department; right?
A Correct.
Q But you didn't get a work permit, did you?
A I did not.
Q And you would have potentially been subject to discipline for doing outside work without a permit?
A 20 years prior I had discipline for working a secondary job without a permit. Correct.

Q Okay. But rather than facing possible discipline, you resigned in 2010?
A No. I resigned for a number of reasons but nothing to do -- I had my 20 years in the LAPD at that time. Mr. Caruso offered me a full-time position as his vice president of security. I agreed to take the position, where I worked for him for 3 years.
Q But you had already been doing work for Mr. Caruso while doing -- getting paid by Los Angeles; right?
A Just one trip, Counsel. The current or former SWAT supervisor that was bodyguarding or providing security for Mr. Caruso's family couldn't make the trip; so his executive assistant asked me if I would accompany his children at the time on a family trip to the Bahamas, and I was compensated, and I didn't have a work permit, and I should have put one in for it.
Q And then you resigned right after that; right?
A No. My resignation papers were already in because he offered me a position as his vice president of security.
Q And then you started -- you went -- worked full time or -- directly for Rick Caruso?
A Oh, it was more than full time, Counsel. It was -- working for billionaires -- about 80 hours a week.
Q Okay. And then 6 years later you eventually did retire from the Los Angeles Police Department?

A I did. I joined Riverside in 2013 to 2014; and then I became pension eligible with LAPD when I turned 50; and then I stayed a reserve, when I left LAPD, in 2010 to 2016 as a firearms and tactics instructor as a Level 1 reserve officer. So I kept my relationship with LAPD for 26 total years, 6 years after I left full time.
Q Okay. And I appreciate your answer, and in order to get this through, can I ask you to listen to the question and maybe try to keep your answers to the question?
A I'll do my very best, Counsel.
Q All right. Thank you.
What's your estimate of how much you're getting paid now annually on top of your retirement to testify in police cases?
A Well, police cases are only two thirds. I also have security cases as well, probably one third of my work. I also own gyms in Southern California. I have other businesses so --
Q I don't mean to stop you, sir, but my question is: How much are you getting paid annually for the work that you're doing in testifying 98 percent of the time that police officers are wrong in officer-involved shootings?
A Well, I think you're misrepresenting something, Counsel. It's -- a third of my work is negligent security cases. So there's -- it's not just police cases.

Q Okay. But my question is pertaining to police cases --
A Okay.
Q -- of which you told us that 98 percent of the 470 officer-involved shootings you have been paid and testified the officers were at fault; right?
A Many of them I haven't testified in. Most of those settle. This is only my 91st trial, and I've been retained 950 times overall. So I don't testify in all cases, Counsel.
Q All right. So let me see if I can ask the question again. How much are you getting paid annually to testify in police cases, 98 percent of the ones you've testified in, in which you've found officers were at fault?
A My company -- my consulting group company -- you want to know what my annual income was?
Q If that's the best way to answer the question.
A Yeah. My consulting group company -- my annual income was about $1.5 million.
Q And that's on top of your retirement from LAPD?
A Yes, sir.
Q I know you -- there's been some reference to POST Learning Domains. Can -- I don't think the jury's heard. Can you tell us what "POST" stands for?
A That's "Peace Officer Standards and Training" (indecipherable) the governing body. They're in Sacramento. Most of us have gone through the seven-to-eight-hundred-hour

police academy. There's 43 Learning Domains, everything from use of force, vehicle operations, people with disabilities.
Q And POST is the state agency in California that sets the standards for training for law enforcement; right?
A Yes, sir. That's correct.
Q Okay. You've never actually taught a POST course, have you?
A At the division level -- I taught not as an instructor at POST, but I went through instructor development training, which allows me to teach as a sergeant and as a watch commander to officers in perishable skills, which is pursuits, vehicle operations, use of force -- all the other Learning Domains that POST requires us to teach.
Q Okay. Let me ask the question again. You've never actually taught a POST-certified course; correct?
A That's incorrect.
Q When did you teach as an authorized POST instructor?
A Once I became -- I went through instructive development course when I was a sergeant in two thousand -- no -- 1996. Pardon me. All new sergeants go through IDC, which allows you to teach POST-certified courses at the divisional level, taught at the academy level. I was in charge of our crisis negotiation team with LAPD SWAT. We taught a 40-year POST-certified negotiation course on an annual basis from 2005 to 2009.

Q You never wrote any of these POST Learning Domains, did you?
A I did not.
Q Now, you talked on direct about POST Learning Domain 20 referencing a "reverence" for life; right?
A Yes.
Q That includes the life of the police officer, doesn't it?
A Yes, sir.
Q And sadly, over a hundred police officers are killed every year in the line of duty, aren't they?
MR. GALIPO: Objection. Irrelevant. 403.
MR. ARIAS: The Galicia join.
THE COURT: Sustained.
BY MR. PRAET:
Q Is it your opinion that these officers should have perceived Mr. Garcia as suffering from some sort of mental illness?
A Potentially. You have to consider that, like all other considerations. If you've got someone who is mentally ill -- pardon me -- homeless -- and we know there's a strong correlation to our homeless population to mental health. Many of them aren't taking their psychotropic medication. Many self-medicate with illicit substances. So part of the deescalation training and approach training is you have to

consider that -- not to diagnose that someone has bipolar or depressive disorder but more a consideration as to Why is he sleeping in a bush? Why is he homeless? and with that understanding, compassion and deescalation.

