# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

- - -

HONORABLE SHERILYN PEACE GARNETT, DISTRICT JUDGE PRESIDING

EMILY GARCIA, et al.,           )
                                )
        Plaintiffs,             )
                                )
                                )
                                )
    vs.                         ) No. CV 22-00131-SPG
                                )
                                )
                                )
CITY OF TUSTIN, et al.,         )
                                )
        Defendants.             )
_____ )

REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

*TRIAL DAY ONE*

LOS ANGELES, CALIFORNIA

TUESDAY, APRIL 14, 2026

MARIA R. BUSTILLOS
OFFICIAL COURT REPORTER
C.S.R. 12254
UNITED STATES COURTHOUSE
350 WEST 1ST STREET
SUITE 4455
LOS ANGELES, CALIFORNIA 90012
(213) 894-2739
MADAMCOURTREPORTER@GMAIL.COM

example.  She is saying they cannot not understand something.  That is basically what she is saying.  If I understand something, then I might raise a hand or something.  She said "hola" and "bye" is not the same.  That doesn't show sufficient basis that she would be unlikely to be impartial over the course of this trial.  It is insufficient basis for this request.

THE COURT:  She said -- and I'm going to grant the for-cause challenge she said, and I quote -- "I'm not able to set aside Spanish understanding."  That is a summary of what she said, basically.  She seemed very resolute.  She understood the questioning, and the questioning came after other people had been questioned.  I don't take any issue with how counsel asked the question, and she was like, "If I hear something that's different, I'm going to go with what I hear."  So that is granted.

Anyone else?

MR. PRAET:  No other challenges for cause.

MR. GALIPO:  One question on the perempts.  My understanding was that it was three per side.

THE COURT:  Yes, three and three and three.

MR. PRAET:  They get six?

THE COURT:  I mean, it is two different plaintiffs.

MR. PRAET:  I understand, but if there are five plaintiffs on the other side, I still get three?

MR. ARIAS:  That is not the law -- I have --

THE COURT:  Three for the Garcias, three for the Galicias, and three for the Defense.

MR. PRAET:  I understand.  They're going to get six for the plaintiffs, and I'm going to get three for Defense?

MR. ARIAS:  I represent my clients who is --

THE COURT:  Please don't argue here.

But yeah.

MR. PRAET:  I understand the Court's ruling.  I've just never seen that.  I've seen it per side, not per party.

THE COURT:  They're technically not a side because the case has been consolidated.  It is not like one group of plaintiffs.  They're two separate plaintiffs with two separate complaints that have been consolidated.

MR. PRAET:  With the exact same issue.

THE COURT:  Fair, but still, we could have two trials.  We're not doing that.

MR. PRAET:  No, no.

THE COURT:  So they get three each.  You get three.

MR. ARIAS:  Thank you, Your Honor.

MR. GALIPO:  Thank you, Your Honor.

THE COURT:  Okay.

MR. PRAET:  And I think you asked before, and it wasn't clear.  If somebody passes, does that count as a peremptory?

THE COURT:  No.

MR. PRAET:  Okay.

THE COURT:  Okay.

(Sidebar concluded.)

THE COURT:  All right.  It is 12:06. Typically, we would take a lunch break right now, but in the interest of letting some of you go, I'm going to try to go until about 12:15.  All right.

But first, I'd like to thank and excuse juror number 16.  Juror number 16, you are excused.  Please leave your badge on the lectern right there in the middle.  Return to the jury room for further instructions.  Thank you for your service.

Also, I will excuse at this time juror number 8.  Thank you for your service.  You are excused. Please leave your badge on the lectern and return to the jury assembly room for further instructions.

Next, what we're going to do is the attorneys are going to exercise what are called peremptory

129

challenges.  They don't give any reason why they are asking people to be thanked and excused.  Please do not assume or speculate as to why anyone is being excused. And we will just go from there.

Before I do that -- never mind.  First peremptory is with Garcia plaintiffs.

MR. GALIPO:  Thank you, Your Honor.  We'd like to have the Court please thank and excuse juror number 14.

THE COURT:  Juror number 14, thank you for your service.  You are excused.  Please place your badge on the lectern and return to the jury room.

Next peremptory is with the Galicia plaintiffs.

MR. ARIAS:  Your Honor, thank you.  On behalf of the Galicia plaintiffs, we'd like the Court to thank and excuse juror number 3.

THE COURT:  Juror number 3, thank you for your service.  You are excused.  Please put your badge on the lectern and return to the jury room.

Defense?

MR. PRAET:  Your Honor, the Defense would thank and excuse juror number 7.

THE COURT:  Juror number 7, thank you for your service.  You are excused.  Please put your badge on the lectern and return to the jury assembly room for further

130

instructions.

Garcia plaintiffs?

MR. GALIPO:  Thank you, Your Honor.  We would like to have the Court please thank and excuse juror number 11.

THE COURT:  Juror number 11, thank you for your service.  You are excused.  Please place your badge on the lectern and return to the jury assembly room for further instructions.  Good luck with your biotech company.

THE PROSPECTIVE JUROR:  Thank you, Your Honor.

THE COURT:  Galicia plaintiffs?

MR. ARIAS:  Thank you, Your Honor.  The Galicia plaintiffs would like the Court to thank and excuse juror number 9.

THE COURT:  Juror number 9, thank you for your service.  You are excused.  Please place your badge on the lectern.  Go to the jury room for further instructions.

Defense?

MR. PRAET:  Your Honor, the Defense would like to thank and excuse juror number 17.

THE COURT:  Juror number 17, thank you for your service.  You are excused.  Please return to the jury assembly room for further instructions.

(presence of the jury:)

THE COURT:  We're back on the record.

Plaintiffs ready to call their first witness?

MR. GALIPO:  Yes, Your Honor.

THE COURT:  You may proceed.

MR. GALIPO:  We'd like to call Estela Silva to the stand.

