# EXHIBIT B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

- - -

HONORABLE SHERILYN PEACE GARNETT, DISTRICT JUDGE PRESIDING

| | |
|---|---|
| EMILY GARCIA, et al.,          ) | |
|                       ) | |
|    Plaintiffs,             ) | |
|                       ) | |
|                       ) | |
|                       ) | |
|    vs.                 ) No. CV 22-00131-SPG | |
|                       ) | |
|                       ) | |
|                       ) | |
| CITY OF TUSTIN, et al.,        ) | |
|                       ) | |
|    Defendants.            ) | |
| _____ ) | |

REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

*TRIAL DAY TWO*

LOS ANGELES, CALIFORNIA

WEDNESDAY, APRIL 15, 2026

_____

MARIA R. BUSTILLOS
OFFICIAL COURT REPORTER
C.S.R. 12254
UNITED STATES COURTHOUSE
350 WEST 1ST STREET
SUITE 4455
LOS ANGELES, CALIFORNIA 90012
(213) 894-2739
MADAMCOURTREPORTER@GMAIL.COM

LOS ANGELES, CALIFORNIA; WEDNESDAY, APRIL 15, 2026

-o0o-

(COURT IN SESSION AT 1:40 P.M.)

(Whereupon, the following was held outside the presence of the jury:)

(Whereupon, the following was held in the presence of the jury:)

THE COURTROOM DEPUTY:  Calling item number five, SA CV 22-00131-SPG: *Emily Garcia, et al., v. City of Tustin, et al.*

Jury trial day two, all counsel are present.

THE COURT:  Okay.  We're back on the record. Welcome back.  We're resuming the trial.

When we left off, we were in direct examination of Officer Estella Silva.

THE WITNESS:  Yes, Your Honor.

THE COURT:  I'll remind you that you're still under oath.

**PLAINTIFFS' WITNESS, ESTELLA SILVA, PREVIOUSLY SWORN.**

THE COURT:  Counsel, you may proceed.

MR. GALIPO:  Thank you, Your Honor.

**DIRECT EXAMINATION (RESUMED)**

MR. GALIPO:

Q        Good afternoon, Officer Silva.

A        Good afternoon, sir.

Q        Did you have any information from any source related to the call in this case that a gun was involved?

A        No, sir.

Q        Did you have any information ever that Mr. Garcia was in possession of a gun?

A        No, sir.

Q        The call was related to someone waving a knife around the night before?

A        That is correct.

Q        And did you at any time ever see a knife either in Mr. Garcia's hand or on his person?

A        No, sir.

        MR. GALIPO:  And then Exhibit 25, please, by agreement.

        MR. PRAET:  No objection.

        THE COURT:  Exhibit 25 is in evidence.

 (Whereupon, Plaintiffs' Exhibit 25 is admitted hereto.)

MR. GALIPO:

Q        This would be the -- the -- the Taser that you had at the time that you would carry on your right side?

A        On my left side.

Q        Oh, left side, I apologize.

        Um, and this Taser, if you know, does it have two cartridges?

UNITED STATES DISTRICT COURT

14

to grab Mr. Garcia?

A       Yes.

Q       At some point, did he say to you, "Why are you grabbing me?"

A       Yes.

Q       Did you ever tell him why?

A       No.

Q       Did he ask you at some point, "Why are you taking me?"  or "Why are you arresting me?"

A       Yes.

Q       Did he say that once or more than once, if you recall?

A       I don't recall how many times.

Q       Did you ever respond to him?

A       Not to answer his questions, no.

Q       Was he under arrest at that point?

A       No.

Q       Is it generally a crime, as you understand it, for a homeless person to be sleeping in the bushes?

A       No.

Q       Looking at exhibit page three, again, this is a time period where you're attempting to grab Mr. Garcia?

A       That is correct.

Q       And your gun is still in your right hand?

A       Yes, sir.

Q        And it looks like Officer Yuhas is grabbing Mr. Garcia towards the back of his head?

A        Yes.

