# EXHIBIT E

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION - SANTA ANA


EMILY GARCIA, et al.,          ) Case No. SACV 22-131-SPG (KESx)
                               )
        Plaintiffs,            ) Los Angeles, California
                               ) Friday, April 17, 2026
            v.                 ) 1:09 P.M. to 3:02 P.M.
                               )
CITY OF TUSTIN, et al.,        )
                               )
        Defendants.            )
_____)


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE


Appearances:                   See Page 2

Deputy Clerk:                  Patricia Gomez

Court Reporter:                Recorded; CourtSmart

Transcription Service:         JAMS Certified Transcription
                               16000 Ventura Boulevard #1010
                               Encino, California  91436
                               (661) 609-4528


Proceedings recorded by electronic sound recording; transcript produced by transcription service.

LOS ANGELES, CALIFORNIA, FRIDAY, APRIL 17, 2026, 1:09 P.M.

(Jury present.)

THE COURT:  All right.  We're back on the record.  Please call your next witness.

DALE K. GALIPO:  Yes.  Thank you, Your Honor.

The plaintiffs would like to call Scott DeFoe.

(Pause.)

THE CLERK:  Please raise your right hand.

SCOTT ALLEN DEFOE, PLAINTIFFS' WITNESS, SWORN

THE CLERK:  Thank you very much.  Please have a seat, and please state your name for the record.

THE WITNESS:  My name is Scott Allen DeFoe, S-c-o-t-t A-l-l-e-n D-e-F-o-e.

THE COURT:  All right.  Good afternoon, Mr. DeFoe.

THE WITNESS:  Good afternoon.

THE COURT:  Counsel, you may --

THE WITNESS:  May I have my water up here?  Would that be okay?

THE COURT:  Yes.

THE WITNESS:  Thank you.

THE COURT:  Counsel, you may proceed.

MR. GALIPO:  Thank you, Your Honor.

Good afternoon, Mr. DeFoe.

THE WITNESS:  Good afternoon.

///

                              DIRECT EXAMINATION

BY MR. GALIPO:

Q    Do you have a background in law enforcement?

A    I do.

Q    What agency did you primarily work for?

A    The Los Angeles Police Department for approximately
26 years.

Q    What rank did you retire out as?

A    Sergeant II+1.

Q    In terms of your work at the LAPD, was there a period of
time you were assigned to patrol?

A    Yes.

Q    Was there a period of time you were supervising patrol
officers?

A    Yes.

Q    Was there a period of time you were assigned to the SWAT
team?

A    Yes.

Q    As part of your duties and work with the LAPD, did you
have to train officers with respect to tactics?

A    Yes.

Q    Did you train officers with respect to use of force?

A    I did.

Q    Can you tell the ladies and gentlemen a little bit about
your educational background?

MALE OFFICER:  Face the wall.

SUSPECT:  (In Spanish.)

MALE OFFICER:  God damn it.

SUSPECT:  (In Spanish) --

MALE OFFICER:  He's got a -- he's got a stick. He's got a stick.

SUSPECT:  (In Spanish) --

FEMALE OFFICER:  Get your hands up.

(Sound of Taser.)

SUSPECT:  (In Spanish.)  Ah.

(Shots fired.)

SUSPECT:  Ay yi yi yi.  Ay yi yi.  (In Spanish.)

(Exhibit 2 video ends.)

BY MR. GALIPO:

Q    Is -- and I stop it there at, I think, 150.  Is that part of a video that you looked at in deciding whether or not you could serve as an expert in this case?

A    Yes.

Q    And what were some of what you were looking for when you -- we could take that down.

When you were looking at the video -- and we'll go into specifics in a moment -- what are some of the things you were looking for?

A    The reason for the initial contact.  You know, did you have reasonable suspicion to detain that person?  Why were

you confronting that person? -- first part of it.  Once there was contact made by Officer Silva, in this matter, did she convey anything to her partner officers of what she sees while looking into the area?  Even at that point you had someone who was sleeping in there.  You could see based on, probably, looking in there, there were cans and things consistent with someone who may be homeless or transient.  I would be looking at, you know, do we even have a crime here?  What has this person done to why I'm going to detain the person?  And, if so, am I going to formulate a plan with my partners that are there?

I also observed that Officer Silva clearly escalated the situation.  It's not sometimes what we say, it's how we say it.  And so by affording someone the opportunity -- you woke them up.  They're gathering their belongings, in that case his only belongings, getting that to come out, giving someone a reasonable opportunity to comply.  You have a human being that's in the bushes there; so we want to give him an opportunity to comply -- if you are going to detain him because I wouldn't know the reason for a detention at this point.

And then, obviously, once he starts coming out of the bush, as you asked him to do -- is to come out -- he does come out, and then there's immediately a force option by Officer Silva and Officer Yuhas that grab at him -- don't

understand the reason for the force -- letting him come out. And then, when he comes out, he's immediately tased by Officer Yuhas, once again, no assaultive behavior, no resistive behavior at that point, and then subsequently he's shot and killed shortly after that.

So I'm looking at everything from the planning, the tactics, the escalation, the use -- consideration of less-than-lethal force and then ultimately the use of the Glock 9-millimeter pistol that Officer Silva fired twice killing the decedent in this case.

