# EXHIBIT F

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

- - -

HONORABLE SHERILYN PEACE GARNETT, DISTRICT JUDGE PRESIDING

| | |
|---|---|
| EMILY GARCIA, et al.,                )<br>                                      )<br>     Plaintiffs,                       )<br>                                      )<br>                                      )<br>                                      )<br>     vs.                              )  No. CV 22-00131-SPG<br>                                      )<br>                                      )<br>                                      )<br>CITY OF TUSTIN, et al.,               )<br>                                      )<br>     Defendants.                      )<br>_____)  | |

REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

*TRIAL DAY FIVE*

LOS ANGELES, CALIFORNIA

MONDAY, APRIL 20, 2026

MARIA R. BUSTILLOS
OFFICIAL COURT REPORTER
C.S.R. 12254
UNITED STATES COURTHOUSE
350 WEST 1ST STREET
SUITE 4455
LOS ANGELES, CALIFORNIA 90012
(213) 894-2739
MADAMCOURTREPORTER@GMAIL.COM

19

Let me say it again:  "If you find that Officer Silva's conduct violated any of the claims under claim two, violation of the Bane Civil Rights Act; claim three, battery; and/or claim four, negligence, then the City of Tustin is responsible for any harm caused by Officer Silva's wrongful conduct.  This instruction applies only to those claims.  The parties have stipulated that Officer Silva was acting within the scope of her employment during this incident."

MR. PRAET:  That works for the Defense, Your Honor.

MR. GALIPO:  Acceptable to Garcia plaintiffs.

THE COURT:  All right.

MR. ARIAS:  And for the Galicia plaintiffs, this is also acceptable.  Thank you, Your Honor.

THE COURT:  We'll make that change.

Okay.  So with that, any objection to -- I guess we are on 25.

MR. PRAET:  I think that was 25.

THE COURT:  Yes, we -- are we -- any other objections to 25?

MR. PRAET:  We have nothing further on that, Your Honor.

MR. GALIPO:  No, Your Honor.

THE COURT:  Twenty-six?

UNITED STATES DISTRICT COURT

MR. PRAET:  I assume, Your Honor, on behalf of the Defense, that you got our brief this morning on the issue of if the Court apparently is inclined to allow the inclusion of reckless disregard, then I think since that's a legal standard, I think there needs to be some definition, which we provided both the authority and some proposed language to give the jury guidance.  So if the Court is inclined, as apparently it is, to allow that, we would ask for that.

THE COURT:  I do think that it needs to be defined.  We will work on something to show the parties before this instruction is given.  But I do -- if we're going to use that language, we need to define "reckless disregard."

So reserve your objections until the complete -- the instruction is complete with a definition, okay?

So I will skip over 26, and we'll go to 27.

MR. GALIPO:  No objection.

MR. ARIAS:  For the Galicia plaintiffs, no objection.

MR. PRAET:  I assume, Your Honor, this is unchanged from the submitted version?

THE COURT:  Yes, it is unchanged.

MR. PRAET:  Then no objection.

decision for the jury?

THE COURT:  Sustained.

MR. PRAET:  All right.

BY MR. PRAET:

Q        You mentioned serious bodily injury.  That's defined in POST Learning Domain 20; isn't it?

A        It is.

Q        Okay.  And serious bodily injury includes loss of consciousness; correct?

A        It does.

Q        Okay.  Also includes fractures?

A        Yes.

Q        Okay.  Is it your belief, sir, that that wooden pole, if brought down on Officer Silva's head, couldn't render her unconscious?

A        Once again, depending on the force, but possibly it could, if it was used in that manner.

Q        And you're saying that no reasonable officer would perceive Mr. Garcia coming out of that bush, having armed himself with that pole, coming directly at her with it raised over his head -- that no reasonable officer would perceive that as an imminent threat of possible serious bodily injury?

A        Counsel, Officer Frias is just south of that location, and he doesn't even take his gun out of his

UNITED STATES DISTRICT COURT

54

holster.

Q        Right.  Because he was assigned hands on; right?

A        It wouldn't matter, Counsel.  If it rose to an imminent threat of great bodily injury or death, going and taking your weapon out of your holster and using lethal force and/or Officer Yuhas transitioning from the Taser that he already deployed to lethal force would be reasonable if the -- there was a likelihood that what the subject, the decedent, was doing in this case would likely cause great bodily injury or death.

Q        And you're suggesting Officer Frias, in that position, should have taken his gun out and shot Mr. Garcia?

A        No, I don't even believe he should have Tased, never mind taking his gun out.

