# EXHIBIT G

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

- - -

HONORABLE SHERILYN PEACE GARNETT, DISTRICT JUDGE PRESIDING


EMILY GARCIA, et al.,           )
                                )
        Plaintiffs,             )
                                )
                                )
                                )
    vs.                         ) No. CV 22-00131-SPG
                                )
                                )
                                )
CITY OF TUSTIN, et al.,         )
                                )
        Defendants.             )
_____)


REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

*TRIAL DAY SIX*

LOS ANGELES, CALIFORNIA

TUESDAY, APRIL 21, 2026

_____

MARIA R. BUSTILLOS
OFFICIAL COURT REPORTER
C.S.R. 12254
UNITED STATES COURTHOUSE
350 WEST 1ST STREET
SUITE 4455
LOS ANGELES, CALIFORNIA 90012
(213) 894-2739
MADAMCOURTREPORTER@GMAIL.COM

likelihood of the harm, but is one that from appearances -- and there goes my Elmo again -- must be instantaneously confronted.

Did I do something?

THE COURT:  Counsel, that is the wrong battery instruction.  That is the not the final.

MR. GALIPO:  Oh, I apologize.  Well, let me go off memory.  I apologize, Your Honor.  I was handed it.

You also have to consider the tactical conduct of the officer leading up, whether she used good tactics, positioning, communication, escalation, and whether she had other reasonable alternatives.

After the battery question on the verdict form, you go to question 8, 9, and 10, that deals with negligence.

Was Estela Silva negligent?  Was that a cause of harm or death?  Yes.

Was Luis Garcia negligent?  Now, this is question 10.  Now, this is an interesting question because in many of these cases, one could say, yeah, the person who was shot was negligent.  But what was he negligent for?  He was asked to come out of the bushes repeatedly.  He did.

What was he negligent for?  For coming out of the bushes.  I guess someone could say for coming out

with a stick or a bag of recyclables.  What was he negligent for?  He didn't verbally harm any of the officers.  He didn't try to swing or swing at any of the officers.  He was being tased.

And then question 11:  Have they proved that his negligence was a substantial factor this causing his death?  Well, the cause of his death was the unnecessary shooting of him while he was being tased.  I would submit he had no negligence.  And if he had any, it didn't cause his death, not under these facts.

And then there is a percentage allocation, which, from our standpoint, should be 100 percent at Officer Silva, but I don't even think you'll get there because you have to find he was a cause of his own death.  That is up to you.

I would -- just by way of summary on the liability, I would submit this isn't even a close call if you really wanted to be honest about it and fair.  At a minimum -- at a minimum, this was an overreaction by this officer.  At a minimum.  And it may have been much more than that.

So then the other question is damages, and those are the last three questions on the verdict form.  And you may remember in the beginning, I asked you, I think, as a group, "Do you think you could be fair on

damages?"  Now, I realize that is a very general question.  What does that mean?  And it really raises some really interesting issues, and you'll discuss this as a juror -- jury.

Look at question 13, pre-death pain and suffering and loss of life.  Well, that's some interesting issues.  What someone's life worth?  I'm sure if you asked eight different people, you'll get eight different answers.

There is a story that's told sometimes as an example of the value of human life.  A structure is burning down.  A firefighter goes in.  There is a $50 million painting on the wall and one person in the unit, and he only has time to save one.  We all know that every time, he is going to save the person.  That's because thankfully, we do and should value human life, everyone's life.

Now, I guess some people could say, well, he had trouble.  He had some prior contacts with law enforcement.  By the way, no evidence of any convictions on these contacts with Officer Silva.

Should we give up on someone because they're homeless?  You know, what is really sad here -- you'll remember hearing from Emily and Camilla.  Now, this is something that probably would be difficult for all of us

41

had dreams that her financial stability would be able to help her help her father to get in a better position and presumably off the streets as he had helped her as a young person.  That's been taken away from her forever. No father at graduation or marriage or with her kids or ever again.  She'll never be able to talk to him or see him again.  And the same with Camilla.  And they'll have to live with this for the rest of their life, especially difficult knowing how he was killed.

So it is up to you, but I would say a range of 5 to $8 million each for them is something you can think about.  It's been five years since this happened.  So part of the damage award has to be for the past, and part of it has to be the future, the rest of their lives.