Q No one had reported him mentally ill; right?

A Correct.

Q Okay. In fact, this call was about a guy who had been wandering around the night before with a knife; right?

A Yeah. Male Caucasian with blonde hair.

Q Right. Now, Officer Silva, when she got to the scene, contacted the reporting party; right?

A I believe so.

Q And the reporting party actually directed the officers to the bush where the person she was calling about was located; correct?

A Yes, sir.

Q So there's no question that the officers were contacting the person that they were called to contact; correct?

MR. GALIPO: Objection. Vague as framed.

MR. ARIAS: Question is calling for a legal conclusion.

THE COURT: Overruled.

THE WITNESS: Up to the point until Officer Silva recognized him and says, "I know you" -- at that point you realize that's not the person who you were advised that was

potentially a suspect, potentially waving a knife around because she looked in and says, "I know you." So there was a relationship -- prior relationship -- professional relationship she had with him at some sort, which would have negated anything that she was told about a male Caucasian with a knife.

BY MR. PRAET:

Q Is it -- well, Mr. Garcia [sic] head was, if not shaved, very short hair, wasn't it?

A Once again, that -- it's not relevant to me because she'd recognized him with short hair, with a beanie on -- would not. She knew it was him because she stated, "I know you," which means she had a prior relationship. And there's no doubt he's male Hispanic; he's not Caucasian, Counsel.

Q Have you ever had witnesses to incidents be incorrect in their observation about the race of a possible suspect?

A Sure. But when I recognize someone that I've interacted with before, then I would know that's not the person because that person's a male Hispanic and the woman that identified the suspect was a Caucasian mail with blonde hair.

Q Okay. So the officer should assume, then, that the person who identified him the night before -- no way that individual mistook him for being a male Caucasian and just not even investigate?

A Sure. You can say, "We don't want you sleeping in the

bush anymore. We got a call, and now that we're here, you don't match the description. So we need you to go ahead and gather your things, if you would kindly, and move on." That would be the appropriate response.
Q You mentioned one of the first things that Officer Silva said was "I know you. Come on"; right?
A Yes, sir.
Q And that included the three prior contacts she had made with him?
A Based on that -- based on her testimony, but she never conveyed that to any of the officers at scene.
Q Okay. My question was: That includes the three prior contacts; right?
A Oh, I understand. That's correct.
Q Okay.
A Yes, sir.
Q You said that you're a DRE, "drug recognition expert"?
A I was.
Q Okay. You're certainly aware that methamphetamine can tend to make somebody more aggressive?
A It can.
Q Make them more violent?
A It can.
Q Okay.
Your Honor, may we briefly approach?

THE COURT: Yes.

(Sidebar on the record.)

MR. PRAET: Your Honor, I didn't want to do this in front of the jury yet, but on direct testimony Mr. DeFoe said, if somebody is sleeping, they're probably not under the influence of methamphetamine.

THE COURT: Yep.

MR. PRAET: So now the evidence is and he knows that he was under the influence of methamphetamine.

MR. GALIPO: Well, I --

THE COURT: He did testify to that.

MR. GALIPO: -- I agree he said that, but I took it as, as a officer on scene, seeing someone sleeping, you would think that this person is not actively under the influence of a stimulant if they're sleeping. That's how I took his response.

THE COURT: Okay. But he did testify: sleeping -- probably not high on meth at the time.

MR. GALIPO: Right.

THE COURT: And he also talked about the autopsy report. So --

MR. GALIPO: The prongs in the --

THE COURT: Uh-huh.

MR. GALIPO: -- autopsy.

THE COURT: Yep.

MR. GALIPO: Oh, I think that went to a different issue.

THE COURT: Yeah, it did, but.

So based on the defense soliciting that -- strike that -- the plaintiffs soliciting that testimony, I think on the -- I will allow limited questioning on that issue.

MR. PRAET: All right. Thank you. Oh, sorry.

THE COURT: (Indecipherable) -- limited. Hard stop at 3:00.

(Sidebar off.)

BY MR. PRAET:

Q Mr. DeFoe, on direct examination you said that, when Mr. Garcia was seen sleeping, he was probably not under the influence of methamphetamine. Do you remember saying that?

A Yes.

Q Okay. You read the autopsy and toxicology in this report -- in this case?

A Yes. I did.

Q You're aware he had 2210 nanograms per milliliter of meth in his system?

A Yes.

Q Is that a pretty high dose, as a drug recognition expert?

A I'm not (indecipherable) medical opinions. I don't know if it's high or not depending on his blood content. But

there's no doubt it's -- it was detectable in his blood.
Q And that would tend to make him more aggressive or more violent?
A Potentially. But he was sleeping in this case; so it didn't make "him" more aggressive or violent and nor was he ever aggressive or violent with Officer Silva in the past, based on her testimony.
Q Now, it's your opinion that when these -- well, when Officer Silva recognized that it was Mr. Garcia -- well, she didn't say she knew him by name, but she recognized him as someone she had contact with before; correct?
A Yes, sir.
Q Did she ever say she remembered his name?
A I don't know if she was asked that or, if she did, I don't recall.
Q Okay. Let's -- on these prior contacts -- let me ask you: You said that once she recognized him as someone she had contacted him and -- well, he was wearing a beanie, wasn't he?
A Until they tried to take it off his head, when he tried to walk out of the opening of the bush, yes.
Q Okay. When she first saw him, he was wearing a beanie; right?
A I believe so. Yes.
Q Okay. So she wouldn’t be able to tell what color hair