**PLAINTIFF'S WITNESS, ESTELLA SILVA, SWORN.**

THE COURTROOM DEPUTY:  Please state your name for the record and spell your last name.

THE WITNESS:  Estella Silva, S-I-L-V-A.

THE COURT:  All right.  Good afternoon, Officer Silva.

THE WITNESS:  Thank you.  Good afternoon, Your Honor.

THE COURT:  Counsel, you may proceed.

MR. GALIPO:  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. GALIPO:

Q    Good afternoon, Officer Silva.

A    Good afternoon, sir.

Q    When did you go to the police academy?

A    I went in 2019.

Q    And what did you do work-wise before you went to the academy?

A       Yes.

Q       Do you recall that I took it?

A       Yes.

Q       And did you understand you had a duty to tell the truth at the time of your deposition?

A       Yes, sir.

Q       And was there a court reporter taking down everything being said, if you know, like we have one here?

A       Yes, we did.

Q       After your deposition, did you make any changes to any of your answers?

A       Not that I recall.

Q       Have you had an opportunity to review your deposition in preparation for the trial?

A       Yes, sir.

Q       Now, in terms of deadly force, were you trained that deadly force is the highest level of force an officer can use?

A       Yes, sir.

Q       Were you trained that shooting someone in their upper body was likely to cause serious injury or death?

A       Yes, sir.

Q       Were you trained that you should only use deadly force as a police officer if there is an

immediate or imminent threat of death or serious bodily injury?

A      Yes, sir.

Q      And were you trained if there's not an immediate or imminent threat of death or bodily injury, that you should not deadly force?

A      Yes, sir.

Q      Were you trained that you have to -- the -- in order to use deadly force, in terms of this imminent threat of death or serious bodily injury, there has to be the ability, opportunity, and apparent intent to immediately cause death or serious bodily injury?

A      Yes, sir.

Q      And you, in fact, were trained you needed all three of those, correct, ability, opportunity, and apparent intent?

A      Yes.

Q      And you were trained to give a verbal warning before using deadly force when feasible?

A      When feasible, yes.

Q      And you were trained that deadly force should only be used when there are no other reasonable options; true?

A      Yes.

Q      And you were trained that seeing a weapon in

199

someone's hand, like a gun or a knife, is not by itself

enough to use deadly force.  Would you agree?

A        Correct.

Q        By the way, were you trained as a police

officer if you see a weapon in someone's hand, one

command you can give them is to drop it?

A        One of them, yes.

Q        And in terms of commands, were you trained to,

when giving commands, give the individual an opportunity

to comply with the commands, if feasible?

A        If feasible.

Q        So you would agree that a gun in someone's

hand, a knife in someone's hand is not enough by itself;

true?

A        Yes.

Q        And certainly, a stick or a pole in someone's

hand is not enough by itself.  Would you agree with

that?

A        If they're just holding it by itself, yes.

Q        Were you trained as a police officer that

people have a right under the United States Constitution

to be free from excessive force by police officers?

A        Yes, sir.

Q        And were you trained as a police officer you

have to justify every shot?

A          Yes, sir.

MR. GALIPO:  If we could, put up Exhibit 23-5, please.

THE COURT:  Is this in evidence?

MR. GALIPO:  We have an agreement on some of them.

THE COURT:  Okay.  If you could, just let me know as to each one.

MR. GALIPO:  Oh, I apologize, Your Honor.

We'll wait to publish after the judge says "admitted."  Thank you, Ms. Masongsong.

THE COURT:  You can just say "we agree."

MR. GALIPO:  Yes, Your Honor.  We agree on Exhibit 23, page 5.

MR. PRAET:  And for the record, that's correct, Your Honor.

THE COURT:  All right.  It's admitted.

(Whereupon, Plaintiff's Exhibit 23-5 is admitted hereto.)

MR. GALIPO:  23-5, or 23, page five, whatever is --

THE COURT:  Just page 5, though?

MR. GALIPO:  Yes, at this point.

THE COURT:  Okay.  It's admitted, page 5.

BY MR. GALIPO:

Q          Is that how you were dressed at the time of

this incident, generally?

A          Yes, sir.

Q          Are you left-handed or right-handed?

A          I'm right-handed.

Q          So is your firearm holster on your right side?

A          That is correct.

Q          And how about your Taser?  Where is that?

A          On my left side.

Q          Is your Taser yellow in color, at least partially yellow?

A          Yes.

Q          Did you have a police baton on you at the time of this incident?

A          No.

Q          Where was it, if you know?

A          Inside my vehicle.

Q          Did you have your body-worn camera on at the time of this incident?

A          No.  It was low battery, so it was docked and charging in my patrol vehicle.

Q          Actually, it had been charging for some time, hadn't it?

A          I don't recall.  When I retrieved my body camera, it was low battery.

Q          When did you retrieve it?

A          That morning.

Q          What time did you start your shift?

A          0600 a.m.

Q          This incident happened at -- after 10:00 o'clock; right?

A          Yes.

Q          That was four hours later?

A          Yes.

Q          So it had been charging for four hours?

A          It wasn't docked the entire time, sir.

Q          I'm sorry?

A          So my body-worn camera was not docked the entire four hours, sir.

Q          How many of the four hours do you think it was charging?

A          I don't recall.

Q          Do you recall saying that you forgot it in the car because of the emergency of the situation?

A          Yes.

Q          Let's talk about the emergency of the situation.  You got a call at some point over your police radio related to this incident; is that right?

A          Yes, sir.

Q          And you met with a reporting party at some point near the scene?

203

A       Yes, sir.

Q       And you understood this reporting party was a retired -- retired police officer for the Anaheim Police Department?

A       Yes.

Q       And it was around 10:00 in the morning.  Does that sound right?  Maybe a little after?

A       Yes, sir.

Q       And was the name of this location the Saddleback Lodge (sic) or something like that?