Q        And at some point, you notice that he had a bag of recyclables in his hand?

A        Yes.

Q        And, in fact, even when you shot him, he had a bag of recyclables in one of his hand; is that true?

A        Yes.  He also had a large wooden pole in his hands when I shot him.

THE COURT REPORTER:  I'm sorry?  He had a what?

THE WITNESS:  Large wooden pole in his hand.

BY MR. GALIPO:

Q        Right.  We're going to get to that.

But he also, in the same hand, was holding a bag of recyclables?

A        Yes.

Q        Now, you had been on patrol for about a year and a half before this incident; correct?

A        Yes.

Q        Had you ever seen a suspect with a weapon or potential weapon in their hand before?

A        Not that I remember, sir.

Q        Other than yourself, do you know if any of the other officers on scene pulled out their gun prior to

16

the shooting?

A        No, sir.

Q        You don't know, or they didn't?

A        I don't know.

Q        Did you ever see any other officer pull out their gun?

A        No.

Q        You had training with respect to dealing with people with mental health issues; correct?

A        That is correct.

Q        And that include -- included homeless people with mental health issues?

A        Yes, sir.

Q        And part of that training was deescalation?

A        Yes.

Q        And the concept of deescalation is try to deal with someone in a calm voice and not threaten them?

A        There are different forms of deescalation. We are taught that there is nonverbal and verbal deescalation.  The mere presence of just our uniform can deescalate.  There's been numerous occasions where people call the police when there's a fight going on, and the moment we get there, their seeing us makes them stop fighting.  Those are -- those are nonverbal deescalation cues.

UNITED STATES DISTRICT COURT

Brandishing a weapon is a deescalation form, as well. Honestly, the moment I said, "Hey, I know you," because I had prior contacts with him where they were not confrontational, he did not fight me, I believed that that was going to deescalate him, but it didn't. It just -- he became more aggressive. So I am taught the moment they become aggressive, I raise my voice, and I try to control the situation.

Q        And my question was:  Is part of deescalation to talk in a calm voice?

A        It can be.  It is one.

Q        And is part of deescalation not to unnecessarily threaten the other person?

A        It can be.

Q        And you -- you had your gun out and directed at some angle into the bushes?

A        Correct.  I was using the flashlight on my gun to look inside the bushes.  That's why -- one of the main reasons why I was pointing in there, as well.

Q        Was some of the information you had that this person who was supposedly waving a knife around the night before -- that they were talking to themselves?

A        I believe so.

Q        Now, based on your training as a law enforcement officer, is that a sign that someone could

have some mental health issue, if they're talking to themselves?

A        It can be, but it can also be a form of a sign or symptom that they are under the influence of drugs.

Q        And were you trained that sometimes people with mental health issues self-medicate and they could also by under the influence?

A        Yes.

Q        But you did have that information as part of the call, that the person suspected in the call was seen talking to themselves?

A        Yes.

Q        And I think you've already said this, but you had no information that the person injured anyone or attacked anyone; is that fair?

A        That is correct.

Q        Did you yourself ever ask to speak to the person who actually claims she saw this white male with blond hair the night before, waving a knife around?

A        Not at the time.  My -- my main goal was getting there, talking to the reporting party, detaining the person to see if there's a crime, and then going back to speaking to the person who actually saw the knife.  But I didn't have that opportunity.

Q        You didn't have that opportunity after you saw

him sleeping in the bushes?

A        No, I -- my goal was to detain him and then go back to speak to the person that contacted that retired Anaheim police officer.

Q        When you looked into the bushes among -- in addition to seeing the bags of recyclables, you also saw a sleeping bag; true?

A        That is true.

Q        And you had the impression that this person was staying there or sleeping there?

A        Yes, sir.

Q        At the time, he was on public property, not private property; true?

A        I -- I don't know if the alcove there is public or private.  I don't know who maintains that bush.

Q        Now, we talked yesterday about you giving your statement in this case about two and a half months later; do you recall that?