Q   And when you looked at the shooting itself, I'm assuming you not only looked at the videos but you reviewed officer statements and depositions at some point; is that correct?

A   I reviewed a total of 44 separate items, including deposition transcripts, policies, audio recordings, police reports, body-worn camera recordings, and then obviously discovery.  That's material that the -- each party gets from the other party through the process.

Q   So -- and I'm going to break this down in a moment, Mr. DeFoe, but what was your general opinion regarding the shooting when you first watched these videos?

A   Probably one of the worst shootings I've seen of the 450 shootings I've been -- at that time been retained on.  In my -- all of the shootings that I take, the subject does not have a weapon, including a gun, at the time.  So I believe --

DIRECT - DE FOE                                    14

as I conveyed to Mr. Galipo, I believe it was one of the worst shootings I'd seen.

Q       Why do you say that?

A       A, the subject was compliant -- decedent was compliant. You asked him to come out.  I believe there was an unnecessary escalation.  There was no reason to initiate force.  That unnecessarily escalated the situation.  The deployment of the Taser in probe mode -- once again, if I'm going to tase this gentleman here, I'm going to want to see what the effect of the Taser is.  In this case if I don't achieve neuromuscular incapacitation -- that means both probes strike this gentleman and it overrides his sensory systems and motor skills.  This case the decedent screams, which is associated, as a former Taser instructor, of the pain associated with the Taser; and he runs, which would be consistent if you don't achieve neuromuscular incapacitation.

        At that point, a, there was never a reason to fire the round in the first place because I never found that carrying the stick in the manner that it was being carried presented a lethal threat.  There was never attempt to look like he was going to strike her with it.  He was carrying cans in his other bag.  If I'm going to assault someone with a stick, I'm going to have both of my hands free.  If I was swinging an object -- a bat, a stick -- I'm not going to be carrying my belongings out if there was ever an intent to

DIRECT - DE FOE                                   15

strike any of the officers.  Never made any verbal threats.
A little reluctant, probably not to the speed that
Officer Silva wanted him to leave the bush.  That's part of
the deescalation process.

Q    And was it important to you that based on the video and
the officers' statements and testimony that he never swung
the stick and the stick was never coming down towards any
officer?

A    According to all the officers' testimony, correct.

Q    Why was that important to you?

A    Because there was no imminent threat of great bodily
injury or death that would necessitate the use of lethal
force, and that's the threshold.  I can't -- if I hit you
with the stick in the stomach or I poke you with the stick,
that's not lethal force.  That's assaultive behavior, and
there's -- within POST, "Peace Officer Standards and
Training," there are Learning Domains that coincide with,
obviously, the Tustin Police Department's use-of-force policy
about the reasonableness of force based on the totality of
the circumstances.

Q    While we're talking about the deadly force now, let me
just ask you: Are there POST standards that apply to deadly
force?

A    Yes.

Q    Is there police training that applies to when you can

and cannot use deadly force?

A     Yes.

Q     And so is subjective fear -- or, in other words, an officer says, "I thought" someone was going to do something, for example, with a stick, "I thought they were going to hit me over the head with a stick" -- is that enough, based on the training, to use deadly force?

A     Future harm is insufficient.  It has to be what the subject's level of resistance is at that time and was it life-threatening?  It's the only time you can use lethal force is when it's life-threatening.

Q     Does POST have some different categories of suspect behavior in Learning Domain 20 and then associate it with the type of force you can use depending on the behavior of the suspect?

A     Yes.

Q     Can you explain that to the jury, please?

A     Well, first, there's compliance.  If I ask this gentleman to "Come here" and he -- and I said, "I need you to come here," and you come here, you're being compliant.

          The second would be passive noncompliant.  You see that a lot in demonstrations.  Maybe he's sitting in the middle of a street, and I'm like, "You need to come" -- he's demonstrating for whatever the reason might be.  He's like, "I'm not coming," but he's offering no form of physical

resistance at that point.

Active resistance, which is a third tier, is that -- it's called "tensing, bracing, or running away." Officer comes up to me, maybe I brace against the desk, or I get out of the stolen car and I run. That's active resistance.

The next is assaultive. I come up, I put my hands up, preassaultive behavior that I look like "Hey, I want to fight you," I say something like that, or I swing at you, or I poke you with something. That's assaultive behavior.

And then last is life-threatening, where my behavior is likely to cause serious bodily injury or death. That could be with an object, could be with a weapon. It could be with hands and feet depending on the circumstances.

Q    And according to the POST table, if the behavior is resistant, is that enough to use deadly force?

A    Resistance behavior will typically coincide with -- depending on the circumstances, would be control hold, where I'm grabbing you, conducting a wrist lock, twist lock -- something to control you with the ultimate objective to what -- apply handcuffs, right, mechanical restraints. Maybe the utilization of OC spray, pepper spray -- 2 to 12 feet typically for pepper spray. A Taser, potentially -- if you're borderline at that point on resistive, potentially a Taser -- 7 to 15 feet -- the optimal range. Doesn't rise to the level of where I'm going to use a baton or an impact

weapon to strike you with.  That would be more on the assaultive behavior.  And then the next tier is obviously lethal force.