Q        Okay.  You didn't wait for the guy in one of your shootings to pull the trigger; right?

A        Two of my shootings, I was -- one, I was being shot at the time I fired.

Q        Let's just talk about the one that we've talked about in court.  Did you wait for him to pull the trigger?

A        No, counsel, but the barrel was pointed at me when I fired.  I probably could've waited -- I probably

seconds of the five-second deployment, is my understanding.

Q       Let me take you back to that approximate two seconds between the time he was Tased and the time that he has now raised that pole over his head.  There's no evidence of any neuromuscular incapacitation; is there?

A       Counsel, I'm not -- I can't agree with the raising the pole over his head.  Your -- your assertion of the facts -- the pole was already in a vertical position at the time in which he was Tased.  He never tried to strike or bring that pole in a defensive manner after being Tased.  He simply ran and screamed, as we've heard on the video, based on the pain associated with the Taser, because it did not achieve NMI.

Q       You don't know what caused him to run; right?

A       I can assume, being a former Taser instructor, that typically if it does not achieve NMI, you're running from that pain.  Either someone will try to tear those darts out to stop it or they're going to run from the pain.  Similarly, like, if we put our finger in a light socket and we get -- and we -- you move away from the pain.  So that's similar.  You're going to move away from that source of electricity, your pain.  Would be a reasonable response to being Tased, if it does not achieve NMI.

Q        And if there's no NMI, there's nothing preventing Mr. Garcia from bringing that pole down on Officer Silva's head; is there?

A        But he didn't, Counsel.

Q        Because she defended herself; right?

A        Not because she defended -- he -- at no point did it ever look on video, any stills that you showed me here in court, that at any point Mr. Silva [sic] was attempting to strike Officer Silva with a pole preceding the firing of the two rounds from her Glock 17 9-millimeter pistol.

Q        All right.  He had it raised over his head. The Taser did not achieve NMI, and then within two seconds, Officer Silva, after she's backed away into those bushes, fires her shot; right?

A        I don't agree with that.  The Taser -- the pole is 49 inches in length.  It had to be over his head. There's no other way to carry it.  He was carrying it in the vertical position.  It was over his head.  He was carrying that as he came out of the bush.  It went into a vertical position.  It never went into a striking position.  It never went into a swinging position.  It never went into an offensive position, that I reviewed in the 40 seconds that it took me to realize that the shooting was unreasonable in this case.

(Whereupon, video is played in open court.)

MR. PRAET:  I don't know what happened to our audio.  You're going to have to back it up again.

(Whereupon, video is played in open court.)

MR. PRAET: Okay.  That's good.

BY MR. PRAET:

Q       And I apologize, "Get your hands up," not "Show me your hands."  Do you hear that?

A       I heard that.

Q       Okay.  And I think even Friday, you indicated when you tell somebody to show their hands or get their hands up, typically you even demonstrated holding both hands with palms exposed to the front; right?

A       It depends.  You know, if show me your hands -- I can see his hands on the video.  They -- one of them had a bag of cans, and the other one had the stick in a vertical position, so I saw his hands.

        If they wanted him to do something, I would have said, which didn't occur even though there's testimony to the contrary at depositions, is what was not said, was "drop the stick" and then give a reasonable -- if you were concerned about the stick.  So that was never said.  So if I was concerned about the stick --

Q       I'm sorry.  Mr. DeFoe, can I stop you and ask

counsel proposing to read?

MR. PRAET:  I'll -- I'm going to ask him -- I'll ask him a question, and then if he needs to refresh or whatever.

BY MR. PRAET:

Q       So, sir, is it still your opinion that an officer would not have to wait for someone to crack their skull open with a pole prior to using force if they reasonably believe that subject was going to use an instrument, such as a pole, to cause great bodily injury or death to them?  Is that still your opinion?

A       Yes.

MR. PRAET:  All right.  I have no further questions, Your Honor.

THE WITNESS:  Thank you.

THE COURT:  Any redirect?

MR. GALIPO:  Yes, thank you, Your Honor.

May I hand a...

**REDIRECT EXAMINATION**

BY MR. GALIPO:

Q       Good morning, Mr. DeFoe.

A       Good morning.

Q       Do you have a copy of your deposition with you?

A       I don't.

MR. GALIPO:  May I hand of copy to your clerk

to use an instrument, such as a pole, to cause great bodily injury or death to them."

Q        Okay.  So in this case, was it important to you that Mr. Garcia was asked to come out of the bushes?

A        Yes.

Q        Was it important to you some of the things he said as he was coming out?

A        Yes.

Q        What was important about that?