What's important to our side, speaking on behalf of myself, is that there is a finding in acknowledgement that it was not necessary to kill him. That is what's important.  The damages is up you to. I'll respect whatever you decide on that.

And I thank you all for listening to me.

Thank you, Your Honor.

THE COURT:  All right.  Thank you.

For the Galicia plaintiffs?

MR. ARIAS:  Your Honor, may it please the

with her gun forever.

What's the message if we agree with the Defense to award reasonable damages and devalue the life of a human being just because at that moment, he just had a plastic bag and a stick?  Message we will be sending is yes, it is okay to kill someone in the street.

MR. PRAET:  Your Honor, objection.  It is not proper to talk about the message.

THE COURT:  Sustained.

MR. ARIAS:  Thank you, Your Honor.

And also the message is if the person is homeless, we can't afford that.

THE COURT:  It was still sustained.

MR. ARIAS:  What is love?  Is love the amount of pictures that we keep of our loved ones, or is love the amount of money that we give?  So the one of the things that we have to decide in this case is, are we open to the possibility that the story of love of a couple who had dreams and who had a story to create a family -- did that -- there is a woman that could have all those dreams and marry with her husband, have a beautiful baby.

The story was beautiful, but you know what?  The story was also real, and she took the stand.  And unlike Officer Silva, she told you the story as it was

51

honestly.  Circumstances, all the things that happened. His promises, his broken promises, and the reasons why she was holding to that feeling still.  Are we open to the possibility that love can exist even in despite of all the things that you now know were the circumstances of Mr. Garcia's life?  Are we open to that possibility? Or again, are we going to wipe out all of that, and we're just going to say, oh, human life, let's go low just because she says so?

And let's talk about love because we heard from Kevin.  Now, I'll tell you -- I'll share something that five years ago came through my mind.  And I was nervous. I was, like, "Does he only have one picture?  He only saw his dad twice?"  I was nervous only until I was able to understand what does that mean for my client, what does it mean to talk to your dad and know that even though he is far away, he loves you; he cares for you; he wants you to be the best you can.

And that son only wants to make him proud.  We heard him.  Proud.

And does he have right to have a photo and perhaps only one moment -- twice being able to see your dad and treasure that, that little thing to that has been minimized by the Defense, and put it into his heart?  He says, "That's my dad, and I love him, and he

UNITED STATES DISTRICT COURT

is being taken away from me."  I submit he does love.

What is love?  Has anybody seen it?  It cannot be captured.  It's inside.  It's deeply.  It's -- it's -- you love, and you are loved.  And the love of a father of a son means a lot, and that has been also been stolen from him for the rest of his life by a cop, by the wrong cop.

We're here asking you to apply the law and to say to the Defense, "We are not ready to go along."  In fact, that is what we're asking you.

So I agree with Mr. Galipo.  And as you have seen, all we're asking here is to do justice, do the right thing, and put a real and fair and just end to this story as provided under the law.

I will submit to you that Kevin deserves the equal treatment of the children of Mr. Garcia -- and I join my colleague -- in the range of 5 to 8 millions for his loss.

And as to my client, the wife of Mr. Garcia, because we do understand might not be -- might not be the same as -- as a child, but I will leave it up to you because I trust you.  You'll do the right thing.  I suggest you can discuss it.  What is the value of love, between 3 and 5 million?  The number is on you.

And I join my colleague.  We have presented to

we missing, or you can go home and go back to your own lives.  But I think your decision today is going to be relatively easy, if you base it on the evidence and not based on sympathy.

So with that, I will thank you for your service and your attention in this case and ask that you return a verdict supporting Officer Silva.

Thank you.

THE COURT:  All right.  Thank you.

For the plaintiffs?

MR. GALIPO:  May I have one moment, Your Honor?

THE COURT:  Yes.

**REBUTTAL**

MR. GALIPO:  Okay.  Good morning, again.  I have one more time to address you before your deliberations.  I told you before and I reiterate again why we are here.  We're here because up to this point in time the city of Tustin, their attorneys, and Officer Silva refuse to accept any responsibility for what happened.  Zero.

They want you as a jury to say this is okay and go onto the next case.  They want to blame -- all the blame on Mr. Garcia, the homeless guy sleeping in the bushes.  No blame for Officer Silva who intentionally fired her gun at him knowing it would most likely kill

weapon.  A stick is not.  Could it possibly be used as a weapon?  Possibly.  Is it a deadly weapon?  No.