he had?
A That's a question for her counsel. I don't know.
Q Well, is there any evidence that she would know when he's got his head covered up with a beanie?
A Depends how the beanie is worn, Counsel. Sometimes it can -- your hair hangs out of it. And I wear a beanie, and you can see I've got -- well, now I have gray hair, but I used to have dark hair. You could see it in there.
Q You've reviewed the video, you said, I think, hundreds of times. Did you -- were you able to tell what color of hair Mr. Garcia had, when you watched the video, as long as he had the beanie on?
A Well, none of the video really showed what -- inside of the bush area where she was looking, Counsel. So I don't know.
Q Now, when I took your deposition, you said that the officers had good cause to contact Mr. Garcia in the bushes on August 9th, didn't you?
A Yes, sir. I agree with that.
Q Okay. And today you say that they should have just -- they can't detain him, and they should have just let him walk away; right?
A No. I testified if there was an ordinance that he shouldn't be sleeping in that bush then they should ask him to leave, which would be reasonable, give him a reasonable

opportunity to comply, and then tell him he can't sleep there anymore, that he created a call for service, neighbors -- or whoever -- may be concerned, and "Please don't come back again," like, unfortunately, we have to do in law enforcement with transients that don't have places to sleep.

Q Okay. The person that had been reported to the officers was seen brandishing a knife the day before; right?

A Yes.

Q Officer Silva had contacted Mr. Garcia for previously brandishing a knife; right?

A I believe so.

Q Okay. Wouldn't it be appropriate for a police officer to investigate if Mr. Garcia was in fact again waving a knife, as had been reported?

A Counsel, respectfully, Officer Silva walked right up to the opening of that bush and stood there. Then she offered to go in that bush by herself. Neither one would be consistent with good tactics if I reasonably believe that you are armed with a knife.

Q When she approached, she hugged that brick wall and peeked in, didn't she?

A Until she wanted to go in until, once again, Officer Yuhas had the wherewithal to tell her not to do that.

Q And I know you haven't been here for trial, but you reviewed her deposition, when she said, "I'm going in," at

that point she had seen his hands and saw that he didn't have a knife, didn't she?
A Well, correct. I mean, there's no information he ever had a knife so -- at all during this time.
Q Okay. So I'm a little confused then. If the officer sees that he has no knife in his hand, now you're saying she shouldn’t stand in front of the bushes?
A Question -- Counsel, you asked me a question: Would the knife be of concern -- she went to investigate it? My response to that would be at no point would I want to be standing in front of an opening -- not the opening of this door, not the opening of that door -- if I reasonably believe the person behind that door has an edged weapon, especially when I can do that from the street, behind one of those patrol cars that are parked adjacent to the opening, and just say, "You in the bush, come on out." Or if I see him in there, I can just tactfully reposition, move back in a safe position, and then, "Hey, partners, we do have someone in here. We need to call him out," and coordinate that. This is just basic police work, Counsel.
Q Okay. She first approached believing he may have a knife. Using that wall as cover, she looked in; right?
A She did.
Q Okay. And she didn't say, "I'm going in to grab him" -- or anything -- until after she had seen that he did not have

a knife in his hands; right?
A She seemed like she wanted to go in because she was frustrated with the fact that he was not moving to the cadence in which she wanted him to move.
MR. PRAET: Objection, Your Honor. He's opining as to her state of mind -- far beyond.
THE COURT: Sustained.
BY MR. PRAET:
Q Okay. So you told this jury that, if all he's doing is sleeping in the bushes, they should say, "Hey, get your stuff together, and be on your way"; right?
A Apparently he's not involved in the alleged knife-wielding the night before. So unless you have another crime you want to charge him with, you have to let him go, Counsel. There's no reasonable suspicion, under the Fourth Amendment, to detain him.
Q Okay. But you said, if there's no reason to detain him, they should let him walk away, but if they believe there's a knife, they should go back behind their police cars and order him out; right?
A Correct. If you reasonably believe someone is armed with a knife -- for one, I don't purport that she should have ever walked up to the opening of the bush ever. She should have called whoever in there out of the bush from a position of cover, as she should have done, and then see who comes

out. Because it could have been the male with -- actually with the knife -- the male Caucasian that was allegedly wielding a knife, and for tactical reasons I don't -- I have to respond to that threat, and I don't want to do it from 3 feet away when I can do it from 15 feet away.
Q Right. Or behind a block wall?
A Well, once again, that block wall is not going to provide her any protection based on the proximity of where the opening of the actual bush area is.
Q She had her gun at the low ready; right?
A She did.
Q If she saw him coming out with a knife, she was in a position to defend herself if he came up with a knife?
A If he did, but he didn't. So yes.
Q Right. So she doesn’t have to run back to her police car with the other two officers and order him out with a bullhorn, "Whoever is in the bushes, come out"? Is that how you did it at L.A.?
A Well, once again, Counsel, officers according -- including Officer Silva are going to train from 25 yards and out with that Glock 17 9-millimeter pistol. If I can do it from 15 feet away, I don't need to be 3 feet from a potential threat to fire that weapon. I can do so from a position that's safe for the officers.
Q Like behind a brick wall?