A       I believe it was the Saddleback Motor Lodge (sic) or the Saddleback Lodge Motor Homes (sic) or something like that.

Q       Okay.  Now, the information that you had at the time, I assume part of that came over the police radio?

A       Yes, sir.

Q       And the call came out as a white male; is that true?

A       Yes, sir.

Q       With blond hair; is that also true?

A       Yes.

Q       And the call came out that it wasn't something that happened that morning; it was something that happened the night before.  Is that correct?

A       Yes.

Q        And the information you had was that some white person with blond hair was waving a knife around; is that right?

A        That is correct.

Q        And you had no information that this blond-haired white person that was waving the knife around had verbally threatened anyone with a knife; is that also a fair statement?

A        The reporting party stated that she wasn't the one that saw him doing that, that it was someone else that lived in the motor lodge, but that it was not reported to her, no.

Q        Right.  And you had no information of any injury; is that correct?

A        Correct.

Q        And in fact, based on what you knew, nobody had called in to the police the night before when this allegedly happened?

A        Correct.  What -- the reporting party stated that any police-related matters or any fear of security, they usually went to the reporting party and asked for her advice before they went to the police.

Q        Okay.  Did anyone, if you know, go to her the night before when this blond-haired white male was allegedly doing this?

A        Not that I know of.

Q        And then you spoke to the reporting party at some point?

A        Yes, sir.

Q        And did she say she saw this blond-haired white male waving the knife around?

A        What she stated was that she recognized who he was, and she pointed out where the bushes were and saw him go in there and had not seen him leave.

Q        This is what I'm trying to clarify.  She did not see this person the night before, based on your understanding; correct?

A        Correct.

Q        So how did she know that this blond-haired white person, if you know, was in the bushes the next day?

A        I don't know.  I'm just -- that is what she told me, that she recognized him going to the same bush, saw him go in there this morning, and didn't see him leave.

Q        Right?  But if -- if she saw him go into the bushes in the morning -- and obviously, you would agree that Mr. Garcia is Hispanic, not white; correct?

A        Correct.

Q        And you would at least agree with me he doesn't

have blond hair?

A        Correct.  At the time, he did have a beanie on, so it could have been a mistake on her part.  He had a beanie on, so you couldn't see his hair.

Q        Right.  But I guess what I'm wondering is how would this person, this reporting party have known that this person she saw going in the bushes on the morning you talked to her was the same blond-haired white person that someone else reported seeing the night before?

A        I don't know, Your Honor -- I'm sorry.  I don't know, sir.  Sorry.

Q        And when -- you were the first officer on scene; correct?

A        Yes, sir.

Q        And some point after you got to the scene, other officers joined you?

A        Yes.

Q        One was Officer Yuhas?

A        Yes, sir.

Q        Another was Officer Frias?

A        Yes.

Q        You were generally --

         MR. GALIPO:  We could take that down.  Thank you, Ms. Masongsong.

BY MR. GALIPO:

right would be the north?

A       That is correct.

Q       And there is a sidewalk there; correct?

A       Yes.

Q       And there is bushes separating the sidewalk from the street?

A       Yes.

Q       And also bushes, I guess, on -- west of the sidewalk where Mr. Garcia was located?

A       Yes.

Q       So did you at least recognize at some point that the person inside was Mr. Garcia?

A       Yeah.  When I first looked into the bushes, it was really dark, so I couldn't see.  Once I used my gun -- there is a light mounted on it.  I used it to illuminate behind the bush.  That is when I was able to see there was a man back there.  He did have a beanie on, so I cannot confirm if he did or did not have blond hair.

Q       So you had prior contacts with Mr. Garcia; right?

A       Correct.

Q       And you recognized the person as Mr. Garcia at some point?

A       Yes, sir.

Q    And you knew Mr. Garcia didn't have blond hair?

A    Yes.

Q    And you certainly knew he was not white?

A    Yes.

Q    Did you -- and at that point, as you understood it, you were the only one of the officers that could really see in the bushes?

A    Yes, sir.

Q    And did you have some type of tact light on your firearm?

A    Yes.

Q    And you were using that kind of for illumination?

A    Yes, sir.

Q    So your firearm would have been in your right hand, and you're directing it inside the bush with the tact light that sits on top of the firearm to -- to illuminate so you can see better?

A    So the gun was on both hands, and it was counted -- canted downwards.  So it was up on my chest canted downwards.

Q    Kind of at an angle downwards?

A    Yes, sir.

Q    And at some point, you see someone in the bushes?

A       Yes.

Q       And that person appeared to be sleeping, according to you?

A       Yes, sir.

Q       And I think you described the person as lying on their back, their hands behind their head, their eyes closed?

A       Yes.

Q       And as far as you could tell, they were sleeping?

A       Yes, sir.

Q       So now, you have a person sleeping in the bushes, and at some point, you recognize it's Mr. Garcia?

A       Yes, sir.

Q       And you said something to the effect to him, "I know you," or words to that effect?

A       Yes.

Q       Now, are you trained that if you think someone has a knife, for example, to keep distance from them, if you can?

A       If you can.

Q       And you, among other things, were telling Mr. Garcia to wake up?

A       Yes, sir.

212

Q        And at some point, did he appear to start waking up?

A        Yes.

Q        And you were asking him to come out of the bushes?

A        Yes.

Q        At some point, you said "keep your hands up" or "let me see your hands"?

A        Yes.

Q        Did you see recyclables at some point or bags?

A        There was a lot of things behind that bush, sir.

Q        I'm wondering if you saw recyclables in his hand at some point?

A        Once he stepped out, that is when I saw him holding the bag of recyclables, yes.

Q        And you knew from past experience that Mr. Garcia was homeless or semi-homeless; is that fair?

A        Yes.

Q        Did you tell the other officers that were with you, Officer Yuhas and Officer Frias, "Hey, I know this guy.  I've had prior contacts with him.  I arrested him once for assault with a deadly weapon"?  Did you share that with your fellow officers?