A        Yes, sir.

Q        And that statement was recorded?

A        Yes.

Q        And your attorney that you had at the time, not Mr. Praet, was present for your statement; is that correct?

A        That is correct.

A       I believe so.  Without the audio, I wouldn't be able to confirm, but I believe so.

MR. GALIPO:  Looking at Exhibit 15, page eight, please.

BY MR. GALIPO:

Q       Are you able to see this on your screen?

A       Yes, sir.

Q       Can you tell from looking at this, whether you have already fired your first shot?

A       I believe so.

Q       And what do you see in this image that leads you to believe you've already fired your first shot?

A       It looks like he's moving away from me.  His body is to the side a little bit.  And based off my gun and the angle, I believe so.

Q       And so prior to your first shot, he was Tased; correct?

A       That is correct.

Q       And I think you told us yesterday, he was screaming after he was Tased?

A       Screaming at me, yes.

Q       Well, he was screaming?

A       I -- I can't tell you the reason why he was screaming.  I took it as he was screaming at me.

Q       Okay.  Well, let me ask you this:  You said in

UNITED STATES DISTRICT COURT

your deposition that part of your training is when people are Tased, they may scream; do you recall saying that?

A        Yes.

Q        And you also said that he didn't scream until he was Tased; do you remember saying that?

A        Yes.

Q        Then you said as soon as he was Tased, he started screaming; do you remember saying that?

A        Yes.

Q        And do you recall saying that he was screaming during the Taser cycle?

A        That is correct, but I can't tell if he was screaming at me.  I mean, he had the pole raised up towards me, so I didn't know if he was screaming at me or the Taser.  Usually, Tasers will completely immobilize you, and that wasn't happening.

Q        The only question I asked you, was he screaming?

A        Yes.

Q        Okay.  And you shot him while he was screaming?

A        Correct.

Q        During the Taser cycle?

A        Yes.

Q        And I think you've already told us that prior

Q    to you shooting him, you gave him no command to drop the stick or pole; correct?

A    Correct.

Q    And you gave him no verbal warning you were going to shoot him?

A    Correct.

Q    You also told us that he never swung the stick at you or anyone and the stick was never coming down towards you before you shot him; correct?

A    Correct.

Q    So looking at this image, Exhibit 15, page eight, you believe that you had already fired your first shot?

A    Correct.

Q    Now, I want to talk to you a little bit about your second shot, because according to you, you assessed between the first shot and the second shot?

A    Yes, sir.

Q    And after your first shot, according to you based on your assessment, he no longer was coming in your direction; he was now moving in the direction of Officer Frias?

A    Yes, sir.

Q    And you, in fact -- you, in fact, in your initial statement said something to the effect that

your -- your perception was that Mr. Garcia know -- knew he couldn't go toward you anymore?

A        That is correct.

Q        And you indicated that he turned towards Frias?

A        Yes, sir.

Q        And was advancing rapidly toward Frias?

A        Yes.

Q        And the reason you fired your second shot, according to you, was not to defend yourself; it was to defend Officer Frias?

A        Yes.

Q        Who was approximately ten feet away from Mr. Garcia?

A        Yes.

Q        And according to you, you shot Mr. Garcia the second time because you were afraid he was going to strike or was about to strike Officer Frias with this stick or pole?

A        That is correct.

Q        And you estimated that the time gap between your first shot and second shot was a couple of seconds?

A        Yes.

Q        And at the scene, it was your handcuffs used; correct?

A        That is correct.

Q        Had you ever seen an officer with pink handcuffs before?

A        Yes, sir.

Q        You selected those handcuffs?

A        Yes.

Q        You noted at the scene at some point, he had gunshot wound to his back?

A        Yes.

Q        And a lot of blood was coming out of it?

A        Correct.

Q        And when you got back to the station, you, at that time, received information that one of his shots was to his back?

A        Well, at the point, we didn't have an autopsy report.  So it was later on discovered that the wound to his back was an exit wound, not an entry wound.  So he was not shot in the back.