Q    How about assaultive behavior?  Based on the POST matrix, can you use deadly force against someone who is being assaultive?

A    No.

Q    So it has to be immediately life-threatening?

A    Unless the assaultive behavior rises to the point where it would likely cause serious bodily injury or death.

Q    And so does the threat of death or serious bodily injury have to be immediate?

A    Immediate or imminent.  Yes.

Q    And is -- based on the POST standards, does it break down what "immediate" and "imminent" means in terms of the ability, opportunity, and apparent intent?

A    Yes.

Q    Can you explain that to the jury, please?

A    Does the subject have the availability -- like, is he or she in a position to do it?  Is there an opportunity -- right? -- the person is going to do it.  And then there's an intent: Am I going to do it?  Am I trying to do it?  Maybe my actions or my words -- "I'm going to kill you," and now I take something and I'm going to hit you with it, or I take a knife out and I'm going to try to stab you with it.  That

DIRECT - DE FOE                              19

would be an imminent threat -- ability, opportunity based on the subject's actions.

Q    Based on your review of the materials, Mr. DeFoe, did you -- where did you think Mr. Garcia was on his requirements of ability, opportunity, and apparent intent to immediately cause death or serious bodily injury based on the facts of this case?

A    The decedent was being compliant.  "Come out of the bushes" -- he was coming out of the bushes at that point.  So that's compliant.  So you're asking me to do something, and I'm complying in doing it.  That's why, when I looked at the force as he was coming out, it didn't make any sense.  It did not seem reasonable based on the totality of the circumstances.

Q    Are officers trained to control their fear?

A    Yes.

Q    Are they trained not to overreact in using force, including deadly force?

A    Yes.  Overreaction is excessive force.

Q    Are officers trained that they're responsible to justify each shot?

A    Yes.

Q    Is the training that a verbal warning should be given before using deadly force when feasible?

A    As well as less-than-lethal force.

DIRECT - DE FOE                                          20

Q      And why is that important?  Can you explain that to the jury?

A      Well, you want to give someone a reasonable opportunity to comply.  If I tell you to "Get on the ground.  Don't move," that's a command.  But if I tell you to "Get on the ground" or "Don't move or I'm going to shoot you," that's a warning.  That's a reasonable opportunity to comply.  That's the difference between the two.

            Now, I've got to take into consideration your ability to comply.  Is there an issue that's causing you, maybe, to be delayed?  You see that a lot with people that are drinking.  They're on a central nervous system depressant.  I tell you to do something, you're probably going to get delayed a little bit because your mind is not functioning in the manner that it should to immediately respond.  We see that with driving accidents and other things.

            So it's got to be a reasonable opportunity to comply, and then, if the person doesn't do that, if the force option is still reasonable at that time -- like, it can't be something where I punch this gentleman and then I back up and then, if I walk towards him, you can shoot me -- or you can do something.  The fact that I did something and stopped doesn't mean that any future harm that may come allows me to use force at that time based on something that happened

before.

Q    And are officers trained that deadly force should only be a last resort?

A    Yes.

Q    What does that mean in terms of the training?

A    It's a reverence for human life.  It's human life we're dealing with.  So what other options do you have?  Use words and actions to influence behavior -- can you use to try to negate the use of lethal force?  That's why officers are trained or should be trained seven-to-eight-hundred-hour police academy.  They go through training.  They're provided impact weapons, such as batons.  They're provided or should be provided OC spray.  They're provided -- with taxpayer money -- Tasers along with the instruction.  There's a number of less-lethal-force options that officers are provided and trained with so we don't have to resort to use of lethal force unless it's necessary.  If it's necessary, then obviously lethal force will be reasonable based on the totality of the circumstances.

Q    So as an expert, when you look at a case like this, is one of the factors you're looking at -- one factor is tactics; correct?

A    Yes.

Q    We're going to talk about that in a moment.

Regarding the shooting, are one of the factors you

look at as to whether there was an imminent or immediate threat of death or serious bodily injury?

A      At the time of the shooting, yes.

Q      Do you also look at -- as to whether there were other reasonable options?

A      Yes.

Q      And do you also look to see whether a verbal warning was given or not?

A      Yes.

Q    So in this case, based on your analysis, was there an imminent or immediate threat of death or serious bodily injury?

BRUCE D. PRAET:  Objection, Your Honor.  That's for the jury.

MR. GALIPO:  I think all the officers testified to it, Your Honor.

MR. PRAET:  Beyond scope of an expert.

THE COURT:  Sidebar.

(Sidebar held on the record.)

THE COURT:  Your objection?

MR. PRAET:  Sure.  Objection, Your Honor, is that that's beyond the scope of an expert witness.  The officers can testify to their observations, but it's for the jury to determine whether or not it was reasonable to believe that there was an imminent threat, not an expert's.

MR. GALIPO:  I don't agree with that, Your Honor. I do think the jury ultimately decides whether it was excessive or reasonable, but their expert has proffered opinions that he thinks that there was an imminent threat of death or serious bodily injury; that's why he believes the shooting was justified.  Mr. Praet had all four of the officers say before this jury that they thought there was an imminent threat of death or serious bodily injury at the time, and that's the state --

THE COURT:  Did you object?