A        He agreed.  He said, "Okay.  Okay.  Let me get out," is what he kept on saying; "Let me get out."  So he wanted the opportunity to collect his things and then to get out.  He didn't cuss back or tell -- say anything derogatory or threatening towards the officer.  He just said, "Okay.  Let me get out."

Q        You were asked about the jab, and you indicated that you could not see it on the video; am I understanding you correctly?

A        Correct.

Q        In your opinion as to whether the use of deadly force was ultimately appropriate or not, would it make a difference to you whether there -- even if there was a jab while he was in the bushes?

A        No.

Q        And can you explain to the jury why not?

A        At best, that would be assaultive behavior.  If I punch you in the stomach or jab you with a pole, the response to that can't be a lethal use of force.  That level of resistance would be assaultive and not life-threatening.

Q        And I think you indicated that you watched the video to see if any white pole was coming out towards Officer Silva's stomach?

A        Yes.

Q        Did you ever see any?

A        No.

Q        Then there was a question about whether or not he initially had this stick in his hands or whether he grabbed it to come out after he was grabbed; do you remember those questions?

A        Yes.

Q        Would it make any difference, in your opinion, as to whether deadly force was appropriate or not, whether he had the stick initially or grabbed it when he was coming out the second time?

A        No.

Q        You were just asked about the autopsy report, and may I -- you reviewed Officer Silva's deposition; correct?

A        I did.

MR. GALIPO:  And may I hand the deposition to your clerk to hand the witness, please?

THE COURT:  Yes.

THE WITNESS:  Thank you, ma'am.

BY MR. GALIPO:

Q        Can you turn to page 19 of the deposition, please.

A        I'm here.

Q        I take it you reviewed this deposition as part of the materials that you reviewed?

A        I did.

Q        And looking at lines 10 through 15, did you get information that Officer Silva believed, when she went back to the police station, that she had shot Mr. Garcia in the back?

A        Yes.

MR. PRAET:  Your Honor, calls for speculation, and it's not in evidence.  She's already testified. We're now bringing up --

THE COURT:  Hold on.

I'm going to sustain the objection as phrased.

MR. GALIPO:  Okay.

BY MR. GALIPO:

Q        Did you review Officer Silva's deposition as to her state of knowledge, as to where she believed she had

evidence from Officer Silva is in on direct and cross.

THE COURT:  One moment.

As phrased, I'm going to overrule the objection.

THE WITNESS:  Yes.

BY MR. GALIPO:

Q        And so when you told counsel a few moments ago that you reviewed information that Officer Silva said that he was moving southbound at the time of her second shot, was this one of the sources of that information?

A        Yes.

Q        20/20 vision of hindsight, did you review this case with a 20/20 vision of hindsight?

A        No.

Q        Did you review it based on the information Officer Silva claims she had at the time?

A        Yes.

Q        And the video and other evidence?

A        Yes.

Q        In terms of what a reasonable officer would do, was it important to you that none of the other three officers on scene even pulled out their firearms?

A        Yes.

Q        Why was that important?

A        Because they didn't recognize that there was a

UNITED STATES DISTRICT COURT

lethal threat.  There was also a -- a comment that was stated by one of the officers, as well, after the shooting that was -- that was important, which just -- which should have justified the reason why they didn't shoot, which was important.  One of the officers asked, "Did you -- did you shoot?"  Which again -- which creates a question as to, did you shoot because there wasn't an imminent threat?

They didn't even take their pistols out of their holsters at any time, even during the Tasing or -- and/or during the two shots by Officer Silva, that recognized -- would have recognized an imminent threat. And they didn't even recognize that, and had they, it would be reasonable based on their training, the same training that Officer Silva received, that they would have removed their holster from their firearm.

Q       Firearm from their holster?

A       Firearm from their holster; correct.

Q       Sorry, once in a while I get it right.

And was it your understanding that Officer Frias, initially wasn't even aware that an officer-involved shooting took place?

A       Yes.

Q       Now, the Taser, you were asked a few questions about that; and asked about the prongs striking him; a

six-inch spread, approximately; him screaming.  Can you have some effect of the Taser without having a 100 percent total incapacitation?

A        Yes, if you don't achieve neuromuscular incapacitation, it's going to be pain associated with the Taser.  No different if I don't fire it in dart mode and I come up and I press the Taser; it's called drive stun mode.  It's a compliance tool to have you comply with what I'm doing.  But you're going to feel sensation of the Taser.  It's going to be very painful if it achieves NMI or not.  Just simply that you're having electricity obviously permeate your body from to the actual Taser.