Can we play the first video?  I guess this is (b)(2) 12.

And I want you to look at the subtitles, ladies and gentlemen.  I mentioned some of what Mr. Garcia was saying.

(Whereupon, video is played in open court.)

MR. GALIPO:  That's the video in realtime.  It is pretty obvious he is not trying to strike Officer Silva or Officer Frias with the stick.  And they said, well, you don't have to wait till they crack your head open.  But you have to see something.  They tried to suggest the fact that he wasn't swinging it or it wasn't coming down towards anyone is -- is not important.  It is very important.

And then with respect to damages, which apparently counsel feels that it should be no damages or -- if we can, play Exhibit 57, starting at 150.

(Whereupon, video is played in open court.)

MR. GALIPO:  I think you remember seeing this.  And you'll have access, if you need to see it.  But this supports a substantial award for pain and suffering.

You also remember the video clip when he was in the ambulance.  And then you'll see in the autopsy

report that he had emergency surgery, et cetera, at the hospital. And I already mentioned part of his lung was removed, bullet went through his lung, diaphragm, liver, internal bleeding, et cetera.

I don't think I have to say much more because I think you nice people understand this case. You get it. And what I'm asking you simply to do is what you agreed that you could do in the beginning. And if it shows it was excessive and unreasonable, vote in favor of the plaintiff. That is all I'm asking you to do.

We believe the evidence is overwhelming in this case. And probably the best piece of evidence in the whole case is the video. We're all going to go home after this. I know you'll think back to this trial and say it was an interesting experience. Some of you may end up keeping in touch with each other. That has happened sometimes with jurors.

But I want to let you know that for the family this is their one chance to get some closure to this, some justice. And in some way, I'm turning the case over to you now, and I hope some of you in the jury room during deliberations will -- will make some of the points that have been made here by our side and maybe even have some of your own points that you think you want to voice.

And we believe evidence supports each and every claim. And in particular, when you get to question three, which I believe you will after answering yes to one and two, the question is -- oh, I'm going to put it up one more time. "Have defendants proven" -- the defendants, that is the city of Tustin and Officer Silva -- "have they proven by a preponderance of the evidence that any reasonable officer with the same knowledge, circumstances, and facts as Officer Silva would have believed that Luis Garcia posed an immediate threat of serious bodily injury or death?"

And that has to apply to both shots. And the answer is simply no. They haven't proven that, and that is the not the case here.

With respect to damages, I totally leave it up to you as to what you think is fair based on our prior discussion.

And on behalf of all the plaintiffs, I thank you again for your time and attention to this matter, and I believe you'll do the right thing.

Thank you.

**REBUTTAL**

MR. ARIAS: Your Honor, I -- I join entirely with Mr. Galipo's rebuttal argument. And with that, we -- we'll submit the case -- our case to the jury.

THE COURT:  All right.  Thank you.

Just a few more instructions.

(Whereupon, jury instructions are read.)

THE COURT:  All right.  Hopefully in a few moments, we'll have a bailiff.  And the bailiff will escort you to the jury room, and you may begin your deliberations.  I will note that it is 11:54.  Lunch has been provided.  Lunch is already there.  And I leave it up to you to decide unanimously if you want to work through lunch, or eat, relax, and then start at one.  And typically now we will do full days.  So you can go until 4:30.  If we're going to be in session each day, until you make your decision.  All right.

So we're going to wait for the bailiff, who hopefully will be here soon.  Feel free to stand up and stretch.  Anyone in the courtroom can stand up and stretch, and hopefully we won't be waiting too long.

**BAILIFF SWORN**.

THE COURTROOM DEPUTY:  Your name, please?

THE BAILIFF:  Antonio Ortiz.

THE COURTROOM DEPUTY:  Thank you.

(Whereupon, the jury is deliberating.)

THE COURT:  If you have your notebooks, you can take them with you to the jury room.

All right.  We're in recess.  I ask that you

# C E R T I F I C A T E

EMILY GARCIA, et al.                    :

                    vs.               :   No. CV 22-00131-SPG

CITY OF TUSTIN, et al.                 :

I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

_____/S/_____        //___

MARIA R. BUSTILLOS                      DATE
OFFICIAL REPORTER