A Like behind a vehicle.
Q Okay. Is that how you did it at LAPD when you went to contact a person living on the street? You guys all hid behind your police cars 25 yards away and ordered them out of the bushes?
A Once again, we didn't know -- at the time she didn't go there for someone that -- a transient on the street. She went there to investigate a crime with a man with a knife. It's a different call. It involved into that.
But, no, Counsel. I worked Downtown L.A., where there's 60,000 homeless; so I understand the complexities of interacting with the homeless population. It's going to be depending on the totality of the circumstances.
Q She went there to contact somebody, as you say, sleeping in the bushes; right?
A Once he -- but, once again, with the caveat that he was armed with a knife.
Q Right. And with a caveat he may be armed with a knife, she stood behind the brick wall with her weapon at low ready, didn't she?
A She did. I thought it was an unsafe position for her, and I thought it was a poor tactical decision, Counsel.
Q Okay. And then once she saw that his hands did not have knife, then she eventually said, "Hey, I'm going in to try to grab him" -- or whatever she said; right?

A She did.
Q Okay. And you're saying that these officers should not have investigated what the reporting person had said about "The guy I see in there may be the guy from the night before with the knife"?
A As I've testified four times already today, I do believe the officers had reasonable suspicion to investigate the information that they had at the time when they approached the bush. I believe that was reasonable and appropriate based on the totality of the circumstances.
Q Okay. And would it be appropriate to identify the person that they're contacting?
A As she did from a prior instance that she dealt with him. So she identified him.
Q Did she say she knew his name or remembered his name?
A No. But she remembered that she interacted with him before.
Q Okay. So would it be appropriate to verify that he's, maybe, not the guy or is the guy who'd been brandishing a knife, to bring him out, detain him, and have the eyewitness from the day before look at him and say, "Is this the guy?"
A Well, once again, you'd have to have reasonable suspicion to do that, and I'm not offering legal opinions here.
Q Oh, okay. You said that Officer Silva should have

requested Mr. Garcia to exit the bushes and give him reasonable time to do so; right?
A Yes.
Q The first thing we hear Officer Silva say -- very calmly, low key -- "Wake up. Come out with your hands up"; right?
A Yes. I thought her initial interaction -- the initial contact, other than the positioning, was fine.
Q Okay. And Mr. Garcia said, "Okay," didn't he?
A He did.
Q Okay. Which reasonable for the officer to believe that that means he's going to come out?
A Yes.
Q Okay. And in fact, when he said, "Okay," we see Officer Silva actually take a couple steps back, don't we?
A She does move at some point, yes.
Q Okay. To give him room to come out like he said he would?
A Well, I don't believe she ever gave him room to come out, Counsel. Up to the point of the shooting, they stood right at the opening of the bush on -- which is depicted on the video.
Q You didn't see her back up?
A Oh, she did back up right before she shot him.
Q No. When he said, "Okay," to her request that he come

out, you're saying that you didn't see her back up to give him room?
A She backed up but still way too close to the opening of that bush area if you do anticipate someone coming out.
Q Mr. Garcia did not come out when he said he would come out, did he?
A He did. He said he was getting his belongings together. He said he was waiting on someone. There was a little bit of procrastination by Mr. Silva. There's no argument -- I mean, by the decedent. There's no -- no contention there. Once again, that's where deescalation comes in, Counsel.
Q Okay. Well, it's about two minutes of him saying, "waiting for a friend," "getting my" --
(Cell phone interruption.)
MR. PRAET: I'm so sorry, Your Honor.
BY MR. PRAET:
Q It's about two minutes of him offering excuses -- "I'm waiting for a friend," recyclables -- all of that -- after he said he would come out, isn't it?
A Counsel, I've been on barricades that have lasted -- over a day we've waited for somebody to come out of a house, not just a couple minutes. Once again, there's --
Q Well, those barricades were armed suspects, though; right?
A Presumed to be.

Q Yeah.

A Nonetheless, it's still -- there's no rush. There's no crime in progress. He's not committing a crime. There's no rush to have him come out right away. Just provide him --

Q Wouldn't that --

A -- a reasonable opportunity to gather his belongings -- that's his life that's in that bush area -- to gather those things and then come out within that time frame. That's what it -- it's accommodating someone that's in a different situation than the rest of us are.

Q Okay. You just said, and you said on direct, give him an opportunity to grab his belongings; right?

A Correct.

Q He had a lot of belongings there -- sleeping bag -- all kinds of stuff -- didn't he?

A Yeah. Probably a lot less than we have.

Q Okay. The only thing that he had in his hands when he started to come out was a can of -- excuse me -- a bag of cans; right?

A Consistent with someone who's homeless. Yes.

Q Okay. And then the officers reached in to help him out; right?

A I didn't view it that way, Counsel. I think they initiated an unnecessary use of force and startled him by not allowing him to come out. That's the way I looked at it.