A        No, sir.  Once I recognized him, I knew,

UNITED STATES DISTRICT COURT

because of my prior history with him, his meth use, his violent history, and the fact that he wasn't paying attention to me, listening to my commands, and was facing opposite of me, I just laid my focus on him.  I didn't have time to communicate that with my officers, to move away, and not look at him.  I was mainly focused on just him and what he was doing, whether he was trying to arm himself with that knife because I had no idea if he had it or not.

Q      How much time do you think passed from you recognizing Mr. Garcia and him finally coming out of the bushes?

A      I don't know.

Q      Do you have an estimate?

A      Maybe a few minutes.

Q      A few minutes.

And is it your testimony that in those few minutes, you didn't have time to tell Officer Yuhas, who was a couple of feet to your right, or Officer Frias, who was ten feet to your left, about your prior contacts with him, with this person so that they would be aware?

A      I don't think it would have changed the outcome, but my main focus was him.

Q      Well, when you say "change the outcome," you mean change Mr. Garcia being killed?

A        No.  I mean him cooperating with my commands. I don't think me communicating, "Hey, this is my prior history," would have changed his ability to follow any of my instructions when I'm instructing him to show me his hands and to come out.

Q        I guess what I'm asking:  Are you saying that you don't think you had time in those couple of minutes to communicate that to the officers?

A        No, sir.  Like I said, my focus was mainly on just him and giving him the commands.

Q        Would you at least agree with me, Officer Silva, that you never once told the other officers about any of your prior contacts or knowledge of Mr. Garcia?

A        That is correct.

Q        Were you trained in the academy that communication is important?

A        Yes.

Q        Including communication with your fellow officers?

A        Yes.

Q        And you're saying that you thought that he might have a knife on him?

A        Yes.

Q        Did you ever see a knife?

A        No.

215

Q        And you're saying that you thought he had a knife on him, and you're standing at the opening of the bushes, telling him to come out towards you?

A        I wasn't able to see what his hand -- what were in his hands, sir, so my main focus was to get him outside safely.

Q        Without using force?

A        Correct.

Q        I guess what I'm wondering:  If you're saying you thought he had a knife and officers are trained to keep distance from someone that might have a knife, why were you asking him to come out of bushes and standing right at the opening?

A        Well, I was also using the brick wall as cover when I was communicating with him.

Q        At some point, he told you words to the effect -- and I'm paraphrasing here.  When you asked him to get out, he said, "Let me get out."  In other words, "Step back a little bit so I can get out."

         Do you recall that?

A        Yes, sir.

Q        He also told you, "I'm waiting for a friend," or words to that effect?

A        Yes.

Q        There was also discussion about his

UNITED STATES DISTRICT COURT

recyclables?

A        Yes.

Q        Let's talk for a moment about your prior contacts with him.  You had three prior contacts with him; correct?

A        Yes, sir.

Q        And by the way, you gave a statement in this case at some point following the incident; correct?

A        That is correct.

Q        You did not give a statement on the day of incident; is that true?

A        Yes.

Q        Are you aware or do you know whether the other three officers that were on scene gave statements the same day?

A        I believe they -- all three of them gave a statement that day.

Q        And you -- and the date of the incident was August 9th, 2021; correct?

A        Yes.

Q        And you would agree you did not give a statement that week?

A        That is correct.

Q        You would agree you didn't give a statement that month?

UNITED STATES DISTRICT COURT

A        Yes.

Q        You would agree you didn't give a statement the next month?

A        I believe so.

Q        In fact, you didn't give a statement till like October 21st, 2021, about two-and-a-half months after the incident?

A        Yes, sir.

Q        And when I asked you in your deposition, "Why was it so long before you gave your statement?" you said you had a preplanned vacation, and you were in between attorneys?

A        That is correct.  And scheduling, sir.

Q        And by chance, before you gave this statement two-and-a-half months later, did you have a chance to look at some prior police reports that related to Mr. Garcia?

A        No.  I -- I remember viewing policy for that -- that DOJ interview, and then I don't remember what else. I remember being informed of -- about a few things, but I don't remember exactly what I reviewed.

Q        You don't remember whether you reviewed some reports or not, or you're saying you recall that you did not review any reports?

A        I don't remember if I reviewed any reports,

218

sir.

Q        You don't remember one way or the other?

A        Yeah.

Q        Fair enough.

So the first contact that you had with Mr. Garcia, the first contact, was he physically resistive with you?

A        No, sir.

Q        Did he try to fight you in any way?

A        No.

Q        Did he have any weapons on him?

A        Not that I saw, but he was reported waving a knife in the air, yes.

Q        Oh, I see.

Did you find any knife on him?

A        Not on him, but it was in the area where he was at, and he did admit that the knife was his.

Q        By the way, he denied that being his knife; correct?

A        No he stated that it was his.  He used it to cut fruit earlier that day.

Q        You've told me before, I think, in your deposition it is not a crime to carry a knife; is that accurate?

A        That is correct.

219

Q        So the first contact you had with him, would you agree he did not -- he was not physically resistive with you.  Would you agree?

A        Yes, sir.

Q        And he was in no way assaultive with you?

A        Correct.

Q        How long were you with him during that initial contact?

A        I don't remember.

Q        Do you know if it was more or less than an hour?

A        I don't remember.

Q        And he was not arrested; correct?

A        That is correct.

Q        The second contact you had with him, how long were you with him that time?

A        I don't know the exact.  Many minutes.  Maybe an hour.

Q        And during that approximate hour, did he try to fight you at all?

A        No, sir.

Q        Physically resistive with you at all?

A        No.

Q        Try to assault you in any way?

A        No.

Q          Did he have any weapons on him?

A          No.

Q          Now, according to you, you had some information that he had robbed a street vendor; is that right?

A          That is correct.

Q          I just want to make sure I get your understanding that this alleged robbery of the street vendor didn't happen on the day you had contact with him; it happened a couple weeks earlier?