Q        Okay.  I'm going to get to that in a moment.

         Right now, I'm asking you, when you went to the police station after this incident, you had information that he had an entry wound to his back?

A        I was told that he had a wound to his back, yes.

Q        And you hadn't seen the autopsy report yet?

A        That is correct.

34

true that it's a quarter of a second between your first shot and your second shot?

A        I don't know.

Q        Isn't it also true that Mr. Garcia was not advancing towards Officer Frias when you fired your second shot?

A        He was.

Q        Isn't it true that Mr. Garcia was exactly the same distance from you for your first shot and your second shot?

A        He might have been the same distance, but his body was turned towards Officer Frias and was going towards him.

Q        You estimated the distance between you and him at the time of the first shot to be two to three feet?

A        That is correct.

Q        And you indicated you shot him the first time in his chest/abdomen area?

A        Correct.

Q        And also you indicated that at the time of the second shot, he was the same distance from you; do you remember that in your deposition?

A        Yes.

Q        And that you also shot him in the chest/abdomen area?

A        Correct.

Q        So how could he be the same distance and you shooting him in the chest/abdomen area for both shots if you're saying he was advancing rapidly towards Officer Frias who was south on the sidewalk for your second shot?

A        Because he was still in front of me.  His body was already turned away from me.  So that's how he got that gunshot wound to his side.  He had a pole raised up, already taking a step forward.  I wasn't going to wait for another step to go forward.

Q        So you're saying he was turned away from you at the time of your second shot?

A        That is correct.

Q        And if your second shot happened a quarter of a second after your first shot, he would have already been turning away from you when you fired; isn't that true?

A        Can you rephrase the question?

Q        Sure.  You're saying he was turned away from you at the time of your second shot; correct?

A        Correct.

Q        And if your second shot was only a quarter of a second after your first shot, wasn't he already turning away from you at the time you fired?

A        Yes.

MR. PRAET:  Objection; lack of foundation for this quarter of a second.  I mean, the best evidence is the video.  And we're going by estimate --

THE COURT:  Okay.

MR. PRAET:  -- (inaudible) counsel or --

THE COURT:  Hold on.

MR. PRAET:  -- the witness.

THE COURT:  Sustained.

MR. GALIPO:

Q    Isn't it true he was already turning away from you at the time of your first shot?

A    Not the first shot.

Q    Here, I have some other photos.

MR. GALIPO:  Exhibit -- I think Exhibit 15, page nine, please.

BY MR. GALIPO:

Q    Can you tell if you fired your second shot yet?

A    No, sir.

Q    You can't tell?

A    No.  Without the audio and actually playing it, no, I can't confirm if it was or it wasn't.

MR. GALIPO:  15, page ten.

BY MR. GALIPO:

Q    Can you tell now whether he was turned away from you and you had fired your second shot?

A          I can tell he's turned away, but I can't say if I had or had not fired the second shot yet.  These are still-shot photos, sir.

Q          With respect to Officer Frias, who you say you shot to protect from imminent threat of serious injury or death, that's what you're saying; right?

A          Yes.

Q          Officer Frias had more experience as a police officer than you did; didn't he?

A          That is correct.

Q          And you were looking at Officer Frias at some point as you looked south on the sidewalk; correct?

A          Yes, sir.

Q          And officers have training that if they see a threat or potential threat, they can pull out a weapon?

A          That is correct.

Q          Did Officer Frias ever pull out his Taser?

A          Not that I know of.

Q          Did he ever pull out his gun?

A          Not that I know of.

Q          In fact, if we look at Exhibit 15, page 11, didn't Officer Frias just kind of push Mr. Garcia to the ground?

A          That is correct, but he also didn't have the ability to take out his gun due to the fact that we were

UNITED STATES DISTRICT COURT

38

in his line of fire.  So he wouldn't even have been able to shoot a gun at the time.

Q       So you're saying that you were in the line of his fire, but you -- but he wasn't in the line of your fire?