MR. GALIPO:  -- of our record.  Pardon?

THE COURT:  Did you object?

MR. GALIPO:  I can't remember.  I don't think I did because I thought it was appropriate [sic] question, just like I think this is an appropriate question.  Because, if part of the analysis is whether there appeared to be an imminent threat of death or serious bodily injury, experts are allowed to testify to that.

JESUS E. ARIAS:  On behalf of the Galicia plaintiffs, Your Honor, some of the officers -- indeed we join and described that to them -- it was a serious bodily injury to them and the only reason they didn't (indecipherable) was because the line of fire.  So we join the position of the Garcia --

THE COURT:  Did you object?

MR. ARIAS:  I don't remember, Your Honor.

THE COURT:  Anything further?

MR. PRAET:  No, Your Honor.

THE COURT:  Hm.  It's more of a factual question than a legal question, and I agree that, when it comes to an expert, the expert shouldn't be opining on a legal question, but I think it's fair game in terms of -- I shouldn't keep saying "fair game."  I think it's appropriate for an expert to opine based on his observations, and you have your cross.

MR. PRAET:  Okay.

MR. ARIAS:  Thank you, Your Honor.

THE COURT:  All right?

MR. GALIPO:  Thank you.

THE COURT:  Thank you.

MR. PRAET:  Thank you, Your Honor.

(Sidebar off.)

THE COURT:  The objection is overruled.

BY MR. GALIPO:

Q    Do you remember the question, Mr. DeFoe?

A    I don't.

Q    I'm not surprised.  I'll try to think of it.

Do -- based on your reviewing the materials in this case, do you have an opinion as to whether or not Mr. Garcia posed an imminent or immediate threat of death or serious bodily injury at the time he was shot?

A    I do.

Q    What's your opinion?

A    He did not pose a serious threat or imminent threat of great bodily injury or death at the time he was shot.

Q    Do you have an opinion as to whether there were other reasonable options available to the officers?

A    Yes.

Q    What's your opinion on that?

A    Well, when he exited the bush, as you asked him to do, unless you were going to detain him for a crime, then you'd have to let him leave because based on my understanding of the case, there was no crime involving the decedent in this case.  If you -- the other options would be that, if you reasonably believe that he presented a threat, it never rose to the level in this case -- based on the videos that I've watched probably north of a hundred times at any point was he a threat to any of the officers when he exited the bush area.

So my feeling would be you have to let him leave, if you're not going to detain him, and I don't know the reason, based on what I read, to detain him any further.  You asked him to leave the area.  I understand that he's sleeping in a bush.  I didn't see him doing anything wrong at the time based on the comments of the call, but just have him leave would be the most you could do at that point and then he -- and then go on his way.

DIRECT - DE FOE                                26

Q     And -- we'll talk about tactics in a moment.

And based on your review, were adequate commands given to Mr. Garcia prior to him being shot?

A     No.

Q     Why not?

A     He was told to put his hands up coming out, and based on the review of the video, his hands were up.  "Can I see your hands?"  By looking at the video, I can see his hands.  There was never a command to drop whatever he had in his hands, and then create some space to drop it, and then give him a reasonable opportunity to comply.  If you're concerned about either a dowel that he's carrying or you're concerned about the recyclable cans that he's carrying as a homeless person -- if you're concerned about either of those, just have him drop those things.

And back away from the opening as well.  It's an awfully poor tactic.  If I'm concerned about someone being in that opening -- if I'm concerned that there's someone bad in that door right there, I'm not going to stand right in front of the door and then articulate that I was afraid of the person behind the door.  I'm going to pull back to a position of cover, especially when you have police cars parked on the street that you could clearly pull back to, even prior to Officer Babb arriving.  As you watched him walk along the path between the bushes, you clearly could have just backed

up and then called him out of the bush from a position of cover -- safer for the officers, safer for the community as well.  Never want to be that close -- especially with a handgun out close to that bush if you're concerned at all that the suspect may be or subject may be any type of threat.

Q     And do -- are officers trained about the concept of tactically repositioning?

A     Yes.

Q     And how would that apply to this case?

A      Once I looked in there -- and Officer Silva recognized the decedent from prior contacts -- just going to pull back. (Indecipherable) I recognize him from before.  Maybe they say what -- does he have a warrant or something any -- just because I've interacted with someone before and they may have committed a crime before doesn't mean I can detain them now. There still has to be the reason for the detention now.  So unless there's some reason to detain now -- there was someone did something wrong in the past -- that's why it's called the criminal "history," it's in the past.  I can't just arbitrarily detain him now unless I can justify the reason for the detention.  It's called "reasonable suspicion" under the Fourth Amendment.

Q     And in terms of tactically repositioning, did you look at video and photos of the area to see whether or not Officer Silva could have backed up further, either in the

DIRECT - DE FOE                                        28

bushes or towards the street?