Q        And based on your experience and your work as a Taser instructor, was Mr. Garcia screaming and turning away from the Taser consistent with how some people react?

A        Yes, sir.

Q        And in your opinion, was Mr. Garcia screaming and turning away from the Taser at the time he was shot?

A        Yes.

Q        In terms of this idea of fear of future harm, was it important to you that Mr. Garcia never swung or attempted to swing or attempted to move the pole downward at any time?

98

A     Yes.

Q     Is it just enough for someone to say, "I thought maybe he was going do that," and -- and kill the person?

A     No.

Q     Why isn't that enough?

A     Subjective.  It's not objectively reasonable based on the totality of the circumstances.

Q     You were asked about your shooting in great detail, at least one of them, where there was that young child face down on the bed and someone was pointing a gun at you, and you fired in self defense.  Do you recall that?

A     Yes.

Q     Do you think the facts of your case, having someone pointing a gun at you who was alleged to have kidnapped a child, are a little different than the facts of our case?

A     Vastly different.

Q     And the other two shootings you were involved in, were the individuals actually shooting or firing at you with guns?

A     One of them, an officer was shot -- an LAPD officer was shot multiple times, and I returned fire. The suspect was firing two handguns at one time for one

of the shootings.  The second shooting, a suspect had shot his estranged wife, a woman holding a child and three people in Newton Division.  While working as a metro K9 sergeant, we conducted a search of the backyard, which we came under gunfire, a very prolonged gunfire incident.  Those are the other two incidents.  Both suspects were firing at me at the time in which I used lethal force.  One of those, an LAPD officer was shot during the course of the shooting.

Q        So in your three officer-involved shootings in your career, in one incident, the person was pointing the gun at you; is that correct?

A        Correct.

Q        And the other two, they were firing rounds at you and other officers?

A        Correct.

Q        And during your career as a law enforcement officer, had you seen suspects or individuals with knives in their hand?

A        Yes.

Q        Weapons in their hand?

A        Yes.

Q        How many times, approximately, including guns?

A        Hundreds of times.

Q        Are officers trained that they can just shoot

someone because they have a weapon or a potential weapon in their hand and they're afraid they might do something with it?

A        They cannot.

Q        You were asked by counsel -- when you indicated the call came out for a white male with blond hair, I think the question was to the effect, well, how did she know what color hair Mr. Garcia had; he had a beanie on? Do you recall that?

A        Yes.

Q        Well, did you consider the fact that she had prior contacts with Mr. Garcia so that she might have known his hair color?

A        Yes, she stated that, "I know you.  Come on," which was an indicator that she knew who he was.

Q        The -- just a few more questions.  The commands here, I think counsel asked you that one of the commands you heard -- the last command was "put your hands up" before he was Tased; do you recall that?

A        Yes.

Q        And I guess there's been a suggestion that that's a sufficient command; you don't need to say "drop it" if you want someone to drop something.  Do you agree with that?

A        I don't.

Q        Why not?

A        You need to tell people what you want them to do.  She didn't want the stick or the cans in his hand when he came out.  Just either "come out with your hands clear," "let me see your hands," or if you see something in the hand, just say, "Drop what's in your hands."  And then give them a reasonable opportunity to comply to drop what's in their hands.

Q        Do you believe, based on your review of the materials, that sufficient commands were given to Mr. Garcia as he was coming out of the bush?

A        Commands and no warnings.

Q        Do you think he had sufficient opportunity to comply with, like, a command to drop it?

A        No.

Q        You mention at some point that I think three of the officers, in their statements, indicated there were multiple commands to drop it?

A        Correct.

Q        And you did not see that on the audio?

A        I did not hear it on the audio.

Q        Would that have been appropriate, if they wanted him to drop it, to give him multiple commands to drop it and an opportunity to comply?

A        And if he didn't drop it, a warning, what would

happen if he didn't drop it.  That's the difference between a warning and a command.

Q        If there had been no Taser at all involved in this case, let's just assume he wasn't Tased at all, would your opinion be any different as to whether the use of deadly force was appropriate or not?

A        No.

Q        The fact that he was undergoing being Tased at the time, did that affect your opinion one way or the other or make it even stronger?

A        Yes.

Q        How so?

A        For one, there was an -- Officer Yuhas recognized -- even though I found it to be unreasonable -- there was a less than lethal force option he was going to deploy.  And then the shooting occurred during the time in which the Taser was deployed.  He was still screaming.  So the shooting occurred while he was screaming.