Q Right. And, of course, you know what was in his mind?
A Whose?
Q Mr. Garcia.
A No. He was shot and killed, Counsel. I don't -- have no idea.
Q You know what was in his mind when they officers reached in after a couple minutes of him making excuses after he said he would come out?
A Well, if I'm going to come out and harm you, I'm probably not going to be carrying a bag of cans. I'm probably getting my stuff together. I'm going to have my hands open so if I'm going to use a weapon -- a knife, a stick -- or whatever. I'm not going to be coming out with my belongings if my intent is to harm you in some way.
Q Excellent point, Mr. DeFoe.
A Thank you.
Q If you're going to come out with your belongings, you're not going to reach back in and grab a 5-foot, heavy, wooden pole, are you?
A If that's part of my belongings, yes. Because we know that people that sift for cans -- they use it as walking sticks. They use those devices for that because they're going through trash to try to get -- jar that trash to get the cans out. So, yes, I think that would be consistent with his belongings.

Q The only thing he reached in and grabbed for was a 5-foot, heavy, wooden pole, wasn't it?

MR. GALIPO: I'm going to object. It assumes facts not in evidence that it was heavy.

MR. ARIAS: And it's argumentative as phrased.

THE COURT: Sustained.

BY MR. PRAET:

Q The only thing he reached in and got was that 5-foot, wooden pole, isn't it?

A He grabbed his cans, he grabbed his stick, which is part of this belongings, and he exited, as he was instructed to do, Counsel.

Q And he didn't exit with that pole as a walking stick, did he?

A We don't know because the second he walked out of it that -- when it was in port arms in a vertical position, he was subsequently tased and then shot.

Q You say that he exited with it as "port arms"; right?

A Correct.

MR. PRAET: Okay. Can we bring up 205B, please.

(Pause.)

BY MR. PRAET:

Q You were in the military; right?

A I was.

Q Is that stick with, probably, a good 2 1/2, 3 feet of it

raised over his head at "port arms"?
A It's in a -- in that position it's in a vertical position, once again, not in a striking or assaultive position. It's in a carry position, especially because he had to maneuver that bush area and bend down because the pole is approximately 5 feet or a little bit less than that.
Q You're saying that's not an assaultive position with it raised over his head as he's coming forward directly toward that officer who's backed up?
A The position that we're looking at right now, Counsel?
Q Yeah.
A Oh, that's definitely not assaultive.
Q That's "port arms" to you?
A That's he's holding that in a vertical -- that's pretty clearcut. That's in a vertical position, not in an assaultive position at all that I'm looking at.
Q All right. You talked about the totality of the circumstances, that's what we need to consider when we're looking at the officer -- whether or not her decision to use force was objectively reasonable; right?
A Yes, sir.
Q Okay. Including in that totality of the circumstances are the three prior contacts she had made with Mr. Garcia; right?
A It's really based on the subject's level of resistance

at the time of which the force is used is what's important.
Q Are you saying that you should disregard prior contacts with him when you're an officer contacting somebody?
A That wasn't your question. Your question -- the evaluation of the force at the time -- which force is used can't be predicated on prior contacts. It's got to be based on the subject's level of resistance at the time in which the force was used.
Q Maybe you misunderstood.
When we look at an officer's totality of the circumstances, we need to take into consideration everything the officer knew at the time; right?
A Correct.
Q Okay. Included in what the officer knew at the time are these three prior contacts; right?
A That's part of the consideration but not the evaluation of the force.
Q We're not there yet. We have to consider these three prior contacts for Officer Silva; correct?
A Yes.
Q Okay. Now, in addition to Officer Silva contacting him on August 9th as maybe the guy who was brandishing a knife, at least to investigate whether he is or not, she had contacted him about a year prior when he was reportedly brandishing a knife; right?

A Allegedly.
Q Right. And she didn't arrest him because she just what we call FI'ed, or "field interviewed," him?
A Which means there probably, hopefully, wasn't probable cause to arrest. That's why she didn't arrest him.
Q Right. And then just three months prior to this incident in August of 2021, she arrested Mr. Garcia for a felony warrant for assault with a deadly weapon, didn't she?
A That sounds about right.
Q And at the same time, in that arrest three months prior, he had meth; right?
A He did.
Q Those are things that she should take into consideration in the totality of the circumstances on August 9th; right?
A Sure. That's why it's important if you are -- if that impacts your decision-making, you don't stand in front of the bush. You advise your partners of the prior contacts, and you formulate a plan if in fact it's concerning to you.
Q And then, thirdly, she had contacted Mr. Garcia on November 13, 2020, nine months before this incident, in which the victim of a robbery in Santa Ana, a street vendor, had been knocked -- reportedly knocked unconscious, and the weapon in that robbery was a large piece of wood; right?
A I believe I read something like that.
Q Okay. That's something that she should take into

consideration when she's dealing with Mr. Garcia, isn't it?
A Once again, if that was a consideration or concern, her tactics dictated otherwise.
Q Okay. And despite the fact that Mr. Garcia had said, "Okay," when he was asked in English to "Come out," Officer Silva also spoke to him in Spanish, didn't she?
A She did.
Q Good deescalation tactic?
A Other than the other officers didn't speak Spanish so that's a problem.
Q What -- was she supposed to translate for them or just carry on a conversation with the person she's dealing with?
A If I'm dealing with a tactical plan, I want to ensure that my partner officers know what I'm saying or doing would be appropriate.
Q Okay. Well, let's talk about what the officers knew. Officer Yuhas had worked with her before; right?
A I believe he has for her 18 months or so on the department at that time.
Q Right. And they trained together -- same policy, same training?
A They should be -- adhere to the same policies and the same training. Correct.
Q And as the primary officer, if you're dealing with somebody possibly going to have a knife, she would be