A          I believe it was maybe two weeks or ten days earlier.

Q          Somewhere between ten days and two weeks earlier?

A          Yes, sir.

Q          Okay.  You, yourself, never spoke to the alleged victim of that incident, did you?

A          No.

Q          And you never saw what the alleged item was used in that incident, did you?

A          That is correct.

Q          And you, at least at some point, gained an understanding that this piece of wood referenced in that prior incident was 10 inches long; true?

A          I was never told at the time how big it was, but what -- I was told when I was dispatched to the call

that the victim let -- let Tustin dispatch know that he was knocked unconscious, and it was later on speaking to an officer that I found out that it was a large piece of wood.

Q      Okay.  Well, let me break that down.

First of all, you are aware now that there -- the report of that incident says no injuries?

A      Now I am, yes.

Q      And the report of that incident says nobody was knocked unconscious; correct?

A      I found that out after the incident, sir.

Q      And the report then says that this item was 10 inches long; correct?

A      That is correct.

Q      And your claim that you knew about him knocking someone unconscious, you say, in part came from call notes?

A      That is correct.

Q      You're talking about a CAD printout?

A      No.  It -- when I was dispatched, that is something that dispatch relays to us over the radio when we're responding to these calls for service.  Not only that, CAD notes is something that dispatch has to type out when someone calls 9-1-1.  We are able -- we have the ability to read it on our screen in our -- in our

222

police units, as well.

Q        Did you -- I know you had two-and-a-half months before you gave your statement, and you were in between lawyers.  Did you have a chance to look at that CAD printout before you gave your statement?

A        Not that I remember, sir.

Q        Because the CAD printout that you're referring to says something about knocking someone out with a bag?

A        Yeah.  It wasn't until after my interview that I remember -- refreshing my memory for this court case, was that it stated that he was knocked unconscious with a bag.

Q        With a bag.

So something said knocking someone out with a bag, and you now know, at least according to the report, there was no injuries and nobody knocked unconscious; correct?

A        That is correct.

Q        And according to you, you didn't tell the other officers at the scene anything about this.  "Hey, I've had some issues with this guy before.  He's been violent in the past.  He knocked someone out."  That was never discussed?

A        That is correct.

Q        And your third encounter with him, how long

would you say that was?

A          Probably over an hour.

Q          And during that encounter, was he physically resistive with you in any way?

A          No, sir.

Q          Tried to kick you, punch you, verbally threaten to harm you?

A          No, sir.

Q          Any weapons on him?

A          No, sir.

Q          So you had three prior encounters with him, approximately an hour each; is that fair?

A          Yes.

Q          And if I had all those up, that is three hours of time with Mr. Garcia prior to the morning of the incident, and not once did he try to physically resist you or assault you; is that correct?

A          He did try to physically assault me, sir, during that incident.  He did try to physically assault me during that incident, sir, behind the bushes.  Is that what you're saying?

Q          No, no.  The three prior?

A          Oh, yes.  Correct, sir.  He did not.  Those three incidents, he did not try to physically assault me.

224

Q        In fact, you, yourself, have never seen him try to physically harm anyone?

A        Correct.

Q        Now, at some point, you tell Officer Yuhas that you're going in, meaning going in the bushes?

A        No.  What I meant was I was going to reach into the bush to grab him.

Q        Did you say, "I'm going in"?  Did you say, "Dude, I'm going in"?

A        I did say that, but that is not what I meant.

Q        Okay.  Well, let's first say -- let's take it one step at a time.

         Did you say that, "Dude, I'm going in"?

A        Yes.

Q        And who was the dude?  Who were you referring to?  "Dude," was that Officer Yuhas?

A        Officer Yuhas, yes.

Q        And when you said, "I'm going in," he said no?

A        Yes.

Q        So you wanted to go in or reach into these bushes, and you're saying you thought he had a knife?

A        Yes.

Q        And you thought that was good police tactics?

A        There is different types of tactics.  There is different ways to skin a cat, sir.

Q        I'm just wondering if you, yourself, thought those were good police tactics?

A        Probably wasn't the best because Officer Yuhas couldn't see what was going on inside or what I was seeing, but at the time, I believed that the best thing was -- to do was to reach in and grab him.

Q        Did you tell anyone that you wanted to grab him?

A        I didn't think I needed to when I said I was going to go in.  That was my main goal.  I wasn't going to just stay behind in the bush with him.

Q        Did you ever consider once you knew where he was, you knew who he was, you had three officers there to maybe back up a little bit and give him space and a chance to come out where you're not right on him so that you can assess him once he comes out, give him commands, if you need to?

A        Yes, sir.  If you watch the video, there is a -- there is a time where he asks for some space to let him get out, and I do step back.  So I wasn't able to see him, so I did get closer to the bush.  But due to him not being cooperative the entire time, I wanted to control the situation.

So once he stepped out, I wanted to be close to grab him and control him.  He did step out with bags,

but I didn't know what he was going to do then.  I didn't know if he was going to swing them around.  So my goal was to grab him and pull him out of the bush.

Q       So you saw him at some point coming out with bags?

A       Yes.

Q       You recall two bags?

A       Yes.

Q       And that's when you physically grabbed him?

A       Yes.

Q       And you grabbed him essentially with your left hand; correct?

A       That is correct, sir.

Q       And you still had your gun in your right hand?

A       Yes, pointed downward.

Q       And you thought that was good tactics, grabbing someone with a gun out in your hand?

A       I wouldn't say they're bad tactics.

Q       And Officer Yuhas would have been to your right?

A       That is correct.

Q       And at the time that you used your left hand to grab Mr. Garcia, Officer Yuhas also tried to grab him at the back of his head?

A       Yes, sir.

Q       And that's when the beanie came off of Mr. Garcia?

A       Yes.

Q       At some point, did you become aware that Officer Babb arrived on scene?

A       He was behind me, so I wasn't paying attention to him, no.