A       That is correct.  I was at a perfect angle where my sector of fire wouldn't have hit him.

MR. GALIPO:  I'm not sure -- is this -- was this included?  I might have missed this.  This is Exhibit 14, page six.

MR. PRAET:  It's not in yet.  But I have no -- no objection, Your Honor.

THE COURT:  You're offering it?

MR. GALIPO:  Yes, thank you.

THE COURT:  Exhibit 14, page six is in evidence.

(Whereupon, Plaintiffs' Exhibit 14-6 is admitted
                    hereto.)

MR. GALIPO:

Q       Can you see yourself in this image?

A       Yes, sir.

Q       Are you standing in the bushes?

A       I am.

Q       Can you tell if you fired your first shot or not yet?

UNITED STATES DISTRICT COURT

39

A       I cannot.

Q       Do you see Mr. Garcia just starting to appear from the bushes?

A       Yes.

Q       And in the background, you can also see Officer Yuhas and Officer Babb?

A       That is correct.

Q       And it's your testimony that you could not back up further; is that what you're saying?

A       Yes.

Q       What was preventing you from taking another step or two backwards?

A       There was branches everywhere.

Q       And you indicated that the street was busy so would have been dangerous to go into the street?

A       That is correct.

Q       Even though cars were blocking the curb lane?

A       At the time, I didn't know Babb was there, so I didn't know that there was a car blocking.  But you can clearly see it looks like there's a vehicle behind Babb's car right there.  So to me, it is a busy street.

Q       You knew Frias's car was there; true?

A       It wasn't close enough to block the whole entire curb, sir.  It wasn't blocking the immediate street right behind us.

MR. GALIPO:  From Exhibit 6, Your Honor, I have pages five, six, eight, nine, ten, and 11.

MR. PRAET:  No objection, Your Honor.

THE COURT:  Exhibit 6, five through -- pages five through six and eight through 11 are in evidence.

(Whereupon, Plaintiffs' Exhibit 6-5, 6-6, 6-8 through 6-11 are admitted hereto.)

MR. GALIPO:  Can we look at 6, page five, please.

BY MR. GALIPO:

Q       This obviously comes from Officer Yuhas's body-worn camera?

A       Yes, sir.

Q       And this is the second time where Mr. Garcia -- well, I guess he's finally stepping out of the bushes at this point?

A       Yes.

Q       And this says at about the time he was Tased?

A       I can't tell.

Q       Wasn't he actually Tased as he was in the process of coming out of the bushes?

A       I believe so.

MR. GALIPO:  Can we go to Exhibit 6, page six.

BY MR. GALIPO:

Q       You see that he's holding this stick or pole in

41

his hand with the recyclable bag?

A        Yes.

Q        And you observed that at the time, that he had a recyclable bag?

A        Yes, sir.

         MR. GALIPO:  Exhibit 6, page eight.

BY MR. GALIPO:

Q        You can see the recyclable bag?

A        Yes.

Q        We can see the distance to Officer Frias?

A        Yes.

Q        Do you know if -- or can you tell if Mr. Garcia had been Tased yet?

A        Yes.

Q        He had been Tased; correct?

A        Yes.

Q        And how can you tell that?

A        I could see the wires coming from Officer Yuhas's Taser.

Q        And you're off the sidewalk at this point; right?

A        Yes.

Q        In the bushes?

A        Yes.

Q        Can you tell if you fired your first shot yet?

42

A          No.

MR. GALIPO:  Can we look at Exhibit 6, page nine.

BY MR. GALIPO:

Q          Can you see this on your screen?

A          Yes.

Q          Would you agree that he's turning away from you in this image?

A          No.

Q          Can you tell if you fired your first shot yet?

A          I believe so because it looks like there's smoke coming from my gun in that picture.

Q          Right.  That's one way to tell, when you can see smoke by the gun; correct?

A          Correct.

Q          And you're saying at this moment, he was about to strike you in the head with this stick or pole?

A          Yes, sir.

MR. GALIPO:  Exhibit 6, page ten.