A     As I mentioned, everything she needed to accomplish didn't need to be done at the opening of the bush, and I'm glad that her partner said, "Don't go in the bush by yourself," which would have been even more of a poor tactic she was already demonstrating.  But, no, you -- once I see someone, if I'm concerned, I'm just going to back away.  A, I want to create some distance and time and, once again, to deescalate.  I'm going to ask you to come out.  I don't need to tell you or talk at you in a way that's going to escalate the thing.  "Hey, do me a favor.  Got a call.  Someone sleeping in a bush.  Hate to wake you up like this.  Grab your stuff.  We need to have you move along."  That's it.  That's your case.

Q     Female officers -- most departments now have female officers, obviously; correct?

A     They do.

Q     Is there any different standard in terms of the use of deadly force, in other words, a different standard that applies to a male officer versus a female officer?

A     My wife was a detective in LAPD for 20 years.  We were classmates.  I worked with women of all -- and men of all sizes and shapes and heights.  The -- it's equitable for all size.  As a supervisor at LAPD SWAT, our -- one of our best officers was, probably, 5-foot-3, and she was a female.  So

DIRECT - DE FOE                                    29

the fact that someone is tall or short, small, regardless of body shape or type or gender, it's equitable for all of us. We have the same policies and procedures, we all go through the same training, and the standards should be the same male or female.

Q    So let's back up to the beginning of this call, and you understand that there was a report on the morning of August 9th about a white, blonde-haired male waving a knife around the night before.  Is that your understanding?

A    Yes.

Q    And some reporting party, who was, I guess, a retired Anaheim police officer, was told of this by someone else.  Is that your understanding?

A    Correct.

Q    And that person, the retired officer, apparently saw someone go into the bushes on the morning of August 9th.  Is that also your understanding?

A    Correct.

Q    So -- and then, as you are aware, Officer Silva is the primary officer.  She approaches the opening of the bush, looks in, she might have shined her tac light in, and at some point sees Mr. Garcia sleeping in the bushes.  Is -- are you with me so far?

A    I'm with you.

Q    Is it a crime, to your knowledge, for him to be sleeping

DIRECT - DE FOE                                30

in the bushes?

A    I don't know of the ordinance -- if there's an ordinance in Tustin -- I don't want to misspeak -- by sleeping in there, but my understanding -- once again, unfortunately, the homeless population sleep somewhere and many times behind cover, which would be in a bush.  So I'm not aware if there's a reason or an ordinance within the city that would necessitate you detaining him, but if there was, then you just ask him to leave.

Q    Was the fact that he was sleeping and awakened by Officer Silva one of the facts you considered in the totality of the circumstances?

A    Yes.

Q    Why was that important?

A    There was no crime in progress.  There was nothing that was occurring at the time.  He was sleeping.  And at the time, you woke him up and -- and right away you realize that, guess what?  That's not the blonde-haired guy or the Caucasian with the knife.  That's a male Hispanic and not the guy we're here for; so I would convey to my partners, "Hey, partners, the guy we're looking for is not here because I've interacted with him before, and he's a male Hispanic, and we're looking for a Caucasian.  So we don't even have a reason to detain him because it's a different person that's in the bush, and it's not the male white with the alleged

knife."

Q    And one of the commands he was given was to come out of the bushes; is that correct?

A    Yes.

Q    And you mentioned something earlier about the escalation in the voice of Officer Silva.  Can you elaborate on that?

A    We just heard it again just a moment ago when we listened to the video.  There's no reason to allow your emotions to drive the day.  If I ask you to do something, I'm professional, and I speak to you rather than at you, you're much more apt to listen.

And then with that comes, maybe, some dialogue and some compassion and by being -- and that's a way to deescalate.  You're waking a homeless person up who's trying to gather all he has, which is his cans, and move along -- there's no crime in progress.  You maybe tell your partners, "Hey, we just need one of you here.  The other two can leave. We have no crime here.  We're just going to have him make sure he gets his stuff up and leave."  That would probably be the way to do it.  But "Come on.  Let's go.  Let's go," and all of that escalation is unnecessary.  It just unnecessary escalates the situation.

Q    And the fact that Officer Silva had, according to her, three prior contacts with Mr. Garcia -- you have an understanding as to the nature of those contacts?

DIRECT - DE FOE                                          32

A    I do.

Q    Does any of that change your opinion with respect to the tactics or the use of force?  The fact that she had arrested him before or there was an incident where there was some meth found on him and another incident where she understood he was in some confrontation with a street vendor -- does any of that change your opinion on the -- on your -- facts of this case?

A    Well, as a former drug recognition expert -- central nervous system stimulants, such as methamphetamine -- well, he's sleeping.  So we know he's probably more than likely not high on meth at that time, at least not right then.  So that's not the issue.

Second issue is: How did I react with him the last time?  If I -- areas I worked in L.A. -- you arrest people all the time, and you meet them again all the time because you work in the areas.  I worked in Watts in 77th Division -- they live in that neighborhood.  So I'm going to base my interaction based on how the prior interactions were.

If Officer Silva felt threatened by the decedent in this case, I don't think she should have been standing in the opening of that bush if -- reasonably believed he was a threat.  If I reasonably believe he's a threat because he was aggressive with me in the past -- "Hey, partners, I got to" -- "pull back" -- "pull back away from the bush.  Last

interactions we had a problem with him.  He was combative with the police, something happened," and that's going to change my plan, and that's going to change how I may interact with him depending on what the prior incidents were.