As I testified to earlier, it was about three and a half seconds of time before the connectivity broke, based on the evidence, in the 4.97 seconds of electricity.  The shooting occurred in between that time.  So he was being Tased at the time in which Officer Silva fired two rounds from her pistol.

Q        You mentioned earlier that you felt the video was the strongest evidence in the case?

A        Yes.

Q        You also mentioned that you thought this was one of the worst shootings you had seen as an expert?

A        Yes.

Q        Had -- has that opinion changed based on any of the questioning that's taken place in court by opposing counsel?

A        No.

Q        Thank you.

        MR. GALIPO:  That's all I have, Your Honor.

        MR. ARIAS:  The Galicia plaintiffs have no further questions for the witness.

        THE COURT:  All right.  Any re-cross?

        MR. PRAET:  Very briefly, Your Honor.

**RECROSS EXAMINATION**

BY MR. PRAET:

Q        Mr. DeFoe, counsel just asked you whether you considered Officer Silva's deposition testimony.  And he said that, did you consider the fact that she said that Mr. Garcia was running towards Officer Frias at the time she fired the second shot; do you remember that?

A        Yes.

Q        In actuality, in her deposition, she said

counsel, if you want to make your motion?

MR. PRAET:  Yes, thank you.  At this point, the Defense would offer a Rule 50 motion based on the fact that I think the evidence is now in, in their case, and they failed to meet their burden of showing that the officer used unreasonable force as to cause of action number 1.

Further, that there is nowhere close to sufficient evidence to show that she acted with intent or reckless disregard, given the definition under the *Bane Act*.

And further, since the standard for battery and Fourth Amendment are essentially the same, the reasonableness standard when necessary is defined.  We believe they've not met their burden there, as well, given the testimony of even their own expert that officers are not required to use the best tactics or even those least likely to cause injury.

I think there's -- even their expert has testified that Officer Silva never violated any established standard from POST or any other recognized organization, so I believe they've also failed to meet their burden on the negligence claim, as well.

THE COURT:  Okay.  Plaintiffs?  First, Garcia.

MR. GALIPO:  Thank you, Your Honor.

Case 8:22-cv-00131-SPG-KES   Document 192-7   Filed 07/01/26   Page 24 of 41   Page ID #:3682

120

Yes, the Court is very aware of the facts of the case, the disputed facts, the state of the evidence in this case. I think there is an abundance of evidence, quite frankly substantial evidence supporting all of the plaintiffs' claims. Of course, it is up to the jury. They have to decide the facts, take reasonable inferences.

For purposes of this motion the Court has to accept plaintiffs' facts and take all reasonable inferences therefrom, and with regards to each and every claim, certainly with the Fourth Amendment claim, there's substantial evidence to support it.

The battery and negligence claim have separate instructions that Court is giving. There is substantial evidence to support those.

The *Bane Act*, as the Court is aware, under the *Reese* case, a reckless disregard could establish, which we believe there is substantial evidence to support.

So for all those reasons the Rule 50(a) motion should be denied.

THE COURT: Okay.

MR. ARIAS: Thank you, Your Honor.

On behalf of the Galicia plaintiffs, we join the position of my colleagues and the Garcia plaintiffs. We believe that the evidentiary basis at this point is

UNITED STATES DISTRICT COURT

sufficient in terms of what the Court and the jury has available for the determination of the issues of the case.

At this point, the Court should look at the facts in the most favorable view for the nonmoving party, and based on the status of the evidentiary value presented for the jury, we respectfully request Court to deny this motion.

THE COURT:  Okay.

MR. PRAET:  Nothing further, Your Honor.  We'll submit.

THE COURT:  Okay.  All right.  I think as to each of the claims, there is sufficient evidence to let the jury decide whether the claims -- or the plaintiff -- strike that -- the defendants are liable as to the 1983 *Bane Act*, the battery, as well as the negligence.

I mean, there's disputes of material fact as to each of those claims, and I think that the plaintiffs have at least presented sufficient facts that should go to a jury.  So I'm going to deny the motion at this time.

Any question?  Or any other --

MR. PRAET:  Your Honor, obviously, we only have one witness, Mr. Handy, and before the jury comes back

instruction, the *Bane Act* instruction.  We've added a definition, and let me know your thoughts on the definition of "reckless disregard."  And I believe that is it in terms of the jury instructions, and then we'll be all set.

MR. PRAET:  Does the Court recall which page number that was?

MR. GALIPO:  Page 31.

MR. PRAET:  Thank you.

MR. GALIPO:  Plaintiffs are okay with the definition, Your Honor.

MR. ARIAS:  The Galicia plaintiffs are okay with that, Your Honor.