designated as the person with lethal force? That would be her role, if necessary; right?
A Maybe not.
Q It would be appropriate for her as the primary to be lethal; right?
A If I'm the primary, I typically am the contact person, which means I'm using words to influence behavior. So maybe not if she's going to take that role. But you don't want any talking and thinking about shooting at the same time. So typically you're going to want to have lethal coverage -- not to say that she can't have her pistol out if she reasonably believes that it's rose to the level where the use of deadly force may be reasonable, but nonetheless as a -- if you're going to run the call, you're the contact person, which means you're the person talking to the person. You're then going to direct your other partner officers, maybe, as lethal and or less lethal.
Q And how many officers would you need to have all those different designations?
A Oh, they had plenty of officers for this incident, Counsel. They had four at the time of the shooting. This is a guy -- this is a homeless guy sleeping in a bush.
Q Right. And are you saying that they should have more than four officers?
A Oh. No. They had plenty based on what were there.

There were plenty -- plenty of officers there to deal with what they had, which was a homeless male sleeping in a bush.
Q Let me ask you this: Is there anything in POST or anywhere else that says that it was improper for Officer Silva, as the primary officer dealing with somebody reportedly having a knife, to have her gun out and be, if appropriate, lethal?
A No. She -- if she reasonably believes someone may have an edged weapon -- once again, tactics inconsistent with that, standing right up the opening of the bush so I've got to -- if you reasonably believe someone has a knife, I don't walk up to the person that I reasonably believe has a knife. I just don't do that. We talked about how she's getting --
Q She didn't do that, did she? She didn't --
A Pardon me?
Q She didn't walk up initially on that bush, did she?
A She ended up at the opening of the bush, Counsel. It's --
Q After --
A -- on video.
Q After she saw nothing in his hands; isn't that true?
A And recognized him as not the male Caucasian with the knife.
Q There you go. So now it's okay for her to stand and say, "Come out"; right?

A Correct. But if there's no potential person with a knife, what's the need for the gun?
Q And she put the gun away, didn't she?
A At one point.
Q Okay. And as the primary officer, Officer Yuhas, her backup, knew he was designated as less-than-lethal cover, in other words, a Taser; right?
A Correct.
Q Okay. Appropriate?
A That's appropriate.
Q Okay. And as the primary officer, Officer Silva asked Officer Frias, "Hey, can you go down and cover the other end in case he runs"; right?
A She did.
Q Okay. Good plan? Good tactics?
A Way too close to the bush, Counsel.
Q Who's way too close to the bush?
A All of them, Counsel. Yuhas and Silva specifically at the opening of that bush.
Q After she's seen nothing in his hands?
A Yes.
Q Why would they need to run behind their police cars once they know he's got nothing in his hands?
A No one's asked anybody to run anywhere, Counsel. We're talking about deploying. You have a police car that's pulled

up right to the curb. I can order you -- I can order you, if you were back at the door, to come out of that door without me walking up to the door. I can just tell you -- put on my outdoor voice and say, "Come out of that bush," from here. I don't need to walk up to the opening of the bush. I don't need to do that because I can accomplish what I need to accomplish from a distance without putting myself in a bad tactical position where the officer could get injured; right? That's part of the consideration.

Q I can also do that from behind a brick wall, can't I?

A Not -- you're talking proximity.

Q Right.

A He could -- if that male white with the knife wanted to lunge out, she would have to react to that threat from that distance and then respond to that threat.

Q So is that how you made contacts? 25 feet away from behind a police car?

A No, Counsel. That's -- it's -- once again, it depends on the totality of the circumstances.

Q Okay. You talked a lot about tactics, okay, but you would agree, sir -- let me quote. Okay? (Reading): An officer's tactics need not be perfect or even least likely to cause injury. They just need to fall within a broad realm of reasonable. Isn't that true?

A Correct.

Q So you may suggest a hundred ways to have handled this, but as long as the officers' tactics at the time were within that broad range of reasonable, doesn't make them wrong, does it?
A Counsel, if the male white with the knife allegedly had came out of that opening and stabbed Officer Silva, during the review process I'm confident that the Tustin Police Department would say, "If you reasonably believed there was a male with an edged weapon" -- back in the LAPD, as you know, is a 21-foot rule. You kept 21 feet from that person if you reasonably believe they have an edged weapon. It's a 1979 rule called a "Tueller" rule. It's so you want to create distance and time. Why? Because, if they come out with a knife, I have a distance to use my Taser; I've got distance to deploy pepper spray.; I have a distance to use a beanbag shotgun, if I have one. If I'm this close to you, it limits my options of what I can do because of the proximity. That's why distance is an officer's friend. It's a form of deescalation, and it gives the officers an opportunity to consider what's occurring and then transition to a force option, may it be lethal or less lethal depending on the totality of the circumstances.
Q Okay. And I asked you to try to keep your answers short and to the question.
So you're saying, if he had come out with a knife,

then you're saying Officer Silva was in a bad position?
A Yes, sir.
Q When she's behind that brick wall with her gun at the low ready?
A Yes, sir.
Q Okay. Once she sees that he doesn't have a knife, she stepped into the opening; right?
A She did.
Q Okay.
A Which would have allowed her to see the stick that was in there as well.
Q Where was the stick?
A Inside of the opening.
Q You know that?
A He came out with it.
Q I agree. Do you know where it was before he reached in and grabbed it and armed himself with it?
A I don't. Because she never told her partners if there was any concern about having the stick. "Hey, partners, there's a stick inside" -- "a 4-foot-and-9.2-inch stick inside of the opening here" -- she never told them that. Yuhas said, "He has a stick," when he's coming out, but apparently Officer Silva didn't hear that when -- prior to her shooting.
Q Is there any evidence that Officer Silva saw that almost