Q       You never became aware he arrived?

A       It wasn't until after the shooting that I was aware.

MR. GALIPO:  Can we look at Exhibit 20-3, please?

MR. PRAET:  No objection, Your Honor.

THE COURT:  Is it already admitted?  Is it already admitted?

MR. GALIPO:  No.  It is deemed to be admitted. We just is need the Court's blessing.

THE COURT:  Defense counsel, please confirm.

MR. PRAET:  Deemed admitted, Your Honor.

(Whereupon, Plaintiff's Exhibit 20-3 is admitted hereto.)

BY MR. GALIPO:

Q       Can you see this on your screen?

A       Yes, sir.

Q       Does this show from some distance the bushes where Mr. Garcia was in?

A        Yes.

Q        It also shows the street; correct?

A        That is correct.

Q        And there appears to be a vehicle parked close to the red curb?

A        Yes.

Q        Is that Officer Yuhas's vehicle?

A        I believe that it is Officer Babb's vehicle.

Q        Okay.  Do you know where Officer Yuhas's vehicle was?

A        I don't recall exactly where he parked.

Q        Do you recall if he parked next to the curb or street?

A        I believe he parked inside the motor lodge by my vehicle.

Q        Do you see where there is spaces in the bushes between the sidewalk and the curb?

A        Yes.

Q        Did you ever think it might be better to stand back some distance while you're asking him to come out of the bushes if you thought he had a knife?

A        No, sir.

         MR. GALIPO:  Exhibit 6-1, please.  Yeah, it is a frame from the body-worn camera.

         MR. PRAET:  No objection, Your Honor.

THE COURT:  Exhibit 6-1 is in evidence.

(Whereupon, Plaintiff's Exhibit 6-1 is admitted hereto.)

BY MR. GALIPO:

Q        Are you able to see this on your screen?

A        Yes, sir.

Q        Now, this is where you're initially looking in at Mr. Garcia; is that correct?

A        I can't confirm it, sir.  There has been numerous times where I've stood like that throughout the video, so I can't confirm if that is exactly when I first initially got there.

Q        I'm not suggesting it is exact moment.

But do you notice Officer Frias is not in the background down the sidewalk?

A        That is correct.

Q        So this would be earlier on before Officer Frias went down the sidewalk?

A        Yes.

Q        And by the way, when Officer Frias went down the sidewalk, that would be going in a south direction; correct?

A        Yes.

Q        And you said that you wanted him there in case Mr. Garcia ran?

A        Yes.

Q        And if he ran, then you were expecting Officer Frias to go hands-on and just take him down?

A        Yes.

Q        Do you recall someone saying "watch your crossfire"?

A        Yes.

Q        Who said that?

A        Officer Frias.

Q        And who was he saying that to?  I guess it would be you since you had your gun out?

A        I believe so.

Q        Because obviously, you don't want to shoot a shot if an officer is in the background?

A        That is correct.

Q        And according to you, you fired your second shot at Mr. Garcia because you claim Mr. Garcia was running in the direction of Officer Frias?

A        That is correct.

Q        Do you recall at some point Mr. Garcia say, "Why are you grabbing me?"

A        Yes.

Q        Do you recall him saying, "Why are you hitting me?" or words to that effect?

A        I don't remember those exact words.

Q        Do you recall words to that effect?

231

A        Yes.

Q        Did you ever respond to his questions as to "why you're grabbing me" or "why you're hitting me"?

A        No.

Q        So at some point, we could at least hear on the audio of the video Officer Yuhas say, "He's got a stick. He's got a stick."  Do you recall that?

A        Yes, sir.

Q        And according to your testimony, you never heard that?

A        That is correct.

Q        How far do you think Officer Yuhas was standing from you when he said, "He has a stick.  He has a stick"?

A        I don't recall.

Q        Don't you recall he was a few feet from you at the time he deployed his Taser?

A        It was probably 1 to 2 feet.

Q        Were you trained on the importance of situational awareness?

A        Yes.

Q        Being able to hear things and observe things around you?

A        Yes.

Q        And you're saying that you never heard Officer

Yuhas say, "He has a stick.  He has a stick"?

A        That's correct because I already saw that he had armed himself with the -- the pole, sir.

Q        You already saw that?

A        Yes.

Q        Well, did you yell out, then, to your fellow officers, "He has a stick"?

A        No.  My main focus was to step back, and I had my hands up in self defense because he had already jabbed it toward my stomach.

Q        So I want to ask you about that jabbing.

         But what I was wondering is:  Was there a reason why, if you say you saw him with the stick, you never said it to anybody?

A        No, there's no reason.

Q        Now, let's talk about the jab.

         You indicated that in your statement taken two-and-a-half months later; right?

A        Yes.

Q        Were you aware at the time you gave your statement that none of the other officers that gave their statements indicated that they saw any jab?

A        No, I did not.

Q        You didn't know that.

         Are you claiming that you could see him jabbing

you in the stomach with this stick in this video?

A        That is not what I'm claiming, no.

Q        Can you see it in the video?

A        No.  It's blocked by the brick wall.

Q        I see.  Did you tell anyone at the scene that he jabbed you or he tried to jab you?

A        No.

Q        And that would have been contrary to everything he had done with you during the approximate three hours you were with him on those three prior contacts, him trying to hit you; right?  That had never happened before?

A        That is correct.

Q        And this jab that you're talking about was one jab; right?

A        Yes.

Q        And he got maybe within a foot, according to you?

A        Yes.

Q        There was no contact; correct?

A        That is correct.

Q        And you're claiming it was towards your stomach?

A        Yes.

Q        And don't you have a -- a bulletproof vest that

A        Yes.

Q        Then according to you, you saw this stick. Then you back up and took your gun out again?

A        That is correct.

Q        So what I'm asking you:  Once you saw the stick and you thought that he tried to jab you before he came out of bushes and you had pulled your gun out, were you thinking of shooting him?