BY MR. GALIPO:

Q          You see yourself in this image in the -- in the bushes?

A          Yes.

Q          Do you know if this was his approximate position when you fired your second shot?

A       I believe so.

Q       And it's your testimony that he was about to strike Officer Frias in the head at this moment?

A       I thought he was going -- advancing towards him, yes.

Q       Well, advancing towards him, according to the standard, isn't enough; correct?  There has to be an immediate threat of death or serious bodily injury, the ability, opportunity, and apparent intent; correct?

A       It has to be reasonably to believe that they have the immediate intent to create any great bodily injury or death.  It's reasonably to believe, not they actually have to do it.

Q       Okay.  But I just want to be clear here:  Based on your training, just because someone has a gun or a knife or a stick or a pole in their hand, you can't shoot them; would you agree with that?

A       Yes.

Q       And just because they're a threat or a potential threat, you would agree you can't shoot them?

A       Correct.  They have to have the -- it's a reasonable officer to reasonably believe that there is a threat to great bodily injury and/or death.

Q       But that reasonable belief of a threat of death or great bodily injury -- that threat has to be

immediate?

A        Correct.

Q        And the training is a fear of future harm potentially is insufficient to use deadly force; true?

A        No, he had the -- he had the -- it was reasonably to believe that he had the intent to commit it.  He just tried to do it to me; right?  I prevented him from hitting me over the head with that wooden pole. He had his body turned and was advancing towards my partner.  So I believe that he did have the intent.  It was reasonably to believe that he had the intent to commit great bodily injury or -- and/or death to my partner.

Q        You understand that ultimately the jury is going to decide that issue?

A        That is correct.  But I also have the opinion to make that I was the officer there on duty that day. I was the one that pulled the trigger, sir.

Q        Yeah, we are aware of that.

         My question was, the training -- forget about this incident for a moment.  The training is they have to have the ability, opportunity, and intent to immediately cause death, not some time in the future?

A        Correct.

Q        So what I'm asking you, are you telling us that

it appeared to you that he was immediately going to cause death or serious bodily injury to Officer Frias standing ten feet away at the time you fired your second shot?

A        Yes, sir.

Q        Do you see Officer Frias going for his gun here?

A        I can't tell.  Officer Yuhas's finger is in the way.

Q        Do you recall Mr. Garcia, at some point before you shot him, saying, "Why are you hitting me?"

A        That is correct.

Q        Did you answer that question for him?

A        No, because no one had hit him.

Q        I'm sorry?

A        No, because no one hit him.  When he said, "Why are you hitting me?"  no one had hit him.

Q        Do you recall him saying, "Why are you grabbing me?"

A        Yes.

Q        And you recall him multiple times, when you asked him to come out, to say words to the effect, "Let me get out"?

A        Yes.

Q        Did you think someone saying, "Let me get out.

112

**REDIRECT EXAMINATION**

BY MR. GALIPO:

Q    He was searched for weapons and had none; correct?

A    Correct.

Q    Did you then take off the handcuffs immediately?

A    No, sir, I wasn't there after that.

Q    Just so we're clear, first you have to have a belief that someone's immediately going to kill someone or cause them serious injury to use deadly force. First, you have to have the belief; is that part of your training?

A    Reasonably believe, yes.

Q    Right.  The second part is the belief has to be reasonable, would you agree?

A    Yes, sir.

Q    And all three of those elements have to be there?

A    Yes, sir.

Q    Ability, opportunity, and intent; correct?

A    Correct.

Q    And they have to apply to each shot; correct?

A    Yes, sir.

Q    So you just said in response to counsel's

UNITED STATES DISTRICT COURT

Q        No, no.  I'm sorry.  My question probably wasn't clear.  Assume you knew nothing about him.  First time you ever saw him in the bushes, everything else the same, are you saying you would have shot him?

A        Yes.

        MR. PRAET:  Objection, Your Honor.  Hypothetical.  It is improper for this witness.  It calls for speculation.