The fact that someone has been arrested before -- it should cause situation awareness, it should cause the use of good tactics, but her actions demonstrated the opposite because, if she was afraid of him, she wouldn't have decided she wanted to go in the bush by herself, especially if there's concern about the size of the officer.  And secondly, if there was an issue of "I felt threatened by him," I'm going to tell my other partners.  I'm going to convey, "Hey, partners, this is what we have."  That never happened.

Q    Did you ever hear her communicating to her partners about her prior contacts or experiences with Mr. Garcia?

A    Not one word of it.

Q    And do you understand that, at least according to Officer Silva, each time she had contacted Mr. Garcia previously, he was cooperative, not physically resistive in any way?

A    Towards her, correct.

Q    You noted in part of the video where Officer Silva says she wants to go into the bushes and the -- I think it was Officer Yuhas who said "no"?

A    Correct.

Q    And how about when they grabbed him as he was coming out?  Based on their request for him to come out, them grabbing him -- what is your thoughts on that?

A    It's evident on the video.  He was startled.  If I ask you to come out and you immediately put your hand in my face, I'm going to be startled.  I just saw a gun being pointed in my direction prior to that, don't really know what I did wrong -- I don't want to speak for the decedent here because he's not here to ask him questions, but I don't know what he's thinking at the time other than it -- the response seems startled.  If I walk up to someone and I put my hands in their face and they're not expecting that -- because I'm complying with what you're asking me to do.  I'm coming out of the bush.  And he's coming out -- he's bending down, coming out from the bush, and immediately there's force that occurs: beanie grabbed, pushed back into the spot.  Once again, I would be more concerned -- just waking up -- as why is this happening at this point?

Q    Do you recall that part of what is being said during this time -- words to the effect -- when she said, "Show me your hands," Mr. Garcia saying something to the effect "I am showing them to you"?

A    Yes.

Q    And "I" -- "I'm waiting for a friend," "I have recyclables" -- things of that nature?

A    I do.

Q    He's asking, "Why are you taking me?" -- words to that effect?

A    Yes.

Q    I want to ask you about this jab.  Your understanding from reviewing -- at least Officer Silva's statement in deposition, she claims that at some point Mr. Garcia was attempting to jab her with the stick or pole.  Do you recall seeing that?

A    I do.

Q    First of all, in looking at all the video footage -- the dashcam, Officer Yuhas's, Officer Babb, Officer Frias -- do you see any jabbing of the pole or stick coming out towards Officer Silva's stomach?

A    No.

Q    Are you aware that Officer Frias, Officer Yuhas, and Officer Babb all testified that they did not see that happen?

A    Correct.

Q    Let's just assume for a moment it did happen.  Let's assume that, as Mr. Garcia is getting out of the bushes, he has this pole or stick and he's got to hold it somewhat horizontal just to get out of the bushes.  Are you with me so far?

A    I am.

Q    And let's assume that the end of it comes within a foot

or so of Officer Silva's stomach, in my hypothetical.  Can you just assume that for a moment?

A     Sure.

Q     And let's assume Officer Silva's wearing, as officers ordinarily do, a bulletproof vest.  Are you with me?

A     I am.

Q     Would that -- if -- assuming that happened just for a moment, would that justify using deadly force, in your opinion, against Mr. Garcia?

A     No.

Q     Why not?

A     There's still no imminent threat of great or serious bodily injury or death based on even if that was in fact true.

Q     So now he comes out, and I'm to the point now where he's got the stick or pole and a bag of something, apparently recyclables, in has hand, and I'm talking about the moment of the tasing.  Are you with me?

A     I am.

Q     And you're aware that Officer Yuhas yelled out, "He's got a stick.  He's got a stick."  You heard that on the audio; correct?

A     I did.

Q     And I think you've already mentioned it, but there were no commands to drop it?

DIRECT - DE FOE                    37

A      Correct.

Q      Did you note in reviewing the statements of Officer Frias, Yuhas, and Babb -- they all said repeatedly in their statements there were repeated commands given to Mr. Garcia to drop the pole or drop the stick?  Do you recall seeing that?

A      I did.

Q      Did you hear any of that on the audio?

A      No.

Q      In your opinion, would that have been a proper command to give?

A      If you were concerned about the stick, sure.  You want to ask him to drop the stick.  I also don't want to be standing at the mouth of the area he's coming out if he has a stick.  So once I hear my partner say he has a stick, I'm just going to back away from the opening, and then, if I want him to drop the stick, I'm going to -- I'm further away.  I'm going to say, "Hey, drop the stick," and then, if he doesn't drop the stick, then that may be escalating things.  If he doesn't drop the stick -- I'm going to give him a reasonable opportunity to comply.  If I feel that it's threatening, it may be a force option.  It just depends on what he'll -- he does with that stick.

Q      Let's talk about the tasing for a moment.  You're aware that Officer Yuhas deployed the Taser; correct?

A      Correct.

Q      Based on the audio, was there any verbal warning that a Taser was going to be deployed?