MR. PRAET:  That's fine, Your Honor.

And, Your Honor, I know Mr. Galipo and I discussed this, and I don't know realistically what Court's feeling is.  I mean, if the close of evidence is at, let's say, 3:30, is the Court inclined to just instruct and then do all the closings tomorrow or...

THE COURT:  I can do that if everybody agrees to that.

MR. PRAET:  And my point being that -- obviously, no fault of anyone's -- we have finally the instructions and everything, but we would maybe have to use the Elmo, which of course was kind of glitchy the

an instrument, such as a pole, to cause great bodily injury or death to them?  Do you agree with that?

A        I would agree they would not have to wait.

MR. PRAET:  No further questions, Your Honor.

THE COURT:  Cross-examination, Garcia plaintiffs?

MR. GALIPO:  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. GALIPO:

Q        Good afternoon, Mr. Handy.

A        Good afternoon, Mr. Galipo.

Q        So about one-third of your cases that you've been retained as a police practice expert have been for Mr. Praet?

A        No.

Q        What percentage would you say have been for Mr. Praet?

A        Maybe close to 10 percent.  I think I've been retained in 55 or 60 cases to date, and four or five were for Mr. Praet.  Those are estimates, sir.

Q        You did write a report in this case; is that correct?

A        Yes, sir, I did.

Q        Have you ever testified in federal court before as a police practice expert?

Officer Yuhas?

A          It appears to be, yes.

Q          You understand the -- from the materials you've reviewed that Mr. Garcia was sleeping in the bushes when he was contacted?

A          Yes.

Q          Told to wake up?

A          Yes.

Q          And that -- asked to come out of the bushes?

A          Yes.

Q          And do you note in reviewing this a time period where Officer Silva is elevating her voice?

A          It occurred right before you stopped the video. She is elevating her voice.

Q          Right.  And do you hear right before I stopped it her telling Officer Yuhas "I'm going in"?

A          Yes, I do.

Q          Do you think that would have been good tactics, for her to go into the bushes on a call that you say is a man that had a knife?

A          I don't know what she sees, and I don't know what "go in" means.  So I'm not certain.  I'm not certain what was in her mind when she said that.

Q          I'm not asking you what was in her mind.  I'm asking you as the expert retained by the Defense whether

another 12 or 15 -- probably 15.

Q        You're saying that you don't know whether the officers in their statements or depositions said that he was given commands to drop it?

A        Well, there are thousands of pages in this case, and there is over -- there is thousands of pages of testimony, and those exact words, I don't recall. I'm not sure.  I'd have to review it and look.

Q        Isn't it true, sir, that you know from listening to the video those commands were not given?

A        I didn't hear those commands, as I testified to.

Q        Isn't it also true that you know that in their statements, they did say that those commands were given?

A        It's true what I testified to.  I don't know that.  I'd have to review their statements.

Q        Okay.  Now, I noticed you didn't mention with questioning by counsel anything about the jab.  You didn't mention that in your testimony so far.  Would you agree with that?

A        He didn't ask me about it, but yes, correct.

Q        Right.  I mean, you can only answer the questions you're being asked; true?

A        Yes, sir.

Q        Right.  And would you agree that you don't --

178

would you agree that you wrote multiple times in your report that Officer Yuhas observed the jab?

A        I think that is what he testified to, yes.

Q        Are you aware, sir, that in this trial, he admitted that he didn't see the jab?

A        I'm not aware of his testimony in this trial.

Q        And you would agree you can't see Officer Silva being jabbed on the video; true?

A        I think you see a little motion right there at the hole of the bushes right at the time where it appears that she is -- that motion is occurring.  It is hard to tell exactly what it is.  I wouldn't say for sure that is the end of the pole being jabbed at her. I'm not sure.

Q        And when he comes out of the bushes, Mr. Garcia, after being grabbed, he is tased, starts turning away from the Taser, and the shots start occurring within a second or two; is that fair?

A        I would also include that he went back into the bushes and armed himself.  It wasn't in rapid succession where they grabbed him and tased him.  So I think it is important, that distinction that they tried to take control of him physically with hands-on.  He broke away from them and went back into the bushes and armed himself with the pole.  And during that time actually,

Officer Silva reholstered.

MR. GALIPO:  Okay.  We stopped it at 1:22. Let's continue, please.

(Whereupon, video is played in open court.)

MR. GALIPO:

Q       That is one of the videos you saw?

A       Yes, sir.

Q       You're aware that Officer Frias didn't even know a shooting had occurred until he saw the blood?

A       I believe that's accurate, yes.