5-foot, wooden pole before Mr. Garcia turned, armed himself with it, and came out?
A It would be hard to hide that 5-foot pole, Counsel, inside of that space.
Q Under a sleeping bag?
A Possibly.
Q You don't know?
A I don't.
Q Okay. All these tactics that you're talking about -- going 25 yards away and ordering him out -- all that -- there's nothing in POST, in Tustin policy, or anywhere that says that's what these officers had to do, is it -- is there?
A Tactics are not a policy. In their policies there's deescalation, and that's using words and actions and behavior to --
Q And I don't mean to stop you, sir. My question to you is: All the stuff that you're recommending is nowhere mandated anywhere by the State of California or any other authority, is it?
A It's best practices, Counsel.
Q Best practices according to Scott DeFoe at $500 an hour?
A No. According to the Tustin Police Department use-of-force policy.
Q What does it say in the use of force policy?
A Regarding deescalation.

Q Right. Which is what she --
A Deescalation is time and distance, to use words and actions to influence behavior. You limit yourself when you're that close to someone. The further away I am, the more options I have to respond to whatever threat you may be.
Q Okay. And everything after the deescalation that you just added is nowhere in policy or any other standard, is it?
A Tactics are not in policy. They're recommendations within standards, and they're fluid based on the totality of the circumstances.
Q Within that broad range of what might be reasonable tactics for any police officer who's on scene making those decisions; right?
A And examined afterwards during the analysis of the use of force, as it is in Supreme Court decisions.
Q Right. With the benefit of 20/20 hindsight and 40-plus hours; right?
A Once again, it doesn't take 40 hours. It takes about three minutes to watch that video and realize the tactical deficiencies here, not 40 hours.
Q You've actually shot and killed several suspects yourself, haven't you?
A Three.
Q One of the cases involved a dispute over a $10 beer. You and your partner were initially called. You didn't even

believe the woman who was calling; right?
A Correct.
Q You thought it was a bogus call?
A I did.
Q Despite your skepticism, you were then dispatched to return to the apartment because now it was reported that the boyfriend had a gun; right?
A It was a cousin.
Q Or a cousin. I'm sorry. The male subject had a gun?
A Correct.
Q Okay.
A And he had taken her baby hostage, and he was in a particular apartment.
Q Okay. And it was just you and your partner; right?
A Correct.
Q So the planning that you and your partner made before you approached this apartment where a subject on what you believed to be a bogus call was reportedly armed with a gun -- you planned for a total of seven seconds; right?
A At the door. Correct.
Q Right. You didn't wait for additional officers, did you?
A No.
Q You didn't get behind cover and call him out, did you?
A No. Because the child was facedown on the bed, and we

thought the child was in peril at the time; so we needed to act swiftly.

Q There was no blood on the bed?

A I couldn't see if there was blood on the bed. I could see a toddler about three years old facedown on the bed in a studio apartment, and the suspect was identified exactly as she identified him in the living room facing away from us.

Q And the child turned out, actually, just to be sleeping on the bed, didn't he?

A Fortunately.

Q Yeah. But you didn't take the time to determine that, did you?

A Oh, I did. I grabbed the child and I -- off the bed while my partner took control of the suspect before he pulled a gun out of his pocket.

Q Well, the way your partner tried to take control was he used his baton and pepper spray; right?

A No. My partner tried to take control of his wrists, broke away from my partner after I handed the baby off to the mom outside in the hallway. I then struck the suspect with my baton as he was fighting with my partner. My partner OC sprayed him -- sprayed him, which probably caused us more discomfort than him. Suspect walked away, took a handgun out of his right front pants pocket, and pointed in my direction, and I fired three rounds from my pistol and killed the

suspect.
Q Right. Because you weren't behind cover; right?
A There was no cover there, Counsel. He pulled a gun out in the middle of an open area that was about 350 square feet. There was nowhere to go.
Q And so the less-than-lethal attempts that you and your partner attempted -- the baton and the pepper spray, which I think you said probably was more disabling to you --
A Yes. Poor choice by my partner in that apartment, but.
Q Yeah. That's the problem with pepper spray; right?
A It can be. But outdoors it works well in bushes if you need to use it.
Q So then he managed to quickly pull a weapon and display it to you; right?
A He didn't display it. He pointed it at me.
Q He pointed it at you. Was that an immediate threat of serious bodily injury or death?
A Immediate defense of life.
Q Listen to my question. Was that an immediate threat of serious bodily injury or death?
A Yes, sir.
Q Okay. And why didn't you wait?
A Because it was an immediate threat of grave bodily injury or death.
Q Okay. So how long -- how do you define "immediate"?