A        If he was going to hit me again, yes, because that was my whole thought process, is if he is going to try to hit me again, he is going to hit me again.  I had backed up as furthest as I could.  The bushes were up to my hips.  Sir, I'm five-foot tall.  The bushes are up to my hips.  I had nowhere else to go.

Q        Well, let's talk about that since you brought it up.

You indicated in your statement that the bushes were up to your waist; correct?

A        Yes.

Q        They actually were not up to your waist.  We could see that from the body-worn camera footage; is that fair?

A        I remember them being up to my waist, sir.

Q        And you also said in your statement you had nowhere to go.  You couldn't go right.  You couldn't go

237

back.  Do you remember that?

A        That is correct, sir.  The pole that he is holding is five-foot.  If I were to turn my back to him, he would have had that ability to hit me in the back of my head.  If I would have gone south down on the street, it would have been the same thing.

Q        You were aware, obviously, that there were three officers there at the time; true?

A        Yes.

Q        And you are trained that you have a duty to tactically reposition when you -- if feasible; true?

A        When it's feasible.

Q        Are you telling us that it was impossible for you to take another step back since you were already in the bushes?

A        The bushes were as tall as me, sir.  There was branches everywhere.  I couldn't -- I couldn't get out of them.  I stepped back as furthest as I could.

Q        I'm asking you:  Are you telling us it was impossible for you to take another step back?

A        Yes.

Q        And you also indicated in your statement that you couldn't go into the street because it was a busy street.  Do you recall that?

A        Yes.

Q        But the truth of the matter is there were two patrol cars parked next to the curb blocking the curb lane at the time of this incident, weren't there?

A        Yes, sir.

Q        So you never told anyone at the scene that he tried to jab you or that you saw the stick; correct?

A        Correct.

Q        And you're saying you never heard Yuhas say he has a stick?

A        Correct.

Q        So let's talk about the Taser.

         Were you aware that he was tased?

A        Yes.

Q        You heard that?

A        Yes.

Q        You're familiar with the sound of a Taser?

A        Yes, sir.

Q        After you saw the stick, did you tell him to drop it?

A        I told him to show me his hands.

Q        Are you saying that you -- the last command you gave him was "show me your hands"; right?

A        Yes, sir.

Q        Are you saying that you told him to show you his hands after you saw the stick or before you saw it?

A        After.

Q        After.

         Why didn't you tell him to drop the stick?

A        I don't know, sir.

Q        You're trained that that is a command you can give someone, to drop something if you think it is a potential threat?

A        It is one of them, but you can also say "show me your hands."  Usually, when you ask someone to show you -- show you their hands, they usually do this.

         (Whereupon, the witness is demonstrating.)

         THE WITNESS:  This is the motion that they do, so there shouldn't be anything in their hands.  It's not "show me your hands."

         (Whereupon, the witness is demonstrating.)

BY MR. GALIPO:

Q        Aren't you trained to try to give commands in a way that is understandable?

A        If feasible.

Q        So your last command was "show me your hands."  You never told him to drop the stick and never gave him a warning if he did something or didn't do something, you were going to shoot him; correct?

A        Correct.

Q        And you've already told me that you were

trained to give a verbal warning before using deadly force when feasible; true?

A        When feasible, yes.

Q        And obviously, based on your training, the reason you want to do that is because you're about to potentially take someone's life; correct?

A        Correct.

Q        So you want to give that person a last chance to comply before you shoot him?

A        Correct.

Q        The Taser, you've already told us, I think, you were aware that Officer Yuhas had his Taser out?

A        Correct.

Q        Because he was less lethal?

A        Yes, sir.

Q        And the whole concept of less lethal is to try that first if you have to use any force?

A        Yes, sir.

Q        And you're aware, based on your training, that the Taser can be used in a probe or dart mode?

A        Yes.

Q        And that it is a five-second cycle?

A        Yes.

Q        And you're trained that sometimes, based on the training, if someone's tased, they may scream or grunt

or something to that effect?

A        They could, yes.

Q        And in this case, when you heard the Taser go off, Mr. Garcia was just in the process of coming out of the bushes onto the sidewalk; is that fair?

A        Yes.

Q        And you heard him start screaming?

A        Yeah, I was under the impression he was yelling at me.

Q        Did you hear him screaming?

A        Yes.

Q        And did you hear him screaming after the Taser was deployed?

A        Yeah.  I was under the impression he was yelling at me, yes.

Q        And you were aware the Taser was deployed, and you were aware the Taser cycle was still going on?

A        Yes.

Q        In fact, you estimate -- strike that.

         By the way, was any warning given to Mr. Garcia that he was going to be tased?

A        No, sir.

Q        Isn't the training to give a Taser warning when feasible?

A        When feasible.

Q        So he is repeatedly asked to come out of the bushes.  He comes out.  As he is coming out, you try to grab him.  He retreats.  He comes back out, and as he is coming out, he is tased.  Do I have it right so far?

A        Yes.  Can you additionally add that when he initially got out, he come out with bags, retreated back into the bush, and then armed himself with a stick?  Because when he first got out of the bushes, he did not have that pole in his hand.

Q        Okay.  Well, let me -- let's talk about that for a moment.

         Could you see him fully, completely from head to toe when he was still in the bushes and you went to grab him?

A        No.  When -- can you -- sorry.  Let's rewind a little bit.  When I tried to go in the bush, or was it when he initially had -- when I went to grab his right side with my left arm?

Q        Yeah.

A        Is that what you're talking --

Q        I'm sorry.  I'll clarify.

         You said at some point you have your gun in your right hand, and you go to grab him with your left hand; right?

A        That is correct.

UNITED STATES DISTRICT COURT

243

Q      That's about the same time that Yuhas goes to grab him behind his head?

A      Yes, sir.

Q      At that point, when you go to grab him with your left hand, I assume you're grabbing, what, his right arm area?