        THE COURT:  Sustained.

MR. GALIPO:

Q        So when you talk about all this prior history being a factor, you're saying that even if you knew none of that based on his actions, you would have shot him?

A        Yes, sir.

Q        Okay.  So now the drug thing, you said here in court you thought he was under the influence of drugs; right?

A        That is correct.

Q        And you took a statement two-and-a-half months later with attorney present; right?

A        Yes, sir.

Q        And would you agree you never once in 74 pages mention that you thought he was under the influence of drugs in that statement; isn't that true?

A        I don't know, sir.  I don't remember.

117

Q        Well, you said you reviewed your statement five times, didn't you?

A        Correct.  In the span of five years.

Q        You haven't reviewed it in preparation for this trial?

A        I probably skimmed through it.

Q        It's true, is it not, that you never once mentioned in your statement that you thought he was under the influence of drugs?

A        I don't know, sir.

Q        And you told him after you say you see this stick or pole in his hands to put his hands up; correct?

A        Yes, sir.

Q        Are you telling us you had no time to say "drop it"?

A        Sir, that is the first command that I thought of.

Q        No.  I'm asking you do you think you could have time to say "drop it" before you shot?

A        Feasible.

Q        Do you think it was feasible in this case to say "drop it" before you shot him?

A        Sir, my first command I thought was "show me your hands" like I showed -- demonstrated earlier. Anyone I've ever asked to show me their hands, they

always just show your hands.  Showing your hands isn't raising a pole above their head ready to hit me.

Q        Normally, you tell someone to show their hands if you can't see their hands; right?

A        It can be a command.

Q        You're saying you could see his hands, and you're claiming you can see that he had a stick in his hands and a bag.  And you're telling him to show his hands; correct?

A        That is correct.  But like I said, when I asked someone to show me their hands, their hands and fingers go like this.  So even if they had something in their hands, they would have dropped it.  Show me your hands, they would drop anything in their hands.  There is no reason to be raising a pole above their head when I say "show me your hands."  When I say "show me your hands," it's show me your hands.

Q        My question is this:  Do you think you had time to say "drop it"?

A        Not right after I said "show me your hands," no.

Q        Do you think you had time to say "drop it" before you shot him?

A        It could have been possibly a command, yes.

Q        Do you think you had time to give him a verbal

UNITED STATES DISTRICT COURT

warning before you shot him and killed him?

A          It wasn't feasible.  The one command I gave him was feasible.

Q          So you're saying in the three or four seconds in between you're giving a command to show his hands and you firing your first shot, you did not have time to give him a warning you were going to shoot him; is that your testimony?

A          Correct, that was not feasible.

Q          Counsel asked you about whether or not you were aware that the person in the bushes, Mr. Garcia, might not have been the person that was the subject of the call the night before, do you remember that?

A          Yes, sir.

Q          And you said you were aware that might not be the person?

A          Correct.

Q          And you've already told us that he wasn't committing any crime by sleeping in the bushes; correct?

A          Correct.

Q          And you were weren't trying to figure out whether there was any crime or not?

A          Yes, sir.

Q          And he wasn't under arrest; correct?

A          He was not under arrest, no.

Q        And you're the one that asked him to come out of the bushes, didn't you?

A        Yes, sir.

Q        This piece of wood that you're talking about in this other incident was ten inches in length; true?

A        Which one?  Which incident?

Q        The prior alleged robbery incident.

A        When I contacted the officer from Santa Ana, he never told me how big the piece of wood was.

Q        But you know now it is ten inches?

A        Correct.

Q        And you don't even know if he was convicted of any of these incidents, do you?

A        Correct.

Q        Did you ever think that this man who was homeless and had his belongings, whatever they were in those bushes, wanted to come out of the bushes with his belonging, including his recyclables?

A        Yes.  But he had other belongings like a sleeping bag.  Why not come out with the sleeping bag? Instead, he came out with that large pole.

Q        I see.  And did you ever think that by him coming out with the pole, naturally he would have to come out with it at some angle to come out of the bushes?