A      No.

Q      Do you have an opinion as to whether or not the Taser prongs struck Mr. Garcia?

A      They did.

Q      And what do you base that on?

A      The autopsy.

Q      And you saw certain officers in their statements indicating that the prongs appeared to strike him.  Do you recall seeing that?

A      I do.

Q      And you said you were a Taser instructor before?

A      I was.

Q      The jury has heard a little bit about this, but the greater the spread, -- meaning the greater the distance between the two prongs up to, like, a foot, for example -- the stronger the current the person is receiving?

A      And more likely to achieve neuromuscular incapacitation.

Q      Okay.  The question, I guess, is if you're closer -- you said earlier the preferred distance is 7 to 15 feet?

A      Correct.  With a Taser 7, which is the model he deployed, you could be closer than that, maybe a little further away, than you could with the former model, which is

the X26.

Q    Okay.  And so let's just assume -- in this case the spread was obviously less than a foot; correct?

A    Correct.

Q    Does that mean that you get no effect of the Taser at all?

A    No.  You're still going to get the pain associated with the barb traveling at 270 feet per second that's entering your body.  So it's going to hurt.  There's still going to be current, as there was in this case, for approximately 3.5 seconds.  So the screaming you hear as he runs south -- in a southerly direction out of there, I would assume -- being present during tasings, as well as being an instructor -- the pain was associated with the tasing, without me offering medical opinions, obviously.

Q    Where do you come up with 3.5 seconds?  Because isn't the cycle generally 5 seconds?

A    It is.  Typically 5 seconds -- if you pull the trigger, it's going to run 5 seconds.  If you depress the trigger, it'll continue to run.  If you take your finger off, you can press it again, it'll be another 5 seconds.  Based on the connectivity, from the information I reviewed, it seemed like the connection was about 3.5 seconds, which is consistent with him screaming as he exited the opening of the bush.

Q    What, if anything, happened, based on your review of the

materials, that stopped the 5-second cycle short to 3.5 seconds?

A    Could have been a number of things.  It could have been the -- one of the -- when he was pushed to the ground after being shot -- that may have caused that if it was within that time frame.  When running after being shot, one of the connections or both could have come ajar.  Many times people will just tear it out.  Like, they'll take it out.  So that would have either been unintentional, after being shot twice, or taken out himself -- that could have been a result of it -- or being pushed to the ground.

Q    And the 3.5 seconds -- did you see that somewhere in the investigation reports?

A    Yes.

Q    Did you feel his conduct rise to the level of making the Taser appropriate?

A    No.  As I testified earlier, Counsel, there was no reason at the time in which to deploy the Taser based on the subject's level of resistance.

Q    And the Taser is less lethal; correct?

A    It is.  Typically.

Q    And given the fact that Officer Silva was aware the Taser was deployed, she heard it being deployed, saw the barbs going towards Mr. Garcia, and heard him screaming, and then fired during the Taser cycle, how does that affect your

opinions in this case?

Q    Well, she's not going to know if it's going to achieve neuromuscular incapacitation.  So the idea -- once again, using the less-lethal-force option, and let's see if it worked, and if it didn't work -- and, once again, doesn't necessitate the use of lethal force if the Taser didn't work because it has to be an imminent threat of great bodily injury or death at the time in which you pull that trigger of that Glock 17 9-millimeter pistol that she fired.

Q    Did you note in your review, Mr. DeFoe, that Officer Yuhas did not deploy a second cartridge on the Taser?

A    Correct.

Q    Did you note that Officer Yuhas did not pull out his gun?

A    Correct.

Q    Did you note that Officer Babb did not pull out his gun?

A    Correct.

Q    Did you note that Officer Frias did not pull out his gun?

A    Correct.

Q    Was that important to you in your review of the case?

A    Yes.

Q    Can you tell the jury why?

A    Well, if I reasonably believe that you're a lethal threat, I'm going to stop a lethal threat with lethal force.

Now, with Yuhas, if I designate this gentleman "You're the Taser person.  That's your job," I understand that, and everyone else, if you believe there's a lethal threat, should have their pistols out, but your job is the Taser or that woman's job is the OC spray -- whatever we designate that person is, that's your job.  Now, you may transition from that job, drop your Taser, and grab your pistol because now that less-than-lethal threat has risen to lethal threat.  So it just depends on the totality of the circumstances.

Q    So let's just say, for example, different people have these different assignments like you're explaining, and the person comes out of the bushes with a gun in their hand. Does that mean they're not allowed to pull their gun out?

A    I would not expect this gentleman to tase the person with the gun.  I'd want him to transition to his pistol because now it's an immediate or imminent threat of death or great bodily injury to him or someone else, which is the threshold, and then use reasonable lethal force if there was a lethal threat.

Q    And is the fact that none of the other officers pulled their gun out, to you -- tell you something as an expert as to whether or not at the time they perceived an imminent threat of death or serious bodily injury?