Q       And you would agree at least in watching the videos, we don't see any other officer pulling out their gun.  Would you agree with that?

A       I would agree.

Q       Now, and you would agree there was no warning that the shots were going to be fired; true?

A       I agree.

Q       And officers are trained to give a verbal warning when feasible?

A       Again, when feasible, yes.

Q       Let me ask you a few questions about the standards that apply to the use of deadly force.  And you've talked about this a little bit.  There has to be an imminent threat of death or serious bodily injury; true?

A         Yes, sir.

Q         Would you at least agree with me, sir, if there was not an imminent threat of death or serious bodily injury, then deadly force should not be used?

A         It depends on the circumstances or like a fleeing felon -- different circumstances.  I'm just talking for this case.  I'm assuming that is what you mean, but yes.

Q         Okay.  Fleeing felon situation doesn't apply to this case; true?

A         Not necessarily, no.

Q         Okay.  So my question is in this case, would you agree if there was not an imminent threat of death or serious bodily injury, then deadly force should not be used?

A         I would agree.

Q         And you understand obviously, it is going to be up to this jury to decide whether there was an imminent threat of death or serious bodily injury in this case; true?

A         I do understand that, yes.

Q         And you also understand they'll decide whether the force --

          MR. PRAET:  Objection, Your Honor.  This is the same -- I was prevented from asking the witness so same

189

I don't know what's there.

Q        And you've already told us, I think, that Mr. Garcia had already been tased and never swung or moved the stick down towards her.  You would at least agree with that; true?

A        Correct.

Q        And he actually was in the process of turning from his left to right when he was shot, wasn't he?

A        The second time.

Q        Well, that is what I want to ask you about because according to Officer Silva's testimony in deposition, she fired the second shot not to protect herself but to protect Frias.  Did you see that?

A        I did.

Q        You also wrote that in your report; true?

A        I did.

Q        So according to Officer Silva, he was not -- Mr. Garcia was not an imminent threat to her anymore. He is now an imminent threat to Officer Frias.  You read that; true?

A        It's not the exact words, but that is the reason she fired, yes.

Q        Right.  And so how much time passed between the two shots?

A        It is a second or two.

193

Q       And you know now from reviewing the materials in the case the person wasn't knocked unconscious at all.  There were, in fact, no injuries; correct?

A       Again, that is not what Officer Silva knew, but yes.

Q       Did Officer Silva tell anyone at the scene, "Hey, I know this guy, and I've had problems in the past"?

A       No, she didn't have an opportunity do that.

Q       You don't think during the minute or so before he came out of the bushes she had any opportunity to tell that to her fellow officers?

A       No.  I think her focus needed to stay on Mr. Garcia.  And she's negotiating with him, trying to get him out of the bushes.  I think her attention needed to be focused there.

Q       Did she tell anyone that she thought he was under the influence?

A       Again, I think she is in the midst of giving him commands and needs to keep focused on him.

Q       You talked about to 20/20 vision of hindsight, wouldn't the toxicology findings be 20/20 hindsight in you opinion?

A       The toxicology results in of themselves -- by themselves, yes, but not when she had a prior arrest

UNITED STATES DISTRICT COURT

A        I would agree with that, and I think it is present in this case.

Q        And officers have to consider other reasonable options.  You would agree with that; correct?

A        I do.

Q        In terms of tactics, is the safety of the person they're contacting a factor to consider?

A        In addition to the safety of the public and officer safety, yes, absolutely.

Q        So it is everyone's safety that should be considered?

A        Correct.

        MR. GALIPO:  Thank you, Your Honor.  That is all I have at this time.

        THE COURT:  Okay.

        MR. ARIAS:  Very briefly, Your Honor.

        THE COURT:  Okay.  Let's take a break, then.

        It is 3:00 o'clock, and we'll take our afternoon break.  Be back at 3:15, and we'll resume the trial at that time.

                    (Recess.)

            (Whereupon, the following was held outside

            the presence of the jury:)

            (Discussion held off the record.)

            MR. PRAET:  Dale?

UNITED STATES DISTRICT COURT

216

with her testimony.

Q        Okay.  And lastly, was there any evidence in this case that you saw that Officer Silva overreacted?

A        Not at all.  I thought her reactions to the aggressions shown by Mr. Garcia were -- were well within training, well within standards.  I felt her reactions were appropriate and controlled and measured.

MR. PRAET:  Thank you, Your Honor.  Nothing further.

THE COURT:  Any re-cross?

MR. GALIPO:  Yes, thank you.

**RECROSS EXAMINATION**

BY MR. GALIPO:

Q        Are officers retrained that an overreaction in using deadly force is excessive force?