A It was right away. My partner yelled, "Gun," and the muzzle of that barrel was pointing in my direction, which would be pretty immediate.
Q Right. So, if you didn't take action to defend yourself in the next two seconds or so, you thought you were going to be shot?
A It was less than two seconds, but yes.
Q Okay. Now, that individual never punched you or your partner, did he?
A He broke away from my partner. I don't know if he struck my partner because I was dealing with the baby. I don't believe so.
Q He never kicked either one of you?
A No, he didn't kick us.
Q Did you believe that he had the apparent ability to cause you serious bodily injury or death?
A Didn't see the gun initially, but she said he was armed with a handgun. I didn't see it. It was in his right front pants pocket. So at the time I didn't -- I assumed it, but, once again, it was the peril of the child being facedown on the bed and at the time -- to make the decision at the time was to make entry, couldn't wait, didn't know the condition of the child; so that's why we made the decision we made.
Q Well, you didn't even ask the woman if the child was okay, did you?

A I didn't know the woman had followed us up. Fortunately, she was in the hallway outside of the door. She just was screaming and said he was in apartment No. 203 "with my child." She was kind of -- she was crying and sobbing in the apartment. Once again, thought it was still a little bit bogus based on the nature of the call.
Q You didn't even believe her, did you?
A I didn't really believe her based -- she had been drinking, and I didn't believe her. I thought it might have been bogus, but I didn't know.
Q Right. So not believing her, she may be drinking, and you didn't ask her any further questions about how you might be endangering this child or wait for backup or take cover -- you didn't do any of that, did you?
A No. I was told there was a man that took a baby hostage that was armed with a gun, and I didn't really ask anything more than that.
Q You just -- you and your partner just rushed right in and tried to -- well, you grabbed this child that you didn't even know the condition of; right?
A I didn't at the time. We didn't rush right in. We looked at the opening of the door. I could see the suspect facing away from us. The plan was my partner was going to take ahold of the suspect, which he did effectively. I grabbed the child -- and then I explained the rest already.

Q Right. And he wasn't displaying the gun when you got there; right?
A No. It was in his right front pants pocket.
Q And he only went for the gun after you and your partner tried to grab him; right?
A Yes. I mean, we -- right after the pepper spray is when he walked away towards the sliding glass window and took the gun out of his right pants pocket and pointed it.
Q Okay. But your tactics of rushing in on what you believe to be a bogus call and trying to grab this individual with no other backup, no cover, no further investigation, and the guy presented a gun after you grabbed him -- your tactics were perfect; right?
A Well, Counsel, if that was your child laying on the bed, you'd want the police to take action. That's what we did. It became immediate once the child was facedown on the bed. It was no longer bogus. It was real at that point.
Q Well, actually, it wasn't real because the child was sleeping.
A I couldn't tell, Counsel, from the door. I could see -- partially see the child from the door. The bedroom was off to the right, didn’t know the condition of the child, didn't know if the child was dead or not.
Q Could you have asked the woman right there in the hallway with you?

A Well, one, she wasn't with me at the hallway. She came up after I grabbed the child. She was walking down the hallway. We didn't ask her to follow us up there, told her to wait in the lobby, but she came up anyway. I'm glad she did because it gave me an opportunity to hand off the child to her.

Q You contacted her in the hallway, someone that you didn't even believe, who said that "He took my child," and you didn't ask her "What's the condition of child?" "What's the layout?" "What are we facing?" You just -- seven seconds -- you and your partner ran up, grabbed this guy, he pulled a gun, and you killed him?

A Well, it was in a lobby. It wasn't there. She was in the lobby downstairs. We ascended up the stairs to the second floor, however long time it took us to do that, looked at the door, it was open, suspect was facing away, child on the bed, quick plan with my partner, take control of the suspect, I'm grabbing the child, and that's how it went.

THE COURT: All right. We're going to stop here for the day. I am going to ask you to come back Monday at 9:30, and we'll resume the trial at that time. Please do not discuss the case with anyone. Do not make up your mind. Have a good weekend. We'll see you Monday at 9:30 a.m.

(Jury not present.)

THE COURT: I'm ordering you back for 9:30 a.m. on

Monday.

THE WITNESS: Yes, Your Honor.

THE COURT: Counsel, I'm ordering you guys back for, shall we say, 8:30 -- the jury instruction conference. Have a good evening. We're in recess.

MR. PRAET: Your Honor, this doesn't have to be on the record. If we have a proposed special verdict -- or whatever -- that I know you want to look at, can we email that, or how do we get that to you with time for you to review? Or just bring it Monday, or what do you want --

THE COURT: No. Don't bring it in Monday. I thought I ordered you guys to bring it -- have it filed by 5:00 p.m. today? Didn't I? Didn't I have --

MR. PRAET: I --

THE COURT: -- jury instructions and the verdict form?

MR. PRAET: I think you -- you ordered us to meet and confer on it, but I don't recall -- I mean, I have the proposed one, which I've given to them over the past week, but I just don't -- we don't have an agreement yet. So, if the Court wants to look at something, I mean, I have it --

THE COURT: You've got two hours to agree.

MR. PRAET: Okay.

THE COURT: Or not. And then file something so that we have it so we can work on it.

Have a good weekend.

MR. PRAET: Thank you, Your Honor.

MR. GALIPO: Thank you, Your Honor.

(Proceedings adjourned at 3:02 p.m.)

///

///

I N D E X


| WITNESSES FOR PLAINTIFFS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Scott Allen Defoe | 4 | 47 | | |

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/ Julie Messa | June 18, 2026
Julie Messa, CET**D-403 | Date
Transcriber