A      Yeah, his shoulder area.

Q      Could you completely see him from head to toe?

A      Not head to toe, but I could see that he didn't have anything in his hands other than the two plastic bags.

Q      Could you see his left hand?

A      I could see that he was carrying a bag.

Q      When he -- he had a bag in his left hand?

A      Yes.

Q      And when he came out eventually, he had a bag in his left hand and the stick; right?

A      That is correct.

Q      He still is holding the same bag?

A      Yes.

Q      And you are estimating that you shot him within one or two seconds of the Taser going off?

A      Yes.

Q      So you shot him during the Taser cycle?

A      It was ineffective.

Q        That was not my question, whether it was effective or not.

You shot him during the Taser cycle; is that true?

A        That is true, but I shot him because it was ineffective.  I wasn't going to wait another second for him to hit me over the head with that pole.

Q        I see.  You were just going to kill him instead?

A        No.  He --

MR. PRAET:  It's argumentative, Your Honor.

THE COURT:  Sustained.

MR. GALIPO:  I'll ask another question.

BY MR. GALIPO:

Q        You were aware that the Taser cycle was still going off when you fired?

A        Correct.

Q        And was he screaming at the time you fired your first shot?

A        Yes.

Q        Would you agree that you never saw him strike anyone with this stick?

A        That is correct.

Q        Would you agree that you, yourself, never saw -- saw him swinging the stick?

A        That's correct.

Q        Would you agree that you, yourself, never saw this stick coming down toward you?

A        That's correct.

Q        And according to you, you fired your first shot to protect yourself?

A        Yes.

Q        And your weapon is a semi-automatic weapon?

A        Yes.

Q        And it is a 9-millimeter?

A        Yes, sir.

Q        You have to press the trigger for each shot?

A        Correct.

Q        And you already told us you're responsible to justify each shot?

A        Yes, sir.

Q        And when you fired the first shot, what part of his body were you aiming at?

A        The center mass.

Q        And what was the center mass from your perspective?

A        Center mass, we're trained to always shoot there.  It is from the collar bone to the belt line.

Q        So essentially, you're aiming at his chest, abdomen area.

A        That is correct.

Q        And based on your training, you know that that's likely to cause death or serious bodily injury?

A        Yes, sir.

Q        And then according to you, after you fired your first shot, he turned away from you and turned towards Officer Frias?

A        Yes.

Q        And you believe that he could no longer go towards you; that is why he was going toward Officer Frias?

A        That is correct.  After I shot the first shot, he turned towards Officer Frias and started running towards him, and that is when I shot -- shot the second shot.

Q        Okay.  So I just want to be clear on your testimony.  You fired the first shot to defend yourself; correct?

A        Yes.

Q        And even though you didn't see him swinging it or it coming down on you; fair?

A        It is fair.  I wasn't going to wait for him to try to hit me.  He was already -- stick was up.  His foot was planted, weight towards going forward, took a fighting stance.  I wasn't going to wait for him to

actually make contact with my head before I shot him.

Q        You weren't even going to wait to see the stick coming in your direction; correct?

A        That is correct.

Q        If you had told him to drop the stick and he dropped it, would you still have shot him?

A        No.

Q        So your second shot, you're saying, was to protect Officer Frias?

A        That is correct.

Q        And so -- and you assessed between the shots?

A        I know it sounds weird.  It was super quick, but the first shot prevented him from hitting me.  That is when he turned towards Frias, and I saw Frias didn't have a weapon in his hand.  His hands were just out, and I was just doing it to protect my partner.  He was -- had the stick still raised up high, and he was sprinting towards him.

Q        He was sprinting towards Frias?

A        Yes.

Q        So you fired your first shot, and then you assessed to see if you need to fire again?

A        Yes.

Q        And that is when, according to you, you saw him sprinting towards Frias?

seconds.

MR. GALIPO:  That is correct, and I'm only going to play to there at this point.

THE COURT:  All right.

(Whereupon, Plaintiff's Exhibit 1 is admitted hereto.)

MR. PRAET:  Is it admitted, Your Honor?

MR. GALIPO:  Well, one second.  I'd like to get through this, please.  I got three minutes left now.

Go ahead and play.

(Whereupon, video is played in open court.)

MR. GALIPO:  Let's stop right there.

Can I have another 60 seconds, mindful of the time, Your Honor?

THE COURT:  Yes.

BY MR. GALIPO:

Q     At some point, you would agree you did not observe Officer Frias try to take his gun out or Taser out?  Would you agree with that?

A     Yes, sir.

Q     And would you agree that Officer Frias at some point threw or guided Mr. Garcia to the ground?

A     Yes, sir.

Q     At some point later, he was handcuffed?

A     Yes.

Q     Your handcuffs were used?

A      Yes.

Q      Your handcuffs are pink in color; is that true?

A      That is true.

MR. GALIPO:  Is this a good time to stop, Your Honor?

THE COURT:  Yes.

We're going to stop for the evening.  Let me read you an instruction.

As indicated before this trial started, you, as jurors, will decide this case based solely on the evidence presented in this courtroom.  This means that after you leave here for the night, you must not conduct any independent research about this case, the matters in the case, the legal issues in the case, or the individuals or other entities involved in the case.

This is important for the same reason that jurors have long been instructed to limit their exposure to traditional forms of media information, such as television and newspaper.

You're almost -- you also must not communicate with anyone in any way about this case, and you must ignore any information about the case that you might see while browsing the Internet or your social media feeds.

Have a good evening.  Remember, tomorrow, we start at 1:30.  1:30.  We'll with go until 4:30.  The

**C E R T I F I C A T E**

EMILY GARCIA, et al.                    :

                    vs.                 :   No. CV 22-00131-SPG

CITY OF TUSTIN, et al.                  :

I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

_____/S/_____          //____

MARIA R. BUSTILLOS                   DATE
OFFICIAL REPORTER

UNITED STATES DISTRICT COURT