121

A        Yes.  But why not come out the first time with the pole?  Why retreat back in and then grab it other than to assault me?

Q        So you had spent all these prior incidents with him where he never tried to assault you or hit you in any way, and all of a sudden, now you think he wants to assault you with a pole?

A        Yes, sir.  The other contacts, he was very cooperative.  This time he wasn't.  He faced way from me, wasn't listening to my other commands.  That is why I believed he was under the influence.  The other commands, he was cooperative, listened, held a conversation.  And this time, it was completely different.

Q        So you didn't think he was under the influence any of the prior times?

A        No, sir.

Q        And you didn't tell any of the officers on the scene you thought he was under the influence, did you?

A        No, sir.

Q        And then we had all these questions about the bushes and the street, and the bushes were too high for you to take another step back.  That is your testimony; right?

A        Yes, sir.

UNITED STATES DISTRICT COURT

122

Q       So rather than take a step back, you thought it was better to shoot this person?

A       Sir, if I stepped back, I would have fallen backwards into a busy street.

Q       Aren't you trained about the reverence for human life?

A       Yes, sir.

Q       You knew that by shooting this man in his upper body, you were likely to kill him; right?

A       Yes.  But it was reasonably believed that he was going to cause great bodily injury or death, sir.

Q       I'm just saying part of the training is to exhaust all other reasonable options before taking someone's life; true?

A       Correct and we did, and he was Tased.  It wasn't effective.  I created space.  I could only go so far.  I couldn't go sideways, and then I brandished my weapon.  He didn't -- that didn't stop him either.  I gave him plenty of time, plenty of commands to listen to me, to come out cooperatively.  And he chose not to.

Q       Well, let's break this down.  You asked him to come out, and he eventually came out; right?

A       Yes, sir.

Q       He was Tased as he is coming out; correct?

A       Well, originally, we tried to grab him and

retreated back into the bush.

Q       And then when he started coming out again, he was Tased?

A       Because he had a wooden pole in his hand.

Q       And you claim you never even heard Officer Yuhas say "He has a stick.  He has a stick."

A       Correct.

Q       And within one or two seconds of being Tased, you shoot him?

A       Yes, sir.

Q       Even though he never swung it or it never came down at you; correct?

A       I did not have to wait for that, sir.

Q       According to your thinking perhaps.  But I want to ask you this:  Did you think in your mind maybe I should take a couple steps back or try to rather than killing this homeless person?

A       I stepped back as farthest as I could.

Q       Well, that is not true because you had more room to step back towards the street, and you decided not to do it.

A       I did not have room to step towards the street. There were branches, sir.  If you had the exhibit where the branches or the bushes are up to my waist, I couldn't step any further back.

of fire, did I understand you correctly?

A        Correct.  I also said that he was, one, in the line of fire, and, two, I noticed that Mr. Garcia was already stumbling down after the second shot.

Q        Last question I have because I know we're going to break:  Would you agree that before you shot Mr. Garcia, you never saw him assault or physically strike anyone at any time before you shot him?

A        He attempted to assault me, yes.

Q        Let me just try it again.  I'm not asking about an attempt.  Would you agree that before you shot him, you never saw him assault anyone or physically strike anyone?

A        Correct.

        MR. GALIPO:  Thank you.  That's all I have, Your Honor.

        THE COURT:  That's all you have for today, or are you passing it for re-cross?

        MR. GALIPO:  I'd like to reserve just in case I have a few follow-up in the morning, but I think at this point I'm done with my questioning.

        MR. PRAET:  Your Honor, I probably have two or three minutes.  I'd like to get the witness off the stand, but it is up to the Court obviously and the jury.

        THE COURT:  Jurors?

EMILY GARCIA, et al.                    :

                vs.                     :   No. CV 22-00131-SPG

CITY OF TUSTIN, et al.                  :

I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

_____/S/_____          //___

MARIA R. BUSTILLOS                      DATE
OFFICIAL REPORTER