A    Perceived, as well as, if I had prior contacts with

someone and I believed them to be a threat, I would assume my partner officer would let me know that this person may be a threat.  Because I would be very angry if they -- someone had a -- prior interactions with someone who may have been aggressive or threatening, and they just didn't tell me, and now this guy comes out of the bush with anything -- knife, a gun or anything -- based on your hypothetical, Counsel, yes, I want to know that because that's changing everything.  Because by not saying it, I'm putting my partners in jeopardy because they -- they've not interacted with the guy in the bush, because they don't know who he is, because she's the only one looking into the bush where the decedent is at the time.

Q    You've watched the videos in real time; correct?

A    In all -- real time, slow time.  I've looked at them a bunch of different ways.

Q    You've even looked at them frame by frame; correct?

A    As well as still shots, frame by frame as well.

Q    Is the best evidence, in your opinion as an expert in this case, the video in real time?

A    Yes.

Q    Now, I want to ask you about the sequence of shots, according to Officer Silva.  Did you, in reviewing her deposition, note that she was informed at the police station that one of the shots struck Mr. Garcia in the back?

A    Page 19 of her deposition.

Q    Okay.  Now, I -- you understand that, according to Officer Silva, she fired the first shot to protect herself?

A    Correct.

Q    And she fired the second shot, according to Officer Silva, to protect Officer Frias.  Is that your understanding?

A    What she testified to.

Q    So according to Officer Silva, she thought that Mr. Garcia was immediate threat to her at the time she fired her shot but at the time -- the first shot -- but at the time she fired the second shot, she thought it was an immediate threat to Frias.  Is that your understanding?

A    Yes.

Q    And according to Officer Silva, based on her deposition, she assessed between the shots.  Do you recall that?

A    Correct.

Q    I think she even estimated there was two seconds between the first shot and the second shot.  Do you recall that?

A    She did.

Q    And that Silva -- I mean, Garcia was running at Frias at the time of the second shot.  Do you recall that?

A    Correct.  And she fired to protect her partner from what she believed to be a threat.

Q    Based on your review of the materials, how much time was there between the first shot and the second shot?

DIRECT - DE FOE                                      45

A    Third of a second.

Q    So was that important to you, that in this third of a second, according to Officer Silva, Mr. Garcia went from being a threat to her to not being a threat to her, being a threat to Frias?

A    It was very important.

Q    Can you explain to the jury why?

A    There's no way she had assessed.  She fired both of those rounds almost simultaneously, and the idea that I'm going to fire and then immediately look and say, "Oh, I'm going to assess because he's running towards my partner right now," doesn't comport with the facts.  Listening to the gunfire, they're simultaneous rounds right on top of one another.

I know that sound.  I was a handgun instructor and a range master for 20 years; so I understand the manner in which she pressed that 9-millimeter semiautomatic pistol, first in double action, which means it's more about a 4 1/2-, 5-pound pull on the trigger.  Second is in single action, means the trigger -- you can hear it click -- those people that shoot pistols -- and it's much easier for the second, third, fourth, all the way up to the 15-plus rounds she had or 17-plus rounds she had in her pistol.

Q    Lastly, Mr. DeFoe, the jury has heard a lot of evidence this week about the case and --

DIRECT - DE FOE                                         46

A       I didn't hear what you said, Counsel.

Q       The jury -- I'm sorry -- has heard a lot of evidence this week about the case, seen a lot of videos, and I want to ask you, as an expert witness, if an officer or officers say they believed there was a imminent threat of death or serious bodily injury, they believed that the person could have used what they had in their hand to cause them serious bodily injury, is that the end of the analysis for you as an expert in opining as to whether the use of deadly force was appropriate or not?

A       It's got to be objectively reasonable based on the totality of the circumstances at the time in which the force was used.

Q       Does that go to the concept you're talking about earlier about subjective fear, sufficiency of fear, and fear of future harm?

A       Yes.

Q       Does part of the POST Learning Domain actually say: Fear of future harm, no matter how great the fear and how likely the harm, is insufficient to use deadly force?

A       It's in Learning Domain 20.

            MR. GALIPO:  Thank you.  That's all I have, Your Honor.

            MR. ARIAS:  The Galicia plaintiffs have no questions for the witness.

Q    Yeah.

A    Nonetheless, it's still -- there's no rush.  There's no crime in progress.  He's not committing a crime.  There's no rush to have him come out right away.  Just provide him --

Q    Wouldn't that --

A    -- a reasonable opportunity to gather his belongings -- that's his life that's in that bush area -- to gather those things and then come out within that time frame.  That's what it -- it's accommodating someone that's in a different situation than the rest of us are.

Q    Okay.  You just said, and you said on direct, give him an opportunity to grab his belongings; right?

A    Correct.

Q    He had a lot of belongings there -- sleeping bag -- all kinds of stuff -- didn't he?

A    Yeah.  Probably a lot less than we have.

Q    Okay.  The only thing that he had in his hands when he started to come out was a can of -- excuse me -- a bag of cans; right?

A    Consistent with someone who's homeless.  Yes.

Q    Okay.  And then the officers reached in to help him out; right?

A    I didn't view it that way, Counsel.  I think they initiated an unnecessary use of force and startled him by not allowing him to come out.  That's the way I looked at it.

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


/s/ Julie Messa_____          June 18, 2026_____
Julie Messa, CET**D-403          Date
Transcriber