A        I think that would depend on the circumstances.

Q        Well, you told me earlier that officers are trained not to overreact?

A        Correct.  But overreact doesn't necessarily mean force being used.  There is overreactions that aren't necessarily force being used.  So I don't know that those two are as intricately tied, as you mentioned.

Q        You would agree that someone could overreact and use unnecessary deadly force.  Would you agree with

THE COURT: You're excused.

THE WITNESS: Your Honor, do I leave this here, or do I hand it over to Mr. Galipo? It's my report.

THE COURT: Might as well hand it to him on the way out.

MR. PRAET: The only thing we have left, Your Honor, is the demo.

THE COURT: All right.

MR. ARIAS: We have an objection, Your Honor.

THE COURT: Okay.

MR. CARRILLO: We're maintaining our previous objections. Sorry, Your Honor. We're just maintaining our previous objections.

THE COURT: Hold on one moment.

During the trial, the object referred to -- I'm reading you an instruction.

During the trial, the object referred to as the stick or pole actually possessed by Mr. Garcia will be shown to you as a demonstration. The stick or pole will not be admitted into evidence. Therefore, you will not be able to touch or handle it during your deliberations. Also, the placement of the stick during the demonstration is not evidence.

You may consider, however, the testimony given and other evidence, such as body-worn camera video

222

showing the stick or pole, in your deliberations.  So we're going to have a demonstration at this time.

MR. PRAET:  Do you want counsel to move?

THE COURT:  Yes.

MR. PRAET:  Could we approach just to make sure?

MR. CARRILLO:  Sidebar?

THE COURT:  With me?

MR. CARRILLO:  Yes, Your Honor.

MR. PRAET:  Yes, Your Honor.

(Sidebar.)

MR. CARRILLO:  Your Honor, I just want to have an understanding.  Did the Court want me to walk back and forth --

THE COURT:  No.

MR. CARRILLO:  -- or just stand stationary.

THE COURT:  Just stationary just in the middle between 4 and 5 -- between jurors number 4 and 5.

MR. CARRILLO:  Where I was sitting?

THE COURT:  You could walk with it down and then -- I don't know.

MR. PRAET:  You can just stay stationary in the agreed-upon position.

THE COURT:  But to get to the agreed-upon position, are you going to walk with it down and then

223

put it in the position or...

MR. PRAET:  That's fine.

MR. CARRILLO:  Yeah, I'll just walk with it down.

MR. PRAET:  And maybe the Court can, just so the jury doesn't wonder why his feet aren't in the same position, say that we're only demonstrating the upper body?

THE COURT:  Okay.  Any objection to that?

MR. CARRILLO:  No, Your Honor.  That will be fair.

MR. PRAET:  Did you find your mark?

MR. CARRILLO:  Yeah, it's right here.

(Sidebar concluded.)

THE COURT:  And members of the jury, the demonstration will involve the upper body part as opposed to any placement of feet or positioning of the feet.

Anything further?

MR. PRAET:  No, Your Honor.

THE COURT:  All right.  The record should reflect that counsel approached the jury, stood approximately between jurors numbers 4 and 5, which is approximately the middle of the jury box, stood approximately a couple of feet, maybe 3 to 4 feet in

224

front of the jury box, and held the stick at the approximate height of Exhibit 205B.

MR. PRAET:  Correct.

MR. CARRILLO:  Yes, Your Honor.

THE COURT:  And with the approximate hand position reflected in 205B and also was holding a bag containing material.  All right.

MR. CARRILLO:  Yes.

THE COURT:  Thank you.

MR. PRAET:  And with that, the Defense would rest.

THE COURT:  All right.  Any rebuttal?

MR. GALIPO:  No, Your Honor.

THE COURT:  All right.

MR. ARIAS:  Nothing further, Your Honor.

THE COURT:  All right.  So at this point, I'm going to read you part of the closing instructions.  Then I will let you go for the evening.  And then tomorrow, when you come back, the attorneys will give their closing arguments.  After that, I will give you a couple more instructions in terms of how to pick a foreperson, et cetera, and you'll start your deliberations.  You will deliberate for full days until you are done.  Okay.

Okay.  All right.  Is there any objection to

UNITED STATES DISTRICT COURT

232

EMILY GARCIA, et al.                    :

                    vs.                 :   No. CV 22-00131-SPG

CITY OF TUSTIN, et al.                  :

I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.


_____/S/_____          //___

MARIA R. BUSTILLOS                  DATE
OFFICIAL REPORTER

UNITED STATES DISTRICT COURT